UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X
HC2, INC.,

        Plaintiff,

        -v-

ANDREW DELANEY,

        Defendant.
------------------------------------------------ X

Civil Action No.: 1:20-cv-3178

**DECLARATION OF STEPHANOS ZANNIKOS IN SUPPORT OF HC2, INC.'S APPLICATION FOR A PRELIMINARY INJUNCTION**

I, Stephanos Zannikos, declare as follows:

1. I am General Counsel for plaintiff HC2, Inc. ("HC2") and submit this declaration in further support of HC2's application for a preliminary injunction in the above-referenced action. The matters stated herein are based upon my personal knowledge and experience, unless noted otherwise.

I. **Relevant Background**

2. I graduated with a B.S. in psychology from New York University, and earned my J.D. from New York Law School. I have been licensed as an attorney in New York since 2008. Prior to joining HC2, I served as General Counsel for a private equity holding company and worked for law firms specializing on matters relating to labor and employment law.

3. HC2, founded in 1987, is incorporated in the District of Columbia with its principal place of business in Chicago, Illinois. HC2 is a legal staffing company that provides attorneys, paralegals, and other legal professionals ("Contract Professionals") as well as associated workspace, IT infrastructure, project management, and related services (collectively "HC2

Services") to satisfy the short-term and long-term staffing needs of its third party customers, including law firms, corporations and government agencies. (*See* Exhibit A, discussed below, [HC2-00000056].)

4. HC2 has twelve office locations throughout the United States, including in New York City. Not all of HC2's customers have sufficient office space to host the Contract Professionals during an assignment, so HC2 offers seven state-of-the-art eDiscovery review centers where HC2 Contract Professionals can work on HC2 customers' projects if the customer does not have adequate space. HC2's New York office at 360 Lexington Avenue, New York, NY 10017 ("HC2 NYC Location") has multiple conference rooms that are designated as workspaces for customer projects.

5. HC2 has had a long history of success and has built a reputation as one of the preeminent legal staffing agencies in the industry. For example, in 2019, HC2 was ranked second on Staffing Industry Analysts' annual list of *Largest Legal Staffing Firms in the US*, and HC2's President and CEO was named one of *150 Global Power Women in Staffing* by the Staffing Industry Analysts.

6. HC2 occupies this position at the top of the legal staffing industry due, in large part, to its reputation for having the very best pool of Contract Professionals, contract attorneys in particular. Indeed, many of HC2's engagements are repeat business and new business is driven primarily by referrals from current and past customers. In short, HC2's success is built upon its reputation and goodwill. For that reason, the performance and conduct of each Contract Professional has a direct impact on HC2's continued success.

7. A key part of HC2's goodwill is dependent upon its reliability in providing highly competent and trustworthy legal professionals who abide by the professional norms governing

attorneys and paralegals who are required to keep inviolate the confidentiality of information learned while working with our law firm clients and their legal clients.

## II.   HC2 Hired Delaney as an At-Will, Temporary Contract Attorney

8.   Delaney executed HC2's Employment Agreement on December 28, 2016 (the "Employment Agreement"), which incorporated a Confidentiality and Non-Disclosure Agreement (the "NDA").[1] The Employment Agreement also incorporated certain rules of conduct (the "Conduct Rules")[2] and an employee handbook (the "Employee Handbook").[3] On the same date, Delaney also executed an acknowledgement form in which he agreed to adhere to the Conduct Rules and Employee Handbook (the "Policies Acknowledgment").[4]

### a.   Delaney was an At-Will Employee of HC2 at All Times

9.   Among other things, the Employment Agreement expressly provides that Delaney was at all relevant times an at-will employee, that any assignment with a client company would be "on an interim/temporary basis," and that when "[Delaney] is placed by [HC2] with a[] [HC2] client, [Delaney] remains a[n] [employee] of [HC2] during the period of such temporary placement." (Ex. A at HC2-00000056.)

