# EXHIBIT A

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    Case No. 1:20-cv-03178(LJL)

     - - - - - - - - - - - - - - - - - -x

4    HC2, INC.,                            :

                                           :

5                        Plaintiff,   :

                                           :

6            - vs -                        :

                                           :

7    ANDREW DELANEY,                       :

                                           :

8                        Defendant.   :

     - - - - - - - - - - - - - - - - - -x

9

10                           May 19, 2020

                             10:09 a.m.

11                           6 N. Pershing Avenue

                             Bethpage, New York 11714

12

13

14

15

16

17

18

19

20           VIRTUAL DEPOSITION UPON ORAL

21    EXAMINATION OF STEPHANOS ZANNIKOS, ESQ., held at

22    the above-mentioned time and place, before Randi

23    Friedman, a Registered Professional Reporter,

24    within and for the State of New York.

25

```
                                              Page 7
 1                    S. Zannikos, Esq.
 2        A     Hire Counsel --
 3                   MR. ROSSI:  Hold on a second,
 4        Stephanos.  You need to give me a little
 5        pause if I want to object.  I object to the
 6        form of the question.
 7   BY MR. ROTMAN:
 8        Q     Let's go back to what my first
 9   question was.  Please describe the relationship
10   between Hire Counsel and HC2.
11                   MR. ROSSI:  Form objection.
12   BY MR. ROTMAN:
13        Q     Are they the same company?
14                   MR. ROSSI:  Form objection.  You
15        can answer, Stephanos.
16                   THE WITNESS:  Okay.  Hire Counsel
17        is the -- HC2 is the corporate name, and its
18        d/b/a is Hire Counsel.
19   BY MR. ROTMAN:
20        Q     And are there any sister companies?
21   Does HC2 have any sister companies?
22        A     It has one sister company called
23   Mestel & Company.
24        Q     Now as general counsel for HC2, what
25   are your responsibilities?
```

```
                                        Page 8
 1                    S. Zannikos, Esq.
 2        A     To oversee all the legal matters
 3   related to HC2.
 4        Q     Does that include litigation?
 5        A     Correct.
 6        Q     Do you supervise any people?
 7        A     At the moment, no.  I have direct
 8   reports.
 9        Q     Direct reports to you?
10        A     In the legal department.
11        Q     Who else is in the legal department at
12   HC2?
13        A     Currently it consists of one attorney,
14   and that would be me.
15        Q     Are there any paralegals or any other
16   staff in the legal department at HC2 currently?
17        A     No.
18        Q     Where is your office located?
19        A     It's located in New York.
20        Q     At what address?
21        A     360 Lexington Avenue, New York, New
22   York, 10017.
23        Q     And you have a full-time office there?
24        A     Yes.
25        Q     And are you at that office five days a
```

```
                                          Page 10
 1                    S. Zannikos, Esq.
 2   focuses on temporary legal staffing services,
 3   where Mestel focuses on permanent legal staffing
 4   services.
 5        Q    Now what is the principal place of
 6   business of HC2?
 7        A    That would be our Chicago office.
 8        Q    And has this changed in the past two
 9   years?
10              MR. ROSSI:  Object to the form.
11              MR. ROTMAN:  Is that confusing?
12   BY MR. ROTMAN:
13        Q    Has the principal place of business
14   changed in the last two years?
15        A    It may have changed over the course of
16   time longer than the last two years.
17        Q    Did it change in the last year?
18        A    No.  It's longer than two years.
19        Q    Now have you heard of the name Andrew
20   Delaney before March 17th, 2020?
21        A    No.
22        Q    Now I want to turn your attention to
23   your declaration, which is Exhibit 1 here.
24        A    Let me correct my last answer.  I may
25   have through various procedures that the company
```

                                    Page 14

1                    S. Zannikos, Esq.

2       project agreement," starting from there?

3   BY MR. ROTMAN:

4       Q     Yes, the last two sentences.

5       A     All right.  "Pursuant to the project

6   agreement, HC2 would manage the employment

7   administrative aspects of the project and provide

8   workspace for the contract professionals during

9   the project.  The law firm customer supervises

10  substantive aspects of the project with HC2

11  assigning day-to-day supervision."

