# EXHIBIT B

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

    ------------------------------------------ x

4   HC2, INC.,

5                        Plaintiff,

6        -against-

7   ANDREW DELANEY,

8                        Defendant.

9   ------------------------------------------ x

10

11

                 Wellesley, Massachusetts

12

                 May 18, 2020

13               12:12 p.m.

14

15               ***CONFIDENTIAL***

16

17          VIRTUAL ZOOM DEPOSITION of MICHAEL

18   HEYISON, taken pursuant to Notice, held via

19   Zoom before Fran Insley, a Notary Public of the

20   States of New York and New Jersey.

21

22

23

24

25

```
 1               HEYISON - CONFIDENTIAL
 2       Q.    He was working -- you were not
 3   actively working on the matter -- on the,
 4   quote/unquote, matter that he lists in
 5   Paragraph 5.  Read the second sentence of
 6   Paragraph 5.
 7       A.    Yes.  "I am not personally involved
 8   in the Matter, but have become familiar with it
 9   in my role as WilmerHale's General Counsel as a
10   result of Mr. Delaney's actions."  Do you want
11   me to stop there?
12       Q.    Yes, that's fine.  Please tell us
13   for the record what the matter is.
14             MR. BUTTS:  I will object and
15       instruct Mr. Heyison not to reveal any
16       privileged information.
17       Q.    Without revealing anything of
18   privilege.  I mean, it's in the declaration.
19       A.    Okay.  So I'll do my best to
20   describe it within the confines of privilege
21   and confidentiality that a corporate client
22   retained WilmerHale to provide it with advice.
23   In connection with providing that advice, it
24   was necessary to review many documents and the
25   matter involved review of the documents,
```

```
                                    Page 13
 1              HEYISON - CONFIDENTIAL
 2   analysis of the documents, and then based on
 3   that analysis, reviewing applicable legal
 4   standards and then advising the client on the
 5   results of the review among other things.  So I
 6   think that's how I describe it, Mr. Rotman.
 7        Q.    Was the defendant, Andrew Delaney
 8   working on the matter?
 9        A.    Yes.
10        Q.    What was his role in working on the
11   matter?  Did he review documents for the
12   matter?
13        A.    Yes, Mr. Delaney -- well, reviewed
14   documents for the matter, made determinations
15   of whether they were relevant.  He also
16   provided comments on certain documents.  He
17   designated documents for noteworthiness, and
18   where he determined that they were noteworthy,
19   provided explanations why, in his view, they
20   were noteworthy in connection with the legal
21   and factual issues of the review.  He also
22   provided his analysis of legal issues and fact
23   issues.  He provided his views as the
24   connections between issues and materials that
25   were under review.  He also --
```

```
 1                  HEYISON - CONFIDENTIAL
 2        Q.    Well --
 3                  MR. BUTTS:  Mr. Rotman, let him
 4        finish his answer, please.
 5        A.    I'm almost done.  And he also made
 6    recommendations on search terms that were not
 7    being used, but he indicated he thought should
 8    be used in connection with the project.  So I
 9    think that completes my answer.
10        Q.    Isn't it correct that he -- that his
11    primary role was reviewing documents on the
12    matter?
13                  MR. BUTTS:  Objection, you may
14        answer.
15        A.    I would say that he was reviewing
16    documents and that's what he was spending most
17    of his time doing, yes.
18        Q.    Was that more than 90 percent of his
19    time?
20        A.    Oh, I can't, I don't know the answer
21    to that, Mr. Rotman.
22        Q.    Mr. Heyison, do you speak Thai or --
23    withdrawn.
24                  Let me say -- hold on.  I'll get to
25    that in a moment.  I want to ask you, isn't it
```

```
                                             Page 15
 1                  HEYISON - CONFIDENTIAL
 2     correct that Andrew Delaney was reviewing Thai
 3     documents, and by Thai documents I mean
 4     documents that are in the Thai language?
 5          A.    My understanding is that he was
 6     reviewing documents in several languages,
 7     English, Thai, and I think there were also
 8     Japanese documents.
 9               MR. BUTTS:  So we will mark the
10          transcript, by the way, as confidential
11          under the protective order.
12          Q.    Mr. Heyison, you're coming in it's
13     just kind of a little --
14          A.    I can hear you, yes.  I can also see
15     you.
16          Q.    Can you please read back that last
17     question.
18               (Whereupon the record was read back
19          by the reporter.)
20          Q.    Mr. Heyison, isn't it correct that
21     the overwhelming number of documents that he
22     was reviewing were in the Thai language?
23               MR. ROSSI:  Objection to form.  You
24          may answer.
25               MR. BUTTS:  Objection to form.
```

```
                                           Page 16

 1              HEYISON - CONFIDENTIAL
 2       A.    I can't -- I don't know what the
 3  percentage of Thai versus English versus
 4  Japanese was.  I don't know.
 5       Q.    Did you ask anyone?
 6       A.    I don't remember whether I asked
 7  anybody or not, but if anybody answered the
 8  question, I just don't remember what the answer
 9  is.
10       Q.    Now, do you speak Thai?
11       A.    Oh, no, I don't.
12       Q.    You're not very familiar with
13  Thailand; isn't that correct?
14            MR. BUTTS:  Objection.
15            MR. ROSSI:  Objection, form.
16            MR. BUTTS:  Form and vague.  If you
17     can answer, you can.
18       A.    I've never been to Thailand.
19       Q.    That's fair enough.  Do you know who
20  the prime minister of Thailand is?
21            MR. BUTTS:  Objection.  You can
22     answer.
23            MR. ROSSI:  Objection.  It's outside
24     the scope of the declaration.
25       Q.    You may answer.  I asked him if he
```

```
                                         Page 17
 1                 HEYISON - CONFIDENTIAL
 2    knew.
 3         A.    No, I don't know who it is,
 4    Mr. Rotman.
 5         Q.    Do you know what type of government
 6    Thailand has currently?
 7              MR. BUTTS:  Objection.  You may
 8         answer.
 9         A.    I do not.
10         Q.    Now, Mr. Heyison, Mr. Delaney
11    provided legal services to WilmerHale, is that
12    not correct?
13         A.    He provided legal services to
14    WilmerHale and its corporate client.
15         Q.    Now, was he doing substance -- I'm
16    sorry.  You say that in Paragraph 13.  I want
17    to point your attention to Paragraph 13 of your
18    declaration.
19         A.    Okay.
20         Q.    Please read the second sentence.
21         A.    Okay.  The second sentence of
22    Paragraph 13, "Mr. Delaney is admitted in New
23    York, he provided legal services for WilmerHale
24    and its Corporate Client there, and his conduct
25    is governed by the New York Rules of
```

```
                                        Page 18

 1              HEYISON - CONFIDENTIAL

 2   Professional Conduct."

 3       Q.    Was Andrew Delaney doing substantive

 4   legal work for WilmerHale?

 5              MR. BUTTS:  Objection.  You may

 6       answer.

 7       A.    He was providing legal services for

 8   WilmerHale and its corporate client, I believe

 9   as I testified before.

10       Q.    Was he researching statutes?

11              MR. BUTTS:  Objection.  You can

12       answer.

13       A.    I don't know whether he researched

14   statutes or not, but I do know that in the

15   background and instruction --

16       Q.    I'll take an I don't know.  You

17   answered you don't know.

18              MR. BUTTS:  No, no, Mr. Rotman.

