**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------- X

HC2, INC.,                                      :

          Plaintiff,                :

           -v-                      :

ANDREW DELANEY,                                 :

          Defendant.                :

---------------------------------------------- X

Civil Action No.: 1:20-cv-3178 (LJL)

**[PROPOSED]FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

FINDINGS OF FACT.................................................................................................. 1

I. The Parties' Evidence ................................................................................... 1

II. Relevant Background ................................................................................... 3

III. HC2 Hired Mr. Delaney as an At-Will, Temporary Contract Attorney ............... 5

  A. Mr. Delaney was an At-Will Employee of HC2 at All Times.................. 5

  B. Mr. Delaney Was Obligated to Maintain Confidentiality......................... 5

  C. Mr. Delaney Agreed to Abide by HC2's Employment Rules and Policies........................................................................................... 7

  D. Mr. Delaney Owed HC2 a Duty of Loyalty.............................................. 7

IV. HC2 is Retained by the Law Firm Customer .................................................. 8

  A. The Law Firm Customer Services Agreement......................................... 13

  B. The Law Firm NDA............................................................................... 13

V. Mr. Delaney Received Privileged or Otherwise Confidential Information While Engaged as an Attorney Working on the Project. .................................... 15

VI. The Suspension of the Project........................................................................ 18

VII. Mr. Delaney Seeks to Exploit the Corporate Client's Confidential Information ................................................................................................... 22

PROPOSED CONCLUSIONS OF LAW ...................................................................... 31

VIII. HC2 Meets the Standard for a Preliminary Injunction ..................................... 31

  A. Absent a Preliminary Injunction, HC2 will Suffer Irreparable Harm. ...................................................................................................... 31

  B. HC2 Has a Likelihood of Success on the Merits of its Claims................ 33

  C. The Balance of Hardships Weigh in Favor of Granting HC2 a Preliminary Injunction. .......................................................................... 36

  D. The Court Should Disregard the Declaration of Mr. Delaney's Attorney in Support of Mr. Delaney's Opposition to HC2's.................. 37

  Request for a Preliminary Injunction ...................................................... 37

IX. Mr. Delaney Violated the New York Rules of Professional Conduct ................ 40

X.    Mr. Delaney Engaged in the Practice of Law on the Project ............................... 41

XI.   HC2 is Not Required to Give Security ............................................................. 42

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Airbnb, Inc. v. City of New York*,
  373 F. Supp. 3d 467 (S.D.N.Y. 2019).................................................................32

*Am. Civil Liberties Union v. Clapper*,
  785 F.3d 787 (2d Cir. 2015).................................................................................31

*Broker Genius, Inc. v. Volpone*,
  313 F. Supp. 3d 484 (S.D.N.Y. 2018)............................................................32, 33

*Carey v. Klutznick*,
  637 F.2d 834 (2d Cir. 1980).................................................................................36

*Clarkson Co. v. Shaheen*,
  544 F.2d 624 (2d Cir. 1976).................................................................................42

*Clayton v. Whitton*,
  233 A.D.2d 828 (3d Dep't 1996)..........................................................................36

*Data-Track Account Servs., Inc. v. Lee*,
  291 A.D.2d 827 (4th Dep't 2002).........................................................................32

*Doctor's Assocs., Inc. v. Distajo*,
  107 F.3d 126 (2d Cir. 1997).................................................................................42

*Hirschfeld v. Stone*,
  193 F.R.D. 175 (S.D.N.Y. 2000) .........................................................................32

*Insussary v. Adminstaff Comp., Inc.*,
  No. 98 CIV. 5404 (AKH), 1999 WL 305102 (S.D.N.Y. May 14, 1999) ..............39

*Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*
  620 F. Supp. App'x 37 (2d Cir. 2015) (S.D.N.Y. May 14, 1999) ........................41

*Pictet Funds (Europe) S.A. v. Emerging Managers Grp., L.P.*,
  No. 14-CV-6854 SAS, 2014 WL 6766011 (S.D.N.Y. Dec. 1, 2014)....................33

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990).................................................................................31

*Roswell Capital Partners LLC v. Alt. Const. Tech.*,
  08-CIV-10647-DLC, 2009 WL 222348 (S.D.N.Y. Jan. 30, 2009)........................33

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995).....................................................................................32

*Wenner Media LLC v. N. & Shell N. Am. Ltd.*,
    No. 05-cv-1286 (CSH), 2005 WL 323727 (S.D.N.Y. Feb. 8, 2005) ......................................31

*Wisdom Import Sales Co. v. Labatt Brewing Co.*,
    339 F.3d 101 (2d Cir. 2003) ...................................................................................................32

**Other Authorities**

Federal Rule of Civil Procedure 65(c) ...................................................................................42

Federal Rule of Evidence 602 ...............................................................................................39

New York Rules of Professional Conduct Rule 1.6 ................................................................40

New York Rules of Professional Conduct Rule 1.9(c) ...........................................................40

THIS COURT, having reviewed the submissions of Plaintiff HC2, Inc. ("HC2") and Defendant Andrew Delaney ("Mr. Delaney"), having reviewed the evidence presented by the parties and having conducted a hearing on May 26, 2020, makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I.      The Parties' Evidence

1.      HC2 presented direct testimony from its General Counsel, Stephanos Zannikos, together with attached exhibits, in support of its application for a preliminary injunction.  Mr. Zannikos, as General Counsel of HC2, oversees all legal matters related to HC2, including litigation.  (Transcript of Virtual Deposition upon Oral Examination of Stephanos Zannikos, Esq. ("Zannikos Dep.") 7:24-8:5,  May 19, 2020)  Pursuant to the Court's order dated May 7, 2020 (ECF No. 25), Mr. Zannikos provided direct testimony by sworn declaration.  (*See* Declaration of Stephanos Zannikos in support of Plaintiff HC2, Inc.'s Application for a Preliminary Injunction ("Zannikos Decl.").)  Mr. Zannikos was then cross-examined by Mr. Delaney's counsel and redirected by Plaintiff's counsel, under oath on May 19, 2020.  Mr. Zannikos' declaration and testimony were based upon his personal knowledge and information that he learned from his partners and colleagues at HC2 while carrying out his duties as General Counsel.  (Zannikos Decl. ¶ 1; Zannikos Dep. at 7:24-8:5.)  The Court finds Mr. Zannikos' declaration and deposition testimony to be credible and persuasive.  At the preliminary injunction hearing on this matter, and in the parties' briefing, Mr. Zannikos' declaration and deposition testimony were unrebutted.

2.      HC2 also presented direct testimony from Michael R. Heyison, the Co-General Counsel of HC2's law firm customer ("Law Firm Customer").   Mr. Heyison provided a declaration, together with attached exhibits, and was deposed by Defendant's counsel and redirected by HC2's counsel.  Mr. Heyison's declaration and testimony were based upon his

personal knowledge and information that he learned from his partners and colleagues at the Law Firm Customer while carrying out his duties.  (Heyison Decl. ¶ 1; Transcript of Virtual Deposition upon Oral Examination of Michael Heyison.  ("Heyison Dep.") 54:8-60:9, May 20, 2020).  Mr. Heyison serves as the Law Firm Customer's Co-General Counsel, and the Co-Chair of the firm's Ethics Committee and of the Committee on Privilege.  (Heyison Decl. ¶ 2.)  As part of his General Counsel duties, he advises the Law Firm Customer lawyers on legal ethics, attorney-client privilege and work-product, the handling of client confidential information, compliance with rules and orders issued by courts and agencies, and agreements with persons outside of the firm. (Heyison Decl. ¶ 2.)  The Court finds Mr. Heyison's declaration and deposition testimony to be credible and persuasive.  At the preliminary injunction hearing on this matter, and in the parties' briefing, Mr. Heyison's declaration and deposition testimony were unrebutted.

3.     For the reasons set forth *infra*, this Court does not credit the declaration offered by Mr. Delaney's counsel, Mr. Robert Rotman (the "Rotman Affirmation"), as its contents and its attachments offer no evidence that rebuts the evidence presented by HC2.

4.     To the extent still a matter of dispute, Mr. Heyison executed his declaration without knowing that Delaney's counsel had submitted his own declaration.  (Heyison Dep. 43:645:15.)

5.     At the heart of this preliminary injunction proceeding is the question of whether Mr. Delaney filed a complaint ("Florida Complaint") in the state of Florida styled as *John Doe v. Toyota Motor Corporation ("Toyota") et al*, in and for Brevard County Florida, Eighteenth Judicial Circuit, Case No. 05-2020-CA-024281 (the "Florida Action"), which impermissibly disclosed attorney-client privileged, attorney work product and otherwise confidential information that Mr. Delaney learned as a result of his employment with HC2 as a contract attorney assigned

to a document review project ("Project") for the Law Firm Customer and its client ("Corporate Client").

6.      Mr. Heyison is familiar with the complaint in the instant litigation.  The Law Firm Customer is the law firm referenced in the complaint.  The name of the Law Firm Customer's client is referenced in this Order as the "Corporate Client," which is how it was referred to in the complaint and in the Heyison and Zannikos declarations and deposition testimony.  (Heyison Decl. ¶ 4; Zannikos Decl. ¶ 17; Complaint ¶ 1.)

7.      Though styled as a "John Doe" complaint, Mr. Delaney admitted in response to Requests for Admission propounded by HC2 that he was the Plaintiff who filed the Florida Complaint.  (Delaney Answer to Request for Admission No. 8 Propounded by HC2, Exhibit C to the Declaration of Ronald R. Rossi ("Rossi Dec."); Zannikos Decl. ¶ 42.)  The press has also reported that Mr. Delaney has stated that he is the plaintiff who filed the Florida Complaint. (Heyison Decl. ¶ 30.)

8.      Based upon my review of the record, including Mr. Zannikos' declaration and deposition testimony, and Mr. Heyison's declaration and deposition testimony, the Court finds that the Florida Complaint discloses privileged and confidential information belonging to the Law Firm Customer and the Corporate Client that Mr. Delaney obtained when he provided legal services through HC2.  (Heyison Decl. ¶ 3, 33-34; Heyison Dep. 49:5-52:15, 53:8-54:7, 54:17-56:4; Zannikos Decl. ¶ 42; Zannikos Dep. 63:14-64:10.)

