**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ X
HC2, INC.,                                           :

                                                     :     Civil Action No.: 1:20-cv-3178 (LJL)

                    Plaintiff,                       :
                                                     :
                                                     :
          -v-                                        :
                                                     :
ANDREW DELANEY,                                      :
                                                     :
                                                     :
                    Defendant.                       :
                                                     :
------------------------------------------------------ X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiff HC2, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

PROCEDURAL HISTORY ...................................................................................... 3

STATEMENT OF FACTS ........................................................................................ 5

       A.    Relevant Background on HC2 ................................................... 5

       B.    HC2 Hires Defendant .............................................................. 6

       C.    HC2 is Retained by a Law Firm Customer ................................ 7

       D.    The Project .............................................................................. 9

       E.    The Suspension of the Project ................................................. 10

       F.    Defendant Seeks to Exploit the Corporate Client's Confidential
           Information .............................................................................. 12

       G.    Defendant's Florida Action and Subsequent Conduct ............... 14

       H.    The Relevant Contract Provisions .......................................... 16

           1.    Defendant Was Obligated to Maintain Confidentiality .............. 17

           2.    Defendant Agreed to Abide by HC2's Employment Rules
               and Policies ............................................................................ 18

           3.    Defendant's Duty of Loyalty and Obligation to Indemnify
               to HC2 as an Employee ............................................................ 18

LEGAL STANDARD ............................................................................................. 19

ARGUMENT ........................................................................................................ 19

    I.    HC2 WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE
        RELIEF ................................................................................. 19

    II.    HC2 IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ........... 22

    III.    THE BALANCE OF EQUITIES WEIGH IN FAVOR OF INJUNCTIVE
        RELIEF ................................................................................. 24

    IV.    HC2 SHOULD NOT BE REQUIRED TO PROVIDE SECURITY ................... 25

CONCLUSION ...................................................................................................... 26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airbnb, Inc. v. City of New York*,
    373 F. Supp. 3d 467 (S.D.N.Y. 2019)..............................................................22

*Am. Civil Liberties Union v. Clapper*,
    785 F.3d 787 (2d Cir. 2015)............................................................................19

*Broker Genius, Inc. v. Volpone*,
    313 F. Supp. 3d 484 (S.D.N.Y. 2018)..........................................................19, 23

*Carey v. Klutznick*,
    637 F.2d 834 (2d Cir. 1980)............................................................................25

*Clarkson Co. v. Shaheen*,
    544 F.2d 624 (2d Cir. 1976)............................................................................26

*Clayton v. Whitton*,
    233 A.D.2d 828 (3d Dep't 1996) ....................................................................24

*Data-Track Account Servs., Inc. v. Lee*,
    291 A.D.2d 827 (4th Dep't 2002)....................................................................22

*Henig v. Quinn Emanuel Urquhart & Sullivan, LLP*,
    151 F. Supp. 3d 460 (S.D.N.Y. 2015)...............................................................9

*Hirschfeld v. Stone*,
    193 F.R.D. 175 (S.D.N.Y. 2000) ....................................................................21

*Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*,
    620 F. App'x 37 (2d Cir. 2015) ........................................................................9

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010)..............................................................................21

*Oberc v. BP PLC*,
    No. 13–CV–1382 (KMH), 2013 WL 6007211, at *6 (S.D.Tex. Nov. 13, 2013).....................9

*Pictet Funds (Europe) S.A. v. Emerging Managers Grp., L.P.*,
    No. 14-CV-6854 SAS, 2014 WL 6766011 (S.D.N.Y. Dec. 1, 2014)....................22

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990)............................................................................19

*Roswell Capital Partners LLC v. Alt. Const. Tech.*,
08-CIV-10647-DLC, 2009 WL 222348 (S.D.N.Y. Jan. 30, 2009)..........................................23

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995)..........................................................................................................19

*Walden v. Fiore*,
571 U.S. 277 (2014)..................................................................................................................15

*Wenner Media LLC v. N. & Shell N. Am. Ltd.*,
No. 05-cv-1286 (CSH), 2005 WL 323727 (S.D.N.Y. Feb. 8, 2005) ........................................19

*Wisdom Import Sales Co. v. Labatt Brewing Co.*,
339 F.3d 101 (2d Cir. 2003)......................................................................................................19

**Other Authorities**

Defendant *and the two other HC2 attorneys working on the Project*..........................................11

Federal Rule of Civil Procedure 65(c) ...................................................................................25, 26

Federal Rules of Civil Procedure Rule 65 ...................................................................................1

New York Rules of Professional Conduct Rules 1.6 and 1.9(c)............................................18, 25

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and this Court's written order, dated May 7, 2020, Plaintiff HC2, Inc. ("HC2") respectfully submits this memorandum of law in support of its motion for a preliminary injunction.[1]

## PRELIMINARY STATEMENT

This motion for a preliminary injunction is necessary to prevent the defendant Andrew Delaney ("Defendant"), an attorney, from continuing to unlawfully use and disclose privileged or otherwise confidential information (the "Privileged Information"), which he obtained through his work on a document review project (the "Project") for one of HC2's law firm customers (the "Law Firm Customer") and the Law Firm Customer's corporate client (the "Corporate Client").

In contravention of his duties as an attorney and of his contractual obligations to his employer, HC2, Defendant designed a scheme to coerce HC2, the Law Firm Customer and Corporate Client to pay him hundreds of thousands of dollars by threatening to initiate a lawsuit that publicly discloses the Privileged Information, if his financial demands were not met. When Defendant's scheme failed because neither HC2, the Law Firm Customer nor the Corporate Client agreed to pay his demand, Defendant followed through on his threat by filing a complaint (the "Florida Complaint") against the Corporate Client in Florida state court (the "Florida Action"), which contained Privileged Information about the Corporate Client. Florida had no relation to the matter and Delaney waited more than a day to begin service. As a result, the Complaint remained on the public docket for several days before the Corporate Client discovered it and filed an emergency motion to seal.

---

[1] Submitted herewith is the Declaration of Stephanos Zannikos, sworn to on May 15, 2020, and the exhibits annexed thereto ("Zannikos Decl."), and the Declaration of Michael R. Heyison, sworn to on May 15, 2020, and the exhibits annexed thereto ("Heyison Decl."). With leave of this Court, portions of the exhibits to the Zannikos Decl. were filed under seal to protect certain personal and confidential third party information. (ECF. Nos. 37 & 40.)

In late September 2019, Defendant was selected by the Law Firm Customer from a roster of HC2 contract attorneys to work on the Project at an HC2 facility in New York City (the "NYC Worksite").  He worked on the Project up until March 17, 2020.  On that day, as COVID-19 infections in New York City rapidly increased, the Law Firm Customer decided to suspend the Project while it determined whether it could continue the Project remotely.