### b.   Delaney Was Obligated to Maintain Confidentiality

10.   Confidentiality is the core of HC2's business. HC2's clients must be able to trust that HC2 employees -- particularly a contract attorney assigned to review confidential documents and identify privileged information to protect it from improper disclosure -- will abide by their

---

[1] A copy of the Employment Agreement and NDA is attached as Exhibit A (HC2-00000056 - HC2-00000058).
[2] A copy of the Conduct Rules is attached as Exhibit B (HC2-00000013 - HC2-00000015).
[3] A copy of the Employee Handbook is attached as Exhibit C (HC2-00000016 - HC2-00000051).
[4] A copy of the Policies Acknowledgement is attached as Exhibit D (HC2-00000001 - HC2-00000002).

contractual and professional obligations to maintain client confidences.  For that reason, HC2 requires every employee to sign the NDA, which strictly forbids disclosure of any confidential and privileged information or communications.  (Ex. A at HC2-00000058.)  Reflecting the supremacy of client confidentiality to HC2's business model, the Employee Handbook and Conduct Rules provide additional guidance with respect to employees' obligation to preserve client confidences and privileges.  (*See* Ex. C at HC2-00000026, Ex. D.)

11. The NDA defines "Confidential Information" as "confidential and proprietary information, ideas, data and/or materials belonging to the Clients or their clients, including but not limited to information concerning their respective existing and future businesses which are secret and not generally known and/or available to third parties . . . ."  (Ex. A at HC2-00000058.)  The Employee Handbook adds that Confidential Information also includes but is not limited to, "[c]ompensation data," "[f]inancial data," and "[i]ndividual client data[.]"  (Ex. C at HC2-00000026.)

12. Pursuant to the Employment Agreement, Delaney unequivocally agreed "not to divulge any confidential information . . . obtained in the course of any assignment with an HC client to which Attorney has provided temporary services under this Agreement as described in Exhibit A, attached hereto and made a part hereof."  (Ex. A at HC2-00000057.)

13. Pursuant to the NDA, Delaney further agreed "to keep, hold, [] maintain in confidence . . . and not [] disclose, directly or indirectly, to any third party" all Confidential Information "of every kind and character" that he "obtained in the course of any assignment . . . ." (Ex. A at HC2-00000058.)  Delaney also agreed not to "exploit such Confidential Information for personal or other purposes under any circumstances . . . ." *Id.*  The NDA also required Delaney to, "upon termination of [his] temporary assignment," return all Confidential Information "in [his]

4

possession or under [his] control" to the HC2 client. *Id*. By the NDA's express terms, Delaney agreed that his duties thereunder were binding and remained in full force and effect "indefinitely" even after his "relationship with [HC2] or any of its Clients terminates." *Id.*

14. Thus, Delaney affirmatively acknowledged that information he obtained during any HC2 assignment was confidential and that he could not disclose any such information to third parties.

### c. Delaney Agreed to Abide by HC2's Employment Rules and Policies

15. The Employment Agreement that Delaney signed incorporated HC2's Conduct Rules, *see* Ex. A at HC2-00000057; which provide in part that "concerns regarding your employment [should be] voiced directly [to] your HC2 recruiter." (Ex. B. at HC2-00000013.) The Conduct Rules are also clear that under no circumstance should Delaney contact an HC2 client before, during or after an HC Engagement: "[c]ontacting anyone from the client . . . is against [HC2] policy." *Id.* at HC2-00000014. Thus, Delaney knew to raise any concerns related to any HC2 Engagement with HC2 only and to never contact an HC2 client.

### d. Delaney Owed HC2 a Duty of Loyalty

16. Delaney was bound by a duty of loyalty to HC2, arising from the employer-employee relationship and memorialized in the Employee Handbook incorporated into the Employment Agreement. The Employee Handbook expressly prohibited Delaney from "tak[ing] any action that is contrary to [HC2's] business interests or incompatible with the loyalty and obligation inherent in [his] employment." (Ex. C at HC2-00000025.)