12      Q     Now my client, Andrew Delaney, was

13  employed by HC2; isn't that correct?

14      A     Correct.

15      Q     Now was that employment to work on the

16  project?

17      A     He was employed to be assigned to

18  projects.

19      Q     But he worked on this project that we

20  just spoke about, Project 17?

21      A     He did work on this particular

22  project, yes.

23      Q     Did his work entail reviewing

24  documents?

25      A     Can you clarify the question?  You

```
                                        Page 16
 1                 S. Zannikos, Esq.

 2        acting as a document reviewer, yes.

 3   BY MR. ROTMAN:

 4        Q     Now when did he become employed by

 5   HC2?

 6        A     When he had signed the Employment

 7   Agreement.  I believe it was December 28, 2016.

 8        Q     Did he receive a paycheck -- you said

 9   December 28th, 2016.  Do you even know if he

10   received a paycheck in January 2017?

11                   MR. ROSSI:  Object to the form.

12                   MR. ROTMAN:  It's a simple

13        question.

14   BY MR. ROTMAN:

15        Q     Do you know if he received a paycheck

16   in January of 2017?

17                   MR. ROSSI:  Object to the form.

18        It's argumentative.  You don't need to

19        characterize your questions, whether they're

20        simple or complex.

21                   MR. ROTMAN:  Please don't lecture

22        me.  If you're instructing him not answer

23        the question, instruct him not to answer the

24        question.  We'll put it down for a ruling.

25        I think it's a very simple question.
```

```
                                          Page 19
 1                  S. Zannikos, Esq.
 2    Delaney.
 3             Do you know when Andrew Delaney was
 4    first placed on assignment by Hire Counsel by
 5    HC2?
 6        A     After December 2016.
 7        Q     Was it September 30th, 2019?
 8        A     My understanding is that he was placed
 9    on an assignment around September 30th, 2019.
10        Q     So he signed an agreement on
11    December -- an Employment Agreement on
12    December 28, 2016, and was placed on an
13    assignment on September 30th, 2019; correct?
14        A     He was placed in our candidate pool
15    after he had signed the Employment Agreement, but
16    then his first assignment wasn't until
17    September 30th, 2019, after that point.
18        Q     Now isn't it correct that Mr. Delaney
19    began working on this project, the project we
20    referred to in Paragraph 17, on September 30th,
21    2019?
22        A     Yes.
23        Q     Isn't it correct that Mr. Delaney left
24    the project on January 4th, 2020?
25        A     I don't know the precise date.  I just
```

```
                                            Page 21
 1                    S. Zannikos, Esq.
 2                    MR. ROSSI:  Your use of the word
 3         "hired."  It's ambiguous.
 4                    THE WITNESS:  Right; he wasn't
 5         hired.  He was selected to begin an
 6         assignment.
 7    BY MR. ROTMAN:
 8         Q     What does that mean -- who was he
 9    selected by?
10         A     Hire Counsel had presented candidates
11    from our candidate pool, which Mr. Delaney was
12    one of them to --
13         Q     And hired --
14         A     The law firm customer.  And from those
15    candidates, the law firm customer selected the
16    reviewers that should be assigned.
17         Q     So it was the law firm customer that
18    selected Mr. Delaney; correct?
19         A     The law firm customer selected
20    candidates that we had submitted to them for
21    consideration.
22         Q     So if I understand this correctly, you
23    pre-selected the list which you submitted to the
24    law firm client; correct?
25         A     We were tasked with finding attorney
```

```
                                      Page 22
 1               S. Zannikos, Esq.
 2   document reviewers for a project for the law firm
 3   customer.  We used our database and we selected
 4   candidates who fit the profile that the law firm
 5   customer wanted, and we submitted those
 6   candidates to the law firm customer for their
 7   review, and they selected the ones that they
 8   wanted to place -- that they thought should be
 9   assigned to the project.  And then afterwards, we
10   assigned them.
11       Q    But the law firm customer made the
12   final selection; correct?
13       A    From the candidates that we submitted
14   to them, yes.
15       Q    Now isn't it correct that Delaney was
16   hired to review Thai documents?
17       A    He was not hired.  He was selected
18   from candidates that we had in our candidate pool
19   and that we submitted to Wilmer.