19       Hold on.  It doesn't work that way.  You

20       asked a question and the witness gets to

21       complete his answer and then it's your

22       turn again.  So, Mr. Heyison --

23              MR. ROTMAN:  I asked him if he was

24       researching -- if Andrew Delaney was

25       researching statutes.  He answered, I
```

```
                                           Page 19
 1              HEYISON - CONFIDENTIAL
 2       don't know.  Nothing needs to be added to
 3       that.
 4            MR. BUTTS:  Hold on, hold on.
 5       Mr. Heyison, finish your answer.
 6       A.    I don't remember exactly where I
 7  was, but I think I was saying that I do know
 8  that in the provision of background information
 9  and instruction that Mr. Delaney and his fellow
10  reviewers receive, it included statutes.
11       Q.    Was Mr. Delaney interpreting
12  statutes?
13            MR. BUTTS:  Objection to form.  You
14       may answer it if you can.
15       A.    Based on what I know about the
16  review, he was conducting in the work he did,
17  he was applying statutes to facts.
18       Q.    Was he drafting briefs for
19  WilmerHale?
20       A.    No.
21       Q.    Was he drafting legal memorandum for
22  WilmerHale?
23            MR. BUTTS:  Objection to the form.
24       You may answer.
25       A.    Yes, I think he was preparing
```

```
                                            Page 20
 1                  HEYISON - CONFIDENTIAL
 2    memoranda on legal fact issues in connection
 3    with the document review.  In particular, his
 4    provision of comments for noteworthy documents.
 5         Q.    Was this on WilmerHale letterhead?
 6              MR. BUTTS:  Objection.
 7         A.    He was using the platform that was
 8    provided to him by Hire Counsel.
 9         Q.    So he was basically -- would it be
10    fair to say he might have been writing notes in
11    the platform?
12              MR. BUTTS:  Objection to that.
13         A.    No.  I don't think that's fair to
14    say, no.
15         Q.    He was drafting memo -- I'm sorry.
16    He was drafting memos in the platform?
17              MR. BUTTS:  Objection.  You may
18         answer.
19         A.    My testimony was that in connection
20    with his duties, one of his responsibilities
21    was to mark or denote documents noteworthy, and
22    in connection with that, to provide a written
23    analysis of why he believed the documents were
24    noteworthy in connection with the legal and
25    factual issues that were the subject of the
```

```
                                                     Page 21
 1                HEYISON - CONFIDENTIAL
 2    review.
 3         Q.    Was that analysis in the form of
 4    notes?
 5              MR. BUTTS:  If you understand the
 6         question, you may answer.
 7         A.    It was in sentence --
 8         Q.    You said he did it in a platform.
 9    How did he -- did he draft a -- you know, a
10    legal memorandum or did he just input some
11    notes into the platform as you stated before?
12              MR. BUTTS:  Objection to form.  You
13         may answer.
14         A.    So as I understand it, Mr. Rotman,
15    there was -- on the platform there was a place
16    to prepare the analysis of noteworthy
17    documents, and then it's my understanding that
18    then that was transferred to an e-mail and that
19    lawyers are --
20         Q.    You just said it was transferred to
21    an e-mail.  It was transferred to an e-mail by
22    who?
23              MR. BUTTS:  Hold on.  Robert, this
24         isn't going to work this way if everyone
25         is talking over one other.  You ask, he
```

```
                                            Page 22
 1                    HEYISON - CONFIDENTIAL
 2         answers.  When he is done, we will take
 3         the next question.
 4              MR. ROTMAN:  My question was -- can
 5         you just repeat the question?  I'm talking
 6         to the court reporter.  He's going beyond
 7         what I asked.
 8              MR. BUTTS:  Well, you know what,
 9         then you can ask whatever you like.  You
10         can make whatever notes you want on the
11         record but he gets to complete his answer.
12         Q.    Mr. Heyison, you stated that Andrew
13    Delaney was drawing analysis; isn't that
14    correct?
15         A.    I don't think I used the words
16    "drawing analysis."
17         Q.    You used the word "analysis."  He
18    was doing analysis, performing analysis?
19              MR. BUTTS:  Objection to form.
20         A.    Yes.
21         Q.    I asked you -- subsequent to that, I
22    said was that analysis in the form of just
23    making notes on the platform?
24              MR. BUTTS:  Objection to form.  You
25         may answer.
```

```
                                                Page 23

                        HEYISON - CONFIDENTIAL
 1
 2          Q.     That you referenced yourself?
 3          A.     All I can tell you is that on the
 4     platform my understanding is that there was a
 5     space for him to discuss why he thought a
 6     document was noteworthy and that he prepared
 7     sentences and paragraphs.   Now, weather --
 8          Q.     No -- go ahead?
 9          A.     I remind you that's a memorandum.
10          Q.     Was Andrew Delaney attending
11     hearings for WilmerHale?
12          A.     No.
13          Q.     Did he meet with WilmerHale clients?
14          A.     No.
15          Q.     Was his time billed as attorney
16     time?
17          A.     I don't -- I don't understand that
18     question.
19          Q.     Was his time billed out individually
20     as attorney time?
21                 MR. BUTTS:  By whom?
22                 MR. ROTMAN:  By WilmerHale.
23          A.     Well, my understanding is that
24     WilmerHale paid Hire Counsel.
25                 MR. BUTTS:  H-I-R-E.
```

```
 1                HEYISON - CONFIDENTIAL
 2        Q.    I mean, I think we've should adopt
 3   like a -- because I mean, I will be referring
 4   back and forth.
 5        A.    I can call it --
 6              MR. ROSSI:  Hire Counsel has been
 7        described as HC2 in all of the papers.
 8              MR. ROTMAN:  Yes, I mean, I'm
 9        assuming that by Mr. Heyison referring to
10        Hire Counsel, he is referring to HC2,
11        Inc.?
12              THE WITNESS:  I'll try to use HC2
13        from now on.
14              MR. ROSSI:  Thank you, Mr. Heyison.
15        Q.    Thank you.
16        A.    You're welcome.
17        Q.    Now, Mr. Heyison, you state in your
18   declaration that Mr. Delaney worked on the
19   document with you for five months; isn't that
20   correct?
21        A.    I think I said approximately.
22        Q.    I believe that's in Paragraph 20, if
23   you need to refer to it.
24        A.    Thank you.  I said approximately
25   five months.
```

```
                                            Page 26
 1              HEYISON - CONFIDENTIAL
 2       A.    I don't know the answer to that
 3   question.
 4       Q.    Fair enough.  Isn't it correct that
 5   he returned to the project on February 18th,
 6   2020?
 7       A.    I don't know the dates.
 8       Q.    Do you know the circumstances under
 9   which he came back?
10       A.    No, I do not.
11             MR. BUTTS:  Objection.  Answer.
12       Q.    Now, it is your testimony, is it not
13   correct, that Mr. Delaney reviewed thousands of
14   documents, isn't that correct?  I believe
15   that's also in Paragraph 20.
16       A.    Yes.
17       Q.    Now, thousands is a very imprecise
18   number.  Could that number be 5,000?
19             MR. BUTTS:  Object to the wind up.
20       If you have the question, just ask him the
21       question.
22       Q.    Could that number be at least 5,000?
23       A.    Yes, it could be.
24       Q.    Could it be at least 10,000?
25       A.    No, I don't think it was 10,000.
```