## II.    Relevant Background

9.      HC2, was founded in 1987 and is incorporated in the District of Columbia with its principal place of business in Chicago, Illinois, where HC2's high level officers are located, including the HC2's head of finance and staff, and where those officers direct control and coordinate HC2's activities.  (Zannikos Decl. ¶ 3; Zannikos Dep. 10:5-7, 67:8-20.)  HC2 is a legal

staffing company that provides attorneys, paralegals, and other legal professionals ("Contract Professionals") to satisfy the short-term and long-term staffing needs of its third party customers, including law firms, corporations and government agencies. (Zannikos Decl. ¶ 3.) HC2 provides workspace, IT infrastructure, project management, and related services (collectively "HC2 Services"). (Zannikos Decl. ¶ 3, Exhibit A.)

10.     HC2 has twelve office locations throughout the United States, including in New York City. (Zannikos Decl. ¶ 4.) HC2's New York office at 360 Lexington Avenue, New York, NY 10017 ("HC2 NYC Location") has multiple conference rooms that are designated as workspaces for customer projects. (Zannikos Decl. ¶ 4.)

11.     HC2 has a reputation as one of the preeminent legal staffing agencies in the industry. (Zannikos Decl. ¶ 5.) For example, in 2019, HC2 was ranked second on Staffing Industry Analysts' annual list of *Largest Legal Staffing Firms in the US*, and HC2's President and CEO was named one of *150 Global Power Women in Staffing* by the Staffing Industry Analysts. (Zannikos Decl. ¶ 5.)

12.     HC2's status as a leader in the legal staffing industry is due to its reputation for employing the most qualified and professional contract attorneys. (Zannikos Decl. ¶ 6.) Many of HC2's engagements are repeat business. (Zannikos Decl. ¶ 6.) New business is driven primarily by referrals from current and past customers. (Zannikos Decl. ¶ 6.) HC2's reputation and goodwill depends upon the performance and conduct of each Contract Professional. (Zannikos Decl. ¶ 6.)

13.     To maintain its goodwill, HC2 must provide highly competent and trustworthy Contract Professionals who abide by their professional obligations as attorneys and paralegals. (Zannikos Decl. ¶ 7.) Those obligations include preserving the confidentiality of information

learned while working with HC2's law firm customers and their legal clients.  (Zannikos Decl. ¶ 7.)

### III.   HC2 Hired Mr. Delaney as an At-Will, Temporary Contract Attorney

14.   When Mr. Delaney executed HC2's Employment Agreement on December 28, 2016 (the "Employment Agreement"), he became employed by HC2.   (Zannikos Decl. ¶ 8; Zannikos Dep. 16:4-7.)  The Employment Agreement incorporated a Confidentiality and Non-Disclosure Agreement (the "NDA").   (Zannikos Decl. ¶ 8, Exhibit A.)   The Employment Agreement also incorporated certain rules of conduct (the "Conduct Rules") and an employee handbook (the "Employee Handbook").  (Zannikos Decl. ¶ 8, Exhibits B, C; Zannikos Dep. 26:15-24, 27:3-20.)  On the same date, Mr. Delaney also executed an acknowledgement form in which he agreed to adhere to the Conduct Rules and Employee Handbook (the "Policies Acknowledgment").  (Zannikos Decl. ¶ 8, Exhibit D).

#### A.   Mr. Delaney Was an At-Will Employee of HC2 During His Placement

15.   The Employment Agreement Mr. Delaney signed expressly provides that he was, at all relevant times, an at-will employee, that any assignment to one of HC2's client's would be "on an interim/temporary basis," and that when "[Delaney] is placed by [HC2] with a[] [HC2] client, [Delaney] remains a[n] [employee] of [HC2] during the period of such temporary placement."  (Zannikos Decl. ¶ 9, Exhibit A at HC2-00000056; *see also* Zannikos Dep. 14:12-14.)  After Mr. Delaney was hired, HC2 could assign him to temporary projects with its customers.  (Zannikos Dep. 14:12-22, 19:10-22.)

#### B.   Mr. Delaney Was Obligated to Maintain Confidentiality

16.   Confidentiality is central to HC2's business.  HC2's clients must be able to trust that HC2 employees -- particularly a contract attorney assigned to review and analyze confidential documents -- will abide by their contractual and professional obligations to maintain client

5

confidences.  (Zannikos Decl. ¶ 10.)  In order to protect confidentiality and privilege, HC2 required Mr. Delaney to sign the NDA, which strictly forbids him from disclosing any confidential and privileged information or communications.  (Zannikos Decl. ¶ 10, Exhibit A at HC2-00000058.) The Employee Handbook and Conduct Rules provide additional guidance with respect to Delaney's obligation to preserve client confidences and privileges.  (*See* Zannikos Decl. ¶ 10, Exhibit C at HC2-00000026, Exhibit D.)

17.     The NDA defines "Confidential Information" as "confidential and proprietary information, ideas, data and/or materials belonging to the Clients or their clients, including but not limited to information concerning their respective existing and future businesses which are secret and not generally known and/or available to third parties . . . ."  (Zannikos Decl. ¶ 11, Exhibit A at HC2-00000058.)  The Employee Handbook adds that Confidential Information also includes but is not limited to, "[c]ompensation data," "[f]inancial data," and "[i]ndividual client data[.]" (Zannikos Decl. ¶ 11, Exhibit C at HC2-00000026.)

18.     Pursuant to the Employment Agreement, Mr. Delaney unequivocally agreed "not to divulge any confidential information . . . obtained in the course of any assignment with an HC client to which Attorney has provided temporary services under this Agreement as described in Exhibit A, attached hereto and made a part hereof."  (Zannikos Decl. ¶ 12, Exhibit A at HC2-00000057.)

19.     Pursuant to the NDA, Mr. Delaney further agreed "to keep, hold, [] maintain in confidence . . . and not [] disclose, directly or indirectly, to any third party" all Confidential Information "of every kind and character" that he "obtained in the course of any assignment . . . ." (Zannikos Decl. ¶ 13, Exhibit A at HC2-00000058.)  Mr. Delaney also agreed not to "exploit such Confidential Information for personal or other purposes under any circumstances . . . ."  (Zannikos

Decl. ¶ 13, Exhibit A at HC2-00000058.)   The NDA also required Mr. Delaney to, "upon termination of [his] temporary assignment," return all Confidential Information "in [his] possession or under [his] control" to the HC2 client.  (Zannikos Decl. ¶ 13, Exhibit A at HC2-00000058.)  By the NDA's express terms, Mr. Delaney agreed that his duties thereunder were binding and remained in full force and effect "indefinitely" even after his "relationship with [HC2] or any of its Clients terminates."  (Zannikos Decl. ¶ 13, Exhibit A at HC2-00000058.)

20.     By virtue of the agreements he signed, Mr. Delaney affirmatively acknowledged that information he obtained during any HC2 assignment was confidential and that he could not disclose any such information to third parties.  (Zannikos Decl. ¶ 14.)

**C.     Mr. Delaney Agreed to Abide by HC2's Employment Rules and Policies**

21.     The Employment Agreement that Mr. Delaney signed incorporated HC2's Conduct Rules.  (Zannikos Decl. ¶ 15; Exhibit A at HC2-00000057).  The Conduct Rules provide, among other things, that "concerns regarding your employment [should be] voiced directly [to] your HC2 recruiter."  (Zannikos Decl. ¶ 15; Exhibit B at HC2-00000013.)  The Conduct Rules also clearly state that under no circumstance should Mr. Delaney contact an HC2 client before, during or after an assignment to one of HC2's customers: "[c]ontacting anyone from the client . . . is against [HC2] policy."  (Zannikos Decl. ¶ 15; Exhibit B at HC2-00000014.)  Thus, Mr. Delaney agreed to raise any concerns related to any HC2 Engagement with HC2 only and to never contact an HC2 client.  (Zannikos Decl. ¶ 15.)

**D.     Mr. Delaney Owed HC2 a Duty of Loyalty**

22.     Mr. Delaney was bound by a duty of loyalty to HC2, arising from the employer-employee relationship and memorialized in the Employee Handbook incorporated into the Employment Agreement.  (Zannikos Decl. ¶ 16.)  Specifically, the Employee Handbook expressly prohibited Mr. Delaney from "tak[ing] any action that is contrary to [HC2's] business interests or

incompatible with the loyalty and obligation inherent in [his] employment." (Zannikos Decl. ¶ 16; Zannikos Decl. Exhibit C at HC2-00000025.)

**IV.**     **HC2 is Retained by the Law Firm Customer**

23.     The Law Firm Customer has been representing the Corporate Client in a confidential matter (the "Matter"). While Mr. Heyison was not personally involved in the Matter, he has become familiar with it in his role as the Law Firm Customer's General Counsel as a result of Mr. Delaney's actions. Prior to Mr. Delaney's disclosures, information about the Matter, including the fact that it was being conducted, its subject matter, and its geographic focus had not been revealed outside of the Corporate Client, its attorneys, and certain vendors such as HC2 that provided support services under a duty of confidentiality. (Heyison Decl. ¶ 5; Heyison Dep. 12:12-14:9.)

24.     In order to assess the Matter and provide the Corporate Client appropriate legal advice, the Law Firm Customer had to collect, review, and assess a large volume of documents. The volume was sufficiently large to require retention of a vendor that could provide a team of temporary lawyers to assist in that review and a technology platform to facilitate the review. (Heyison Decl. ¶ 6). The Matter concerned the Corporate Client's privileged and confidential information, and therefore maintaining confidentiality of the Matter and all documents, information, and analysis was of the utmost importance. (Heyison Decl. ¶ 7.)

25.     The Law Firm Customer considered several legal staffing vendors, and ultimately retained HC2. (Heyison Decl. ¶ 8.) One of the key factors in that decision was HC2's commitment to provide secure and confidential services. (Heyison Decl. ¶ 8.) HC2 offered secure document review centers, dedicated review rooms with physical security measures, and security cameras that allowed remote monitoring. (Heyison Decl. ¶ 8.)