Apparently displeased with the Law Firm Customer's decision, Defendant sent multiple unauthorized communications to the Law Firm Customer and its Corporate Client making patently false allegations that HC2, the Law Firm Customer and Corporate Client had conspired to suspend the Project and terminate his employment in retaliation for his having raised concerns -- on the same day the Project was suspended -- about potential exposure to COVID-19 at the NYC Worksite.  In a series of escalating threats leveled directly against senior leadership at the Corporate Client, Defendant and his counsel claimed retaliatory termination, demanded a $450,000 payment (an amount that bore no relation to what he was being paid on the Project), and threatened litigation concerning the subject matter of the Project unless it acceded to his payment demand.

On April 15, 2020, the day after a deadline Defendant imposed had passed, Defendant's lawyer made good on Defendant's prior threat by publicly filing the Florida Complaint against the Corporate Client.  The Florida Complaint publicly disclosed Privileged Information including detailed allegations about the subject matter of the Project, related legal strategy and numerous other confidences, all of which the Law Firm Customer and Corporate Client entrusted to Defendant in his capacity as an attorney during the Project.

Although the Florida Complaint is a "John Doe" complaint, Defendant has since conceded that he is the "plaintiff" in the Florida Action.  While the Corporate Client has now managed to

have the Florida Complaint provisionally sealed as the result of an emergency motion, Defendant's actions make it clear that he has and continues to improperly use the Privileged Information he obtained during the Project in violation of his ethical and contractual duties. Indeed, following the filing of this lawsuit, Defendant unmasked the names of the Law Firm Customer and the Corporate Client to the press.

All of the elements are met for the issuance of a preliminary injunction.  Unless Defendant is enjoined, HC2 will face irreparable harm because Defendant's actions and threatened actions have caused and will continue to damage HC2's goodwill and reputation, which cannot be adequately quantified by monetary damages.  Under New York law, unauthorized disclosure of confidential information, such as the Privileged Information here, constitutes irreparable harm. HC2 is also likely, if not certain, to succeed on the merits of its breach of contract claims given Defendant's breaches of the plain language of his contract with HC2 prohibiting him from using or disclosing any information, including the Privileged Information, that he learned during his employment by HC2 on the Project.

Accordingly, HC2's request for a preliminary injunction enjoining Defendant from disclosing the information he learned, including the Privileged Information, during the course of his employment with HC2 on the Project, should be granted.

## **PROCEDURAL HISTORY**

On April 22, 2020, HC2 filed a Verified Complaint against Defendant alleging claims for breach of contract, faithless servant, and a preliminary and permanent injunction.  (*See* ECF. No. 1.)  That same day, HC2 also filed an *ex parte* motion by order to show cause for a temporary restraining order ("TRO") and preliminary injunction against Defendant which sought to enjoin him from further disclosing publicly the Privileged Information learned during his employment with HC2.  (*See* ECF. No. 7.)

3

On April 29, the Court held oral argument on HC2's TRO application, with notice to and the participation of Defendant, and issued a written order temporarily restraining Defendant from "from divulging any information that is privileged, confidential or protected by his non-disclosure and/or employment agreement(s) with the Plaintiff, and that he learned through his employment with Plaintiff," setting a preliminary injunction hearing date, and extending the TRO through that date.  (ECF. No. 14.)

On May 6, the Court held a telephonic status conference with the parties.  The next day, the Court issued an order (the "May 7 Order") setting a briefing schedule for the preliminary injunction hearing and established specific rules governing how the parties could present witness testimony, specifically:

> By agreement of the Parties, the Court will receive testimony in support of and in opposition to the motion for a preliminary injunction in the form of declarations (or affidavits) of the witnesses submitted by the proponent of the witness containing the direct testimony of such witness and deposition testimony to be taken prior to the hearing containing any cross-examination or re-direct examination . . . .

(ECF. No. 25.)

Between May 8 and May 19, the parties engaged in expedited discovery related to the preliminary injunction hearing.  On May 15, HC2 served witness declarations on behalf of Stephanos Zannikos ("Mr. Zannikos") -- the General Counsel of HC2 -- and Michael R. Heyison ("Mr. Heyison") -- a partner and the Co-General Counsel of the Law Firm Customer.  Defendant did not submit an affidavit or declaration in opposition, nor did he offer one from any witness with first-hand knowledge.  Instead, his attorney, Mr. Rotman submitted an affirmation (the "Rotman Affirmation") that attaches forty-six (46) Exhibits consisting of news articles, blog posts, and internet and online database search results that Mr. Rotman contends are "representative printouts

from the worldwide web which were used as the basis for the [Florida] [C]omplaint."[2]  On May 18 and 19, HC2's two declarants, Mr. Heyison and Mr. Zannikos, were cross-examined and redirected during their depositions.[3]

## STATEMENT OF FACTS[4]

### A.      Relevant Background on HC2

HC2, founded in 1987, is incorporated in the District of Columbia with its principal place of business in Chicago, Illinois.  HC2 is a legal staffing company that provides attorneys, paralegals, and other legal professionals ("Contract Professionals") as well as associated workspace, IT infrastructure, project management, and related services (collectively "HC2 Services") to satisfy the short-term and long-term staffing needs of its third party customers, including law firms, corporations and government agencies.  (Zannikos Decl. ¶ 3.)

HC2 has twelve office locations throughout the United States, including in New York City. (Zannikos Decl. ¶ 4.)  HC2 offers seven state-of-the-art eDiscovery review centers where HC2 Contract Professionals can work on HC2 customers' projects at the customer's election, including on Lexington Avenue, in New York, NY ("HC2 NYC Location").

HC2 has had a long history of success and has built a reputation as one of the preeminent legal staffing agencies in the industry, which it occupies, in large part, due to its reputation for having the very best pool of Contract Professionals and, in particular, contract attorneys.

---

[2]  Mr. Rotman's declaration and the exhibits thereto were sealed on May 20.  (ECF 34 & 40.)

[3]  Citations to the "Zannikos Dep." refer to the deposition transcript of Stephanos Zannikos, dated to May 19, 2020. Citations to the "Heyison Dep." refer to the deposition transcript of Michael R. Heyison, dated May 18, 2020.

[4]  In lieu of live witnesses, HC2 tenders the entirety of the Zannikos and Heyison Declarations, and all exhibits thereto, as its evidentiary record in support of its preliminary injunction application and its proposed findings of fact and conclusions of law.  In addition, HC2 tenders pages 7; 8; 10; 14; 16; 19; 21; 22; 26; 27; 48; 56; 57; 63; 64; 67-71; 73-76; and, 79-81 of the Stephanos Zannikos Deposition transcript ("Zannikos Dep."), and pages 12-14; 15; 17-24; 26; 27; 33; 34; 43-45; and, 49-67 of the Michael Heyison transcript ("Heyison Dep.") filed separately but contemporaneously herewith by the parties as part of its evidentiary record in support of its preliminary injunction application and its proposed findings of fact and conclusions of law.