## III. HC2 is Retained by a Law Firm Customer

17. On or about September 25, 2019, HC2 entered into an agreement with one of its pre-existing law firm customers (the "Law Firm Customer") and the Law Firm Customer's

corporate client (the "Corporate Client") (the "Project Agreement")[5] to provide Contract Professionals, including contract attorneys fluent in [a foreign language] for a document review project the Law Firm Customer was performing on behalf of the Corporate Client (the "Project"). Pursuant to the Project Agreement, HC2 would manage the employment and administrative aspects of the Project and provide workspace for the Contract Professionals during the Project. The Law Firm Customer supervised the substantive aspects of the Project, with HC2 assigning day-to-day supervisors. *Id.*

18. The Project Agreement also set out HC2 and the Law Firm Customer's obligations and responsibilities with respect to protecting confidential and privileged information. For example:

> Any Confidential Information may include materials subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege ("Privileges"), the disclosure of such materials to [HC2] pursuant to this Agreement is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under any Privileges. Information, documents, or materials generated or prepared by or on behalf of [HC2], [the Law Firm Customer], or [the Corporate] Client in connection with the Services are prepared or generated to assist [the Law Firm Customer] in the rendering of legal advice and are protected by Privileges. All documents and other materials generated or prepared by [HC2] in connection with the Services shall be created only at [the Law Firm Customer's] direction, shall be marked "Privileged and Confidential — Attorney Work Product," and shall become and remain the property of [the Law Firm Customer].

*Id.*

19. Prior to executing the Project Agreement, however, the Law Firm Customer had asked HC2 to identify 14 attorneys to assign to the Project, including 10 who were fluent in [a foreign language] and 4 who were fluent in [a different foreign language]. *Id.* To that end, on September 11, 2019, an HC2 recruiter emailed Delaney to notify him that "[HC2] is currently

---

[5] A copy of the Project Agreement is attached as Exhibit E (HC2-00000278 - HC2-00000287).

seeking [a foreign language] Fluent Attorney candidates for a document review project," and the recruiter stated the requirements for placement on the Project, which were fluency in [that foreign language], bar membership from any U.S. state (preferred), J.D. or L.L.M. degree (preferred), experience in the practice of law or document review preferred and authorization to work in the United States without a sponsor.[6] The email provided instructions for Delaney to submit his candidacy, which involved providing a current resume and answering qualification questions about his [foreign language] fluency, bar admission and current legal employment. *Id.* Delaney responded to the recruiter's email that same day stating that he was available for the Project.[7] Minutes later, Delaney emailed the recruiter again to answer the screening questions, stating that he was fluent in [the foreign language], admitted to practice in New York and Arizona and that he did not have any conflicting legal employment so HC2 could ensure that its lawyers did not have a conflict under the relevant ethical rules.[8] Delaney submitted his resume the next day.[9]

20. At one point, when it appeared that HC2 may not have been able to find enough attorneys fluent in a certain language, HC2 advertised for non-attorneys while discussing the possibility of using such individuals for aspects of the review. The Law Firm Customer chose not to use non-attorneys, and all HC2 employees assigned to the project were attorneys.

21. On September 12, 2019, after Delaney completed a conflicts check form, the HC2

---

[6] A copy of the recruiter, John Interman's, September 11, 2019 email is attached as Exhibit F (HC2-00000076-HC2-00000077).
[7] A copy of Delaney's September 11, 2019 email is attached as Exhibit G (HC2-00000080-HC2-00000081).
[8] A copy of Delaney's September 11, 2019 email answering the recruiter's screening questions is attached as Exhibit H (HC2-00000082- HC2-00000083).
[9] A copy of Delaney's September 12, 2019 email submitting his resume is attached as Exhibit I (HC2-00000090- HC2-00000091).