20       Q    And he was selected to review Thai
21   documents?
22               MR. ROSSI:  Object to the form.
23               THE WITNESS:  As an attorney, yes.
24   BY MR. ROTMAN:
25       Q    Now how many agreements did
```

```
                                          Page 26
 1                 S. Zannikos, Esq.
 2    exhibit from what I recall.  Other than that,
 3    around the time when he was hired in 2016, I
 4    believe there was an employee handbook, a Code of
 5    Conduct.  There may have been additional
 6    documents.
 7                 But my understanding from what you're
 8    asking is that if it's just an agreement, and
 9    using that in the legal context, the only
10    agreement that Mr. Delaney would have signed at
11    the time of his hire was his Employment
12    Agreement, which was only, including the NDA that
13    was attached as an exhibit, I would say five
14    pages.  Five to maybe six pages.
15        Q    Now you specifically refer to the HC2
16    agreement.
17                 Didn't the HC2 agreement make him
18    subject to other agreements with your clients?
19                     MR. ROSSI:  Object to the form of
20         the question.  Misstates the testimony.
21                     THE WITNESS:  The HC2 Employment
22         Agreement does incorporate by reference, I
23         believe, the employee handbook and the Code
24         of Conduct.
25
```

```
 1                    S. Zannikos, Esq.
 2    BY MR. ROTMAN:
 3         Q     And any of the policies and any of the
 4    other agreements of the law firm customer?
 5                    MR. ROSSI:  Object to the form.
 6                    THE WITNESS:  At the point where
 7         he's being hired, the law firm customer --
 8         there are no documents associated with the
 9         law firm customers.
10    BY MR. ROTMAN:
11         Q     But the HC2 Employment Agreement
12    incorporates by reference other agreements; isn't
13    that correct?
14         A     Not other agreements.  I mean, there's
15    the NDA which could constitute an agreement,
16    which I believe is the two pages.  That's
17    attached as an exhibit.  The agreement then
18    refers to, I believe, the employee handbook and
19    the Code of Conduct.  That, I believe, is the
20    full scope of the agreement.
21         Q     And are some of those obligations to
22    other people other than HC2?  I'm referring to
23    the obligations of the agreements that you just
24    described.
25                    MR. ROSSI:  Form objection.
```

```
                                            Page 48
 1                    S. Zannikos, Esq.
 2         The law firm customer.
 3    BY MR. ROTMAN:
 4         Q    HC2 did not suspend the project on
 5    that date; isn't that correct?
 6                    MR. ROSSI:  Object to the form.
 7                    THE WITNESS:  The law firm
 8         customer suspended the project.
 9    BY MR. ROTMAN:
10         Q    HC2 did not suspend the project?  Let
11    me rephrase.
12              Did HC2 suspend the project on that
13    date?
14         A    No.
15                    MR. ROSSI:  Object to the form.
16         Asked and answered.
17                    MR. ROTMAN:  Court Reporter, I
18         want to introduce a document as an exhibit.
19         Let me email it to all of you and we can
20         discuss it.  Let me just take a moment.
21                    MR. ROSSI:  Mr. Rotman, why don't
22         we take a break for five minutes.  We've
23         been going an hour, unless you're going to
24         finish in the next 10 to 15.
25                    MR. ROTMAN:  No.  I think I need
```

```
                                          Page 56
 1                    S. Zannikos, Esq.
 2    controlled the project; isn't that correct?
 3         A     That is not correct.
 4         Q     They made the decision to terminate
 5    the project; correct?
 6         A     I'm sorry.  You said law firm
 7    customer?
 8         Q     Yes.  If I said -- I'm sorry.
 9                    MR. ROTMAN:  Reporter -- Randi,
10         can you please read that last question?  I
11         may have misspoken or maybe -- just so we
12         were correct on this.
13                    (Whereupon the reporter read back
14         the requested portion of the record.)
15    BY MR. ROTMAN:
16         Q     So the law firm client made the
17    decision to terminate the project; isn't that
18    correct?
19         A     No, that's not correct.  The project
20    wasn't terminated.  It was suspended.
21         Q     The law firm client made the decision
22    to suspend the project on that date?
23         A     That's my understanding, yes.
24         Q     HC2 did not make the decision to
25    terminate -- to suspend the project on that date?
```