Page 27

                    HEYISON - CONFIDENTIAL
1
2       Q.    So approximately -- and I know you
3    used the word "approximately."  So it was
4    approximately between 5,000 and 10,000, give or
5    take?
6              MR. BUTTS:  Objection to form.
7       A.    I have been informed that it's
8    actually almost 8,000 documents.
9       Q.    Fair enough.  Now, WilmerHale had to
10   collect, review, and assess large number of
11   documents for the review, correct?
12      A.    Yes.
13      Q.    This is in Paragraph 6, "And the
14   volume of documents was sufficiently large that
15   an outside vendor had to be brought in to
16   provide temporary lawyers to assist in the
17   review collect -- in the review," also in
18   Paragraph 6, is that not correct?
19              MR. BUTTS:  Objection to form.  If
20         you understand the question, you may
21         answer.
22      A.    Yes, that's correct.
23      Q.    Now, how many documents were in the
24   review database?
25      A.    I don't know.

```
 1                 HEYISON - CONFIDENTIAL
 2     question?
 3          A.     No.
 4          Q.     Did you think it was relevant?
 5          A.     I don't understand that question.
 6          Q.     The number of documents that were in
 7     the Thai language, did you consider that
 8     relevant?
 9                 MR. ROSSI:  Object to the form.
10          A.     I don't -- relevant to what?  I
11     don't know how to answer that question.
12          Q.     Well, is Thai a rare language?
13                 MR. ROSSI:  Object to the form of
14          the question.
15                 MR. BUTTS:  Same objection.  You may
16          answer, if you can.
17          A.     No, I don't think it's a rare
18     language.  I mean, people in Thailand speak
19     Thai.  I know that.
20          Q.     Yes, I'm very well of aware that
21     people in Thailand speak Thai.
22          A.     So I don't know why you would say
23     it's a rare language.
24          Q.     It's a rare language in the United
25     States, is that not fair to say?
```