26.     In addition, HC2 committed to rigorous evaluation of candidates for the Project, including a proprietary credentialing process, criminal background checks, a credit check, education/graduation/degree verification, verification of bar admissions and standing, review of work experience, and a check of conflicts interest.  (Heyison Decl. ¶ 9.)

27.     HC2 also required its employees to enter into employment agreements including promises to protect client information.   Mr. Delaney's employment agreement with HC2 contained his promise "not to divulge any confidential information, proprietary information or trade secrets obtained" during work for any HC2 client and "to keep, hold, and maintain in all confidence all…Confidential Information" of HC2's clients.  Mr. Delaney agreed that Confidential Information included "confidential and proprietary information, ideas, data and/or materials belonging to [HC2's] Clients [e.g., Law Firm Customer] or their clients [e.g., the Corporate Client], including but not limited to information concerning their respective existing and future businesses which are secret and not generally known and/or available to third parties."  (Heyison Decl. ¶ 10, Zannikos Decl. Exhibit A.)

28.     On or about September 25, 2019, HC2 entered into an agreement with the Law Firm Customer and the Corporate Client (the "Project Agreement").  (Zannikos Decl. ¶ 17, Exhibit E.)  Pursuant to the Project Agreement, HC2 agreed to provide Contract Professionals, including contract attorneys fluent in particular foreign languages for the Project, which the Law Firm Customer was performing on behalf of the Corporate Client.  (Zannikos Decl. ¶ 17, Exhibit E.) The Project Agreement detailed the services that HC2 agreed to provide to the Law Firm Customer and its Corporate Client.  Specifically, the Project Agreement required HC2 to provide fourteen attorneys and two project managers, all of whom were to have particular foreign language fluency. (Zannikos Decl. ¶ 19; Exhibit E at HC2-00000285.)  The Project Agreement also required HC2 to

supply workspace in New York City for the Contract Professionals to work on the Project. (Zannikos Decl. Exhibit E at HC2-00000285.)  The Law Firm Customer supervised the substantive aspects of the Project with HC2 assigning day-to-day supervisors.  (Zannikos Decl. ¶ 17, Exhibit E at HC2-00000278, HC2-00000285–HC2-00000286.)  The Project Agreement required HC2 to staff the Project with attorneys or project managers, the Law Firm Customer did not authorize, nor did the Project Agreement contemplate, that HC2 would staff the Project the with non-attorney foreign language reviewers, translators or consultants -- only licensed attorneys and project managers.  (Zannikos Decl. Exhibit E at HC2-00000278, HC2-00000285–HC2-00000287.)

29.     All materials and information associated with the Project were deemed confidential.  (Zannikos Decl. Exhibit E at HC2-00000279–HC2-00000280, HC2-00000287.)  The Project Agreement also established HC2 and the Law Firm Customer's obligations and responsibilities with respect to protecting privileged information.  For example:

> Any Confidential Information may include materials subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege ("Privileges"), the disclosure of such materials to [HC2] pursuant to this Agreement is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under any Privileges. Information, documents, or materials generated or prepared by or on behalf of [HC2], [Law Firm Customer], or [the Corporate] Client in connection with the Services are prepared or generated to assist [Law Firm Customer] in the rendering of legal advice and are protected by Privileges. All documents and other materials generated or prepared by [HC2] in connection with the Services shall be created only at [the Law Firm Customer's] direction, shall be marked "Privileged and Confidential — Attorney Work Product," and shall become and remain the property of [the Law Firm Customer].

(Zannikos Decl. ¶ 18, Exhibit E at HC2-00000280.)

30.     Prior to executing the Project Agreement, the Law Firm Customer had asked HC2 to identify 14 attorneys for the Project, including 10 who were fluent in a particular foreign language and 4 who were fluent in a different foreign language.  (Zannikos Decl. ¶ 19, Exhibit E

at HC2-00000285.)  The specific requirements for assignment included:  passing a criminal background check; passing a global sanctions check; clearing conflicts; and active and good standing membership with the Bar of the jurisdiction where the HC2 Contract Professional would be working.  (Zannikos Decl. ¶ 19, Exhibit E at HC2-00000285.)  To that end, on September 11, 2019, an HC2 recruiter emailed Mr. Delaney to notify him that "[HC2] is currently seeking [a foreign language] Fluent Attorney candidates for a document review project," and the recruiter stated the requirements for placement on the Project, which were fluency in [that foreign language], bar membership from any U.S. state (preferred), J.D. or L.L.M. degree (preferred), experience in the practice of law or document review preferred and authorization to work in the United States without a sponsor.  (Zannikos Decl. ¶ 19, Exhibit F.)  The email provided instructions for Mr. Delaney to submit his candidacy, which involved providing a current resume and answering qualification questions about his [foreign language] fluency, bar admission and current legal employment.  (Zannikos Decl. ¶ 19, Exhibit F.)  Mr. Delaney responded to the recruiter's email that same day stating that he was available for the Project.  (Zannikos Decl. ¶ 19, Exhibit G.)  Minutes later, Mr. Delaney emailed the recruiter again to answer the screening questions, stating that he was fluent in the requisite foreign language, admitted to practice in New York and Arizona and that he did not have any conflicting legal employment such that HC2 could ensure that Mr. Delaney did not have a conflict under the relevant ethical rules.  (Zannikos Decl. ¶ 19, Exhibit H.)  Mr. Delaney submitted his resume to the recruiter the next day.  (Zannikos Decl. ¶ 19, Exhibit I.)

31.    Consistent with the Project Agreement, all HC2 employees assigned to the Project were attorneys.  (Zannikos Decl. ¶ 20.)

11

32.     On September 12, 2019, after Mr. Delaney completed a conflicts check form, the HC2 recruiter submitted the names and resumes of Mr. Delaney and other HC2 contract attorneys to the Law Firm Customer for consideration for assignment to the Project.  (Zannikos Decl. ¶ 21, Exhibit J; Zannikos Dep. 21:8-22:23.)  The Law Firm Customer initially selected three lawyers for the New York-based review; one of them was Mr. Delaney.  According to the information HC2 provided to the Law Firm Customer, Mr. Delaney is a lawyer licensed to practice in New York, who graduated from Harvard Law School and was formerly an associate at Skadden, Arps, Slate, Meagher & Flom LLP.  (Heyison Decl. ¶ 11; Heyison Decl. Exhibit 1.)

33.     On September 13, a Law Firm Customer contact replied to the HC2 recruiter that "[t]he case team would like to onboard all of the below 3 contract attorneys to this review . . . ." (Zannikos Decl. ¶ 21, Exhibit J at HC2-00000219.)  The HC2 recruiter then informed Mr. Delaney that he had been selected for assignment to the Project.  (Zannikos Decl. ¶ 21, Exhibit L.)  The Project ultimately commenced on September 30, 2019.  (Zannikos Decl. ¶ 21.)  Months later, on or about February 21, 2020, the recruiter who recruited Mr. Delaney to the Project resigned from HC2, but in a parting email to Delaney's personal email account, the recruiter provided Mr. Delaney with contact information to use going forward.  (Zannikos Decl. ¶ 21, Exhibit M.)  That email instructed Mr. Delaney to direct any questions at all -- other than onboarding, payroll, timesheets and benefits questions -- to HC2's Senior Managing Director, Denise Asnes.  (Zannikos Decl. ¶ 21, Exhibit M.)

34.     Mr. Delaney reported to the HC2 NYC Location on September 30, 2019 to begin work on the Project.  (Zannikos Decl. ¶ 22; Zannikos Dep. at 68:2-8.)  Prior to beginning his work on the Project, on September 30, Mr. Delaney and the other attorneys executed a confidentiality agreement with the Law Firm Customer (the "Law Firm NDA").  (Zannikos Decl. ¶ 22, Exhibit

N.)  He also executed a temporary services agreement with the Law Firm Customer that day (the "Law Firm Services Agreement").  (Zannikos Decl. ¶ 22, Exhibit O at HC2-00000005.)  Mr. Delaney also signed an acknowledgment confirming that he received other onboarding materials for the project on October 1, 2019.  (Zannikos Decl. ¶ 22, Exhibit P at HC2-00000158).)

### A.   The Law Firm Services Agreement

35.     Pursuant to the Law Firm Services Agreement, Mr. Delaney acknowledged he was "assigned to the [Law Firm Customer] to provide temporary services … [and] underst[oo]d that the need for [his] temporary services may be terminated by [the Law Firm Customer] at any time and at will for any reason, without resort to disciplinary or other procedures *normally followed for employees*."  (Zannikos Decl. ¶ 23, Exhibit O at HC2-00000005 (emphasis added).)  Thus, Mr. Delaney acknowledged and agreed that he had been assigned by HC2 to the Law Firm Customer for a temporary engagement, which could be terminated at any time for any reason, and that he was not an employee of the Law Firm Customer or the Corporate Client.  (Zannikos Decl. ¶ 23, Exhibit O at HC2-00000005.)  In fact, throughout Delaney's employment on the Project, he was paid by HC2 *and not the Law Firm Customer or the Corporate Client*.  (Zannikos Decl. ¶ 23, Exhibit O at HC2-00000005 (emphasis added).)  Mr. Delaney also indicated on the onboarding paperwork that he considered himself and the services he was providing the Law Firm Customer as falling under "Legal Personnel."  (Zannikos Decl. ¶ 23, Exhibit O at HC2-00000005.)

### B.   The Law Firm NDA

36.     Before the HC2 lawyers began work on the Matter, each of them, including Mr. Delaney signed an additional non-disclosure agreement with the Law Firm Customer (the "Law Firm NDA").  Under the Law Firm NDA, Mr. Delaney "agreed that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Firm's business or financial affairs…is and shall be the exclusive property of [the Law Firm Customer]"

13

and that he would "not to disclose any [such information] other than to employees or partners of [the Law Firm Customer] or use the same for any purposes (other than in the performance of [his] duties or services for [the Law Firm Customer])."  (Zannikos Decl. ¶ 24, Exhibit N at HC2-00000003.)  Mr. Delaney also agreed that his "obligations not to disclose or to use information and materials of the types set forth above…extend to such types of information, materials and tangible property of clients of [the Law Firm Customer]."  (Heyison Decl. ¶ 12; Heyison Decl. Exhibit 2; Zannikos Decl. ¶ 26, Exhibit N at HC2-00000003.)  Mr. Delaney further agreed that any materials containing confidential information, including but not limited to documents, photographs or any other tangible or intangible material, "whether created by me or others, which come into my custody or possession or to which I otherwise have access, shall be and are the exclusive property of the Firm to be used by me only in the performance of my duties or services for the Firm[.]"  (Zannikos Decl. ¶ 25, Exhibit N at HC2-00000003.)