(Zannikos Decl. ¶¶ 4-5.)  Indeed, many of HC2's engagements are repeat business and new business is driven primarily by referrals from current and past customers, which is why the performance and conduct of each Contract Professional has a direct impact on HC2's continued success.  (Zannikos Decl. ¶¶ 4-5.)

A significant reason for HC2's reputation and goodwill is dependent upon its reliability in providing highly competent and trustworthy legal professionals, as well as its ability to provide secure and confidential services.  (Zannikos Decl. ¶ 7; Heyison Decl. ¶¶ 8-9.)

### B.   HC2 Hires Defendant

On December 28, 2016, Defendant executed HC2's Employment Agreement (the "Employment Agreement"), after which he became employed by HC2.  (Zannikos Decl. ¶ 8; Zannikos Dep. at 16:4-7.)  The Employment Agreement incorporated a Confidentiality and Non-Disclosure Agreement (the "NDA").  (Zannikos Decl. ¶ 8, Exhibit A.)  The Employment Agreement also incorporated certain rules of conduct (the "Conduct Rules") and an employee handbook (the "Employee Handbook").  (Zannikos Decl. ¶ 8, Exhibits B, C; Zannikos Dep. at 26:15-24, 27:3-20.)  On the same date, Defendant also executed an acknowledgement form in which he agreed to adhere to the Conduct Rules and Employee Handbook (the "Policies Acknowledgment").  (Zannikos Decl. ¶ 8, Exhibit D.)

Among other things, the Employment Agreement expressly provides that Defendant was, at all relevant times, an at-will employee, and that any assignment to one of HC2's client's is "on an interim/temporary basis," and when "[Defendant] is placed by [HC2] with a[] [HC2] client, [Defendant] remains a[n] [employee] of [HC2] during the period of such temporary placement." (Zannikos Decl. ¶ 9, Exhibit A at HC2-00000056 ["Contract Professionals"]; *see also* Zannikos Dep. at 14:12-14.)  After Defendant was hired, HC2 could assign him to temporary assignments with its clients.  (Zannikos Dep. at 14:12-22, 19:10-22.)

6

### C.     HC2 is Retained by a Law Firm Customer

The Law Firm Customer represents the Corporate Client in a confidential matter, which concerned the Corporate Client's privileged and confidential information (the "Matter").  (Heyison Decl. ¶¶ 5, 7.)  In order to assess the Matter and provide necessary legal advice, the Law Firm Customer had to collect, review and analyze a large set of documents.  To assist in the review and assessment, the Law Firm customer wanted to retain a vendor capable of providing a team of temporary attorneys.  (Heyison Decl. ¶ 6.)  One of the key factors in the Law Firm Customer's decision to hire HC2 included HC2's commitment to provide secure and confidential services as well as HC2's ability to offer secure document review centers and rooms with physical security measures, such as security cameras that allowed remote monitoring.  (Heyison Decl. ¶¶ 5, 8; Heyison Dep. 12:12-14:9.)

On or about September 25, 2019, HC2, the Law Firm Customer and Corporate Client entered into an agreement (the "Project Agreement") to provide Contract Professionals, including contract attorneys fluent in a foreign language for the Project.  (Zannikos Decl. ¶ 17, Exhibit E.) Prior to executing the Project Agreement, the Law Firm Customer had asked HC2 to identify 14 attorneys to assign to the Project, including 10 who were fluent in a particular foreign language and 4 who were fluent in a different foreign language.  (Zannikos Decl. ¶ 19, Exhibit E at HC2-00000278, HC2-00000285–HC2-00000286.)  The Law Firm Customer's requirements to work on the document review included: passing a criminal background check, passing a global sanctions check, clearing conflicts, and active and good standing membership with the Bar of the jurisdiction where the HC2 Contract Professional would be working.  (Zannikos Decl. ¶ 19, Exhibit E at HC2-00000285.)

HC2 emailed Defendant to notify him about the Project, as well as the client's requirements and qualification questions, to see if he was interested.  (Zannikos Decl. ¶ 19, Exhibit F.)

Defendant responded stating that he was available for the Project and answered the qualification questions, stating that he was fluent in one of the relevant foreign languages, admitted to practice in New York and Arizona, did not have any conflicting legal employment, and provided a current resume.  (Zannikos Decl. ¶ 19, Exhibits G, H and I.)

On September 12, 2019, after Defendant completed a conflicts check form, HC2 submitted the names and resumes of Defendant and two other HC2 contract attorneys to the Law Firm Customer for consideration.  (Zannikos Decl. ¶ 21, Exhibit J at HC2-00000220–HC2-00000221; Zannikos Dep. at 21:8-22:23.)  The Law Firm Customer initially selected three New York-based attorneys proposed by HC2, including Defendant.  (Heyison Decl. ¶ 11; Zannikos Decl. Exhibit J.)  HC2 then informed Defendant he was selected for the Project, which ultimately commenced on September 30, 2019.  (Zannikos Decl. ¶ 21, Exhibit L.)

On September 30, 2019, Defendant reported to the HC2 NYC Location to begin work on the Project.  (Zannikos Decl. ¶ 22; Zannikos Dep. at 68:2-8.)  However, before beginning any work, Defendant was required to review and sign a confidentiality agreement with the Law Firm Customer (the "Law Firm Customer Confidentiality Agreement").  (Zannikos Decl. ¶ 22, Exhibit N.)  He also executed a temporary services agreement with the Law Firm Customer that day (the "Law Firm Customer Services Agreement").  (Zannikos Decl. ¶ 22, Exhibit O.)  Finally, he signed an acknowledgment confirming that he received other onboarding materials for the Project on October 1, 2019.  (Zannikos Decl. ¶ 22, Exhibit P.)

Pursuant to the Law Firm Customer Services Agreement, Defendant acknowledged that he was "assigned to the [Law Firm Customer] to provide temporary services … [and] underst[oo]d that the need for [his] temporary services may be terminated by [the Law Firm Customer] at any

time and at will for any reason, without resort to disciplinary or other procedures *normally followed for employees*."  (Zannikos Decl. ¶ 23, Exhibit O (emphasis added).)

Pursuant to the Law Firm Customer Confidentiality Agreement, Defendant acknowledged that, as an attorney, he was bound by the rules of professional conduct in New York where he was barred, and that he would direct any ethical questions to the Law Firm Customer's General Counsel's office.  (Zannikos Decl. ¶ 27, Exhibit N; Heyison Decl. ¶ 13.)