recruiter submitted the names and resumes of Delaney and two other HC2 contract attorneys to the Law Firm Customer for consideration for assignment to the Project.[10] On September 13, the Law Firm Customer contact replied that "[t]he case team would like to onboard all of the below 3 contract attorneys to this review . . . ." *Id.* at HC2-00000219. The HC2 recruiter then informed Delaney that he had been selected for assignment to the Project.[11] In a September 19 follow up email, the HC2 recruiter informed Delaney that the Project would run longer than expected, because the Law Firm Customer's initial time estimate was based on a team of fifteen reviewers, however only four -- including Delaney -- had been assigned to the Project.[12] The Project did later commence on September 30, 2019. Months later, the recruiter who recruited Delaney to the Project resigned from HC2 on or about February 21, 2020, but in a parting email to Delaney's personal email account, the recruiter provided Delaney with contact information to use going forward.[13] That email instructed Delaney to direct any questions at all -- other than onboarding, payroll, timesheets and benefits questions -- to Denise Asnes, HC2's Senior Managing Director, National Fulfillment.

22. As stated above, Delaney reported to the HC2 NYC Location on September 30, 2019 to begin work on the Project. Prior to beginning his work on the Project, on September 30, Delaney executed a confidentiality agreement with the Law Firm Customer (the "Law Firm

---

[10] A copy of the recruiter, John Interman's, September 12, 2019 email to the Law Firm Customer is attached as Exhibit J (HC2-00000219-HC2-00000221).

[11] A copy of the recruiter, John Interman's, September 13, 2019 email to Delaney is attached as Exhibit K (HC2-00000198-HC2-00000199).

[12] A copy of the recruiter, John Interman's, September 19, 2019 email to Delaney is attached as Exhibit L (HC2-00000128-HC2-00000129).

[13] A copy of the recruiter, John Interman's, February 21, 2020 email to Delaney is attached as Exhibit M (HC2-00000175).

Customer Confidentiality Agreement"),[14] as well as a temporary services agreement (the "Law Firm Customer Services Agreement").[15] Delaney acknowledged receiving other onboarding materials for the project on October 1, 2019.[16]

### a. The Law Firm Customer Services Agreement

23. Pursuant to the Law Firm Customer Services Agreement, Delaney acknowledged he was "assigned to the [Law Firm Customer] to provide temporary services … [and] underst[oo]d that the need for [his] temporary services may be terminated by [the Law Firm Customer] at any time and at will for any reason, without resort to disciplinary or other procedures *normally followed for employees*." (Ex. O at HC2-00000005) (emphasis added). Thus, Delaney acknowledged and agreed that he had been assigned by HC2 to the Law Firm Customer for a temporary engagement, which could be terminated at any time for any reason, and that he was not an employee of the Law Firm Customer or the Corporate Client. Indeed, throughout Delaney's time on the Project, he was paid by HC2 *and not the Law Firm Customer or the Corporate Client*. Delaney also selected that he considered himself and the services he was providing the Law Firm Customer as falling under "Legal Personnel." *Id.*

### b. The Law Firm Customer Confidentiality Agreement

24. Pursuant to the Law Firm Customer Confidentiality Agreement, Delaney agreed to uphold "the high standards of confidentiality, trustworthiness and integrity required of [him] with regard to materials and information to which I am exposed" during the Project, and further agreed

---

[14] A copy of the Law Firm Customer Confidentiality Agreement is attached as Exhibit N (HC2-00000003-HC2-00000004).

[15] A copy of the Law Firm Customer Services Agreement is attached as Exhibit O (HC2-00000005).

[16] A copy of Delaney's October 1, 2019 email confirming receipt of the Project onboarding materials is attached as Exhibit P (HC2-00000158).