                                          Page 57

 1                    S. Zannikos, Esq.

 2        A      That is correct.

 3        Q      And before we had gotten into a

 4   discussion as to was the project suspended, and

 5   you bifurcated your answer when you said, are you

 6   talking about the New York project or everywhere

 7   else.

 8              Has this project been suspended at

 9   other locations?

10        A      From my understanding, yes.

11        Q      Is it fair to conclude that the

12   project is effectively suspended right now?

13        A      I don't know what the current status

14   would be, but at some point, the project was

15   suspended in three locations.

16        Q      What were those three locations?

17        A      One location in New York.  One

18   location in Los Angeles.  And one location in the

19   United Kingdom.

20        Q      Is that location in United Kingdom in

21   London?

22        A      Yes.

23                    MR. ROTMAN:  Court Reporter, I

24        want to introduce another exhibit.  We'll

25        just go through that same procedure that we

```
                                        Page 59
 1                    S. Zannikos, Esq.
 2   hours.
 3        Q     Do they work year-round?
 4        A     Some do.  Some don't.
 5        Q     Let me turn your attention to Page 4
 6   of this document.  Not Page 4.  I mean pdf Page
 7   4; not the actual Page 4 of the document.
 8              You see it?  Where it says, "Welcome
 9   to Hire Counsel"?
10        A     I see it.
11        Q     Okay.  That first sentence states that
12   the headquarters at HC2 was in New York; isn't
13   that correct?
14        A     The document does state that.
15              MR. ROTMAN:  Court Reporter, I
16        want to introduce another exhibit, and we'll
17        follow the procedure as we just did.  We'll
18        call this Defendant's 5.
19                 (Defendant's Exhibit 5 was
20        identified.)
21   BY MR. ROTMAN:
22        Q     Call it the Antonelli complaint.
23   Curran Antonelli complaint.
24              Mr. Zannikos, do you recognize this
25   document?
```

```
                                           Page 60
 1                  S. Zannikos, Esq.
 2        A      I do.
 3        Q      What is this document?
 4        A      The complaint that the company had
 5    filed in the collection action against the law
 6    firm, Curran Antonelli.
 7        Q      I turn your attention to the filing
 8    receipt at the top.  What date was this action
 9    filed?
10        A      It was filed on May 24, 2019.  It was
11    received then.  Let me see when it was filed.  I
12    believe that's the file date, May 24, 2019.
13        Q      And did you sign -- is that you who
14    signed the summons?  Is that your signature on
15    Page 1?
16        A      That is my signature, yes.
17        Q      And is that your signature on the last
18    page of the complaint?
19        A      That is my signature, yes.
20        Q      Let me turn your attention now to
21    Paragraph 5 of the complaint.  Now that paragraph
22    says, "Plaintiff maintains its principal place of
23    business at 360 Lexington Avenue, Suite 1100, New
24    York, New York, 10017"; isn't that correct?
25        A      That's correct.  That's what the
```