1                    HEYISON - CONFIDENTIAL

2              MR. BUTTS:  Object to form.  You can

3        answer.

4              MR. ROSSI:  Objection.

5        A.    I don't understand that question.

6        Q.    Now, isn't it correct that you

7   personally did not review any of the documents

8   in the database?

9        A.    That is correct.

10       Q.    If the answer -- if that is correct,

11  you certainly didn't review any Thai documents

12  that were in the database?

13       A.    That is correct.

14       Q.    Now, you testified that some of the

15  documents -- and I'm pointing to paragraph 21.

16  You testified that some of the documents

17  reviewed --

18              MR. BUTTS:  Give him a moment to get

19        there, Robert, so we can hear your

20        question with the reference.

21       A.    Yes.  All right.  I see Paragraph

22  21.

23       Q.    It says there that some of the

24  documents in your language reviewed by

25  Mr. Delaney were in a foreign language that he

```
                                           Page 32
 1                HEYISON - CONFIDENTIAL
 2   was fluent in, correct?
 3        A.    Yes.
 4        Q.    Was that language Thai?
 5             MR. BUTTS:  Objection.
 6        A.    That is my understanding, yes.
 7        Q.    Now, you testified, also in
 8   Paragraph 21, that Mr. Delaney's foreign
 9   language proffiency was helpful; isn't that
10   correct?
11        A.    Yes.
12        Q.    Now, would it be fair to say that
13   his language skills were welcome on the
14   project?
15             MR. BUTTS:  Objection to form.  You
16        may answer.
17        A.    Welcome by whom?
18        Q.    Well, you said they were helpful.
19   Your previous -- you stated that it was
20   helpful.  So I'm assuming that if they were
21   helpful, they were welcome.  I'll always take
22   some help, if I can get some.
23             MR. ROSSI:  Object to the form of
24        that.
25             MR. BUTTS:  I don't know what you
```

```
 1                    HEYISON - CONFIDENTIAL
 2         are asking him now.
 3                 MR. ROTMAN:  I asked him were
 4         Mr. Delaney's language skills welcome on
 5         the project.
 6                 MR. BUTTS:  Objection.  You may
 7         answer, if you can.
 8         A.     Mr. Rotman, I don't know that I can
 9    say more than I have been informed that it was
10    helpful that he had foreign language
11    proficiency.  Whether people on the project
12    welcomed that or not, I really can't speak for
13    them.  I didn't ask that question.
14         Q.     Fair enough.  That's a legitimate
15    answer.  Now, were his language skills
16    productive on the review?
17                 MR. BUTTS:  Objection.  You may
18         answer.
19         A.     Yes.
20         Q.     Were his language skills
21    indispensable on the Thai review?
22                 MR. ROSSI:  Objection.
23         A.     No.
24         Q.     Now, also in Paragraph 21 you say --
25    you state, "Translation services are generally
```

1              HEYISON - CONFIDENTIAL

2      available at lower cost" than legal services,

3      correct?

4          A.    I say that, "Translation only

5      services are generally available at lower

6      cost," yes, I agree with that.

7          Q.    Does that apply generally or that

8      applies specifically to Thai translation

9      services?

10             MR. BUTTS:  Objection to form.  You

11         may answer, if you can.

12         A.    I believe generally.

13         Q.    WilmerHale asked HC2 to suspend the

14     project on March 17, 2020, isn't that correct?

15         A.    March 17, 2020, I believe that is

16     correct.

17         Q.    Now, would it be fair to say that

18     Andrew Delaney did not have access to the

19     premises where the review was being conducted

20     after March -- that date again, March 17, 2020?

21             MR. ROSSI:  Object to the form of

22         the question.

23             MR. BUTTS:  Same.  You may answer it

24         again.

25         A.    Well, my understanding is that after

Page 43

1                    HEYISON - CONFIDENTIAL

2      docket?

3                 MR. BUTTS:  Objection, you may

4         answer.

5         A.     I don't remember.

6         Q.     Now, Mr. Heyison, when did you sign

7      the declaration that is your testimony today?

8         A.     Last Friday.

9         Q.     Was this after 5:00 p.m. Eastern?

10        A.     I don't recall the exact time.

11        Q.     Was it before 5:00 p.m. Eastern on

12     Friday?

13                MR. BUTTS:  Objection.

14        A.     I think it was -- I think it was

15     after.

16        Q.     Do you know what time that it

17     actually was?

18        A.     I do not.

19        Q.     Did you review my declaration before

20     signing your declaration?

21        A.     No.

22        Q.     Did you review my exhibits -- I'm

23     sorry.  Did you review the -- withdrawn.