37.    Additionally, Mr. Delaney agreed that his "obligations not to disclose or to use information and materials of the types set forth above and to return materials and tangible property, as set forth above, also extend to such types of information, materials and tangible property of [the Corporate Client] or other third parties who may have disclosed or entrusted the same to the [Law Firm Customer] or me as part of the [Law Firm Customer's] representation of [the Corporate Client] . . . ."  (Zannikos Decl. ¶ 26, Exhibit N at HC2-00000003.)  Mr. Delaney "agree[d] to comply with any additional non-disclosure and property policies and guidelines that [the Corporate Client] may require as part of the [Project], *and I understand that it is my obligation to learn such restrictions and/or policies prior to undertaking any work on behalf of* [*the Corporate Client*]."  (Zannikos Decl. ¶ 26, Exhibit N at HC2-00000003.)

38.     Finally, Mr. Delaney acknowledged and agreed that, as an attorney, he was "bound by the rules of professional conduct for the jurisdiction(s) where I am admitted to practice law . . . [and] any questions regarding my ethical obligations under this policy or the applicable rules of professional conduct … [must be directed to] a member of the [Law Firm Customer's] Office of General Counsel."  (Zannikos Decl. ¶ 27, Exhibit N at HC2-00000004.)

39.     Mr. Delaney further agreed in his NDA with the Law Firm Customer that he is obligated to comply with the rules of professional conduct for the jurisdictions where he is admitted to practice.  Mr. Delaney is admitted in New York, he provided legal services for the Law Firm Customer and its Corporate Client there, and his conduct is governed by the New York Rules of Professional Conduct.  (Heyison Decl. ¶ 13.)

## V.     Mr. Delaney Received Privileged or Otherwise Confidential Information While Engaged as an Attorney Working on the Project

40.     On September 30, 2019, after the HC2 lawyers had executed the necessary agreements, the Law Firm Customer provided a training to Mr. Delaney and others about the Matter.  (Heyison Decl. ¶ 14.)  As part of that training, the Law Firm Customer provided Mr. Delaney and his fellow HC2 team members a 22-page memorandum and document review protocol (the "Protocol").  (Heyison Decl. ¶ 14.)  Each page was marked "Privileged and Confidential: Attorney Client Communication [and] Attorney Work Product."  (Heyison Decl. ¶ 14.)  The Law Firm Customer lawyers leading the training then discussed the Protocol document in a meeting with the HC2 lawyers. (Heyison Decl. ¶ 14; Heyison Dep. 61:7-65:9.)

41.     The Law Firm Customer instructed the HC2 attorneys that the review is confidential and protected by the attorney-client privilege and the attorney work product doctrine; that reviewers are ethically obligated to keep all information, documents, and communications, including the Matter's subject matter, completely confidential; that their confidentiality

obligations continue after the Matter has ended; and that the HC2 lawyers should be especially careful not to discuss the Matter with anyone outside of the group of HC2 and Law Firm Customer colleagues with whom they are working directly on the Matter. (Heyison Decl. ¶ 15.)

42.     Through the Protocol and training, the Law Firm Customer also gave the HC2 lawyers a detailed analysis of the relevant laws, the facts as the Law Firm Customer understood them as of that point, the questions and legal issues that gave rise to the Matter, the legal and factual issues for review, and the types of information the Law Firm Customer considered relevant and potentially noteworthy. (Heyison Decl. ¶ 16.)

43.     The Law Firm Customer also instructed the HC2 lawyers that, in addition to reviewing documents for relevance to a range of issues, they should use the comment field to identify the particular portions of long documents that they deemed to be relevant and if not obvious indicate why the document is relevant. (Heyison Decl. ¶ 17.) For documents identified by the reviewer as potentially noteworthy, the HC2 lawyers were asked to include an explanation for their designations. (Heyison Decl. ¶ 17.)

44.     Among the legal services Mr. Delaney and his other lawyer colleagues provided were analyzing documents, including documents that were privileged communications of the Corporate Client, to determine whether and how the documents related to a variety of legal and factual issues; identifying additional issues that may be appropriate for further inquiry, conducting focused reviews of documents for certain issues; developing strategies to research emerging issues identified from the available documents; identifying documents that may have particular significance to the Matter; and drawing connections between documents to assist the Law Firm Customer in gaining a better understanding of the underlying issues in the Matter. (Heyison Decl. ¶ 18.)

45.     During the course of the review, the Law Firm Customer lawyers and personnel were available for guidance, advice, and questions, and provided feedback, made suggestions, and ensured that the reviewers were alerted to new information that was relevant to their work. (Heyison Decl. ¶ 19.)  Over time, the Law Firm Customer refined the issues that were under review and adjusted the review protocol as appropriate.  (Heyison Decl. ¶ 19.)

46.     Mr. Delaney worked on the Project over a period of approximately five months. (Heyison Decl. ¶ 20; Heyison Dep. 24:17-24:25.)  During that time, he reviewed thousands of documents, highlighted a number of documents he believed were of significance, and sent emails explaining his views as to the relevance of certain documents.  (Heyison Decl. ¶ 20; Heyison Dep. 26:12-27:8)  Some of the documents Mr. Delaney reviewed were written in English, and some were written in a foreign language in which he is fluent.  (Heyison Dep. 14:22-15:8.)  While his foreign language proficiency was helpful, Mr. Delaney, like the other HC2 attorneys, was hired to provide legal services as outlined in the various agreements.  (Heyison Dep. 17:10-17:14, 18:3-19:17, 33:3-19.)

47.     Mr. Delaney provided legal services to the Law Firm Customer and the Corporate Client.  (Heyison Dep. 17:10-17:14, 18:3-19:17.)  Translation only services are generally available at lower cost, and the Law Firm Customer engaged a separate vendor to provide translation services.  (Heyison Decl. ¶ 21; Heyison Dep. 33:24-34:12)  Mr. Delaney's language skills were not indispensable to the review of documents related to the Matter.  (Heyison Dep. 33:20-33:23.)

48.     Mr. Delaney prepared memoranda in the document review platform, and in emails to the Law Firm Customer, concerning legal and factual issues, and in particular, his memoranda explaining why he believed certain documents were significant.  (Heyison Dep. 19:21-23:9.)

49.     Over the course of the document review, Mr. Delaney exercised his legal judgment, identifying whether documents were relevant to certain issues and whether he considered a document significant to the Matter.  (Heyison Decl. ¶ 22.)

50.     In working on the Matter, the Law Firm Customer entrusted Mr. Delaney with attorney work product, including the Law Firm Customer's thoughts and impressions, as well as with client confidences including highly sensitive confidences.  In so doing, the Law Firm Customer expected Mr. Delaney to honor his contractual obligations and his professional obligations as an attorney admitted in New York State to protect those confidences and that information.  (Heyison Dep. at 49:5-52:15.)

## VI.     <u>The Suspension of the Project</u>

51.     During the first half of March, as COVID-19 was spreading at rapid and unanticipated pace throughout the United States, but in particular New York City, HC2 was monitoring the situation based on publicly available information -- just like any other employer. (Zannikos Decl. ¶ 28.)  On March 2, 2020, Patti Ayala, HC2's Vice President of Human Resources and Administration, emailed the Contract Professionals, including Delaney, to advise them that HC2 was monitoring the situation and that they should too, and instructed them not to come to the office if they were symptomatic.  (Zannikos Decl. ¶ 28, Exhibit Q at HC2-00000177.)  The email also referred Mr. Delaney to the CDC website for additional information as well.  (Zannikos Decl. ¶ 28, Exhibit Q at HC2-00000177.)  Ms. Ayala sent an update email on March 12, informing Mr. Delaney of HC2's efforts to help prevent the spread of COVID-19.  (Zannikos Decl. ¶ 28, Exhibit R at HC2-00000180.)  Mr. Delaney did not respond to either message.  (Zannikos Decl. ¶ 28.)

52.     By the week of March 16, 2020, the press reports were reporting that many experts believed that the State of New York needed to take more drastic action to address the spread of

COVID-19, particularly in New York City, and that New York's response would likely involve closing businesses in New York City. (Zannikos Decl. ¶ 29.)

53.     On the morning of March 17, 2020, Mr. Delaney sent an email to other Hire Counsel Contract Professionals working on the Project in New York and London, regarding his concerns about the risk of contracting COVID-19 while working at the HC2 NYC Location. (Zannikos Decl. ¶ 30, Exhibit S at HC2-00000273.) Mr. Delaney asked to work on the Project remotely or be paid to stay home, without working, if remote work was not approved. (Zannikos Decl. ¶ 30, Exhibit S at HC2-00000273.)

54.     After consideration, including concerns about security for confidential information, it was decided not to move to remote review. Later on March 17, 2020, the Law Firm Customer asked HC2 to suspend the review in New York and HC2 notified all of the New York reviewers that the review was suspended immediately. (Heyison Decl. ¶ 23; Heyison Dep. 34:13-16; Zannikos Decl. ¶ 31; Zannikos Dep. 48:12-14; 56:16-57:2.)

55.     During this same time period, other HC2 customers did not authorize remote document review. (Zannikos Dep. 79:8-24.)

56.     Upon being notified of that the Law Firm Customer elected to suspend the Project, HC2's Senior Managing Director informed Mr. Delaney *and the two other HC2 attorneys working on the Project* in the New York area of this decision, as follows:

> We understand and appreciate everyone's concerns regarding the work environment and well-being of those around you. Most importantly, we understand the need for an immediate response regarding remote work. At this time, the client is electing to suspend work on the case in NYC effective immediately. Please note that remote work has not been authorized for this project, as of now. . . . You will be compensated for your time today. We will continue to monitor the efforts of Congress in helping to off-set the impact of lost work.