### D.   **The Project**

During training conducted by the Law Firm Customer, the HC2 contract lawyers, including Defendant, received a detailed analysis of the relevant laws, the facts of the Matter as the Law Firm Customer understood them at the time, the relevant questions, and facts and legal issues that were part of the review and considered potentially noteworthy.  (Heyison Decl. ¶ 16.)

During the Project, Defendant provided various legal services.[5]  (Heyison Decl. ¶ 18.)  Over the approximately five months he worked on the Project, he reviewed thousands of documents, highlighted a number of them that he considered significant, and sent emails explaining his views as to the relevance and potential significance of certain documents to the Matter. (Heyison Decl. ¶

---

[5] Any argument by Defendant that he was not working as an attorney engaged in the practice of law while assigned to the Project is unavailing, both factually and legally.  As the Second Circuit clarified in *Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*, 620 F. App'x 37, 44 (2d Cir. 2015), the question whether an attorney is engaged in the practice of law hinges upon whether his or her work requires "exercise of some legal judgment," which is an "essential element of the practice of law."  The unrebutted evidence shows that Defendant exercised legal judgment in the performance of his assignment, including: analyzing documents and privileged communications to determine whether and how the documents related to a variety of legal and factual issues, identifying additional issues that might require further inquiry, developing strategies to research emerging issues that were identified, and drawing connections between documents to assist the Law Firm Customer with gaining a better understanding of the underlying issues in the Matter.  (Heyison Decl. ¶ 18; Heyison Dep. at 57:7-59:3.)  These tasks require the exercise of legal judgment.  *See Henig v. Quinn Emanuel Urquhart & Sullivan, LLP*, 151 F. Supp. 3d 460, 469 (S.D.N.Y. 2015) (document review contract attorney's "use of the deliberative process and 'key' tags on certain documents, as well as his comments on the potentially privileged nature of other documents, make clear that [the contract attorney's] work on the Document Review Project involved the type of professional judgment necessary to be engaged in the practice of law [under *Lola*].") (citing *Oberc v. BP PLC*, No. 13–CV–1382 (KMH), 2013 WL 6007211, at *6 (S.D.Tex. Nov. 13, 2013]) ("The mere fact that [document review] may be routine or constrained by guidelines does not make it any less 'legal.'").

20.)  Defendant was required to, and in fact did, exercise his legal judgment.  (Heyison Decl. ¶ 22; Heyison Dep. 57:7-59:3.)

      **E.**      **The Suspension of the Project**

During the first half of March, as COVID-19 was spreading at rapid and unanticipated pace throughout the United States, but in particular New York City, HC2 was monitoring the situation based on publicly available information -- just like any other employer.  (Zannikos Decl. ¶ 28.) The Law Firm Customer was doing the same.  (Heyison Decl. ¶ 23.)

On March 2, 2020, Patti Ayala, HC2's Vice President of Human Resources and Administration, emailed the Contract Professionals, including Defendant, to advise them that HC2 was monitoring the situation and that they should too, and instructed them not to come to the office if they were symptomatic.  (Zannikos Decl. ¶ 28, Exhibit Q.)  Ms. Ayala sent an update email on March 12, informing Defendant of HC2's efforts to help prevent the spread of COVID-19. (Zannikos Decl. ¶ 28, Exhibit R.)  Defendant did not respond to either message.  (Zannikos Decl. ¶ 28.)  By mid-March, HC2 and the Law Firm Customer discussed how COVID-19 might affect the Project and whether the HC2 lawyers could work remotely from home.  (Heyison Decl. ¶ 23.)

On the morning of March 17, 2020, Defendant sent an email to the Law Firm Customer's lawyers who were overseeing the Project, as well as other Hire Counsel Contract Professionals working on the Project in New York and London, regarding his concerns about the risk of contracting COVID-19 while working at the HC2 NYC Location and asked to work remotely. (Zannikos Decl. ¶ 30, Exhibit S.)  Shortly thereafter, HC2, at the Law Firm Customer's request, suspended the Project in view of the COVID-19 pandemic and its impact in New York, NY. (Zannikos Decl. ¶ 31; Zannikos Dep. 48:12-14; 56:16-57:2; Heyison Dep. 34:13-16.)  The Law Firm Customer evaluated whether the reviewers could work remotely, but ultimately rejected the

10

option due to security concerns, including concerns about security for confidential information. (Heyison Decl. ¶ 23; Zannikos Decl. ¶ 31.)

Upon being notified of this, HC2's Senior Managing Director informed Defendant *and the two other HC2 attorneys working on the Project* in the New York area of this decision, as follows:

> We understand and appreciate everyone's concerns regarding the work environment and well-being of those around you. Most importantly, we understand the need for an immediate response regarding remote work. At this time, the client is electing to suspend work on the case in NYC effective immediately. Please note that remote work has not been authorized for this project, as of now. . . . You will be compensated for your time today. We will continue to monitor the efforts of Congress in helping to off-set the impact of lost work.

(Zannikos Decl. ¶ 31, Exhibit T.)

Under the Employment Agreement, Defendant was entitled to pay only for hours he worked on a project. HC2 did not terminate Defendant's employment under the Employment Agreement. Rather, in the March 17 email from HC's executive, Defendant was advised that "[i]f a decision to re-start the project in NYC is made, we will contact you – directly." (Zannikos Decl. ¶ 32, Exhibit T; Zannikos Dep. 69:11-70:8.)

Without authorization, Defendant emailed the Law Firm Customer on March 17 -- and included on his email the Co-Managing Partners and 14 members of the firm's Management Committee. (Heyison Decl. ¶ 3.) Defendant's email falsely claimed that HC2 illegally terminated him in retaliation for raising concerns about COVID-19 and demanded payment. (Zannikos Decl. ¶ 34, Exhibit U at D-15–D-17.) The Law Firm Customer emailed Defendant back to inform him that it had not requested Defendant's termination but had merely suspended the Project. (Zannikos Decl. ¶ 34, Exhibit U at D-16.)[6]

---

[6] As of March 17, 2020, Defendant was still eligible to work on the Project if the suspension was lifted. (Zannikos

On March 18, again without permission from HC2, Defendant responded to the Law Firm Customer's email and accused its attorneys of colluding with the Corporate Client to terminate him in retaliation for raising concerns about workplace safety.  (Zannikos Decl. ¶ 35, Exhibit U at D-15.)  Subsequently, on March 18, HC2's vice president of human resources and General Counsel, called Defendant to discuss his emails to the Law Firm Customer and Corporate Client.  (Zannikos Decl. ¶ 36.)  Defendant refused to speak with them, insisting that HC2 communicate with him only in writing.  (Zannikos Decl. Exhibits V and W.)  HC2 sent Defendant emails on March 19 and March 27 to follow up on his concerns and remind him that maintaining confidentiality and attorney-client privilege was of the utmost importance, but defendant never responded.  (Zannikos Decl. ¶ 36.)