9

that:

> [A]ll information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the [Law Firm Customer's] business or financial affairs (collectively, "Confidential Information") is and shall be the exclusive property of the [Law Firm Customer] … I agree not to disclose any Confidential Information other than to employees or partners of the Firm or use the same for any purposes (other than in the performance of my duties or services for the Firm) without written approval by the Firm, unless and until such Confidential Information has become public knowledge without fault or negligence by me. I agree to use my best efforts to prevent unauthorized publication or disclosure of any of the Firm's Confidential Information.

(Ex. N at HC2-00000003.)

25. Delaney further agreed that any materials containing confidential information, including but not limited to documents, photographs or any other tangible or intangible material, "whether created by me or others, which come into my custody or possession or to which I otherwise have access, shall be and are the exclusive property of the Firm to be used by me only in the performance of my duties or services for the Firm[.]" (*Id*. at HC2-00000003.)

26. Delaney also agreed that his "obligations not to disclose or to use information and materials of the types set forth above and to return materials and tangible property, as set forth above, also extend to such types of information, materials and tangible property of [the Corporate Client] or other third parties who may have disclosed or entrusted the same to the [Law Firm Customer] or me as part of the [Law Firm Customer's] representation of [the Corporate Client] . . . ." (*Id*. at HC2-00000003.) Delaney "also agree[d] to comply with any additional non-disclosure and property policies and guidelines that [the Corporate Client] may require as part of the [Project], *and I understand that it is my obligation to learn such restrictions and/or policies prior to undertaking any work on behalf of [the Corporate Client]*." *Id.* (emphasis added).

27. Finally, Delaney acknowledged and agreed that, as an attorney, he was "bound by the rules of professional conduct for the jurisdiction(s) where I am admitted to practice law

10

. . . [and] any questions regarding my ethical obligations under this policy or the applicable rules of professional conduct … [must be directed to] a member of the [Law Firm Customer's] Office of General Counsel." (*Id*. at HC2-00000004.)

## IV. The Suspension of the Project

28. During the first half of March, as COVID-19 was spreading at rapid and unanticipated pace throughout the United States, but in particular New York City, HC2 was monitoring the situation based on publicly available information -- just like any other employer. On March 2, 2020, Patti Ayala, HC2's Vice President of Human Resources and Administration, emailed the Contract Professionals, including Delaney, to advise them that HC2 was monitoring the situation and that they should too, and instructed them not to come to the office if they were symptomatic.[17] The email referred Delaney to the CDC website for additional information as well. *Id.* Ms. Ayala sent an update email on March 12, informing Delaney of HC2's efforts to help prevent the spread of COVID-19.[18] Delaney did not respond to either message.

29. By the week of March 16, 2020, the press reports were clear that the state of New York needed to take more drastic action to address the spread of COVID-19, particularly in New York City, and that New York's response would likely involve closing businesses in New York City.

30. On the morning of March 17, 2020, Delaney sent an email to the Law Firm Client, as well as other Hire Counsel Contract Professionals working on the Project in New York and

---

[17] A copy of Patti Ayala's March 2, 2020 email is attached as Exhibit Q (HC2-00000177-HC2-00000178).
[18] A copy of Patti Ayala's March 12, 2020 email is attached as Exhibit R (HC2-00000179-HC2-00000180).

London, regarding his concerns about the risk of contracting COVID-19 while working at the HC2 NYC Location.  Delaney asked to work on the Project remotely or be paid to stay home, without working, if remote work was not approved.[19]

31. Shortly thereafter, the Law Firm Customer decided to suspend the Project in view of the COVID-19 pandemic and in particular its impact in areas where the Project was being conducted.  The Law Firm customer considered the possibility of moving to a remote review, but chose not to do so because of concerns about security.  Upon being notified of this, HC2's Senior Managing Director informed Delaney *and the two other HC2 attorneys working on the Project* in the New York area of this decision, as follows:

> We understand and appreciate everyone's concerns regarding the work environment and well-being of those around you.  Most importantly, we understand the need for an immediate response regarding remote work.  At this time, the client is electing to suspend work on the case in NYC effective immediately.  Please note that remote work has not been authorized for this project, as of now. . . . You will be compensated for your time today.  We will continue to monitor the efforts of Congress in helping to off-set the impact of lost work.[20]

32. Under the Employment Agreement, HC2 was obligated to pay Delaney only for hours he worked on the Project, which it did.  HC2 did not terminate Delaney's Employment Agreement, rather, the March 17 email from HC2's Senior Managing Director informed Delaney that "[i]f a decision to re-start the project in NYC is made, we will contact you – directly." (*Id*.)

33. The decision by the Law Firm Customer and Corporate Client to suspend the Project in order to protect the health of the attorneys working on the Project turned out to be the right choice, considering Governor Andrew Cuomo issued an initial stay-at-home order the next

---

[19] A copy of Delaney's March 17, 2020 email is attached as Exhibit S (HC2-00000273).

[20] A copy of HC2's Senior Managing Director's March 17, 2020 email is attached as Exhibit T (HC2-00000182).

day.  Indeed, on March 18, Governor Cuomo signed an Executive Order (the "March 18 Order") requiring all "non-essential" New York businesses to reduce their in-person workforce at any work location by 50%.  On March 19, Governor Cuomo issued another Executive Order (the "March 19 Order"), requiring all "non-essential" New York businesses to reduce their in-person workforce at any work location by 75%.  And on March 20, Governor Cuomo issued yet another Executive Order (the "March 20 Order"), requiring all "non-essential" New York businesses to reduce their in-person workforce at any location by 100%.[21]

34.  Upon learning that the Law Firm Customer had suspended the Project without authorizing remote work or to pay him to stay home as he had demanded, Delaney emailed the Law Firm Customer -- including its managing partners and members of its management committee -- and falsely claimed that HC2 illegally terminated him in retaliation for raising concerns about COVID-19 and demanding payment.[22]  HC2 had not authorized Delaney to contact the Law Firm Customer directly after the project was suspended.  The Law Firm Customer emailed Delaney back to inform him that the Law Firm Customer had not requested Delaney's termination but had merely suspended the Project.  (*Id*. at D-16.)

35.  On March 18, Delaney responded to the Law Firm Customer's email, this time accusing its attorneys of colluding with the Corporate Client to terminate him in retaliation for raising concerns about workplace safety.  (*Id*. at D-15.)

---

[21] Ben Axelson, *Coronavirus timeline in NY: Here's how Gov. Cuomo has responded to COVID-19 pandemic since January*, WWW.SYRACUSE.COM, https://www.syracuse.com/coronavirus/2020/04/coronavirus-timeline-in-ny-heres-how-gov-cuomo-has-responded-to-covid-19-pandemic-since-january.html (last visited May 15, 2020).

[22]  Attached as Exhibit U are copies of pages excerpted from Defendant's recent document production, Bates-numbered D-15 – D-17.

36. HC2's vice president of human resources, Ms. Ayala, and I called Delaney on March 18 to discuss the concerns he had raised to the Law Firm Customer and Corporate Client, particularly because HC2 had not terminated Delaney's employment. But, Delaney refused to speak with us, insisting, instead, that we communicate with him only in writing.[23] Ms. Ayala then attempted to contact Delaney twice by email on March 19 and March 27 to follow up on his concerns and to remind him that maintaining confidentiality and attorney-client privilege was of the utmost importance.[24] Delaney never responded.