Page 61

1                    S. Zannikos, Esq.



Page 62

S. Zannikos, Esq.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 63

```
 1                  S. Zannikos, Esq.
 2   Delaney did not have access to the HC2 premises
 3   after that date?
 4       A    It would be safe to say that there are
 5   measures that would prevent him from accessing
 6   the space after that time.
 7       Q    Would it be fair to say that Andrew
 8   Delaney did not have access to documents located
 9   in the center after that date?
10       A    It would be safe to say that.  I mean,
11   there are things implemented that would prevent
12   him from reviewing documents on the site after
13   March 17th, 2020.
14       Q    Now isn't it correct that Wilmer Hale
15   employees told you that information in the
16   Florida complaint was confidential?
17                  MR. ROSSI:  I'm sorry.  I didn't
18        hear the question.  Can I have it read back?
19                  MR. ROTMAN:  Court Reporter,
20        please repeat the question.
21                  MR. ROSSI:  Thank you,
22        Ms. Friedman.
23                  (Whereupon the reporter read back
24        the requested portion of the record.)
25                  THE WITNESS:  Wilmer Hale
```

```
                                       Page 64
 1                  S. Zannikos, Esq.
 2        employees did instruct me -- or did inform
 3        me that they believed that information was
 4        confidential.
 5   BY MR. ROTMAN:
 6        Q     So they informed you of that
 7   information?
 8        A     Well they informed me in a general
 9   sense that the information in the complaint was
10   confidential.
11        Q     And you relied on that information
12   conveyed for your conclusion --
13        A     It was one of the factors.
14        Q     -- that the complaint was
15   confidential; isn't that correct?
16                  MR. ROSSI:  Sorry.  You guys are
17        both speaking at the same time.  Let him
18        finish his question and then give your
19        answer.
20                  MR. ROTMAN:  Randi, please restate
21        the question.
22                  (Whereupon the reporter read back
23        the requested portion of the record.)
24                  THE WITNESS:  It was a factor.
25
```

```
                                        Page 67
 1                    S. Zannikos, Esq.
 2     enforced.
 3                    MR. ROTMAN:  No other questions.
 4                         EXAMINATION
 5     BY MR. ROSSI:
 6         Q     Again, I'm Ron Rossi from Kasowitz
 7     Benson for the plaintiff, HC2.
 8                  Mr. Zannikos, currently the principal
 9     place of business of Hire Counsel is Chicago,
10     Illinois; correct?
11         A     Correct.
12         Q     And that's where the high level
13     officers of Hire Counsel are located and where
14     they direct, control and coordinate HC2's
15     activities?
16         A     That's correct.
17         Q     That would include the CEO and the
18     CFO, among others?
19         A     The interim CFO, correct, and others,
20     correct.
21         Q     You had some questions about 320 -- I
22     think if I get the address wrong, please correct
23     me -- an office located in New York at 320
24     Lexington, I think it was?
25         A     360 Lexington.
```

```
                                           Page 68
 1                 S. Zannikos, Esq.
 2       Q     360 Lexington, thank you.
 3             And that's an HC2 office space?
 4       A     That is correct.
 5       Q     Is that the physical location where
 6   Mr. Delaney and others were working on the
 7   project?
 8       A     That is correct.
 9       Q     And do you recall that March 17, 2020
10   was a Tuesday?  I'll represent for the record
11   that it was.  I remember it because it's one of
12   the saddest St. Patrick's Day in New York history
13   because the parade was canceled.
14                 MR. ROTMAN:  That is correct.  I
15        will stipulate to that.
16   BY MR. ROSSI:
17       Q     Do you recall whether or not the 360
18   Lexington Avenue was closed to all employees at
19   any point in time following March 17, 2020?
20       A     It closed after the stay-at-home order
21   was issued the following Friday, I believe.
22       Q     So just sequentially, Tuesday, 17
23   March, some time thereafter during that week, the
24   stay-at-home order was issued by Governor Cuomo?
25       A     Correct.
```

```
                                          Page 69

 1                  S. Zannikos, Esq.
 2       Q     And then by the following Monday, the
 3   23rd, all non-essential businesses had to close;
 4   correct?
 5       A     Correct.
 6       Q     And was the 360 Lexington Avenue
 7   closed to all as of 23 March, 2020?
 8       A     Correct, it was.
 9       Q     Has it stayed closed since then?
10       A     Yes.
11       Q     On 17 March, 2020 when the project was
12   suspended, was Mr. Delaney eligible to work on
13   the project if it had been -- if the suspension
14   had been lifted?
15       A     Yes.
16       Q     And on March 17, 2020, was Mr. -- did
17   Mr. Delaney remain eligible to work on other HC2
18   projects if other of its clients had selected
19   Mr. Delaney for participation?
20       A     That is correct.  We would have
21   submitted him, too, for consideration.
22       Q     So was the only change in his
23   employment status as of March 17, 2020, the fact
24   that the active project that he was working on
25   was no longer active due to the law firm customer
```

```
                                              Page 70

 1                     S. Zannikos, Esq.

 2    suspension of it?

 3         A     That's correct.

 4         Q     And was that the exact same status

 5    change that happened to all of the other

 6    similarly-situated reviewers on that project in

 7    New York as of March 17, 2020?

 8         A     That's correct.

 9         Q     You had a couple of questions about

10    the Florida complaint in the action, and I have a

11    few questions of my own about that, if you would

12    just give me a moment.

13                Between the date that the Florida

14    complaint was lodged publicly on the docket in

15    Brevard County, Florida which was April --

16                     MR. ROTMAN:  Objection to the word

17         "lodged."

18    BY MR. ROSSI:

19         Q     Which was April 15th, 2020, and the

20    date that the complaint was provisionally sealed,

21    which was April 20, 2020, so during that five-day

22    period, did you have occasion, sir, to review

23    that complaint while it was publicly available?

24         A     I did.

25         Q     I have a couple of general questions
```