24                Did you review the exhibits to my

25     declaration before signing your declaration?

```
                                           Page 44
 1                HEYISON - CONFIDENTIAL
 2             MR. BUTTS:  Objection to form.  You
 3        may answer.
 4        A.    No.
 5        Q.    Now, did Mr. Rossi or your counsel
 6   review my declaration before finalizing your
 7   declaration?
 8             MR. ROSSI:  Object to the form of
 9        the question.
10             MR. BUTTS:  Yes, likewise.
11             MR. ROTMAN:  I asked him if he
12        knows.  If he doesn't know, he doesn't
13        know.
14             MR. ROSSI:  Well, hold on a second.
15        It implies that I finalized the
16        declaration which -- object to the form.
17             MR. BUTTS:  Yes, likewise.
18        A.    I don't --
19        Q.    Well, I said "either."  I said
20   either Mr. Rossi or if you don't know, you
21   don't know.  I'll take that answer.
22             MR. BUTTS:  You know, we are not --
23        you can't pick which answers are
24        acceptable and which are not.  You ask the
25        question.  It's a confusing --
```

```
                                          Page 45
 1                HEYISON - CONFIDENTIAL
 2             MR. ROTMAN:  Let him -- let him
 3        answer.
 4             MR. BUTTS:  It's difficult to
 5        understand.  You're asking him to
 6        speculate what's in multiple peoples' head
 7        but go ahead.  Objection.
 8        A.    All I can tell you is I didn't even
 9   know you had a declaration when I signed mine.
10   So you're asking a question about what people
11   were doing with your declaration in conjunction
12   with mine.  I didn't even know you submitted
13   one.
14        Q.    I asked you if you knew.
15        A.    Yeah, I don't, so no.
16             MR. BUTTS:  He's answered the
17        question.  Let's keep going.
18        Q.    Now, Mr. Heyison, is WilmerHale a
19   party to -- WilmerHale is not a party to this
20   litigation; is that correct?
21        A.    That's correct.
22             MR. BUTTS:  And this litigation you
23        are referring to is the --
24             MR. ROTMAN:  The HC2, yes.
25             MR. BUTTS:  In the Southern District
```

```
                                        Page 49
 1                HEYISON - CONFIDENTIAL
 2    I'm thinking back, it's been, you know, over
 3    the years, but I don't remember communicating
 4    with you.
 5         Q.    Sir, was Mr. Delaney selected by
 6    WilmerHale to work on the project?
 7         A.    Yes.
 8         Q.    Was he selected to work on the
 9    project in his capacity as an attorney?
10         A.    Yes.
11         Q.    In working on the project, did
12    WilmerHale entrust Mr. Delaney with
13    attorney/client privileged information?
14         A.    Yes.
15         Q.    In working on the project, did
16    WilmerHale entrust Mr. Delaney with attorney
17    work product including the thoughts and
18    impressions of WilmerHale lawyers?
19         A.    Yes.
20         Q.    In working on the project, did
21    WilmerHale entrust Mr. Delaney with its
22    clients' confidences including highly sensitive
23    confidences?
24         A.    Yes.
25         Q.    In so doing, did WilmerHale expect
```

```
                                              Page 50
 1                    HEYISON - CONFIDENTIAL
 2      Mr. Delaney to honor whatever obligations he
 3      may have had contractually to protect those
 4      confidences and that information?
 5           A.    Yes.
 6           Q.    In so doing, did WilmerHale expect
 7      Mr. Delaney to abide by whatever professional
 8      obligations he had as an attorney admitted in
 9      New York State?
10           A.    Yes.
11           Q.    Did you have a chance to review the
12      so-called Florida complaint?
13           A.    Yes, I did.
14           Q.    Did you come to a conclusion as to
15      whether or not the Florida complaint reveals
16      any such confidences, attorney/client privilege
17      information, or attorney work product that had
18      been entrusted to Mr. Delaney during the course
19      of the project?
20           A.    Yes.
21           Q.    What was your conclusion, sir?
22           A.    The Florida complaint did disclose
23      both privileged and confidential information.
24           Q.    Without getting into any of the
25      details, what is the basis for that conclusion?
```

1          HEYISON - CONFIDENTIAL

2       A.    Because as is stated in the

3   complaint, Mr. Delaney says he participated in

4   this privilege and confidential review.  He was

5   provided with information about it and reviewed

6   many documents and information that is both

7   privileged and confidential and attorney work

8   product is revealed in the allegations of the

9   Florida complaint.

10      Q.    Have you been able to make a

11  determination one way or the other as to

12  whether or not the information that you -- that

13  is in the Florida Complaint that is privileged,

14  confidential, or otherwise protected by an

15  evidentiary privilege was publicly available

16  prior to the time that Mr. Delaney came to know

17  his work on the project?

18      A.    I have.

19      Q.    What is that view?

20      A.    That view is that the information

21  that he revealed in the complaint was not

22  publicly available.