(Zannikos Decl. ¶ 31, Exhibit T.)

57.     Under the Employment Agreement, Mr. Delaney was only entitled to be paid for hours he worked on the Project, which it did.  (Zannikos Decl. ¶ 32.)  HC2 did not terminate Delaney's employment under the Employment Agreement, rather, the March 17 email from HC2's Senior Managing Director informed Mr. Delaney that "[i]f a decision to re-start the project in NYC is made, we will contact you – directly."  (Zannikos Decl. ¶ 32, Exhibit T at HC2-00000182); Zannikos Dep. 69:11-70:8.)

58.     On the afternoon of March 17, 2020, Mr. Delaney sent an email to one of the Law Firm Customer's lawyers supervising the Project, and copied the firm's Co-Managing Partners as well as and 14 members of its Management Committee.  In that email, Mr. Delaney complained about the suspension of the Project and that he expected the Law Firm Customer and HC2 to pay.  Mr. Delaney's email was referred to Mr. Heyison and since then Mr. Heyison provided advice to the firm's management and its lawyers concerning this and other correspondence sent by Mr. Delaney; the instant lawsuit; and the April 15, 2020 Florida Complaint.  (Heyison Decl. ¶ 3.)

59.     On March 18, New York Governor Andrew Cuomo signed the initial stay-at-home Executive Order, which required all "non-essential" New York businesses to reduce their in-person workforce at any work location by 50%.  (Zannikos Decl. ¶ 33.)  On March 19, Governor Cuomo issued another Executive Order that required all "non-essential" New York businesses to reduce their in-person workforce at any work location by 75%.  (Zannikos Decl. ¶ 33.)  And on March 20, Governor Cuomo issued yet another Executive Order, which required all "non-essential" New York businesses to reduce their in-person workforce at any location by 100%.  (Zannikos Decl. ¶ 33.)

60.     The Law Firm Customer eventually suspended the Project in the other HC2 locations that were involved in the Project (Los Angeles and the United Kingdom).  (Zannikos

Dep. 57:11-22.)  HC2 employee Brian Harstein, a salesperson at HC2, did not play a role in the determination to suspend the project.  (Zannikos Dep. 75:18-76:10.)  As of March 23, 2020, the HC2 NYC Location was closed to all employees and has remained closed since then.  (Zannikos Dep. 68:5-69:10.)  Mr. Zannikos began working from home shortly thereafter.  (Zannikos Dep. 80:16-81:4.)

61.     Mr. Delaney did not accept the Law Firm Customer's decision to suspend the Project.  Within hours of being advised that the review had been suspended and over the next several weeks, in a series of emails and letters sent to the Law Firm Customer's management and to executives at the Corporate Client, Mr. Delaney claimed to have been wrongfully terminated in retaliation for raising concerns over the work environment and COVID-19.  Later, Mr. Delaney also complained about what he claimed was the unauthorized disclosure of his name and involvement in the document review project to others during the fall of 2019, and he threatened litigation if his demands for payment were not met.  (Heyison Decl. ¶ 24.)  Mr. Delaney also falsely claimed that HC2 illegally terminated him in retaliation for raising concerns about COVID-19 and demanding payment.  (Zannikos Decl. ¶ 34, Exhibit U (D-15–D-17.)

62.     HC2 had not authorized Mr. Delaney to contact the Law Firm Customer directly after the Project was suspended, and the Conduct Rules prohibited him from doing so.  (Zannikos Decl. ¶ 34, *supra* at ¶21.)  The Law Firm Customer emailed Mr. Delaney back to inform him that the Law Firm Customer had not requested Delaney's termination but had merely suspended the Project.  (Zannikos Decl. ¶ 34, Exhibit U at D-16.)  As of March 17, Mr. Delaney was still eligible to work on the project if the suspension was lifted.  (Zannikos Dep. 69:11-15.)  Mr. Delaney was also eligible to work on other HC2 projects if a client had selected him for participation.  (Zannikos Dep. 69:16-21.)  Therefore, the only change to Delaney's employment status as of March 17, was

that the project he was working on was suspended, but he was otherwise eligible for reassignment or a new assignment.  (Zannikos Dep. 69:22-70:3.)  The other New York reviewers assigned to the Project had the exact same employment status as Mr. Delaney after March 17.  (Zannikos Dep. 70:4-8.)

63.     On March 18, Mr. Delaney responded to the Law Firm Customer's email, this time accusing its attorneys of colluding with the Corporate Client to terminate him in retaliation for raising concerns about workplace safety.  (Zannikos Decl. ¶ 35, Exhibit U at D-15.)

64.     HC2's vice president of human resources, Ms. Ayala, and Mr. Zannikos called Mr. Delaney on March 18 to discuss the concerns he had raised to the Law Firm Customer and Corporate Client.  (Zannikos Decl. ¶ 36.)  But, Mr. Delaney refused to speak with Ms. Ayala and Mr. Zannikos, insisting, instead, that HC2 communicate with him only in writing.  (Zannikos Decl. ¶ 36, Exhibit V at HC2-00000187.)  Ms. Ayala then attempted to contact Mr. Delaney twice by email on March 19 and March 27 to follow up on his concerns and to remind him that maintaining confidentiality and attorney-client privilege was of the utmost importance.  (Zannikos Decl. ¶ 36, Exhibit W at HC2-00000189-HC2-00000190.)  Mr. Delaney never responded.  (Zannikos Decl. ¶ 36.)

## VII.   Mr. Delaney Seeks to Exploit the Corporate Client's Confidential Information

65.     The Law Firm Customer and the Corporate Client considered Mr. Delaney's communications on and after March 17 troubling.  (Heyison Decl. ¶ 25.)  Among other things, Mr. Delaney directed the communications to senior people within the Law Firm Customer and the Corporate Client who had nothing to do with, and did not even know about, the HC2 review. (Heyison Decl. ¶ 25.)  For example, Mr. Delaney sent several other emails to the Law Firm Customer's Co-Managing Partners and members of the firm's Management Committee.  He also

sent emails to an executive of the Corporate Client.  (Heyison Decl. ¶ 25; Heyison Decl., Exhibits 3, 4, 5.)

66.     At some point, Mr. Delaney engaged counsel and, on March 27, his attorney informed the Law Firm Customer that he represented Mr. Delaney and asked the Law Firm Customer to direct all correspondence regarding Mr. Delaney to the attorney moving forward. (Zannikos Decl. ¶ 37.)  Delaney's lawyer also made a $450,000 demand on his behalf.  (Heyison Dep. 65:25-66:25.)  In response to these communications, on March 27, Mr. Heyison emailed Mr. Delaney in his capacity as the Law Firm Customer's General Counsel.  (Heyison Decl. ¶ 26, Exhibit 6.)   Among other things, Mr. Heyison told Mr. Delaney that Mr. Heyison would be representing the Law Firm Customer and that Mr. Delaney should communicate with Mr. Heyison and not engage in further direct communications with other Law Firm Customer personnel. (Heyison Decl. ¶ 26; Heyison Decl. Exhibit 6.)  Mr. Heyison also told him Mr. Delaney that one of the Law Firm Customer's partners was representing the Corporate Client and that Mr. Delaney should direct all future communications regarding the Corporate Client to that partner.  (Heyison Decl. ¶ 26; Heyison Decl. Exhibit 6.)  Finally, Mr. Heyison reminded Mr. Delaney of his "legal and ethical obligations as an attorney [not to disclose] privileged and confidential information belonging to [the Corporate Client] and/or its counsel [the Law Firm Customer]."  (Heyison Decl. ¶ 26; Heyison Decl. Exhibit 6; Heyison Dep. 61:7-65:9.)

67.     Shortly after receiving Mr. Heyison's email, Mr. Delaney ignored Mr. Heyison's instructions and again emailed the Law Firm Customer's Co-Managing Partners as well as a senior executive of the Corporate Client, who at that point Mr. Delaney knew was a represented party. (Heyison Decl. ¶¶ 26-27; Heyison Decl. Exhibit 7.)  After receipt of such an email from Mr. Delaney, the Law Firm Customer again cautioned Mr. Delaney and his counsel not to disclose

privileged or otherwise confidential information.  The Law Firm Customer did so because it was concerned that Mr. Delaney would not respect his contractual and professional ethical obligations, in part, because over several weeks, Mr. Delaney had repeatedly sent emails directly to the Law Firm Customer and the Client Corporate even though he had been told that both were represented parties and that he should not do so.  (Heyison Dep. 61:7-65:9.)

68.     Despite retaining counsel, Mr. Delaney also emailed the CEO of HC2 on March 27, stating that he had been unlawfully terminated and that he was not an employee of HC2. (Zannikos Decl. ¶ 38; Zannikos Decl. Exhibit X.)  Mr. Zannikos responded to Mr. Delaney's attorney on March 30 to clarify Delaney's apparent factual misunderstandings about the suspension of the Project and his failure to comprehend that he was an HC2 employee and that HC2 determined the status of his employment as it pertained to the Project.  (Zannikos Decl. ¶ 38, Exhibit Y.)

69.     Mr. Delaney's initial attorney withdrew his representation shortly after making the $450,000 demand to the Law Firm Customer, but Mr. Delaney immediately engaged new counsel. (Zannikos Decl. ¶ 39.)  Shortly thereafter, the Law Firm Customer and Mr. Delaney's counsel had a call wherein Mr. Delaney's new counsel reiterated Delaney's initial demand that the Corporate Client pay Mr. Delaney $450,000.  (Zannikos Decl. ¶ 39.)

70.     On or about April 13, 2020, Mr. Delaney significantly escalated his threats by causing his second lawyer to send a communication addressed to the Corporate Client's senior officials that previewed the allegations he makes in his Florida Complaint.  In that communication, Mr. Delaney's counsel discusses the Corporate Client's privileged and confidential information that Mr. Delaney's learned during the Project, and indicates that Mr. Delaney will commence legal action without further notice unless provided with a settlement offer within seven days.  (Heyison

Decl. ¶ 28; Zannikos Decl. ¶ 40; Zannikos Decl. Exhibit Z.)  As further evidence of Delaney's bad faith, although the letter was dated April 7, it was transmitted to the Corporate Client on April 13, effectively providing the Corporate Client one (1) day to respond.  (Zannikos Decl. ¶ 40.)