### F.    Defendant Seeks to Exploit the Corporate Client's Confidential Information

The Law Firm Customer and Corporate Client considered the emails Defendant sent between March 17, 2020 and March 27, 2020 troubling.  (Heyison Decl. ¶ 25.)  On March 27, the Law Firm Customer's Co-General Counsel, Mr. Heyison, emailed Defendant to inform him that he would be representing the Law Firm Customer and all future communications regarding the firm should be with him and not other personnel employed by the Law Firm Customer.  (Heyison Decl. ¶ 26, Exhibit 6.)  Mr. Heyison also told Defendant that another partner with the Law Firm Customer would be representing the Corporate Client and that Defendant should direct all future communications regarding the Corporate Client to that partner.  (Heyison Decl. ¶ 26.)  Finally, Mr. Heyison reminded Defendant of his "legal and ethical obligations as an attorney [not to

---

Dep. at 69:11-15.)  Defendant was also eligible to work on other HC2 projects if a client had selected him for participation. (Zannikos Dep. at 69:16-21.) Therefore, the only change to Defendant's employment status as of March 17, 2020, was that the Project was suspended, but he was otherwise eligible for reassignment or a new assignment. (Zannikos Dep. at 69:22-70:3.)  The other reviewers assigned to the Project had the exact same employment status as Defendant after March 17.  (Zannikos Dep. at 70:4-8.)

disclose] privileged and confidential information belonging to [the Corporate Client] and/or [the Law Firm Customer]." (Heyison Decl. ¶ 26.)

Shortly thereafter, on March 27, without permission from HC2 and despite Mr. Heyison's email informing Defendant they were now represented parties, Defendant again emailed senior people at the Law Firm Customer and Corporate Client. (Heyison Decl. ¶ 27, Exhibit 7.) Additionally, on March 27, Defendant retained an attorney, who contacted the Law Firm Customer to ask it to direct all future correspondence regarding Defendant to him. (Zannikos Decl. ¶ 37.) During a subsequent call on or shortly after March 27 between Defendant's attorney and the Law Firm Customer partner representing the Corporate Client, Defendant demanded that the Corporate Client pay him $450,000. (Zannikos Decl. ¶ 37.)

Also on March 27, Defendant emailed the HC2 Chief Executive Officer stating that he had been unlawfully terminated and was not an employee of HC2. (Zannikos Decl. ¶ 38, Exhibit X.) Mr. Zannikos responded to Defendant's attorney on March 30 to clarify Defendant's apparent factual misunderstandings about the suspension of the Project and his failure to comprehend that he was an HC2 employee and that HC2 determined the status of his employment as it pertained to the Project. (Zannikos Decl. Exhibit Y.)

On April 13, after Defendant's initial attorney withdrew from representing Mr. Delaney, Defendant significantly escalated his threats by causing a second attorney he had retained to send a letter to senior executives of the Corporate Client that previewed the allegations he would ultimately include in his Florida Complaint. (Heyison Decl. ¶ 28.) The April 13 letter discussed the Corporate Client's privileged and confidential information that Defendant learned during his employment with HC2 on the Project, added a new grievance against the Corporate Client that dated back to the fall of 2019 and was unrelated to the suspension of the Project, and threatened to commence legal action

without further notice unless the Corporate Client made a settlement offer within seven days. (Heyison Decl. ¶ 28.)  As evidence of Defendant's bad faith, although the letter was dated April 7, it was transmitted to the Corporate Client on April 13, effectively providing the Corporate Client one day to respond.  (Zannikos Decl. ¶ 40, Exhibit Z.)

On April 14, the Law Firm Customer responded to Defendant's attorney's demands. (Heyison Decl. ¶ 29.)  The Law Firm Customer informed Defendant's attorney of their concerns regarding Defendant's misuse and disclosure of the Corporate Client's confidential information, which he learned during the Project.  (Heyison Decl. ¶ 29.)  The Law Firm Customer again also reminded Defendant of his ethical obligations as a member of the bar and his contractual non-disclosure obligation.  (Heyison Decl. ¶ 29.)  Finally, the Law Firm Customer proposed a telephone call for later that day.  (Heyison Decl. ¶ 29.)  Defendant's attorney did not respond.  (Heyison Decl. ¶ 30.)

### G.   Defendant's Florida Action and Subsequent Conduct

On April 15, 2020, Defendant, through his second attorney, filed the Florida Complaint on the public docket suing the Corporate Client in the Civil Division of the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida.  (Zannikos Decl. ¶ 42.)  Although the Florida Complaint was filed on behalf of an undisclosed, *John Doe* plaintiff, Defendant subsequently admitted in discovery responses and in statements to the press that he was the plaintiff in the Florida Action and directed the filing of the Florida Complaint.  (Zannikos Decl. ¶ 42; Heyison Decl. ¶ 30; Declaration of Ronald Rossi ("Rossi Decl.") Exhibit C (Delaney Response to Request for Admission, No. 8).)

Defendant's attorney filed the Florida Complaint publicly, without any request that the court seal it from public view.  It was accessible to the public, including but not limited to the media, through the Florida court's website.  (Heyison Decl. ¶ 30.)  The Florida Action was not easy

for HC2, the Law Firm Customer or Corporate Client to detect because it was filed in Florida, where HC2 would have no reason to believe Delaney had a connection.  (Zannikos Decl. ¶ 43.)



when, in fact, he has admitted in this action that he is a New York

resident.[7]  (Zannikos Dep. 71:3-5; Zannikos Decl. ¶ 43; Def. Counterclaims ¶ 2 (ECF No. 26).)

The Corporate Client did not learn of the matter for several days.  On Friday, April 17, Mr. Delaney's counsel served a copy on an affiliate's registered agent. (Heyison Decl. ¶ 32.)  It was not until late on Friday April 17 that the Corporate Client learned of the Florida Complaint. (Heyison Decl. ¶ 32.)  The Corporate Client filed an emergency motion to seal on the following business day, but the Florida Complaint remained on the public docket for five days.  (Heyison Decl. ¶¶ 31-32; Zannikos Decl. ¶ 44.)[8]

(Zannikos Dep. 73:4-73:18; Letter to the Court from Bogdan Rotman dated March 20, 2020 (ECF No. 42).)

(Zannikos Dep. at 73:20-25.)  Mr. Heyison has reviewed the Florida Complaint and testified under oath that it not only disclosed the Corporate Client's Privileged Information related to the Matter,

---

[7]  The Court may exercise personal jurisdiction over Defendant because the claims asserted herein arise from his wrongful conduct and tortious acts within New York *See, e.g., Walden v. Fiore*, 571 U.S. 277, 283-86 (2014) (explaining the "minimum contacts" necessary for specific jurisdiction over defendants based on their own contacts with the forum).