V. **Delaney Seeks to Exploit the Corporate Client's Confidential Information**

37. At some point, Delaney engaged counsel. On March 27, an employment attorney informed the Law Firm Customer that he represented Delaney and asked the Law Firm Customer to direct all correspondence regarding Delaney to the attorney moving forward. During a call between the Law Firm Customer on or shortly after March 27, Delaney's attorney demanded that the Corporate Client pay him $450,000. The Law Firm Customer responded on March 27, expressing its concerns about Mr. Delaney's misuse and disclosure of confidential information obtained while he was acting as a lawyer in connection with a privileged review for the Corporate Client, and reminding his counsel that Mr. Delaney had ethical obligations as a member of the bar and his contractual non-disclosure obligations, and that he was not permitted to disclose information obtained during the course of the review to anyone.

38. Despite retaining counsel, on March 27, Delaney emailed the CEO of HC2 stating

---

[23] A copy of Patti Ayala's March 19, 2020 email confirming Delaney's preference to communicate by email is attached as Exhibit V (HC2-00000187- HC2-00000188).
[24] A copy of Patti Ayala's March 27, 2020 email is attached as Exhibit W (HC2-00000189- HC2-00000190).

that he had been unlawfully terminated and that he was not an employee of HC2.[25]  In response, I emailed Delaney's attorney on March 30 to clarify Delaney's apparent factual misunderstandings about the suspension of the Project and his failure to comprehend that he was an HC2 employee and that HC2 determined the status of his employment as it pertained to the Project.[26]

39.     Delaney's attorney withdrew shortly after making the $450,000 demand to the Corporate Client, but Delaney immediately engaged new counsel.  Shortly thereafter, the Law Firm Customer and Delaney's Counsel had a call wherein Delaney's new counsel reiterated Delaney's initial demand that the Corporate Client pay him $450,000.

40.     On April 13, Delaney's second attorney emailed a letter to senior officials of the Corporate Client, reiterating Delaney's demand for a payment and threatening litigation and disclosure of the Corporate Client's privileged and confidential information if his demand was not met within seven (7) days from the date of the letter.[27]  As further evidence of Delaney's bad faith, although the letter was dated April 7, it was transmitted to the Corporate Client on April 13, effectively providing the Corporate Client one (1) day to respond.

41.     The Corporate Client did not capitulate to Delaney's demands or threats.

42.     On April 15, Delaney, through his second attorney, filed on the public docket a purported "whistleblower" action against the Corporate Client in the Civil Division of the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida, entitled *John Doe v. Toyota Motor Corporation, et al*, Case No. 05-2020-CA-024281 (the "Florida Action").  That

---

[25] A copy of Delaney's March 27, 2020 email to the CEO of HC2 is attached as Exhibit X (HC2-00000194).

[26] A copy of my March 30, 2020 email to Delaney's counsel is attached as Exhibit Y (HC2-00000402- HC2-00000403).

[27] A copy of Delaney's counsel's April 13, 2020 demand letter is attached as Exhibit Z (HC2-05000511- HC2-05000512).

complaint filed in the Florida Action directly named the Corporate Client as the defendant and, as the Corporate Client asserted in an emergency motion to seal, the complaint disclosed confidential and privileged information that Delaney obtained while working on the Project. Although the complaint was filed on behalf of an undisclosed, *John Doe* plaintiff, Delaney subsequently admitted in his response to HC2's initial discovery demands that he is the plaintiff in the Florida Action and directed the filing of the complaint.

43. The Florida Action was not easy for HC2 or the Law Firm Customer to detect because it was filed in state court in a state that HC2 would have no reason to believe Delaney had a connection. Indeed, in pleading his jurisdictional allegations in the Florida Action, Delaney misrepresented that he was a Florida resident, when, in fact, he has admitted in this action that he is a New York resident. Furthermore, in an attempt to establish legal claims against the Corporate Client and as an apparent pretext for filing the complaint in the Florida Action, Delaney falsely asserted in the Florida Action that he was employed by the Corporate Client during the Project, which is demonstrably false. Delaney's attempts to do so made good on his threats to the Corporate Client through a specious legal filing.