Page 71

1                     S. Zannikos, Esq.



Page 73

1                    S. Zannikos, Esq.



```
                                              Page 74
  1                      S. Zannikos, Esq.
  2       BY MR. ROSSI:
  3           Q      Last question about the Florida
  4       complaint.
  5                      In the Florida complaint, Mr. Delaney
  6       alleges that he was fired by the corporate
  7       client, not HC2; correct?
  8           A      That is correct.
  9                      MR. ROSSI:  I'm checking my notes
 10            to see if I have anything else.
 11                      THE WITNESS:  Do you mind having a
 12            quick call?
 13                      MR. ROSSI:  Yeah, sure.  We can go
 14            off the record at this time.
 15                      MR. ROTMAN:  Please put it on the
 16            record that, you know, the witness asked for
 17            a call and we're going off the record.
 18                      MR. ROSSI:  Yeah.  The witness
 19            asked to confer with his counsel.  We're
 20            going to go off the record to confer.  We'll
 21            come back on the record.  I may be finished.
 22                      (Whereupon there was a brief
 23            recess from 11:46 a.m. until 11:52 a.m.)
 24                      MR. ROSSI:  Just a couple more
 25            questions, Mr. Rotman, before I finish my
```

```
                                        Page 75
 1                  S. Zannikos, Esq.
 2          current examination.
 3     BY MR. ROSSI:
 4          Q     Mr. Zannikos, during that period in
 5     March that you were questioned about earlier in
 6     or about early March through the closure of the
 7     Lexington office on March 23rd, 2020, who, if
 8     anyone at HC2, was responsible for coordinating
 9     HC2 efforts with respect to dealing with the
10     COVID-19 virus in the workplace?
11          A     That would be the vice president of
12     human resources, Patti Ayala.
13          Q     And one other question, Mr. Zannikos.
14                Do you recall an email from Mr.
15     Hartstein to someone at Wilmer Hale that you were
16     questioned about earlier?
17          A     I do.
18          Q     What was Mr. Hartstein's position at
19     HC2 in or about March of 2020?
20          A     Salesperson.
21          Q     And he was resident in Los Angeles?
22          A     Yes.
23          Q     What, if any, role did Mr. Hartstein
24     have with respect to either Wilmer Hale's
25     decision to suspend the project or any subsequent
```

```
1                    S. Zannikos, Esq.
2   actions that HC2 took?
3       A    None.  He's not in a position.
4       Q    And -- I'm sorry.  I didn't mean to
5   interrupt you.
6       A    He's not in a position to influence
7   that determination.
8       Q    To your understanding, did he
9   influence that determination in any way?
10      A    He did not.
11               MR. ROSSI:  I pass the witness at
12          this point in time, Mr. Rotman, subject to
13          any questions you might have.
14               MR. ROTMAN:  Sure.
15               MR. ROSSI:  Otherwise, I'm done.
16               FURTHER EXAMINATION
17  BY MR. ROTMAN:
18      Q    I'm going to limit my examination to
19  the scope of what Mr. Rossi just asked you about,
20  Mr. Zannikos.
21               You just stated that Mr. Hartstein had
22  no authority to fire Mr. Delaney; isn't that
23  correct?
24      A    That is correct.  Well that's --
25  within what I said, you can assume that he does
```

```
                                        Page 79
 1                 S. Zannikos, Esq.
 2    BY MR. ROTMAN:
 3        Q     He wouldn't be concerned -- would it
 4    be fair that he would not be concerned about that
 5    account?
 6        A     It would be fair to say that he has an
 7    interest in the account.
 8        Q     Now I want to ask you, yourself,