23      Q.    And does it follow then that the

24  only reason that he knew it was because it was

25  entrusted to him while he was working in his

```
                                            Page 52
 1                 HEYISON - CONFIDENTIAL
 2    capacity as an attorney on the project?
 3         A.    My understanding is that he was
 4    provided with that information and that it was
 5    disclosed in the Florida complaint.
 6              When I say "provided with that
 7    information," he was provided with that
 8    information during the course of the
 9    confidential review.
10         Q.    I take it, sir, that neither
11    WilmerHale nor its corporate client has waived
12    any of those evidentiary privileges or
13    otherwise authorized Mr. Delaney to reveal that
14    information, correct?
15         A.    Correct.
16              MR. ROTMAN:  I don't think I have
17         any further questions of the witness at
18         this time.  Subject to any other questions
19         Mr. Rotman might have.
20              MR. ROTMAN:  I just want to recross
21         here.  Just follow-up on a couple of
22         items.
23    RECROSS
24    BY MR. ROTMAN:
25         Q.    Mr. Heyison, did I understand you to
```

```
                                            Page 53
 1                  HEYISON - CONFIDENTIAL
 2   say that there is no public information in the
 3   Florida complaint?
 4             MR. BUTTS:  Objection.
 5        A.    I didn't -- I did not give that
 6   answer, so I don't know why you would
 7   understand from my testimony.
 8        Q.    Did you go through the whole
 9   complaint line by line?
10        A.    Yes.
11        Q.    Did you go through the footnotes of
12   the complaint?
13        A.    Yes.
14        Q.    Did you review any internet sources
15   to see what was -- what was the basis of you
16   saying that it was not based on public
17   information?  What --
18             MR. BUTTS:  Objection to form.
19             MR. ROSSI:  Object to the form.
20        A.    Because I reviewed -- I reviewed the
21   footnotes and I reviewed the articles that were
22   discussed in the footnotes and the footnotes
23   are not the subject of the confidential review.
24   The information that he disclosed about the
25   confidential review does not appear either in
```

Page 54

1                HEYISON - CONFIDENTIAL
2    the footnotes or the articles that are cited in
3    the footnotes.  That is public information, but
4    not the information that Mr. Delaney was
5    provided during the review, the documents that
6    he reviewed as part of that review.  They are
7    different subject matters.
8        Q.    Well, you had stated earlier when I
9    questioned you that you did not review any of
10   the documents of the -- withdrawn.
11            You had stated earlier that you did
12   not review any of the documents within the
13   database; is that correct?
14       A.    No, I had not reviewed the
15   documents, but I reviewed the protocols that
16   describe the subject matter of the review.
17       Q.    Did you review any -- other than the
18   footnotes, which you said you didn't review,
19   did you review any independent websites out
20   there about the subject matter of the
21   complaint?
22            MR. BUTTS:  Objection to form.
23       Answer if you can.
24       A.    Well, I know that I reviewed links
25   to the articles that are cited with the Florida

```
                                          Page 55

 1                 HEYISON - CONFIDENTIAL
 2     complaint.
 3          Q.    Anything else?
 4          A.    I may have.  I may have.  Oh, I just
 5     don't -- you know, it's possible that I may
 6     have done some web -- you know, like a brief
 7     web search some time, you know, maybe in March
 8     or April.  I don't -- I don't have a
 9     recollection of doing it.  I say that because
10     sometimes I'll do that when I have a case and
11     then I'll just do some -- some informal
12     research on it.  I just -- it's possible but I
13     just don't have a memory of it.
14          Q.    How many -- how many websites did
15     you visit?
16          A.    Well, all I can tell you is that --
17          Q.    I'm trying to get a breath -- a
18     sense of what the breath of your exam, outside
19     of the protocol was?
20          A.    Well --
21                MR. BUTTS:  Hold on, hold on.
22          Objection to form.  You may answer.
23          A.    All I can tell you is that I know
24     that I -- that I clicked on a link -- links in
25     the footnotes that -- somebody sent me those
```