71.    Finally, on April 13, Mr. Delaney's Florida lawyer made demands directly to the Corporate Client to get paid in settlement.  Neither the Law Firm Customer nor the Corporate Client acceded to Mr. Delaney's demands.  (Heyison Dep. 65:25-67:8; Zannikos Decl. ¶ 41.)

72.    Thereafter, Mr. Delaney's lawyer did not respond to the invitation for a call. Instead, on April 15, 2020, one day after being expressly reminded that Mr. Delany was under contractual and ethical obligations not to disclose information obtained during the course of the review to anyone, Mr. Delaney's counsel filed the Florida Complaint on Mr. Delaney's behalf against the Corporate Client, an affiliate, and a senior executive of the Corporate Client.

73.    Mr. Delaney filed the Florida Complaint on the public docket as a purported "whistleblower" action against the Corporate Client.  (Zannikos Decl. ¶ 42.)  The Florida Complaint directly named the Corporate Client as a defendant and, as the Corporate Client asserted in an emergency motion to seal, disclosed confidential and privileged information that Mr. Delaney obtained while working on the Project.  (Zannikos Decl. ¶ 42.)

74.    Mr. Delaney's lawyer filed the Florida Complaint on the public docket without any request that the court seal it from public view and it was accessible through the court's website. (Heyison Decl. ¶ 31.)

75.    The Corporate Client learned of the Florida Complaint late in the day on Friday, April 17, after one of its subsidiaries received a copy through CT Corporation, and Mr. Heyison received a copy that day.  On Monday, April 20, the Corporate Client filed an emergency motion to seal the complaint.  On Tuesday, April 21, the clerk removed the complaint from the public

docket on account of the emergency motion.  The Florida court has not yet ruled on the motion. (Heyison Decl. ¶ 32.)

76.     Mr. Heyison reviewed the Florida Complaint line by line and has personal knowledge of its contents.  He also reviewed the footnotes in the Florida Complaint as well as the articles discussed therein.  (Heyison Dep. 53:8-54:7.)

77.     In some footnotes in the Florida Complaint, Mr. Delaney cites publicly available information as background.  The cited public sources do not reveal the Corporate Client's privileged and confidential information that the Law Firm Customer provided to Mr. Delaney during the review and that he reveals elsewhere in the Florida Complaint.  (Heyison Decl. ¶ 34; Heyison Dep. 53:8-54:7; 58:2-60:9.)  In other words, the confidential information that Mr. Delaney was provided during the review, but that he disclosed in the Florida Complaint, does not appear in the articles cited in Mr. Delaney's footnotes in the Florida Complaint.  (Heyison Dep. 53:8-54:7, 54:17-56:4.)

78.     The Florida Complaint discloses the Corporate Client's privileged and confidential information and attorney work product information that was not publicly available.  (Heyison Dep. 50:11-51:9, 53:8-54:7.)  It divulged and disclosed both privileged and otherwise confidential information of the Corporate Client that Mr. Delaney obtained when he provided legal services through HC2 and that he learned from the Law Firm Customer or from reviewing the Corporate Client's documents during the review as well as inferences he drew from that information. (Heyison Decl. ¶ 33; Heyison Dep. 49:5-52:15.)

79.     Neither the Law Firm Customer nor the Client Corporate ever waived any of its evidentiary privileges; nor did they ever authorize Mr. Delaney to reveal that information. (Heyison Dep. 52:10-15)

26

80.     The Florida Action was not easy for HC2 or the Law Firm Customer to detect because it was filed in state court in a state that HC2 would have no reason to believe Mr. Delaney had a connection.  (Zannikos Decl. ¶ 43.)  Mr. Zannikos, however, did locate and review the complaint in the Florida Action on the public docket before it was sealed.  (Zannikos Dep. 70:9-24.) ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  Both of those assertions are directly contradicted by the Employment Agreement Mr. Delaney signed with HC2 and by the Law Firm Customer Services Agreement he executed with the Law Firm Customer (Zannikos Decl. ¶ 43; *see also* Zannikos Dep. 69:11-70:3.)  Mr. Delaney admitted in the Florida Complaint that he had no advanced knowledge of the nature of the Project.  (Zannikos Dep. at 71:12-19, 73:12-18; Letter from Robert Rotman to the Court, dated May 21, 2020 (ECF No. 42).)  The Law Firm Customer informed HC2 that the Florida Complaint contained confidential information and that was one factor that informed HC2's understanding that the Florida Complaint revealed confidential information.  (Zannikos Dep. 63:14-64:24.)

81.     The difficulty associated with identifying the Florida Action meant that the complaint Mr. Delaney filed, which delineated privileged and confidential information that he learned about the Corporate Client while working on the Project as an HC2 employee, sat on a public docket for more than five days.  (Zannikos Decl. ¶ 44.)

82.     While Mr. Delaney later dismissed the Florida Action without prejudice, the Law Firm Customer and Corporate Client were compelled to expend substantial legal fees to seal the Florida Complaint.  (Zannikos Decl. ¶ 45.)  As a result of the Florida Action and the information improperly disclosed in the Florida Complaint, HC2 was compelled to initiate this action to enforce its rights and uphold its obligations to its customers, which has resulted in legal fees and associated costs.  (Zannikos Decl. ¶ 45.)

83.     Mr. Delaney dismissed the Florida Action only after being threatened with sanctions, however, HC2, the Law Firm Customer and Corporate Client have no confidence that Mr. Delaney will abide by his ethical and contractual obligations not to use or disclose the Corporate Client's privileged and confidential information.  (Zannikos Decl. ¶ 46.)  ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  He also revealed the nature of the Matter.  (Zannikos Dep. 73:4-10.) In addition, Mr. Delaney dismissed the Florida Action without prejudice, so there is a possibility that he could refile his complaint.  (Zannikos Decl. ¶ 46.)  There is also legitimate concern that Mr. Delaney may find another outlet to deliver on his threat to publicly disclose privileged and confidential information about the Corporate Client.  (Zannikos Decl. ¶ 46.)

84.     HC2's concern in this regard is particularly acute given that in initiating the Florida Action, Mr. Delaney used an alias in an attempt to invoke jurisdiction in an unforeseeable state and county where it took HC2, the Law Firm Customer and the Corporate Client several days to learn about the complaint.  (Zannikos Decl. ¶ 46.)  In addition, after HC2 had moved for a temporary restraining order, Mr. Delaney disclosed the names of the Law Firm Customer and Corporate Client to Law360, which has now referred to them in multiple articles.  (Zannikos Decl.

¶ 46.)  Mr. Delaney's conduct reveals a motive to inflict maximum irreparable damage while the complaint disclosing the Corporate Client's privileged and confidential information lingered on the docket.  (Zannikos Decl. ¶ 46.)

85.     As made clear by Mr. Zannikos' testimony, Mr. Delaney's conduct, if left unchecked, threatens irreparable harm to HC2's goodwill and standing in the marketplace, as well as to the document review industry as a whole.  (Zannikos Decl. ¶ 47.)  Mr. Delaney's egregious conduct has required HC2 to expend time and financial resources to defend its reputation in the marketplace, a reputation for excellence that it has earned and developed over the course of decades.  (Zannikos Decl. ¶ 47.)  The injunction in this case serves the public interest by preserving the sanctity of client confidences and privileges, but also protects the legal staffing industry more generally because law firm, government, and corporate entities will stop engaging HC2 and other similarly situated companies if contract attorneys cannot be held to their contractual and professional obligations to maintain client confidences.  (Zannikos Decl. ¶ 47.)  An injunction requiring Mr. Delaney to abide by his contractual and professional obligations, which dictate here that he refrain from disclosing confidential information he learned during the Project, is necessary to prevent Mr. Delaney from continuing to damage HC2's reputation, goodwill and its business. (Zannikos Decl. ¶ 47.)

86.     Mr. Zannikos provided persuasive testimony that Delaney's actions have already strained HC2's goodwill and compromised HC2's relationships with its Law Firm Customer and the Corporate Client.  (*See* Zannikos Decl. ¶¶ 47-48.)  As a provider of legal staffing, the need for an injunction is manifest given the damage that Mr. Delaney has caused to date, the risk associated with any future disclosures of confidential or privileged information, and the risk that Mr. Delaney may continue in his attempts to seek to extract money from the Corporate Client using threats to

further disclose its confidential and privileged information.  (Zannikos Decl. ¶ 48.)  And there is no way for HC2 to quell, or quantify monetarily, the damage done to its business should Mr. Delaney continue on his course of conduct absent a court order.  (Zannikos Decl. ¶ 48.)

87.    The Court finds that an order precluding Mr. Delaney from disclosing attorney-client privileged and confidential information he learned as an HC2 employee working on the Project, and requiring him to comply with his ethical obligations as an attorney and with his contractual obligations to HC2 and the Law Firm Customer is necessary.  The Court further finds that Mr. Delaney has failed to present any evidence that he will suffer any prejudice if a preliminary injunction is imposed that requires him to abide by his contractual obligations and his ethical obligations as a New York lawyer.

## PROPOSED CONCLUSIONS OF LAW

**VIII.**   **HC2 Meets the Standard for a Preliminary Injunction**

88.     A preliminary injunction is appropriate where the movant shows irreparable harm "a likelihood of success on the merits . . . and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *See Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015).

89.     Ultimately, the determination of whether to issue a preliminary injunction rests in the sound discretion of the district court which, "absent abuse of discretion, will not be disturbed on appeal." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

90.     As set forth below, HC2 meets the standard for a preliminary injunction, enjoining Mr. Delaney from:

   a.   Continuing to possess and not return any and all documents in any form he acquired during and as a result of his employment with HC2, which contain client information, including any documents he created using such information;

   b.   In any way disclosing, disseminating or revealing or continuing to disclose, disseminate or reveal any client information he acquired during and as a result of his employment with HC2; and,

   c.   Filing, or causing to be filed, on this Court's public docket any document that discloses, disseminates, or reveals client information he acquired during and as a result of his employment with HC2.