[8]  Since it was then too late to file an emergency motion to seal the Florida Complaint, the Corporate Client had to wait until the following Monday, April 20, to do so, which allowed the Florida Complaint to remain accessible to the public for another three days.  (Heyison Decl. ¶ 32.)  The Corporate Client's motion to seal was filed on April 20 and the Florida court's clerk removed the complaint in its entirety from the public docket on April 21 pending a decision on the motion, which remains outstanding.  (Heyison Decl. ¶ 32.)

but that the information it disclosed could only have been learned as a result of Defendant's work on the Project, including from reviewing Project-related documents. (Heyison Decl. ¶ 3; Heyison Dep. 50:11-52:15; Zannikos Decl. ¶ 42; Zannikos Dep. 63:14-64:10.) Defendant has not refuted that the Florida Complaint disclosed such information; instead, Defendant had his current attorney submit the Rotman Affirmation, which cited samples of publicly available information that Mr. Rotman claims were used in preparing the Florida Complaint. However, Mr. Rotman has no personal knowledge of the Florida Complaint since he was not involved in its preparation.

The Law Firm Customer and Corporate Client were compelled to expend substantial legal fees to seal the complaint, a procedure that remains ongoing. (Zannikos Decl. ¶ 45.) Furthermore, because of the Florida Action and the information it improperly disclosed, HC2 was compelled to initiate this action, which has resulted in legal fees and associated costs. (Zannikos Decl. ¶ 45.)

Defendant dismissed the Florida Action, without prejudice, only after he was threatened with sanctions, however, HC2, the Law Firm Customer and Corporate Client have no confidence that Defendant will abide by his ethical and contractual obligations not to use or disclose the Corporate Client's privileged and confidential information. (Zannikos Decl. ¶ 46.)

In addition, after HC2 had moved for a temporary restraining order under a complaint that anonymized the Law Firm Customer and Corporate Client, Defendant disclosed their names to Law360, which has now referred to them in multiple articles. (Zannikos Decl. ¶ 46.) Defendant's conduct reveals a motive to inflict harm upon HC2, the Law Firm Customer and the Corporate Client. (Zannikos Decl. ¶ 46.)

## H.    The Relevant Contract Provisions

Defendant's actions after the suspension of the Project violated his Employment Agreement, the NDA, the Conduct Rules, and the Employee Handbook.

## 1.   Defendant Was Obligated to Maintain Confidentiality

Confidentiality is the core of HC2's business.  HC2's clients must be able to trust that HC2 employees -- particularly a contract attorney assigned to review confidential documents and identify privileged information to protect it from improper disclosure -- will abide by their contractual and professional obligations to maintain client confidences.  (Zannikos Decl. ¶ 10.) For that reason, HC2 requires every employee to sign the NDA, which strictly forbids disclosure of any confidential and privileged information or communications.  (Zannikos Decl. ¶ 10, Exhibit A at HC2-00000058.)   Reflecting the supremacy of client confidentiality to HC2's business model,[9] the Employee Handbook and Conduct Rules provide additional guidance with respect to employees' obligation to preserve client confidences and privileges.  (*See* Zannikos Decl. ¶ 10, Exhibit C at HC2-00000026, Exhibit D.)   Pursuant to the Employment Agreement, Defendant unequivocally agreed not to divulge any confidential information that he obtained in the course of any assignment with an HC2 client.  (Zannikos Decl. ¶ 12, Exhibit A at HC2-00000057.)  Under the NDA, Defendant further agreed to keep, hold, and maintain in confidence, and to not directly or indirectly disclose to any third party all Confidential Information "of every kind and character" that he obtained in this course of any HC2 assignment like his work on the Project for the Law Firm Customer.  (Zannikos Decl. ¶ 13, Exhibit A at HC2-00000058.)

---

[9] The NDA defines "Confidential Information" as "confidential and proprietary information, ideas, data and/or materials belonging to the Clients or their clients, including but not limited to information concerning their respective existing and future businesses which are secret and not generally known and/or available to third parties . . . ." (Zannikos Decl. ¶ 11, Exhibit A at HC2-00000058.)  The Employee Handbook adds that Confidential Information also includes but is not limited to, "[c]ompensation data," "[f]inancial data," and "[i]ndividual client data[.]" (Zannikos Decl. ¶ 11, Exhibit C at HC2-00000026.)  Defendant also agreed not to "exploit such Confidential Information for personal or other purposes under any circumstances . . . ."  (Zannikos Decl. Exhibit C at HC2-00000026.)  The NDA also required Defendant to, "upon termination of [his] temporary assignment," return all Confidential Information "in [his] possession or under [his] control" to the HC2 client.  (Zannikos Decl. Exhibit C at HC2-00000026.)   By the NDA's express terms, Defendant agreed that his duties thereunder were binding and remained in full force and effect "indefinitely" even after his "relationship with [HC2] or any of its Clients terminates." (Zannikos Decl. Exhibit C at HC2-00000026.)

Furthermore, as an attorney licensed to practice in New York State, Defendant has a professional duty, under Rules 1.6 and 1.9(c) of the New York Rules of Professional Conduct (the "NY Rules"), not to make any unauthorized use or disclosures of the privileged or otherwise confidential information of a client or former client, like the Privileged Information at issue here. The NY Rules also prohibit Defendant from manipulating and using the Privileged information to the Corporate Client's disadvantage.  (Heyison Decl. ¶ 13.)

### 2.       Defendant Agreed to Abide by HC2's Employment Rules and Policies

Defendant's Employment Agreement also incorporated the Conduct Rules.  (Zannikos Decl. ¶ 15; Exhibit A at HC2-00000057 ["Hire Counsel Policies and Handbook"].)  The Conduct Rules provide, among other things, that "concerns regarding your employment [should be] voiced directly [to] your HC2 recruiter."  (Zannikos Decl. ¶ 15; Exhibit B at HC2-00000013.)  The Conduct Rules also clearly state that under no circumstance should Defendant contact an HC2 client before, during or after an assignment to one of HC2's customers: "[c]ontacting anyone from the client . . . is against [HC2] policy."  (Zannikos Decl. ¶ 15; Exhibit B at HC2-00000014.)  Thus, Defendant knew to raise any concerns related to any HC2 Engagement with HC2 only and to never contact an HC2 client.  (Zannikos Decl. ¶ 15.)

### 3.       Defendant's Duty of Loyalty and Obligation to Indemnify to HC2 as an Employee

Defendant was also bound by a duty of loyalty to HC2, arising from the employer-employee relationship and memorialized in the Employee Handbook incorporated into the Employment Agreement.  (Zannikos Decl. ¶ 16.)  Specifically, Defendant was barred from "tak[ing] any action that is contrary to [HC2's] business interests or incompatible with the loyalty and obligation inherent in [his] employment."  (Zannikos Decl. ¶ 16, Exhibit C at HC2-00000025.) He also is required to indemnify and hold HC2 harmless for any economic loss HC2 suffers

because of Defendant's conduct pursuant to his Employment Agreement.  (Zannikos Decl. Exhibit A at HC2-00000056.)