44. The difficulty associated with identifying the Florida Action meant that the complaint Delaney filed, which delineated privileged and confidential information that he learned about the Corporate Client while working on the Project as an HC2 employee, sat on a public docket for at least five days and was accessible to the media.

45. While Delaney dismissed the Florida Action without prejudice, the Law Firm Customer and Corporate Client were compelled to expend substantial legal fees to seal the complaint, a procedure that remains ongoing. Furthermore, as a result of the Florida Action and the information it improperly disclosed, HC2 was compelled to initiate this action, which has

resulted in legal fees and associated costs.

46. Although, after being threatened with sanctions, Delaney dismissed the Florida Action, HC2, the Law Firm Customer and Corporate Client have no confidence that Delaney will abide by his ethical and contractual obligations not to use or disclose the Corporate Client's privileged and confidential information. Among other reasons, he dismissed the Florida Action without prejudice, raising the possibility that he might refile his complaint. They are also concerned that Delaney may find some other outlet to deliver on his threat to publicly disclose privileged and confidential information about the Corporate Client. This concern is particularly acute to HC2 given that in initiating the Florida Action, Delaney lied and used an alias in an attempt to invoke jurisdiction in an unforeseeable state and county where it took HC2, the Law Firm Customer and the Corporate Client several days to learn about the complaint, all in an attempt to inflict maximum irreparable damage while the complaint disclosing the Corporate Client's privileged and confidential information lingered on the docket. In addition, after HC2 had moved for a temporary restraining order, Delaney disclosed the names of the Law Firm Customer and Corporate Client to Law360, which has now referred to them in multiple articles.

47. Delaney's conduct, if left unchecked, threatens irreparable harm to HC2's goodwill and standing in the marketplace, as well as to the document review industry as a whole. Delaney's egregious conduct has required HC2 to expend time and financial resources to defend its gold-standard reputation in the marketplace, a reputation for excellence it earned over the course of decades. At the same time, contract attorneys must be held to their contractual and professional obligations to maintain client confidences as any other attorney who provides legal representation to his or her clients or it will negatively impact the ability of HC2 to conduct business. The only way for HC2 to be confident that such harm is avoided is for Delaney to be restrained by an

injunction requiring him to abide by his contractual and professional obligations, which dictate here that he refrain from disclosing confidential information he learned during the Project.

48. As a provider of legal staffing, the need for an injunction is manifest given the damage that Delaney has caused to date, the risk associated with any future disclosures of confidential or privileged information, and the risk that Delaney may continue in his attempts to seek to extract money from the Corporate Client using threats to further disclose its confidential and privileged information. Obviously, Delaney's actions have already strained the good will and compromised the relationship between HC2 and its Law Firm Customer, and between HC2 and the Corporate Client. Equally as problematic, HC2's business cannot risk having its reputation and goodwill tarnished by further disclosures by Delaney. There is no way for HC2 to quell, or quantify monetarily, the damage done to its business should Delaney continue on his course of conduct absent a court order, particularly given the deception he employed in filing the Florida Action.

49. Accordingly, an order precluding Delaney from disclosing attorney-client privileged and confidential information he learned as an HC2 employee working on the Project, and requiring him to comply with his ethical obligations as an attorney and with his contractual obligations to HC2 and the Law Firm Customer, is needed. HC2 further submits that it is unaware of any prejudice that Delaney will suffer if a preliminary injunction is imposed as he is required to abide by his contractual obligations and his ethical obligations as a New York lawyer.

I declare under penalty of perjury that the above is true and correct, and that I executed this declaration this 15th day of May 2020 in New York, New York.

_____
STEPHANOS ZANNIKOS

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic mail to:

<u>Counsel for Defendant Andrew Delaney</u>:

Robert Rotman, Esq.
305 East 24th Street Ste. 17R,
New York, NY 10010
Email:  rrotmanlaw@gmail.com

Dated:  May 15, 2020

      */s/ Andrew R. J. Muir*
      Andrew R.J. Muir