 9    personally, did there now come a point earlier
10    this year in 2020 when you went to remote work?
11        A     Are you talking after -- you know, in
12    or around March time when the stay-at-home
13    order --
14        Q     I don't want to conclude that it was
15    in March.
16              When did that happen?  Did you go to
17    remote work -- did you ever go to -- more than
18    50 percent remote work at any point?
19                   MR. ROSSI:  Object to the form.
20                   THE WITNESS:  After the
21        stay-at-home orders were issued, some
22        clients elected to continue their projects
23        based on remote work, and some decided not
24        to.
25
```

```
                                        Page 80
 1                  S. Zannikos, Esq.
 2     BY MR. ROTMAN:
 3          Q     I'm referring that question to you
 4     specifically.
 5                  When did you start working remotely
 6     full time?  Not client work.  I mean you.
 7          A     After the stay-at-home order was
 8     issued in New York.
 9          Q     Did there come a point earlier this
10     year when you went to part-time working remotely?
11     And when I mean "part time," I don't mean, you
12     know, two hours a week.  I mean where more than
13     half your time was working remotely; that's what
14     I'm getting at.
15          A     I don't recall that, no.
16          Q     So then it's fair to say that in this
17     whole period in early March, from let's say
18     March 1st to March 17th, you were still coming
19     into the office at 360 Lexington avenue?
20          A     Predominantly, yes.
21          Q     Five days a week?
22          A     For the most part.
23          Q     And what was your last day you worked
24     full time at 360 Lexington Avenue?
25          A     I want to say I don't recall
```

```
                                     Page 81
 1                    S. Zannikos, Esq.
 2   specifically.  Maybe it was the Monday or Friday
 3   before -- so maybe the 16th of March, which I
 4   believe was a Monday.
 5       Q    Is there anything that would make your
 6   recollection more accurate?
 7       A    I suppose there could be something; I
 8   mean, if it's exists.
 9       Q    Is there an HC2 document that can
10   actually confirm the last date you were in the
11   office full time?
12                    MR. ROSSI:  Object to the form of
13        the question.
14                    THE WITNESS:  I don't know one
15        that exists.  If you're saying that there's
16        something, then I suppose it might.
17                    MR. ROTMAN:  Okay.  No further
18        questions.
19                    MR. ROSSI:  No further questions?
20                    MR. ROTMAN:  No.
21                    MR. ROSSI:  I don't have any
22        further questions of Mr. Zannikos at this
23        time either, so this closes the deposition
24        of Mr. Zannikos.  I would like to thank
25        Ms. Friedman for her time and skill today.
```

Page 84

1                     S. Zannikos, Esq.

2               C E R T I F I C A T I O N

3           I, Randi Friedman, Registered

4    Professional Reporter and Notary Public of the

5    State of New York, do hereby certify:

6        THAT, the witness whose testimony is herein

7    before set forth, was duly sworn by me, and

8    THAT, the within transcript is a true record of

9    the testimony given by said witness.

10       I further certify that I am not related

11   either by blood or marriage to any of the parties

12   to this action; and that I am in no way

13   interested in the outcome of this matter.

14       IN WITNESS WHEREOF, I have hereunto set my

15   hand this day, May 20, 2020.

16

17

18   *Randi C. Friedman*

19   Randi Friedman, RPR

20

21

22

23

24

25   *      *      *      *      *      *      *      *      *