Page 56

HEYISON - CONFIDENTIAL

1
2    and then I clicked on those links and I
3    reviewed those articles which I understand are
4    on the Web.
5         Q.    Any other articles other than what
6    was in the footnote in the complaint?
7         A.    No, I don't recall any others.
8         Q.    Were you concerned -- withdrawn.
9               Would it be important that there was
10   other information, publicly available
11   information?
12              MR. BUTTS:  You're asking him
13        hypothetically or?
14        Q.    You said -- you stated you that
15   reviewed the footnotes, and did he review
16   anything else other than the footnotes online?
17              MR. BUTTS:  Objection.  You may
18        answer.
19        Q.    Other than the footnotes to the
20   complaint.
21        A.    Mr. Rotman, I don't know how to
22   answer that.  I mean, I know that I reviewed
23   the materials in the footnotes.
24        Q.    Anything else?
25        A.    Whether I may have reviewed

```
                                          Page 57
 1                HEYISON - CONFIDENTIAL
 2   something else, I just -- I don't have a memory
 3   of it, but I'm telling you it's possible.
 4        Q.    How much of that review did you do
 5   other than the footnotes?
 6        A.    All can I tell you is --
 7        Q.    How much time did you spend on doing
 8   that review?
 9             MR. BUTTS:  Hold on.  Hold on,
10        Robert.  All right.  There's a couple of
11        questions there.  If you ask it, give him
12        a chance to answer.  Let's take it fresh.
13        What's the question, please?
14             MR. ROTMAN:  Fran, can you just
15        reread that last question?
16             (Whereupon the record was read back
17        by the reporter.)
18        A.    I don't know.  I didn't -- I didn't
19   calculate it.  I didn't look at a clock.
20   Whatever time it took me to read those
21   articles.
22        Q.    So you didn't rely on anything that
23   was publicly available?
24        A.    No, I did.  Those articles are all
25   publicly available.
```

```
 1              HEYISON - CONFIDENTIAL
 2       Q.    Well, outside of -- outside of what
 3   was in the footnotes, you didn't rely on
 4   anything else that was outside of -- you didn't
 5   rely on any outside publicly available
 6   information for your basis -- Mr. Rossi had
 7   asked you what was the basis for your opinion
 8   and you cited the protocol or the protocols and
 9   the complaint; is that correct?
10              MR. BUTTS:  Objection to form.  If
11         you understand that, you may answer.
12       A.    Well, no, it would -- I don't think
13   that was my answer, but I can tell you what I
14   reviewed.  I did review the protocols.  I also
15   reviewed -- what do they call those -- sheets
16   that -- coding sheets.
17              I -- and then I saw e-mails that
18   contained Mr. Delaney's noteworthy comments,
19   and I saw the format of those but they were
20   redacted.  They were heavily redacted, so
21   those, I didn't see the information.  I
22   reviewed -- I reviewed the complaint.  I talked
23   to people on the case team about the
24   information in the complaint and was that
25   information part of the review.  Was that
```

```
 1              HEYISON - CONFIDENTIAL
 2    information contained in documents.  So all of
 3    those things, Mr. Rotman, went into my
 4    conclusion that the Florida complaint contains
 5    privileged and confidential information that
 6    Mr. Delaney received in the review.  So that's
 7    how I would answer the question if you are
 8    asking me about the sources.
 9         Q.    So you said -- you just said you
10    relied on other people to give you information;
11    is that right?
12         A.    Yes, in part, in part but only in
13    part.  I didn't --
14         Q.    Who were those other people?
15              MR. BUTTS:  Let him finish, please.
16         A.    There were people on the case team.
17         Q.    Can you identify a handful?
18         A.    Sure.
19         Q.    Without telling me what they told
20    you.  I just want to know their identity.
21              MR. BUTTS:  Objection to form.  You
22         may answer.
23         A.    So I talked to Ron Machen,
24    M-A-C-H-E-N, Ronald Machen.  Oh, I don't know
25    if it's Ronald.  I just know it's Ron.  I
```

```
                                          Page 60

 1                    HEYISON - CONFIDENTIAL

 2    talked with Jay Holtmeier.  I talked with

 3    Michael Posada, P-O-S-A-D-A.  Holtmeier is

 4    H-O-L-T-M-E-I-E-R.

 5         Q.    Is that it?

 6         A.    I think those are the people on the

 7    case team I spoke with.

 8         Q.    Anyone else?

 9         A.    That's all I remember now.

10         Q.    What office -- what WilmerHale

11    office does Mr. Machen work out of?

12         A.    Washington, D.C.

13         Q.    And Mr. Holtmeier?

14         A.    New York.

15         Q.    Mr. Posada?

16         A.    I don't know what office he is in.

17         Q.    I presume that information is on the

18    website?

19              MR. BUTTS:  I don't know if that's a

20         question or not.

21              MR. ROTMAN:  Yes, that's a question.

22         Q.    Is that information available on the

23    website?

24         A.    I think it is.

25              MR. ROTMAN:  I have no further
```

Page 61

1          HEYISON - CONFIDENTIAL
2     questions.
3               MR. BUTTS:  I have one or two
4     follow-ups.
5  CONTINUED BY
6  BY MR. ROSSI:
7     Q.    Mr. Heyison, you just testified
8  about speaking to Mr -- is it Machen?
9     A.    Machen.
10    Q.    Machen, excuse me, I think I have
11 may have been mispronouncing it, so it's good
12 to know, Machen.
13              Mr. Machen, Mr. Holtmeier, and
14 Mr. Posada?
15    A.    Yes.
16    Q.    Did you know and understand them to
17 be very knowledgeable about the subject matter
18 of the corporate client representation in a
19 project?
20    A.    Yes.
21    Q.    Is that why you consulted them on
22 this topic?
23    A.    Yes, that's why I consulted with
24 them.  They were consulting with me too so it
25 wasn't -- it wasn't one way because, you know,

Page 62

1                    HEYISON - CONFIDENTIAL
2      I was general counsel for the firm.
3           Q.    Between March 17, 2020, when the
4      project was suspended and April 15, 2020, when
5      the state court complaint was filed, did
6      WilmerHale have occasion to remind Mr. Delaney
7      about his ethical and contractual obligations
8      with respect to the confidentiality of the
9      information he had obtained during the project?
10          A.    Yes.
11          Q.    What, if any, reminder did it give
12     him?
13          A.    We told Mr. Delaney that he had
14     contractual obligations not to disclose client
15     confidential information, business confidential
16     information, privileged information.  We also
17     reminded him of his ethical obligations as a
18     lawyer not to disclose client confidences,
19     which includes privileged information,
20     confidential information, materials that the
21     client has requested not be disclosed, or
22     information that if disclosed would be
23     detrimental or embarrassing to the client.
24          Q.    Were these -- were these reminders
25     given to him prior to his causing to be filed

```
                                          Page 63
 1               HEYISON - CONFIDENTIAL
 2    on a public docket in the state court
 3    complaint?
 4         A.    So I can tell you that I remember --
 5    I sent him a letter, not a letter, an e-mail on
 6    May 27th, not May 27th, March 27th reminding
 7    him of his confidentiality obligations, and the
 8    day before the Florida complaint was filed by
 9    Mr. Delaney's lawyer, Mr. Machen sent
10    Mr. Delaney's lawyer an e-mail expressing
11    concern about the misuse of confidential and
12    privileged information, requesting a discussion
13    and the very next day the Florida complaint
14    with confidential and privilege information in
15    it was filed publicly.
16         Q.    Why, during this period, did
17    WilmerHale think it necessary to give these
18    expressed reminders to Mr. Delaney?
19         A.    Because it was concerned that
20    Mr. Delaney would not respect his duties.
21         Q.    What, if anything, was the basis of
22    those concerns?
23         A.    Well, from the very beginning, I
24    believe it was on March 17th, Mr. Delaney sent
25    an e-mail directly to the corporate -- a
```