**A.**   **Absent a Preliminary Injunction, HC2 will Suffer Irreparable Harm**

91.     To meet the requirement of irreparable harm or injury, "a movant need not demonstrate its certainty." *Wenner Media LLC v. N. & Shell N. Am. Ltd.*, No. 05-cv-1286 (CSH), 2005 WL 323727, at *3 (S.D.N.Y. Feb. 8, 2005) (citations omitted). Rather, the movant must

show that absent a preliminary injunction it will suffer "an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (citation and quotation marks omitted); *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003) (same).

92.     Irreparable harm is demonstrated by the loss of goodwill, business opportunities, or the loss of customer relationships.  *See Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 496 (S.D.N.Y. 2018) (a "loss of reputation, good will, . . . business opportunities, or loss of customer relationships can justify injunctive relief on a breach of contract claim") (citations omitted).

93.     The disclosure of confidential information itself constitutes irreparable harm.  *See Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) (the disclosure of confidential information "is the quintessential type of irreparable harm that cannot be compensated or undone by money damages"); *see also Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (granting preliminary injunction because "the confidentiality of . . . records will be irreversibly lost even if plaintiffs ultimately prevail on the merits of their claim").

94.     The disclosure of privileged information by an attorney also constitutes irreparable harm.  *See Data-Track Account Servs., Inc. v. Lee*, 291 A.D.2d 827, 827 (4th Dep't 2002) (affirming permanently enjoining defendant from "disclosing confidences and secrets he obtained during his employment as an attorney for plaintiffs" given irreparable harm from defendant's "repeated disclosures of confidential information to [plaintiffs'] detriment").

95.     The evidence of Mr. Delaney's disclosures of confidential and privileged information entrusted to him on the Project in the Florida Complaint, and the risk that Mr. Delaney

may further disclose confidential and privileged information from the Project, demonstrates irreparable harm.  (Zannikos Decl. ¶¶ 42-48; Heyison Decl. ¶¶ 25-33; Heyison Dep. 49:5-52:15, 53:8-54:7, 54:17-56:4, 61:7-65:9, 65:25-67:8.)

## B.    HC2 Has a Likelihood of Success on the Merits of its Claims

96.    To determine whether a plaintiff has demonstrated a likelihood of success on the merits, "a court is not called upon finally to decide the merits of the controversy . . . [i]t is necessary only that the court find that the plaintiff has presented a strong prima facie case to justify the discretionary issuance of preliminary relief."  *See Pictet Funds (Europe) S.A. v. Emerging Managers Grp., L.P.*, No. 14-CV-6854 SAS, 2014 WL 6766011, at *3 (S.D.N.Y. Dec. 1, 2014) (granting preliminary injunction) (citation omitted).  To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty [but] need only make a showing that the probability of [] prevailing is better than fifty percent."  *Broker Genius*, 313 F. Supp. 3d at 497 (citations omitted).

97.    To prevail on a breach of contract claim under New York law, a party must demonstrate "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."  *See Roswell Capital Partners LLC v. Alt. Const. Tech.*, 08-CIV-10647-DLC, 2009 WL 222348, at *9 (S.D.N.Y. Jan. 30, 2009) (finding plaintiff would be successful on the merits of its breach of contract claim where it showed undisputed evidence of defendants' breach and defendants did not show a likelihood of success at trial on any affirmative defense to excuse their breaches); *see also Broker Genius*, 313 F. Supp. 3d at 497 (finding that plaintiff would likely succeed on the merits of its breach of contract claims where it showed the defendant improperly used plaintiff's information gained while using plaintiff's product).

98.    The Court finds that HC2 has a likelihood of success on its breach of contract claim.

33

99.     There was a valid contract.  Mr. Delaney executed the Employment Agreement on December 28, 2016, which incorporated the NDA.  (Zannikos Decl. ¶ 8, Exhibit A.)  The Employment Agreement also incorporated the Rules of Conduct and the Employee Handbook. (Zannikos Decl. ¶ 8, Exhibits B, C.)  Mr. Delaney also executed the Policies Acknowledgment in which he agreed to adhere to the Conduct Rules and Employee Handbook.  (Zannikos Decl. ¶ 8; Exhibit D.)

100.     The Employment Agreement contained Mr. Delaney's promise "not to divulge any confidential information, proprietary information or trade secrets obtained" during work for any HC2 client and "to keep, hold, and maintain in all confidence all…Confidential Information" of HC2's clients.  Mr. Delaney agreed that Confidential Information included "confidential and proprietary information, ideas, data and/or materials belonging to [HC2's] Clients [e.g., Law Firm Customer] or their clients [e.g., the Corporate Client], including but not limited to information concerning their respective existing and future businesses which are secret and not generally known and/or available to third parties."  (Heyison Decl. ¶ 10; Zannikos Decl. Exhibit A.)

101.     HC2 required Mr. Delaney to sign the NDA that forbids disclosure of any confidential and privileged information or communications.  (Zannikos Decl. ¶ 10; Exhibit A at HC2-00000058.)  The Employee Handbook and Conduct Rules provide additional guidance with respect to Mr. Delaney's obligation to preserve client confidences and privileges.  (Zannikos Decl. ¶ 10, Exhibit C at HC2-00000026, Exhibit D.)

102.     Pursuant to the Employment Agreement, Mr. Delaney agreed "not to divulge any confidential information . . . obtained in the course of any assignment with an HC client to which Attorney has provided temporary services under this Agreement as described in Exhibit A, attached hereto and made a part hereof."  (Zannikos Decl. ¶ 12, Exhibit A at HC2-00000057.)

103.    Pursuant to the NDA, Mr. Delaney further agreed "to keep, hold, [] maintain in confidence . . . and not [] disclose, directly or indirectly, to any third party" all Confidential Information "of every kind and character" that he "obtained in the course of any assignment . . . ." (Zannikos Decl. ¶ 13, Exhibit A at HC2-00000058.)  Mr. Delaney also agreed not to "exploit such Confidential Information for personal or other purposes under any circumstances . . . ." (Zannikos Decl. ¶ 13, Exhibit A at HC2-00000058.)   The NDA also required Mr. Delaney to, "upon termination of [his] temporary assignment," return all Confidential Information "in [his] possession or under [his] control" to the HC2 client.  (Zannikos Decl. ¶ 13, Exhibit A at HC2-00000058.)  By the NDA's terms, Mr. Delaney agreed that his duties thereunder were binding and remained in full force and effect "indefinitely" even after his "relationship with [HC2] or any of its Clients terminates."  (Zannikos Decl. ¶ 13, Exhibit A at HC2-00000058.)

104.    The Conduct Rules also clearly state that under no circumstance should Mr. Delaney contact an HC2 client before, during or after an assignment to one of HC2's customers: "[c]ontacting anyone from the client . . . is against [HC2] policy."  (Zannikos Decl. ¶ 15; Exhibit B at HC2-00000014.)   Thus, Mr. Delaney knew to raise any concerns related to any HC2 Engagement with HC2 only and to never contact an HC2 client.  (Zannikos Decl. ¶ 15.)

105.    HC2 performed under the Employment Agreement by facilitating Mr. Delaney's placement on the Project.  (Zannikos Dep. 14:12-18.)

106.    Mr. Delaney breached the Employment Agreement, NDA, Conduct Rules, and Employee Handbook by disclosing confidential and privileged information from the Project in the Florida Complaint, and the risk that Mr. Delaney may further disclose confidential and privileged information from the Project, demonstrates irreparable harm.  (Zannikos Decl. ¶¶ 42-48; Heyison Decl. ¶¶ 25-33; Heyison Dep. 49:5-15, 53:8-54:7, 54:17-56:4, 61:7-65:9, 65:25-67:8.)

107.    Further, Mr. Delaney breached the Conduct Rules as HC2 had not authorized Mr. Delaney to contact the Law Firm Customer directly after the project was suspended.  (Zannikos Decl. ¶ 34.)  The Law Firm Customer and the Corporate Client considered Mr. Delaney's communications on and after March 17 troubling.  Among other things, Mr. Delaney directed the communications to senior people within the Law Firm Customer and the Corporate Client who had nothing to do with, and did not even know about, the HC2 review.  For example, Mr. Delaney sent several emails to the Law Firm Customer's Co-Managing Partners and members of the firm's Management Committee.  He also sent emails to an executive of the Corporate Client.  (Heyison Decl. ¶ 25, Exhibits 3, 4 & 5.)

108.    Mr. Delaney's breach of the Employment Agreement, NDA, Conduct Rules, and Employee Handbook and failure to abide by his contractual and professional obligations caused and will continue to cause damage to HC2's reputation, goodwill and its business.  (Zannikos Decl. ¶¶ 47-48.)

C.    **The Balance of Hardships Weigh in Favor of Granting HC2 a Preliminary Injunction**

109.    The balance of equities favor injunctive relief where the defendant fails to make "a convincing showing that he will be harmed in any material way" by the issuance of a preliminary injunction.  *See Clayton v. Whitton*, 233 A.D.2d 828, 830 (3d Dep't 1996).

110.    In balancing the equities, the Court may also consider various other factors, such as "the interests of the general public."  *See Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) ("the public interest has always been a factor to be considered in the granting of a preliminary injunction").

111.    The public interest strongly weighs in favor of injunctive relief as it would preserve the integrity of the attorney-client privilege and otherwise protect client confidences.  Mr. Delaney

36

will not be harmed by being enjoined from further disclosing information he learned on the Project. However, Mr. Delaney has already demonstrated his lack of regard for his contractual obligations and his duties under New York's professional responsibility rules governing New York attorneys by publicly disclosing the Law Firm Customer's and the Corporate Client's confidential and attorney-client privileged and work product information, and by unmasking the names of the Law Firm Customer and Corporate Client to the press after this lawsuit was commenced.  (Zannikos Decl. ¶ 46; Zannikos Decl. ¶¶ 42-48; Heyison Decl. ¶¶ 25-33; Heyison Dep. 49:5-15, 53:8-54:7, 54:17-56:4, 61:7-65:9, 65:25-67:8.)   In addition to the lack of prejudice to Mr. Delaney, the substantial interests of HC2, the Law Firm Customer and the Corporate Client to preserve inviolate the attorney-client privilege, the attorney work product doctrine, and other confidential information, the scales tip heavily in favor of continuing the relief afforded by this Court's temporary restraining order by the issuance of a preliminary injunction.