## LEGAL STANDARD

A preliminary injunction is appropriate where the movant shows irreparable harm and "a likelihood of success on the merits . . . and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015).  Ultimately, the determination of whether to issue a preliminary injunction rests in the sound discretion of the district court which, "absent abuse of discretion, will not be disturbed on appeal."  *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

## ARGUMENT

### I.    HC2 WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

To meet the requirement of irreparable harm, "a movant need not demonstrate it[] [with] certainty."  *Wenner Media LLC v. N. & Shell N. Am. Ltd.*, No. 05-cv-1286 (CSH), 2005 WL 323727, at *3 (S.D.N.Y. Feb. 8, 2005) (citation omitted).  Rather, the movant need only show that it will suffer an injury that is actual and imminent -- rather than speculative -- absent a preliminary injunction and the injury cannot be adequately compensated through money damages.  *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995); *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003).  HC2 has met this standard.

First, HC2 has demonstrated irreparable harm by virtue of the loss of its goodwill, business opportunities, and harm to its customer relationships.  *See Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 496 (S.D.N.Y. 2018) (a "loss of reputation, goodwill, . . . business opportunities, or loss of customer relationships can justify injunctive relief on a breach of contract claim") (citations omitted).  Here, HC2's reputation as one of the preeminent legal staffing agencies in the industry and its goodwill and success -- all of which have been cultivated over three decades -- is largely

due to the fact clients and prospective clients consider HC2's candidate roster, including but not limited to contract attorneys such as Defendant, to be the very best.  (Zannikos Decl. ¶¶ 4-5.) Indeed, the mainstay of HC2's continued success is repeat business from current and former customers, as well as referrals from those customers.  But customers refer HC2 to others, or return with their next project, only if they are satisfied with HC2's services on their last project, which places a premium on the performance and conduct of each Contract Professional because those characteristics directly impact HC2's reputation, goodwill, and future business opportunities. (Zannikos Decl. ¶¶ 4-5.)

Another reason for HC2's goodwill is its reliability in providing highly competent and trustworthy services, which includes but is not limited to securing confidential information; in fact, the Law Firm Customer confirmed that it retained HC2 for the Project because of its ability to provide secure and confidential services.  (Zannikos Decl. ¶ 7; Heyison Decl. ¶¶ 8-9.)  However, Defendant's public disclosures in the Florida Action of the privileged or otherwise confidential information that he learned while employed by HC2 on the Project has placed the goodwill that HC2 had cultivated over the last three decades in jeopardy.  Further, based on Defendant's recent conduct, including his discussions with press outlets and dismissal of the Florida Action *without prejudice*, as well as his continued, but unsubstantiated, insistence that the Florida Complaint did not contain privileged and confidential information about the Corporate Client that he learned during the Project, the threat of similar actions by Defendant moving forward are real and imminent.  (Zannikos Decl. ¶ 46.)

Significantly, Defendant has chosen not to testify as a witness in this proceeding to explain his conduct or the factual basis for the Florida Complaint.  He has offered no evidence to rebut the testimony of Mr. Zannikos and Mr. Heyison that the Florida Complaint revealed the Corporate

Client's privileged and confidential information.  Rather than testify under oath in support of his opposition -- and subject himself to cross-examination -- Defendant submitted the Rotman Affirmation, which merely attaches publicly-sourced articles, blog posts, and internet search results that facially have no connection to the Florida Complaint and do not explain Defendant's conduct, and which he characterizes, without any foundation, are "representative examples" of what was used to prepare the complaint.  Even if these documents were used, in part, to inform the Florida Complaint -- and there is no admissible evidence to support that conclusion -- the Rotman Affirmation does not deny nor disprove that other portions of the Florida Complaint contain Privileged Information that Defendant learned while employed by HC2 and staffed on the Project.  Nor does it rebut, for example, Mr. Heyison's definitive testimony that from his "line by line" review of the Florida Complaint, it definitely contained privileged and confidential information from the Project.  (Heyison Dep. 53:8-54:7)

Moreover, Mr. Rotman merely states that the articles were "representative examples" of documents "used as the basis of" the Florida Complaint without explaining the basis of his alleged personal knowledge for what materials undergirded the Florida Complaint, or any other evidence that the articles he attached were utilized in its drafting.  Mr. Rotman's "affirmation" is of no evidentiary import as a result, and its content and attachments are hearsay that should be afforded no weight.[10]

Second, the disclosure of confidential information constitutes irreparable harm.  *See Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) (the disclosure of confidential information "is the quintessential type of irreparable harm that cannot be compensated or undone

---

[10] "The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage."  *Mullins v. City of New York*, 626 F.3d. 47, 52 (2d Cir. 2010).

by money damages"); *see also Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (granting preliminary injunction because "the confidentiality of . . . records will be irreversibly lost even if plaintiffs ultimately prevail on the merits of their claim"). Here, Mr. Heyison has personal knowledge of the facts underlying the Project and Matter and he provided *unrebutted* testimony that Defendant's Florida Complaint disclosed the Corporate Client's Privileged Information. (Heyison Decl. ¶¶ 25-33; Heyison Dep. 49:5-52:5, 52:10-15, 53:8-54:7, 54:17-56:4, 61:7-65:9, 65:25-67:8.) Mr. Zannikos has done the same. (Zannikos Decl. ¶¶ 42-48.)

Finally, the disclosure of privileged information by an attorney also constitutes irreparable harm. *See Data-Track Account Servs., Inc. v. Lee*, 291 A.D.2d 827, 827 (4th Dep't 2002) (affirming permanently enjoining defendant from "disclosing confidences and secrets he obtained during his employment as an attorney for plaintiffs' given irreparable harm from defendant's "repeated disclosures of confidential information to [plaintiffs'] detriment"). Here, the evidence of Defendant's disclosures of Privileged Information learned during the Project in the Florida Complaint, and the risk that he, as attorney, may further disclose confidential and privileged information from the Project, demonstrates irreparable harm. (Zannikos Decl. ¶¶ 42-48; Heyison Decl. ¶¶ 25-33; Heyison Dep. 49:5-52:5, 52:10-15, 53:8-54:7, 54:17-56:4, 61:7-65:9, 65:25-67:8.)