Page 64

1           HEYISON - CONFIDENTIAL
2   corporate client executive whose identity he
3   became aware of as part of this confidential
4   review and was confidential information that
5   was improperly used.
6           And so from March 17 forward, we
7   were concerned about whether Mr. Delaney would
8   respect his contractual and professional
9   ethical obligations, and that concern continued
10  because Mr. Delaney kept sending e-mails
11  directly to WilmerHale and to the corporate
12  client when he had been told they represented
13  parties and he should not do that anymore but
14  he ignored that.  He just repeatedly kept
15  sending those e-mails, which was additional
16  concern about whether he would respect his
17  professional obligations.
18          And then his lawyer wrote -- his
19  Florida lawyer wrote another e-mail directly to
20  the president of the corporate client or an
21  affiliate discussing confidential information
22  and privileged information in that letter which
23  was cause for additional concern.
24          Mr. Machen, as I told you before,
25  wrote a letter expressing that concern, and

```
                                          Page 65

 1                 HEYISON - CONFIDENTIAL
 2   what happened showed that that concern, which
 3   we had throughout this whole period, was
 4   justified because his lawyer, the next day, the
 5   very next day, filed a complaint publicly with
 6   confidential and privileged information.  So
 7   that's why we were concerned and it turned out
 8   very unfortunately that those concerns were
 9   justified.
10        Q.    During this period of concern that
11   you describe between March 17 and April 15, had
12   Mr. Delaney made any demands on the corporate
13   client, Wilmer or did you know --
14             MR. ROTMAN:  Objection, a lot of
15        this testimony is outside of the scope of
16        what I asked him.  We're going -- we are
17        on direct now.  It sounds like you're
18        going into a direct examination,
19        Mr. Rossi.  I don't think you have a form
20        for that.
21        Q.    Go ahead and answer, Mr. Heyison, if
22   you have the question in mind.
23        A.    I don't.  If you could repeat it for
24   me, please.
25        Q.    Sure.  During this period of concern
```

```
                                          Page 66
```

1                HEYISON - CONFIDENTIAL

2    that you just described that was roughly

3    between 17 March 2020 and 15 April 2020, had

4    Mr. Delaney made any monetary demands on either

5    the corporate client, WilmerHale, or if you

6    know, HC2?

7              MR. ROTMAN:  Objection.  What is

8         "monetary demands"?

9         A.    I believe in his very first e-mail

10   he did.  He said that he wanted to be paid and

11   then he threatened legal action against

12   WilmerHale and the corporate client.  So from

13   the very beginning, and then I understand that

14   he made certain demands and then he retained a

15   lawyer who made a demand on his behalf of

16   $450,000.  And then I don't know what happened

17   to that lawyer, but then he retained another

18   lawyer in Florida who made demands on the

19   corporate client to get paid in settlement, I

20   think he called it, and then the very next day

21   without waiting to hear back, he filed the

22   complaint.  He said in that letter, if I

23   remember correctly, he said, please respond in

24   seven days.  He sent the letter on April 13.

25   The very next day he filed a complaint.

```
                                              Page 67
 1              HEYISON - CONFIDENTIAL
 2      Q.    Prior to Mr. Delaney causing the
 3   state court complaint to be filed, had either
 4   WilmerHale or it's corporate client acceded to
 5   any of its monetary demands?
 6              MR. ROTMAN:  Objection to monetary
 7        demands.
 8      A.    No, I don't believe they did.
 9              MR. ROSSI:  I don't have any further
10        questions of the witness at this time.
11        Thank you, Mr. Heyison, for your time.
12              THE WITNESS:  You're welcome.
13              MR. BUTTS:  It seems like we are
14        concluded.
15              MR. ROTMAN:  Yes, we are.
16              (Time noted:  1:33 p.m.)
17
18
19
20
21
22
23
24
25
```

Page 69

1

2                    C E R T I F I C A T E

3          I, FRAN INSLEY, hereby certify that the

4    Deposition of Michael Heyison was held before

5    me on the 18th day of May, 2020; that said

6    witness was duly sworn before the commencement

7    of testimony; that the testimony was taken

8    stenographically by myself and then transcribed

9    by myself; that the party was represented by

10   counsel as appears herein;

11          That the within transcript is a true

12   record of the Deposition of said witness;

13          That I am not connected by blood or

14   marriage with any of the parties; that I am not

15   interested directly or indirectly in the

16   outcome of this matter; that I am not in the

17   employ of any of the counsel.

18          IN WITNESS WHEREOF, I have hereunto set

19   my hand this 19th day of May, 2020.

20

21

     FRAN INSLEY

22

23

24

25