### D.    The Court Disregards the Affirmation of Mr. Delaney's Attorney in Support of Mr. Delaney's Opposition to HC2's Request for a Preliminary Injunction

112.    Mr. Delaney did not come forward with credible, admissible evidence in opposition to HC2's preliminary injunction motion.  Rather, the sole declaration he submits in opposition is the Rotman Affirmation from his current attorney Robert Rotman, who is a not a witness competent to testify about the underlying facts and circumstances.

113.    The Rotman Affirmation is most significant for what it does not say.  Most notably, it does not dispute that the Florida Complaint reveals the Corporate Client's privileged and confidential information.  Even if the Court fully credited Mr. Rotman's testimony, his declaration purports only to identify "representative printouts from the worldwide web which were used as the basis for the" Florida Complaint.  (Rotman Aff. ¶ 2.)  He does not assert that no other information was used to prepare the Complaint.

114.    In addition, Mr. Rotman's assertions do not counterbalance the considerable evidence that HC2 submitted.  By submitting a declaration from his counsel, rather than from a witness competent to testify about the facts and circumstances relevant to the preliminary injunction hearing, Mr. Delaney did not comply with the Court's May 7, 2020 order (the "May 7 Order") requiring the parties to present direct witness testimony by declaration and to make those witnesses available for cross examination by deposition.  (*See* ECF. No. 25.)

115.    The May 7 Order sets forth the standard for establishing the preliminary injunction hearing record:

> By agreement of the Parties, the Court will receive testimony in support of and in opposition to the motion for a preliminary injunction in the form of declarations (or affidavits) of the witnesses submitted by the proponent of the witness containing the direct testimony of such witness and deposition testimony to be taken prior to the hearing containing any cross-examination or re-direct examination.

(ECF 25, ¶ 2).

116.    In compliance with the Court's order, HC2 served declarations from two fact witnesses, Mr. Zannikos, HC2's General Counsel, and Mr. Heyison, the Co-General Counsel of the Law Firm Customer, both of whom were deposed this week by Mr. Delaney's counsel.

117.    This Court's May 7 Order set forth a procedure for the parties to present their hearing evidence by deposing the opposing party's declarants.  Since Mr. Delaney did not submit a declaration at all, this Court did not hear from him or hear any evidence propounded by Mr. Delaney based upon the personal knowledge of anyone responsible for or involved with the drafting of the Florida Complaint.

118.    The Rotman Affirmation does not provide any substantive testimony tying the allegedly public information in its attached articles to the specific allegations in the Florida Complaint.  Nor does the Rotman Affirmation even attempt to make a threshold showing that the Declarant, who was not involved in drafting the Florida Complaint, is competent to provide

testimony based on personal knowledge about what was used to prepare the Florida Complaint or its contents.

119.    Under Federal Rule of Evidence 602:

A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.

*See also Insussary v. Adminstaff Comp., Inc.*, No. 98 CIV. 5404 (AKH), 1999 WL 305102, at *3 (S.D.N.Y. May 14, 1999) (striking plaintiff's affidavit in support of motion for a preliminary injunction and denying plaintiff's request for a preliminary injunction where the only factual basis for plaintiff's assertions were her attorney's affidavit and the attorney lacked actual personal knowledge of the facts).

120.    Mr. Rotman did not represent Mr. Delaney in the Florida Action and was not engaged by Mr. Delaney until after that complaint had been filed.  (*See* ECF No. 14; Rossi Dec. Exhibit D (April 22, 2020 email from Mr. Delaney, stating "Mr. Rossi:  I received both of your emails.  As I just learned about this case, I will need time to hire an attorney].)

121.    Since Mr. Rotman does not have personal knowledge of the information Mr. Delaney and his Florida counsel used to prepare the complaint in the Florida Action, and since Mr. Delaney has chosen not to testify in his own defense, or to offer testimony from a witness competent to testify in his defense, the Court disregards the Rotman Affirmation.

122.    Even if the Court were inclined to consider the Rotman Affirmation, it would still be of no evidentiary weight because the Declarant offers no competent evidence whatsoever to establish that the unauthenticated articles attached to his Rotman Affirmation provide the entire substantive basis of the Florida Complaint.

123.    While the Court has discretion to consider hearsay evidence in the context of a preliminary junction application, it declines to do so as to the Rotman Affirmation here for the

following reasons. The Rotman Affirmation fails to comply with the Court's Order dated May 7,

2020, because the Rotman Affirmation is offered by a non-witness declarant not competent to

testify.  Even if deemed competent to testify, the declarant lacks personal knowledge, and the

proffered testimony thus consists entirely of inadmissible hearsay that lacks any foundational

basis.  Accordingly, the Court assigns no weight to the Rotman Affirmation or its attached exhibits,

in considering HC2's application for a preliminary injunction.

**IX.**     **Mr. Delaney Violated the New York Rules of Professional Conduct**

124.     Rule 1.6 of the New York Rules of Professional Conduct provides that:

A lawyer shall not knowingly reveal confidential information, as defined in this
Rule, or use such information to the disadvantage of a client or for the advantage
of the lawyer or a third person, unless:  (1) the client gives informed consent, as
defined in Rule 1.0(j); (2) the disclosure is impliedly authorized to advance the best
interests of the client and is either reasonable under the circumstances or customary
in the professional community; or (3) the disclosure is permitted by paragraph (b).

125.     Rule 1.6 of the New York Rules of Professional Conduct defines "confidential

information" as consisting of:

information gained during or relating to the representation of a client, whatever its
source, that is (a) protected by the attorney-client privilege, (b) likely to be
embarrassing or detrimental to the client if disclosed, or (c) information that the
client has requested be kept confidential.

126.     Rule 1.9(c) of the New York Rules of Professional Conduct provides:

A lawyer who has formerly represented a client in a matter or whose present or
former firm has formerly represented a client in a matter shall not thereafter: (1)
use confidential information of the former client protected by Rule 1.6 to the
disadvantage of the former client, except as these Rules would permit or require
with respect to a current client or when the information has become generally
known; or (2) reveal confidential information of the former client protected by Rule
1.6 except as these Rules would permit or require with respect to a current client.

127.     As an attorney licensed to practice in New York State, Mr. Delaney has professional

duties, under Rules 1.6 and 1.9(c) of the New York Rules of Professional Conduct, to the Corporate

Client, including the duty not to make any unauthorized use or disclosures of the privileged or

40

confidential information of a client or former client, like the information he learned during the Project.  Mr. Delaney acknowledged and agreed that, as an attorney, he was "bound by the rules of professional conduct for the jurisdiction(s) where I am admitted to practice law . . .  [and] any questions regarding my ethical obligations under this policy or the applicable rules of professional conduct … [must be directed to] a member of the [Law Firm Customer's] Office of General Counsel."  (Zannikos Decl. ¶ 27, Exhibit N at HC2-00000004.)

128.    He is also prohibited from manipulating and using the Privileged information to the Corporate Client's disadvantage.  (Heyison Decl. ¶13.)

129.    Based upon the evidence presented by HC2 in support of its preliminary injunction application, Mr. Delaney's conduct, including his filing of the complaint in the Florida Action, revealing attorney-client privileged and confidential information, violated these ethical rules and the Court will refer Mr. Delaney to the appropriate Attorney Grievance Committee.

## X.    Mr. Delaney Engaged in the Practice of Law on the Project

130.    The question of whether an attorney is engaged in the practice of law hinges upon whether his or her work requires the "exercise of some legal judgment," which is an "essential element of the practice of law."  *See Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*, 620 F. App'x 37, 44 (2d Cir. 2015).  An attorney is not practicing law where he or she merely "provided services that a machine could have provided."  *Id.* at 45.  But, where an attorney exercises judgment about how documents relate to issues like those involved in the Matter, the attorney is practicing law. *See Henig v. Quinn Emanuel Urquhart & Sullivan, LLP*, 151 F. Supp. 3d 460, 469 (S.D.N.Y. 2015) (document review contract attorney's "use of the deliberative process and 'key' tags on certain documents, as well as his comments on the potentially privileged nature of other documents, make clear that [the contract attorney's] work on the Document Review Project involved the type of professional judgment necessary to be engaged in the practice of law [under

41

*Lola*].") (citing *Oberc v. BP PLC*, No. 13–CV–1382 (KMH), 2013 WL 6007211, at *6 (S.D. Tex. Nov. 13, 2013) ("The mere fact that [document review] may be routine or constrained by guidelines does not make it any less 'legal.'").

131. Mr. Delaney held himself out as an attorney admitted to practice law in the state of New York and the work Mr. Delaney conducted on the Project occurred in New York. (Zannikos Decl. ¶ 19.)

132. The legal services performed by Mr. Delaney included: analyzing documents and privileged communications to determine whether and how the documents related to a variety of legal and factual issues, identifying additional issues that might require further inquiry, developing strategies to research emerging issues that were identified, and drawing connections between documents to assist the Law Firm Customer in gaining a better understanding of the underlying issues in the Matter. (Heyison Decl. ¶ 18.) Mr. Heyison's testimony demonstrates that Mr. Delaney exercised judgment with respect to the documents he reviewed, and, as such, he was engaged in the practice of law on the Project.

## XI.    HC2 is Not Required to Give Security

133. Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, it is within the discretion of the district court to decide that, under the circumstances, no security is required. *See Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976); *see also Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm . . . .") (internal quotation marks omitted)

134.    Because Mr. Delaney faces no risk of monetary loss from being enjoined from using confidential information from his employment with HC2, HC2 is not required to post a bond.

Dated:  New York, New York                    Respectfully submitted,
        May 22, 2020
                                              KASOWITZ BENSON TORRES LLP


                                              By:    */s/ Ronald R. Rossi*
                                                   Marc E. Kasowitz
                                                   Ronald R. Rossi
                                                   Kalitamara L. Moody

                                                   1633 Broadway
                                                   New York, NY 10019
                                                   Telephone:  (212) 506-1700
                                                   Facsimile:  (212) 506-1800

                                              *Attorneys for Plaintiff HC2, Inc.*

43