## II.    HC2 IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

To determine whether a plaintiff has demonstrated a likelihood of success on the merits, "a court is not called upon finally to decide the merits of the controversy . . . [i]t is necessary only that the court find that the plaintiff has presented a strong prima facie case to justify the discretionary issuance of preliminary relief." *Pictet Funds (Europe) S.A. v. Emerging Managers Grp., L.P.*, No. 14-CV-6854 SAS, 2014 WL 6766011, at *3 (S.D.N.Y. Dec. 1, 2014) (granting preliminary injunction) (citation omitted). To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty [but] need only make a showing that

the probability of [] prevailing is better than fifty percent." *Broker Genius*, 313 F. Supp. 3d at 497

(citations omitted).[11]  HC2 demonstrated with overwhelming, uncontroverted evidence that it will

succeed on its breach of contract claim against Defendant.

First, there was a valid contract.  Defendant executed the Employment Agreement on

December 28, 2016, which incorporated the NDA.  (Zannikos Decl. ¶ 8, Exhibit A.)  The

Employment Agreement also incorporated the Rules of Conduct and the Employee Handbook.

(Zannikos Decl., Exhibits B, C.)  Defendant also executed the Policies Acknowledgment in which

he agreed to adhere to the Conduct Rules and Employee Handbook.  (Zannikos Decl., Exhibit D.)

The NDA, Employee Handbook and Conduct Rules prohibited Defendant from disclosing

any confidential or privileged information and communications, and required him to preserve all

confidences with respect to HC2's clients.  (Zannikos Decl. ¶ 10, Exhibit A, Exhibit C, Exhibit

D.)  Furthermore, pursuant to the Employment Agreement, Defendant agreed not to divulge any

confidential information learned in the course of any assignment.  (Zannikos Decl. ¶ 12, Exhibit

A.)  By the NDA's express terms, Defendant agreed that his duties under the NDA were binding

and remained in full force and effect "indefinitely" even after his "relationship with [HC2] or any

of its Clients terminates."  (Zannikos Decl. ¶ 13, Exhibit A.)  Additionally, HC2's Conduct Rules

state that under no circumstance should Defendant contact an HC2 client without authorization,

either before, during or after an assignment to one of HC2's customers: "[c]ontacting anyone from

the client . . . is against [HC2] policy."  (Zannikos Decl. ¶ 15; Exhibit B.)  Second, HC2 performed

under the Employment Agreement by facilitating Defendant's placement on the Project and

---

[11]  To prevail on a breach of contract claim under New York law, a party must demonstrate "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."  *See Roswell Capital Partners LLC v. Alt. Const. Tech.*, 08-CIV-10647-DLC, 2009 WL 222348, at *8 (S.D.N.Y. Jan. 30, 2009) (finding plaintiff would be successful on the merits of its breach of contract claim where it showed undisputed evidence of defendants' breach).

abiding by its terms throughout the duration of the Project. (Zannikos Decl. ¶¶ 15-18.) Indeed, Defendant has not provided any evidence to the contrary.

Third, on several occasions, Defendant breached his Employment Agreement with HC2. As attested to by witnesses with personal knowledge of the facts underlying the Project and Matter, Defendant's Florida Complaint disclosed Privileged Information about the Corporate Client that he learned while employed by HC2 on the Project. (Zannikos Decl. ¶¶ 42-48; Heyison Decl. ¶¶ 25-33; Heyison Dep. 49:5-52:5, 52:10-15, 53:8-54:7, 54:17-56:4, 61:7-65:9, 65:25-67:8.) Such disclosures violated Defendant's Employment Agreement, the NDA, Employee Handbook and Conduct Rules. (Zannikos Decl. ¶ 8, Exhibits A-D.) Also, on several occasions between March 17 and 27, 2020, in violation of his Employment Agreement, and more specifically, the Conduct Rules, Defendant sent unauthorized emails to the Law Firm Customer and Corporate Client. (Zannikos Decl. ¶ 15; Exhibit B.) Finally, Defendant's breach of the Employment Agreement, NDA, Conduct Rules, and Employee Handbook and failure to abide by his contractual and professional obligations caused and will continue to cause damage to HC2's reputation, goodwill and its business. (Zannikos Decl. ¶ 47.) Defendant's conduct since March 17, culminating in the filing of the Florida Complaint, has compelled HC2 to initiate and litigate this action, which has resulted in legal fees and associated costs. (Zannikos Decl. ¶ 45.)

## III.    THE BALANCE OF EQUITIES WEIGH IN FAVOR OF INJUNCTIVE RELIEF

The balance of equities favor injunctive relief where the defendant fails to make "a convincing showing that he will be harmed in any material way" by the issuance of a preliminary injunction that requires him to comply with his obligations. *Clayton v. Whitton*, 233 A.D.2d 828, 830 (3d Dep't 1996). In balancing the equities, the Court may consider various other factors, such as "the interests of the general public." *See Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980)

("the public interest has always been a factor to be considered in the granting of a preliminary injunction").

Here, the public interest weighs in favor of injunctive relief, as it would preserve the integrity of the attorney-client privilege, attorney work product doctrine, and client confidences. As an attorney licensed to practice in New York State, Defendant has a professional duty, under Rules 1.6 and 1.9(c) of the New York Rules of Professional Conduct, not to make any unauthorized use or disclosures of the privileged or confidential information of a client or former client, like the information he learned during the Project.  He is also prohibited from manipulating and using the Privileged Information to the Corporate Client's disadvantage.  (Heyison Decl. ¶13.)  Despite this ethical and professional obligation (as well as his contractual obligations), Defendant has already violated Rules 1.6 and 1.9(c) by filing the Florida Complaint.  (Zannikos Decl. ¶¶ 42-48; Heyison Decl. ¶¶ 25-33; Heyison Dep. 49:5-52:5, 52:10-15, 53:8-54:7, 54:17-56:4, 61:7-65:9, 65:25-67:8.) In seeking the injunctive relief underlying this motion, Plaintiff seeks to prevent any future violations of Defendant's ethical and professional obligations as an attorney licensed in the State of New York, which is an interest shared by the public.  Moreover, Defendant has not offered any evidence that he will be harmed if enjoined from making any further disclosures in violation of his Employment Agreement and ethical and professional obligations as a New York attorney.

## IV.    HC2 SHOULD NOT BE REQUIRED TO PROVIDE SECURITY

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  However, it is "within the discretion of the district court to decide that, under the circumstances, no security [is] required."  *See Clarkson Co. v. Shaheen*, 544

F.2d 624, 632 (2d Cir. 1976) (same).  Here, because Defendant faces no risk of monetary loss from the issuance of an injunction requiring him to comply with his obligations, HC2 should not be required to post a bond.

## **CONCLUSION**

For the foregoing reasons, HC2's motion for a preliminary injunction should be granted.

Dated: New York, New York  
      May 22, 2020

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By:   */s/ Ronald R. Rossi*
     Marc E. Kasowitz
     Ronald R. Rossi
     Kalitamara L. Moody

     1633 Broadway
     New York, NY 10019
     Telephone:  (212) 506-1700
     Facsimile:  (212) 506-1800

     *Attorneys for Plaintiff HC2, Inc.*