# Exhibit A

408 F.Supp.3d 424
United States District Court, S.D. New York.

725 EATERY CORP. d/b/a "Lace", and 689
Eatery, Corp. d/b/a "Satin Dolls", Plaintiffs,
v.
CITY OF NEW YORK, Bill De Blasio, as
Mayor of the City of New York, and Rick D.
Chandler, as Commissioner of Buildings
of the City of New York, Defendants.
59 Murray Enterprises, Inc. a/k/a 59 Murray
Corp. d/b/a "New York Dolls", AAM Holding
Corp. d/b/a "Private Eyes", West 20th Enterprises
Corp. d/b/a "VIP Club New York", and JNS
Ventures Ltd. d/b/a "Vixen", Plaintiffs,
v.
City of New York, Bill De Blasio, as Mayor
of the City of New York, and Rick D.
Chandler, as Commissioner of Buildings
of the City of New York, Defendants.
Club at 60th St., Inc., and Jacaranda
Club, LLC d/b/a "Sapphire", Plaintiffs,
v.
City of New York, Defendant.
336 LLC d/b/a "The Erotica", Chelsea 7 Corp.,
Gotham Video Sales & Distribution Inc., Rainbow
Station 7 Inc., Video Lovers Inc., Vishara Video, Inc.,
Explore DVD LLC, Vishans Video, Inc., 725 Video
Outlet Inc., Jaysara Video, Inc., DCD Exclusive
Video Inc., and 557 Entertainment Inc., Plaintiffs,
v.
City of New York, Hon. Bill De Blasio, as Mayor
of the City of New York, and Rick D. Chandler,
as Commissioner of Buildings, Department of
Buildings of the City of New York, Defendants.

02cv4431
|
02cv4432
|
02cv8333
|
18cv3732
|
Signed September 30, 2019

**Synopsis**

**Background:** Owners of strip clubs and adult bookstores brought § 1983 action against city, mayor, and commissioner of city's department of buildings, seeking to enjoin enforcement of stringent zoning and permitting scheme for adult establishments, alleging violation of their First and Fourteenth Amendment rights. Owners moved for preliminary injunction.

**Holdings:** The District Court, William H. Pauley, Senior District Judge, held that:

[1] city's regulations were content-neutral, warranting intermediate scrutiny;

[2] city demonstrated that amended zoning regulations applicable to adult establishments served an important governmental interest; but

[3] city failed to show that regulations left open adequate alternative channels for speech, and thus owners were likely to succeed on merits of their claims; and

[4] balance of hardships weighed in favor of owners, and issuance of preliminary injunction would not have harmed city.

Motion granted.

West Headnotes (50)

**[1]**  **Constitutional Law**  Pornography in general
 **Constitutional Law** Nude dancing in general

While a far cry from political speech entitled to the fullest possible measure of constitutional protection, nude dancing and erotic materials nevertheless fall within the ambit of the First Amendment's free speech guarantees. U.S. Const. Amend. 1.

**[2]**    **Civil Rights** 👈 **Nature and elements of civil actions**

To state a § 1983 claim, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. 42 U.S.C.A. § 1983.

**[3]**    **Injunction** 👈 **Hearsay**

In the Second Circuit, courts routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief, including affidavits, depositions, and sworn testimony.

**[4]**    **Injunction** 👈 **Actions and Proceedings**
**Injunction** 👈 **Standard of proof in general**
**Injunction** 👈 **Hearing procedure**

A decision of whether to award preliminary injunctive relief is often based on procedures that are less formal and evidence that is less complete than in a trial on the merits.

**[5]**    **Injunction** 👈 **Weight and Sufficiency**

Motions for preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact.

**[6]**    **Evidence** 👈 **Records or decisions in same case**

District court would not take judicial notice of 80 documentary exhibits submitted by owners of adult establishments, in support of their motion for preliminary injunction in § 1983 action, alleging city's zoning scheme violated their First and Fourteenth Amendment rights; court could consider such documents without taking judicial notice of them because they were part of the record with respect to owners' motions for preliminary injunction. U.S. Const. Amends. 1, 14; Fed. R. Evid. 201.

**[7]**    **Injunction** 👈 **Pleadings and affidavits as evidence**
**Injunction** 👈 **Admissibility**

Courts may consider even inadmissible evidence in assessing the propriety of preliminary injunctive relief, be it in the form of affidavits or documentary evidence.

**[8]**    **Evidence** 👈 **Geographical Facts**

District Court would not take judicial notice of proposed adjudicative fact, submitted by owners of adult establishments, that city's analysis indicating there were more than 500 sites to which establishments could have relocated did not include consideration of 500-foot buffer zone being imposed around all then-existing establishments, when considering owners' request for preliminary injunction in § 1983 action, alleging city's zoning scheme applicable to such establishments violated their First and Fourteenth Amendment rights; owners did not identify a source from which such fact might have been accurately determined, and record indicated there was ambiguity as to veracity of proposed fact. U.S. Const. Amends. 1, 14; 42 U.S.C.A. § 1983; Fed. R. Evid. 201(b).

**[9]**    **Injunction** 👈 **Grounds in general; multiple factors**

A party seeking a preliminary injunction must typically establish (1) the likelihood of irreparable harm in the absence of injunctive relief; (2) either a likelihood of success on the merits, or sufficiently serious questions going to the merits of its claims to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor; and (4) that a preliminary injunction is in the public interest.

2 Cases that cite this headnote

**[10]**    **Injunction** 👈 **Injunctions Against Enforcement of Laws and Regulations**

Where a preliminary injunction is sought against government action taken in the public

interest pursuant to a statutory or regulatory scheme, the less-demanding fair ground for litigation standard is inapplicable, and therefore a likelihood of success on the merits must be shown in order to establish grounds for preliminary injunction.

**[11]**   **Injunction** 🔑 Injunctions Against Enforcement of Laws and Regulations

Higher standard requiring proof of likelihood of success on the merits, rather than merely demonstration that merits were fair ground for litigation, reflects the judicial deference toward legislation or regulations developed through presumptively reasoned democratic processes when considering a request for a preliminary injunction.

1 Cases that cite this headnote

**[12]**   **Injunction** 🔑 Purpose or function in general

Fundamentally, the purpose of interim equitable relief in the form of a preliminary injunction is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward.

**[13]**   **Injunction** 🔑 Injury, Hardship, Harm, or Effect

A plaintiff must demonstrate that, absent preliminary injunctive relief, it is likely to suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.

**[14]**   **Injunction** 🔑 Irreparable injury

A plaintiff seeking a preliminary injunction need only show a threat of irreparable harm, not that irreparable harm already has occurred.

**[15]**   **Civil Rights** 🔑 Preliminary Injunction

Loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury for purposes of a request for a preliminary injunction. U.S. Const. Amend. 1.

**[16]**   **Injunction** 🔑 Likelihood of success on merits

To establish a likelihood of success on the merits in support of a request for a preliminary injunction, plaintiffs need not show that success is an absolute certainty, but only that the probability of their prevailing is better than fifty percent.

2 Cases that cite this headnote

**[17]**   **Injunction** 🔑 Likelihood of success on merits

Plaintiffs seeking a preliminary injunction need not demonstrate a likelihood of success on the merits of every claim; rather, they need only show a likelihood of success on the merits of at least one of their claims.

4 Cases that cite this headnote

**[18]**   **Constitutional Law** 🔑 First Amendment

First Amendment's protections apply to states and municipalities through the Due Process Clause of the Fourteenth Amendment. U.S. Const. Amends. 1, 14.

**[19]**   **Civil Rights** 🔑 Preliminary Injunction

While plaintiffs seeking to enjoin government regulation carry the burden of persuading a court that they are entitled to a preliminary injunction, defendants bear the burden of justifying the governmental infringement on speech protected by the First Amendment. U.S. Const. Amend. 1.

**[20]**   **Constitutional Law** 🔑 Strict or exacting scrutiny; compelling interest test

Content-based restrictions on speech are presumptively invalid under the First

Amendment and must withstand strict scrutiny. U.S. Const. Amend. 1.

**[21]**    **Constitutional Law**    Narrow tailoring requirement; relationship to governmental interest

Regulations of expressive activity that are not based on content trigger only intermediate scrutiny under the First Amendment. U.S. Const. Amend. 1.

**[22]**    **Constitutional Law**    Narrow tailoring requirement; relationship to governmental interest

**Constitutional Law**    Existence of other channels of expression

Content-neutral regulations may limit the time, place, or manner of expression, whether oral, written, or symbolized by conduct, even in a public forum without violating the First Amendment, so long as the restrictions are reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information. U.S. Const. Amend. 1.

**[23]**    **Constitutional Law**    Zoning and land use in general

**Zoning and Planning**    Sexually-oriented businesses; nudity

City's amended zoning regulations applicable to adult establishments were properly analyzed as a form of time, place, and manner regulation in § 1983 action alleging regulations violated the First Amendment; regulations did not categorically ban such establishments, but instead principally restricted their location. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[24]**    **Constitutional Law**    Governmental disagreement with message conveyed

Principal inquiry when determining whether a restriction of speech is content-neutral for purposes of a First Amendment claim is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys. U.S. Const. Amend. 1.

**[25]**    **Constitutional Law**    Content-Neutral Regulations or Restrictions

An ordinance that regulates expressive activity is content-neutral so long as it is justified without reference to the content of the regulated speech. U.S. Const. Amend. 1.

**[26]**    **Constitutional Law**    Content-Neutral Regulations or Restrictions

Even if a regulation has an incidental effect on some speakers or messages but not others, it is content-neutral so long as it serves purposes unrelated to the content of expression. U.S. Const. Amend. 1.

**[27]**    **Constitutional Law**    Narrow tailoring requirement; relationship to governmental interest

Regulations that target only the potential harmful secondary effects of speech are content-neutral and trigger intermediate, rather than strict, scrutiny when considering a First Amendment claim. U.S. Const. Amend. 1.

**[28]**    **Constitutional Law**    Zoning and land use in general

**Zoning and Planning**    Sexually-oriented businesses; nudity

City's amended zoning regulations applicable to adult establishments were content-neutral, and thus intermediate scrutiny applied to such regulations in § 1983 claim by owners of such establishments, alleging regulations violated the First Amendment; purpose of regulations was not to suppress adult expression based on its content, but instead to reduce adverse secondary

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    4

effects of such establishments. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[29]**  **Constitutional Law**  👉 Narrow tailoring requirement;  relationship to governmental interest

For the intermediate scrutiny inquiry, with respect to a claim that governmental regulation of speech violates the First Amendment, the narrow tailoring requirement is satisfied so long as the content-neutral regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation. U.S. Const. Amend. 1.

**[30]**  **Constitutional Law**  👉 Narrow tailoring requirement;  relationship to governmental interest

In order to withstand intermediate scrutiny, on a claim that government regulation of speech violates the First Amendment, the regulation need not be the least restrictive or least intrusive means of achieving the stated governmental interest. U.S. Const. Amend. 1.

**[31]**  **Constitutional Law**  👉 Narrow tailoring requirement;  relationship to governmental interest

In the free speech context, a content-neutral time, place, or manner restriction will be considered narrowly tailored, and will withstand intermediate scrutiny under the First Amendment, unless a substantial portion of the burden on speech does not serve to advance its goals. U.S. Const. Amend. 1.

**[32]**  **Constitutional Law**  👉 Narrow tailoring requirement;  relationship to governmental interest

In order to withstand intermediate scrutiny on a claim under the First Amendment, a law must not burden substantially more speech than is necessary to further the government's legitimate interests. U.S. Const. Amend. 1.

**[33]**  **Courts**  👉 Number of judges concurring in opinion, and opinion by divided court

Rule that when a fragmented United States Supreme Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds only applies when one opinion is a logical subset of other, broader opinions; that is, only when the narrow opinion is the common denominator representing the position approved by at least five justices.

**[34]**  **Constitutional Law**  👉 Zoning and land use in general

**Zoning and Planning**  👉 Sexually-oriented businesses;  nudity

City demonstrated that amended zoning regulations applicable to adult establishments served an important governmental interest, as required to satisfy intermediate scrutiny with respect to First Amendment claim by owners of such establishments; city sought to reduce negative secondary effects of establishments with predominant, ongoing focus on adult-oriented expression, and city was not required to show that amended regulations were more effective than predecessor regulations, but rather that amended regulations promoted city's interest in reducing secondary effects more effectively than if they did not exist. U.S. Const. Amend. 1.

**[35]**  **Constitutional Law**  👉 Narrow tailoring requirement;  relationship to governmental interest

First Amendment does not require a municipality to conclusively prove its theory for establishing a connection between the regulated speech and the secondary effects sought to be abated in order to withstand intermediate scrutiny. U.S. Const. Amend. 1.

**[36]** **Constitutional Law** 👈 Availability of other sites

When considering whether a regulation of speech in the adult entertainment context leaves open reasonable alternative channels, as required under the First Amendment, a municipality need not identify the exact locations to which adult establishments may relocate, as opposed to identifying the general areas that remain available and proving that such areas contain enough potential relocation sites that are physically and legally available to accommodate the adult establishments. U.S. Const. Amend. 1.

**[37]** **Constitutional Law** 👈 Existence of other channels of expression

When determining whether reasonable alternative channels of speech are available, in the context of a First Amendment challenge to a government regulation of speech subject to intermediate scrutiny, availability inquiry centers on whether proposed sites are physically and legally available, and whether they are part of an actual commercial real estate market in the municipality. U.S. Const. Amend. 1.

**[38]** **Constitutional Law** 👈 Existence of other channels of expression

Availability of alternative channels for speech, in the context of determining whether regulation of speech satisfies intermediate scrutiny under the First Amendment, does not mean that the acquisition or use of land must be profitable or commercially practicable, and sites are not rendered unavailable simply by being already occupied by existing businesses, not currently for sale or lease, or otherwise not commercially viable. U.S. Const. Amend. 1.

**[39]** **Constitutional Law** 👈 Existence of other channels of expression

Fact that a site must be developed or is located in an industrial or manufacturing zone does not make it unsuitable when considering whether

that site may constitute an available alternative channel for free speech, in the context of determining whether government regulation of speech satisfies intermediate scrutiny on a First Amendment claim. U.S. Const. Amend. 1.

**[40]** **Constitutional Law** 👈 Existence of other channels of expression

When determining whether alternative channels for speech are available, in the context of considering whether regulation of speech withstands intermediate scrutiny under the First Amendment, land may be excluded as unavailable if the physical features of a site or the manner in which it has been developed are totally incompatible with any average commercial business, or the site lacks the basic infrastructure that is a precondition to private development. U.S. Const. Amend. 1.

**[41]** **Constitutional Law** 👈 Availability of other sites

Touchstone for determining whether other channels of speech are available, in the context of considering whether government regulation of adult-oriented business will withstand intermediate scrutiny under the First Amendment, is whether sites are part of the commercial market generally, irrespective of whether they meet the needs of adult businesses specifically. U.S. Const. Amend. 1.

**[42]** **Constitutional Law** 👈 Availability of other sites

A court considering whether alternative channels of speech remain available, when assessing whether government regulation of adult-oriented businesses will withstand intermediate scrutiny under the First Amendment, should account for circumstances as they exist at the time the court issues its judgment, or as close as is practicable to that time. U.S. Const. Amend. 1.

**[43]**　**Constitutional Law** 🔑 Availability of other sites

First Amendment does not allow courts to ignore post-enactment, extralegal changes and the impact they have on the sufficiency of alternative avenues of communication, when determining whether regulation of adult-oriented businesses will withstand intermediate scrutiny. U.S. Const. Amend. 1.

**[44]**　**Civil Rights** 🔑 Property and housing

City failed to demonstrate that its amended zoning regulations applicable to adult establishments left open sufficient alternative channels for adult-oriented speech, and thus owners of such establishments were likely to succeed on merits of their § 1983 claim that such regulations could not withstand intermediate scrutiny and violated the First Amendment, as required for owners to obtain preliminary injunction; while city presented maps purporting to show 36 lots available in one of city's boroughs, city's map did not take into consideration anti-concentration provisions in regulations, which prohibited establishments from being located within 500 feet of one another, and when such criteria were applied to city's map, a maximum of only 13 such establishments could co-exist in borough. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[45]**　**Constitutional Law** 🔑 Absolute nature of right

First Amendment simply does not guarantee the right to communicate one's views at all times and places and in any manner that may be desired. U.S. Const. Amend. 1.

**[46]**　**Injunction** 🔑 Extraordinary or unusual nature of remedy

**Injunction** 🔑 Factors Considered in General

Preliminary injunction inquiry requires courts to balance the competing claims of injury, consider the effect on each party of the granting or

withholding of the requested relief, and pay particular regard to the public consequences in employing the extraordinary remedy of preliminary relief.

**[47]**　**Injunction** 🔑 Injunctions against government entities in general

Factors requiring consideration of balance of hardships and public interest when determining whether to issue a preliminary injunction merge when the government is the opposing party.

**[48]**　**Civil Rights** 🔑 Property and housing

Balance of hardships weighed in favor of owners of adult establishments, and issuance of a preliminary injunction would not have disserved public interest, warranting issuance of such injunction to prevent city's enforcement of amended zoning regulations governing adult-oriented businesses, on § 1983 claim by owners, alleging such regulations violated the First Amendment; owners faced loss of their businesses, leases, and employees if regulations were enforced, and city would not have been harmed, since it had already refrained from enforcing amended regulations for 18 years, and city had no interest in enforcing an unconstitutional law. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[49]**　**Injunction** 🔑 Operation and effect

District Court's findings when deciding a motion for preliminary injunction are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses.

**[50]**　**Civil Rights** 🔑 Preliminary Injunction

With respect to a motion for preliminary injunction in the context of a regulation of speech, securing First Amendment rights is in the public interest. U.S. Const. Amend. 1.

## Attorneys and Law Firms

**\*430** Daniel Alan Silver, Silver & Silver LLP, New Britain, CT, Jennifer Marie Kinsley, Kinsley Law Office, Cincinnati, OH, for Plaintiffs 725 EATERY CORP. d/b/a "Lace", and 689 Eatery, Corp. d/b/a "Satin Dolls."

Edward S. Rudofsky, Zane and Rudofsky, New York, NY, for Plaintiffs 59 Murray Enterprises, Inc. a/k/a 59 Murray Corp. d/b/a "New York Dolls", AAM Holding Corp. d/b/a "Private Eyes", West 20th Enterprises Corp. d/b/a "VIP Club New York", and JNS Ventures Ltd. d/b/a "Vixen".

John H. Weston and G. Randall Garrou, Weston, Garrou & Mooney, Los Angeles, California, Alan M. Abramson, Abramson & Morak, New York, NY, for Plaintiffs Club at 60th St., Inc., and Jacaranda Club, LLC d/b/a "Sapphire".

Erica T. Dubno, Fahringer & Dubno, New York, NY, for Plaintiffs 336 LLC d/b/a "The Erotica", Chelsea 7 Corp., Gotham Video Sales & Distribution Inc., Rainbow Station 7 Inc., Video Lovers Inc., Vishara Video, Inc., Explore DVD LLC, Vishans Video, Inc., 725 Video Outlet Inc., Jaysara Video, Inc., DCD Exclusive Video Inc., and 557 Entertainment Inc.

Robin Binder, Sheryl Rebecca Neufeld, Kerri Ann Devine, Mark W. Muschenheim, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

## OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

Plaintiffs—the owners and operators of gentlemen's cabarets (or in lay terms, strip clubs) and adult bookstores primarily located in Manhattan—challenge the constitutionality of amendments to sections of the Zoning Resolution of the City of New York (the "Zoning Resolution," and the "City") that define and apply to adult establishments. Tracing its origins to the City's early 1990s crusade against adult entertainment businesses, this litigation has been ensnared in a time warp for a quarter century. During that interval, related challenges to the City's Zoning Resolution have sojourned through various levels of the state and federal courts.

**\*431** Plaintiffs seek to preliminarily enjoin the City, the Mayor of the City, and the City's Commissioner of Buildings from enforcing the amendments, which would subject them to the City's stringent zoning and permitting scheme for adult establishments. In connection with Plaintiffs' motions, the parties have offered a Homeric record of affidavits, documentary evidence, and stipulations. Having reviewed the briefing and evidentiary submissions by the parties, this Court makes the following findings of fact and conclusions of law pursuant to Rules 52(a)(2) and 65 of the Federal Rules of Civil Procedure. Plaintiffs' motions for preliminary injunctions are granted, as specified in the conclusion of this Opinion & Order.

## BACKGROUND

[1] While a far cry from political speech "entitled to the fullest possible measure of constitutional protection," Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 816, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), nude dancing and erotic materials nevertheless fall within the ambit of the First Amendment's free speech guarantees, see City of Erie v. Pap's A.M., 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion) (explaining that nude dancing may constitute expressive conduct that "falls only within the outer ambit of the First Amendment's protection"); Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 70, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality) ("[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate ....").

These consolidated actions represent the latest installment in a decades-long dispute between purveyors of adult entertainment and the City that pits the First Amendment rights of private citizens against the government's interest in regulating the harmful secondary effects that may be engendered by that speech. The plaintiffs in these actions are part of an adult entertainment industry boom that began in the mid-1960s. The City—like many other municipalities across the United States—sought to contain the fallout of increased crime, lowered property values, and decreased quality of life by regulating where adult establishments could be located. Consequently, in 1995, the City adopted regulations that barred adult establishments from certain districts, prohibited

them from being located near sensitive receptors such as schools and churches, and sought to disperse them.

The kaleidoscopic litigation that ensued ultimately upheld the constitutionality of the City's efforts. But it also resulted in a determination by New York's highest court that the regulatory scheme did not apply to adult establishments so long as they limited their adult component to less than 40 percent of their floor area and stock-in-trade. Unsurprisingly, many adult establishments did just that. In response to what it viewed as a naked attempt to skirt the adult-use regulations through nothing more than formalistic compliance, the City amended its regulations in 2001. According to the City, these amendments more faithfully effectuate the regulations, which it maintains were always intended to apply to establishments with a predominant, ongoing focus on sexually explicit content. On the other hand, the adult establishments principally argued that the City needed to—but did not—demonstrate some nexus between the reconfigured adult establishments and the negative secondary **\*432** effects it identified in the early 1990s.

At center stage in these actions is the constitutionality of the City's 2001 amendments to its adult-use regulations. The plaintiffs may generally be cleaved into two groups. The first set of challengers to the City's adult-use regulations are owners and operators of gentlemen's clubs that present exotic dancing in at least part of their establishments (collectively, the "Club Plaintiffs"). The second set of challengers own and operate bookstores that contain private booths for patrons to view adult films (collectively, the "Bookstore Plaintiffs," and together with the Club Plaintiffs, the "Plaintiffs"). For background, this Court describes the City's iterative efforts to regulate adult establishments and the legal challenges mounted by those establishments before turning to the facts of this case.

I. Adult Entertainment Regulation in New York City
The events underlying these actions begin in the early 1990s, when the City undertook efforts to regulate where adult businesses could be located. [1] (Second Amended Complaint of Plaintiff 725 Eatery, Corp. and Initial Complaint of 689 Eatery, Corp., ECF No. 77, 02cv4431 ("4431 Compl."), ¶¶ 11-13; Amended Complaint, ECF No. 20, 18cv3732 ("3732 Compl."), ¶¶ 43-47.) Before that time, the City's Zoning Resolution did not distinguish between adult establishments and non-adult commercial establishments for zoning purposes. In late 1993, however, the City's Department

of City Planning ("DCP") undertook an "Adult Entertainment Study," which was completed in September 1994. (See Declaration of Kerri A. Devine, ECF No. 101, 02cv4431 ("Devine Decl."), Ex. J (the "DCP Study").)

A key question in these actions (and parallel challenges to the City's adult-use regulations) is whether the DCP Study may be used to justify the City's 2001 amendments. Thus, this Court reviews the DCP Study in considerable—though not exhaustive—depth.

A. The 1994 Adult Entertainment Study
The purpose of the DCP Study was to evaluate the nature and extent of adverse impacts that adult establishments have on surrounding communities. (DCP Study at 1.) To that end, the DCP Study focused on three types of adult uses, defined generally as commercial establishments dealing in materials or activities of a sexual nature: adult video and bookstores; adult theaters showing film or live entertainment; and topless or nude bars. (DCP Study at 1-2.)

1. The Experience of Other Municipalities

The DCP Study briefly canvassed impact studies from several other municipalities—namely, Islip, New York; Los Angeles, California; Indianapolis, Indiana; Whittier, California; Austin, Texas; Phoenix, Arizona; Manatee County, Florida; New Hanover County, North Carolina; and the State of Minnesota. (See DCP Study at 3-9.) The DCP Study also reviewed methods other municipalities **\*433** employed to regulate where adult establishments could be located, generally by concentrating adult uses in specified locations or by dispersing adult establishments throughout the municipality. (See DCP Study at 9-15.) Most of the impact studies from other municipalities appeared to find some correlation between the existence of adult establishments and increased crime, lowered commercial and residential property values, and/or lowered quality of life in surrounding commercial areas and residential neighborhoods. However, several additional observations are warranted.

First, the DCP's scant treatment of each impact study spans only a few paragraphs, and the DCP Study's survey of these studies does not flesh out the causal link between adult establishments and negative secondary effects. (See, e.g., DCP Study at 4 (noting that in the Los Angeles study, police department statistics indicated a "greater proportion of certain

crimes in Hollywood (where the largest concentration of adult establishments is found in the city) compared with the city as a whole").) Second, the correlations observed in some of the impact studies can best be described as tepid. For instance, the Los Angeles study conceded that "there was insufficient evidence to support the contention that concentrations of sex-related businesses have been the primary cause of [property devaluation]." (DCP Study at 62.) Likewise, the Minnesota study observed that adult establishments concentrate in relatively deteriorated areas and "at most, they may slightly contribute to the continued depression of property values." (DCP Study at 8.) Third, the decrease in property values suggested by some of the impact studies is based on surveys of real estate professionals regarding what they believed the impact of an adult establishment would be. Moreover, several of the impact studies rely on the experiences of and studies by other municipalities.

2. The Antediluvian State of Affairs in Adult Entertainment

The DCP Study also reviewed the adult entertainment industry as a whole and as it existed in New York City. As for the former, the DCP Study observed the explosion in adult video sales and rentals beginning in the 1980s, along with the rise in upscale topless clubs and bars catering to a young, affluent clientele in the early 1990s. (DCP Study at 16-19.) With respect to New York City, the DCP charted the substantial growth of adult establishments from 9 such establishments in 1965 to 177 in 1993. (DCP Study at 20.) In line with nationwide trends, the number of adult bookstores or video stores and adult topless or nude bars increased between 1984 and 1993. (DCP Study at 21.) The DCP Study also found that the vast majority of adult establishments were located in Manhattan and Queens, especially in the Times Square and Chelsea neighborhoods in Manhattan. (DCP Study at 20-23.)

In response to the proliferation of adult establishments in Times Square (particularly massage parlors, somewhat euphemistically referred to as "adult physical culture establishments"), the City undertook efforts to regulate adult businesses in the mid- to late-1970s. As the DCP Study explains, these efforts culminated in a proposal by the City Planning Commission (the "CPC") to establish five categories of adult uses, restrict those uses to particular districts, and subject them to other distance, concentration, signage, and amortization requirements. [2] (DCP Study at 31-32.) Notably, the CPC's proposal contained **\*434** a safety

valve under which the City's Board of Standards and Appeals and the CPC could exempt existing and new adult uses from these restrictions after making findings to ensure that any adverse impacts would be minimized. (DCP Study at 32.) Nonetheless, the City's early foray into comprehensive adult-use regulation proved only partially successful. In particular, the CPC's proposal functionally pushed the City's adult establishments outside Manhattan and concentrated them in the outer boroughs, resulting in a public outcry that scuttled the proposed legislation. (See DCP Study at 33 (statement by then–CPC counsel that "[t]he Commission was accused [by citizens of the four boroughs other than Manhattan] of fostering 'red light districts' in the outer boroughs[,] and the cry was raised ever more loudly to restrict adult uses to Manhattan") (second alteration in original).) Thus, while the City eventually succeeded in eliminating massage parlors as a permitted use city-wide following a 1978 proposal by the CPC, "only part of the effort to control the location of adult uses was adopted legislatively." (DCP Study at 33.)

3. Impacts of Adult Entertainment Businesses in New York City

Importantly for purposes of Plaintiffs' motions, the DCP Study catalogues the impacts of adult uses identified by various studies and sources, starting with those identified by the CPC in 1977. Specifically, the CPC had justified its 1970s regulatory efforts on the basis that they would "reduce the adverse economic and social effects that these concentrations produce." (DCP Study at 34 (citation omitted).) These impacts included "economic factors, increased criminal activity, the damaging influences on minors and the disruptive effects that adult uses have on neighboring residential communities and the youth of such communities." (DCP Study at 34-35 (citation omitted).)

The CPC's findings were generally corroborated by subsequent sources reviewed by the DCP Study. For instance, the 1983 Annual Report of The Mayor's Office of Midtown Enforcement highlighted the increased criminal activity occurring in districts with adult establishments. (DCP Study at 35-36.) Ten years later, a survey of businesses conducted by the Chelsea Action Coalition and Community Board No. 4 revealed widespread perceptions by the business community that adult establishments negatively impact Chelsea's reputation and the economic vitality of its businesses. (DCP Study at 37-38.) Property and business owners surveyed by the Times Square Business Improvement

District (the "TSBID") in an April 1994 study also expressed their view that adult businesses negatively affect property values and contributed to declining business. [3] (DCP Study at 41.) The TSBID study also found a direct correlation between crime and the concentration of adult establishments based on a review of crime statistics. (DCP Study at 41.) Similarly, during a 1993 public hearing conducted by Manhattan's Task Force on the Regulation of Sex-Related Businesses, members of the community testified to increased crime and decreased quality of life wrought by adult establishments, especially in residential neighborhoods. (DCP Study at 38-39.) These community objections based on crime and quality of life concerns are also generally echoed in newspaper reports **\*435** summarized by the DCP. (See DCP Study at 41-46.)

In addition to relying on these extraneous sources, the DCP conducted its own community survey and analysis of criminal complaint statistics and property value data for six study areas to assess the impact of adult establishments. [4] As to the former, the DCP surveyed community organizations, businesses, real estate brokers, police officers, and sanitation department officials in the study areas. The results of the survey were mixed, suggesting that adult uses may negatively impact businesses, property values, quality of life in the community, and crime to different degrees. [5] (DCP Study at 47-51.) For example, over 80% of responding community organizations believed that adult establishments negatively impacted the community in some fashion. (DCP Study at 49.) Similarly, over 80 percent of responding real estate brokers reported that an adult establishment tended to decrease property values within a 500-foot radius, though several brokers acknowledged that the impact would be minimal or that other factors contributed to property values in the surrounding areas. (DCP Study at 50-51.) On the other hand, only roughly half of responding businesses believed that their business would be negatively affected by adult establishments, while a nearly equal number believed that their business would be positively affected by more bars, theaters, videos, or bookstores of any kind. (DCP Study at 49-50.) And at the other end of the spectrum, the responding police officers "generally did not link higher incidents with adult uses," and four out of six respondents thought that adult uses had no effect on crime. (DCP Study at 50.)

The results of the DCP Study's analysis of criminal complaint data for the three-month period beginning on June 1, 1993 also failed to conclusively link adult establishments with increased crime rates. (DCP Study at 52-53.) After controlling for differences in land use and the number of blockfronts

examined, the DCP Study found that in three of the six study areas, the blockfronts with adult uses had fewer criminal complaints than those without adult uses. In one study area, neither the blockfront with adult uses nor the blockfront without adult uses had any criminal complaints. And in only two study areas, the number of criminal complaints was higher for the blockfronts with adult uses than those without adult uses. Thus, the DCP Study found no causal link between adult establishments and criminal complaints, explaining as follows:

> In summary, it was not possible to draw definitive conclusions from the analysis of criminal complaints. Land uses other than adult entertainment establishments, e.g. subway station access, appear to have a far stronger relationship to criminal complaints. It was not possible to isolate the impact of adult uses relative to criminal complaints.

(DCP Study at 54.)

With respect to property values, the DCP compared the percentage change in **\*436** property assessed valuations between 1986 and 1992 in survey blockfronts with the percentage change in control blockfronts, the community district, and the borough as a whole. As with its analysis of crime rates, the DCP Study found the impact of adult establishments on property values to be inconclusive, notwithstanding the responses by real estate brokers to the DCP's survey. (DCP Study at 54.) In the four study areas outside of Manhattan, the total assessed valuation increased by a greater percentage in the blockfronts with adult uses than those without adult uses. (DCP Study at 54-55.) However, in the two Manhattan study areas, the valuation for the non-adult-use blockfronts "substantially exceeded" the change in the assessed valuation for the adult-use blockfronts. (DCP Study at 54.) As the DCP Study explains,

> [i]t would appear that if adult entertainment uses have negative impacts, they are overwhelmed by other forces that increased property values overall, at least as measured

by assessed values.... While the total assessed values on the survey blockfronts [i.e., those with adult uses] may be influenced to some extent by the presence of adult entertainment uses, demonstrating such effects is very difficult.

(DCP Study at 54; see also DCP Study at 55 (listing reasons why the DCP's assessed value findings "are necessarily ambiguous").)

### 4. The DCP's Conclusions and Recommendations

Despite the inconclusive results of its own analysis of crime statistics and property values, the DCP "believe[d] it appropriate to regulate adult entertainment establishments differently from other commercial establishments." (DCP Study at 65.) Though it disclaimed "[c]onsideration of the specific nature and extent of regulations that would be appropriate for adult entertainment establishments" in the City, it suggested that "restrictions on the location of adult uses in proximity to residential areas, to houses of worship, to schools and to each other" as other municipalities had done merited further consideration "in light of the negative impacts of adult uses in concentration." (DCP Study at 65.)

Specifically, the DCP Study noted that "[n]umerous studies in other localities found that adult entertainment uses have negative secondary impacts such as increased crime rates, depreciation of property values, deterioration of community character and the quality of urban life."[6] (DCP Study at 63; see also DCP Study at 56-58 (describing the negative secondary impacts found in studies conducted by various municipalities).) The DCP Study reiterated that the number of adult establishments in the City had increased substantially from 131 establishments in 1984 to 177 in 1993, and that adult uses often tended to cluster together. (See DCP Study at 56, 64.) In particular, it observed that the Times Square and Chelsea neighborhoods—with their higher concentrations of adult establishments—had more severe negative secondary effects than areas with sparser concentrations of adult establishments. (See DCP Study at 64.) In so concluding, the DCP summarized the **\*437** studies, newspaper articles, and other sources that documented the secondary effects of adult establishments in the City. (See DCP Study at 58-60, 64.)

Finally, it pointed to the results of its own survey,[7] in which a substantial majority of real estate brokers and community organizations complained about the negative impact that adult establishments had on property values and the community. (See DCP Study at 61, 63-65.)

### B. The 1995 Adult-Use Regulations

On November 23, 1994, the Council of the City of New York (the "City Council") adopted an application submitted by the DCP and approved by the CPC for a text amendment to the Zoning Resolution to define the term "adult establishment" as a land use. (Plaintiffs' Joint Appendix in Support of Plaintiffs' Motion for Preliminary Injunction ("PJA") at 1473.[8]) The adopted application imposed a one-year moratorium on the establishment of new adult businesses and the extension or enlargement of existing adult businesses to allow permanent adult-use zoning regulations to be developed, in part, as a result of the DCP Study. (4431 Compl. ¶ 12; 3732 Compl. ¶ 47; see Devine Decl., Ex. L (the "1995 CPC Report"), at 1-5.) The Club Plaintiffs allege that the studies and ordinances referenced by the DCP Study were not provided to the City Council when it enacted the moratorium. (4431 Compl. ¶ 14.) This section outlines the City's efforts during the one-year moratorium to create a set of permanent regulations governing the types of adult establishments studied by the DCP, as well as the morass of litigation that followed.

### 1. The 1995 CPC Report and Proposed Amendments

On March 21, 1995, the DCP and the City Council's Land Use Committee filed a joint application to amend the Zoning Resolution. (PJA at 1475; Devine Decl., Ex. I (the "Karnovsky Decl."), ¶ 25.) The CPC approved the proposed zoning regulations (with modifications in response to public comment) in a September 18, 1995 report describing the regulations and explaining their bases, which this Court refers to as the "1995 CPC Report." As explained in the preamble to the 1995 CPC Report, the proposed regulations would discontinue the one-year moratorium and "provide permanent regulations governing the siting of adult establishments in a manner which works to protect against the adverse secondary effects of adult establishments while allowing sufficient opportunity for and access to adult materials." (1995 CPC Report at 1; see also 1995 CPC Report at 5.)

**\*438** As described by the CPC, the proposed regulations were referred to the City's community and borough boards

and the borough presidents for review and comment. (1995 CPC Report at 13-23.) Out of thirty-nine community boards, eleven voted in favor of the proposed zoning regulations, eleven others voted in favor but wanted to make the zoning proposal more restrictive (for example, by increasing the buffer zones or adding additional sensitive receptors), four voted in favor but wanted to make the zoning proposal less restrictive (for example, by decreasing the buffer zones or cabining the list of sensitive receptors), and thirteen voted against the proposal. (1995 CPC Report at 13-16.) Of the thirteen community boards voting against the proposal, six still sought some restrictions on adult uses, and four wanted adult establishments banned entirely. (1995 CPC Report at 13.) The borough presidents for the Bronx and Staten Island recommended approval of the proposed regulations with modification, while the borough president for Manhattan recommended against approval. (1995 CPC Report at 17-19.) Similarly, the Bronx, Queens, and Staten Island borough boards voted to approve the proposed regulations with modification, whereas the Brooklyn and Manhattan borough boards voted against approval. (1995 CPC Report at 19-21.)

The CPC also conducted public hearings on the proposed regulations on July 26 and 27, 1995. (1995 CPC Report at 23-33.) Of the eighty speakers who testified, twenty-four testified in favor of the proposal, while fifty-six opposed. As a general matter, those in favor of the proposal pointed to the adverse secondary effects of adult establishments, such as decreased quality of life, increased crime, adverse economic impacts on businesses and property values, and the intrusion of adult establishments (and with them, gaudy or inappropriate signage) on the character of residential and commercial areas. (1995 CPC Report at 25-30.) It should be noted that while some speakers who opposed the proposed regulations cited constitutional concerns and the fear that such regulations would disproportionately target the gay and lesbian communities, the "great preponderance of testimony" against the proposed regulations actually "reflected the perception that the proposal was not restrictive enough and that adult uses should be prohibited in more areas of the City" based on some of the same secondary-effects rationales. (1995 CPC Report at 25-30.)

Ultimately, the CPC found the proposed zoning regulations (with modifications) to be "an appropriate and necessary response to the adverse secondary effects stemming from adult establishments" identified by the DCP Study, the studies conducted in the City and in other municipalities, and public testimony. (See 1995 CPC Report at 33-42.) It explained how the locational, anti-concentration, signage, and amortization provisions were designed to target each of the identified adverse effects stemming from adult establishments. (See 1995 CPC Report at 42-43.) Referencing analyses conducted by the DCP, [9] the CPC believed that the proposed regulations would continue to allow adult establishments to locate and operate in "substantial numbers in all boroughs and in a variety of locations, assuring sufficient access to adult materials." (1995 CPC Report at 44.) Nonetheless, the CPC found modifications warranted in response to comments by the public. First, the CPC recommended modifications that would increase the number of potential sites in **\*439** Manhattan without significantly impairing the efficacy of the proposed regulations to account for Manhattan's greater share of adult establishments and potential users. (1995 CPC Report at 45-48.) Second, the CPC recommended modifications that would clarify the adult-use definitions to "tailor application of the regulations to the types of enterprises studied in the DCP Study." (1995 CPC Report at 45; see 1995 CPC Report at 48-57.)

On October 25, 1995, the City Council passed Resolution No. 1322, adopting the CPC's approval of the proposed regulations (the "1995 Regulations"). In broad strokes, §§ 32-01 and 42-01 of the Amended Zoning Resolution ("AZR") subjected adult establishments in commercial and manufacturing zones to special locational, anti-concentration, signage, and amortization provisions on top of the existing regulations that governed non-adult commercial uses in those districts. (PJA at 353, 356; 1995 CPC Report at 6-7.) With respect to location, AZR §§ 32-01 and 42-01 barred adult establishments from residential districts as well as commercial and manufacturing districts that permitted new residential uses. (PJA at 354, 356; 1995 CPC Report at 7.) In the specified commercial and manufacturing districts in which adult establishments would be allowed, AZR §§ 32-01 and 42-01 required each establishment to be located at least 500 feet from certain sensitive receptors (i.e., an existing house of worship, school, or daycare center); another adult establishment; or certain districts in which new residences were permitted—though houses of worship, schools, or daycare centers subsequently established within 500 feet of a conforming adult establishment would generally not render it non-conforming. (PJA at 354, 356-57; 1995 CPC Report at 7-8.) The 1995 Regulations also limited the number of adult establishments per zoning lot to one establishment, not to exceed 10,000 square feet of floor area and cellar space. (PJA at 354, 357; 1995 CPC Report at 7-8.)

Under AZR §§ 52-734 and 52-77, non-conforming existing adult establishments would generally be required to terminate or change their operations to conform within one year of the effective date of the regulations or within one year of a subsequent map change to allow business owners to recoup their investment in the adult portion of the establishment. (PJA at 359-60; 1995 CPC Report at 11.) The amortization provisions set forth in AZR § 72-40 allowed owners to apply the Board of Standards and Appeals at least 120 days before the termination date for additional time to amortize their establishments. (PJA at 361-62; 1995 CPC Report at 11.) Existing adult establishments made non-conforming solely by virtue of being located within 500 feet of another adult establishment, being located in the same zoning lot as another adult establishment, or exceeding 10,000 square feet of floor area and cellar space were not subject to the termination provisions. (PJA at 355, 357; 1995 CPC Report at 9.)

Of course, these special restrictions apply only to "adult establishments." On that score, the 1995 Regulations amended AZR § 12-10 to define the term "adult establishment" and four types of adult establishments distinguished primarily by their emphasis on "specified sexual activities" and "specified anatomical areas." [10] (See 1995 **\*440** CPC Report at 6.) Specifically, the proposed regulations defined an "adult establishment" as a commercial establishment in which a "substantial portion" of the establishment includes an "adult book store," "adult eating or drinking establishment," "adult theater," or other "adult commercial establishment." (PJA at 351.) In turn, AZR § 12-10 defined an "adult book store" as a book store that has a "substantial portion" of its stock-in-trade printed matter or visual representations characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas." (PJA at 351.) An "adult eating or drinking establishment" was defined in the ordinance as an eating or drinking establishment that "regularly features" live performances or films characterized by an emphasis on "specified anatomical areas" or "specified sexual activities," or employees who, as part of their employment, "regularly expose" to patrons "specified anatomical areas." (PJA at 351-52.) Similarly, AZR § 12-10 defined an "adult theater" as a theater that "regularly features" live performances or films characterized by an emphasis on "specified anatomical areas" or "specified sexual activities," and included "commercial establishments where such materials or performances are viewed from individual enclosures." (PJA at 352.)

Importantly for purposes of subsequent legal challenges to the City's adult-use regulations, AZR § 12-10 also offered guidance in determining whether a "substantial portion" of a commercial establishment includes an adult use or whether a "substantial portion" of a book store's stock-in-trade contains the materials enumerated in the ordinance. The former required a consideration of the following factors:

> (1) the amount of floor area and cellar space accessible to customers and allocated to such uses; and (2) the amount of floor area and cellar space accessible to customers and allocated to such uses as compared to the total floor area and cellar space accessible to customers in the establishment.

(PJA at 353.) As for the latter, AZR § 12-10 prescribed the following considerations:

> (1) the amount of such stock accessible to customers as compared to the total stock accessible to customers in the establishment; and (2) the amount of floor area and cellar space accessible to customers containing such stock; and (3) the amount of floor area and cellar space accessible to customers containing such stock as compared to the total floor area and cellar space accessible to customers in the establishment.

(PJA at 353.)

The 1995 CPC Report explains why the CPC embraced a quantitative test based on floor area rather than a qualitative test. Specifically, the 1995 CPC Report noted that "[p]articular concern was expressed regarding the use of the word 'substantial' in the definitions of adult book stores and of adult establishments. Certain speakers questioned whether the word provided sufficient guidance to an enforcement official to allow enforcement in an objective, non-biased, manner." (1995 CPC Report at 50.) To allay these concerns,

the 1995 CPC Report recommended that "substantial" be defined in terms of floor area:

> **\*441**  To further the general intent of the adult use regulations, the [CPC] believes an enforcement agency should consider the following factors to establish whether a "substantial" portion of an establishment is occupied by an adult use or adult materials: (1) the overall amount of floor area accessible to customers devoted to adult purposes; (2) the amount of floor area devoted to adult purposes as compared to the total commercial floor area of the establishment; and (3) the amount of stock of a sexually explicit nature as compared to the total stock. <u>As a general guideline, the [CPC] believes that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an "adult establishment" or "adult bookstore."</u>

(1995 CPC Report at 50 (emphasis added).) In sum, the CPC embraced a floor-area approach due to its objective nature, specifically rejecting an approach based on the nature or prominence of adult materials vis-à-vis non-adult materials as overly subjective. (See 1995 CPC Report at 51 ("Other factors, such as the nature or prominence of display of adult materials, would reinsert a level of discretion into an enforcement effort which the [CPC] believes is unnecessary and should be avoided.").)

One final point is worth noting. Notwithstanding the preeminence of what eventually became known as the "60/40 Standard," the 1995 CPC Report acknowledged that "there may be exceptions to this general guideline," such as an establishment that moves a disproportionate amount of adult materials into a small floor area or one with over 10,000 square feet of floor area devoted to adult purposes, irrespective of the overall size of the establishment. (1995 CPC Report at 50-51.) The overarching theme is that the regulations "[were] not intended to cover general interest

book or video stores with a section of adult materials that is modest in scale as compared to the overall size of the establishment." (1995 CPC Report at 51.) Rather, the CPC reiterated that "adult establishments" were "intended to be only those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities." [11]  (1995 CPC Report at 49.) In other words, the CPC emphasized that this "limited range of establishments" analyzed in the DCP Study and found to give rise to adverse secondary effects "are the only establishments covered by the adult use regulations." (1995 CPC Report at 49.)

### 2. Legal Challenges to the 1995 Regulations

The 1995 Regulations opened a Pandora's box of litigation by over 100 owners and operators of adult establishments as well as patrons of such establishments. (See 4431 Compl. ¶¶ 27-28.) Defendants removed two of those actions —Amsterdam Video, Inc. v. City of New York and Hickerson v. City of New York—to the Southern District of New York. The court remanded the claims arising under the New York state constitution in both actions and held in abeyance the federal constitutional claims pending the determination of the **\*442**  state constitutional claims in state court. See Hickerson v. City of New York, 932 F. Supp. 550, 559 (S.D.N.Y. 1996). Subsequently, Amsterdam Video and Hickerson were consolidated with a third case filed in New York state court —Stringfellow's of New York, Ltd. v. City of New York.

On summary judgment, the state court upheld the 1995 Regulations under the state constitution, applying the standards set forth by New York's highest court in Town of Islip v. Caviglia, 73 N.Y.2d 544, 542 N.Y.S.2d 139, 540 N.E.2d 215 (1989). Stringfellow's of N.Y., Ltd. v. City of New York, 171 Misc.2d 376, 653 N.Y.S.2d 801, 814 (N.Y. Sup. Ct. 1996). In particular, the Stringfellow's court determined that the 1995 Regulations were content-neutral, that defendants proffered sufficient evidence of adverse secondary effects, that the 1995 Regulations were no broader than necessary to achieve a significant governmental purpose, and that defendants demonstrated an adequate number of available alternative locations. Both the New York Appellate Division and the New York Court of Appeals unanimously affirmed. Stringfellow's of N.Y., Ltd. v. City of New York, 241 A.D.2d

360, 663 N.Y.S.2d 812 (1997) (memorandum), aff'd 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407 (1998).

Following the New York Court of Appeals' decision in Stringfellow's, the Hickerson court denied plaintiffs' motion for a temporary restraining order and preliminary injunction staying enforcement of the 1995 Regulations. The court found that plaintiffs failed to demonstrate a likelihood of success on the merits because the collateral estoppel effect of the state court factual findings in Stringfellow's would also be dispositive of plaintiffs' federal constitutional claims. Hickerson v. City of New York, 997 F. Supp. 418, 424 (S.D.N.Y. 1998). The Second Circuit affirmed, agreeing that plaintiffs could not show a likelihood of success on the merits because "the New York courts' rejection of plaintiffs' state constitutional claims forecloses plaintiffs from relitigating, in the form of a First Amendment claim in federal court, the same issues that were resolved against them in state court." Hickerson v. City of New York, 146 F.3d 99, 103 (2d Cir. 1998). In so holding, the Second Circuit rejected plaintiffs' contention that collateral estoppel ought not to apply, explaining that "the issues decided and the standards applied by the New York state courts ... are the same that would be applicable to plaintiffs' First Amendment claim." Hickerson, 146 F.3d at 104.

Though the Second Circuit's holding in Hickerson was principally procedural, another panel of the Second Circuit upheld the 1995 Regulations against facial challenges under the First Amendment and Equal Protection Clause of the Fourteenth Amendment less than three months earlier. See Buzzetti v. City of New York, 140 F.3d 134 (2d Cir. 1998). In Buzzetti—litigated roughly contemporaneously with the cases meandering their way through the state courts—the proprietor of a strip club and a female topless dancer sought to preliminarily enjoin the enforcement of the 1995 Regulations, as relevant here, on the basis that the regulations constituted a presumptively invalid content-based restriction. The district court denied plaintiffs' motion, holding that because the 1995 Regulations withstood the intermediate-scrutiny test governing content-neutral time, manner, and place regulations under City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), plaintiffs failed to establish a likelihood of success on the merits. Buzzetti v. City of New York, 1997 WL 164284, at *2-3, *6 (S.D.N.Y. Apr. 8, 1997). The Second Circuit affirmed the district court's First Amendment holding for largely the same reasons. Buzzetti, 140 F.3d at 139-41.

**\*443** 3. The 60/40 Standard

At the same time that federal and state courts grappled with the constitutionality of the 1995 Regulations, the City's Department of Buildings ("DOB") periodically provided enforcement guidance in the form of Operations Policy and Procedure Notices ("OPPNs"), which further interpreted various aspects of the 1995 Regulations. As relevant here, Appendix A to OPPN # 6/96—issued on October 25, 1996—echoed the factors set forth in AZR § 12-10 for determining whether a "substantial portion" of an establishment was devoted to an adult establishment or whether a "substantial portion" of an establishment's stock-in-trade was devoted to specified materials. (PJA at 488.) It did not, however, reference the CPC's "general guideline" that an establishment "would need to have at least 40 percent of its accessible floor area used for adult purposes" to constitute an "adult establishment" or "adult bookstore." (1995 CPC Report at 50.)

On July 22, 1998—on the heels of the New York Court of Appeals' decision in Stringfellow's and the Second Circuit's decisions in Buzzetti and Hickerson—the DOB issued OPPN # 4/98 to tease out the meaning of "substantial portion" as used in AZR § 12-10. (See PJA at 502.) In particular, OPPN # 4/98 explained that an establishment included an adult bookstore "if 40 percent of the establishment's floor area and cellar space accessible to customers contains stock in adult materials." [12] (PJA at 503.) With respect to adult eating or drinking establishments, the DOB advised that whether a "substantial portion" of an eating or drinking establishment included an adult use should depend on "the amount of floor area and cellar space accessible to customers allocated to adult use for performance and viewing purposes as compared to total combined floor area and cellar space accessible to customers." (PJA at 503.) Thus, according to OPPN # 4/98, a "substantial portion" of an establishment "is devoted to an adult use"—making the establishment an "adult eating or drinking establishment"—if it "has at least 40 percent of the floor and cellar area that is accessible to customers[ ] available for adult performance and viewing purposes." (PJA at 503.)

The DOB's issuance of OPPN # 4/98 appears to have been motivated (at least in part) by developments in the Amsterdam Video litigation proceeding in this district. In a hearing on plaintiff's preliminary injunction motion just two days after the release of OPPN # 4/98, the City represented to the court that any commercial establishment with less than 40 percent

of its stock-in-trade or accessible floor area devoted to adult uses would comply with the 1995 Regulations—ostensibly, to avert plaintiff's constitutional vagueness challenge to the "substantial portion" language in AZR § 12-10. (4431 Compl. ¶¶ 33-35; 3732 Compl. ¶¶ 63-65; see PJA at 1675-76.) Thus, according to Plaintiffs, the 1995 Regulations did not apply to any adult business so long as it complied with the 60/40 Standard. Less than a week after the DOB issued OPPN # 4/98, the 1995 Regulations became enforceable on July 28, 1998 when the U.S. Supreme Court denied a stay in Amsterdam Video, thereby ending the judicial stays that had been in effect. See City of New York v. Les Hommes, 94 N.Y.2d 267, 702 N.Y.S.2d 576, 724 N.E.2d 368, 370 (1999).

OPPN # 6/98, which the DOB released on August 13, 1998 to supersede OPPN **444 # 4/98, further refined the meaning of the phrase "substantial portion." (See PJA at 506.) Although OPPN # 6/98 left unchanged the guidance set forth by OPPN # 4/98 with respect to adult bookstores, it restated the "substantial portion" test with respect to commercial establishments with two or more uses in part as follows:

> The determination as to whether a "substantial portion" of a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an "other adult commercial establishment," includes an adult use should include consideration of (1) the amount of floor area and cellar space accessible to customers allocated to adult use and (2) such amount of floor area and cellar space as compared to total combined floor area and cellar space accessible to customers.

> Thus, if [such a commercial establishment] has at least 40 percent of the floor and cellar area that is accessible to customers available to adult use, then a "substantial portion" of the establishment is devoted to an adult use and the commercial establishment is deemed to be an adult establishment.

(PJA at 507.) Of note—and somewhat inconsistent with the City's representations in Amsterdam Video—OPPN # 6/98 stated that this 60/40 Standard "shall not apply to a commercial establishment that is entirely an eating or drinking establishment, a theater, an 'other adult establishment,' or any combination thereof," (PJA at 508), sowing the seeds for additional litigation.

In this regulatory milieu, many adult establishments modified their interior configurations to comply with the 60/40 Standard. Eating and drinking establishments erected partitions to separate their establishments into adult and non-adult sections or otherwise reduced the amount of accessible floor space devoted to adult uses. (See 4431 Compl. ¶ 37; PJA at 229-30, 263-64, 267, 269-70, 285-86, 299-300.) Likewise, bookstores redesigned their floor space and interiors or reduced the number of private viewing booths in which patrons could view sexually explicit films. (See 3732 Compl. ¶ 66; PJA at 1622-23, 1645, 1664.) Notwithstanding its position in Amsterdam Video, the City commenced nuisance abatement proceedings against certain of these so-called "60/40 establishments" that it believed to be engaged in sham compliance with the 60/40 Standard. The City argued that the "substantial portion" test applied only to adult bookstores and multi-use commercial establishments, not single-use eating or drinking establishments regularly featuring adult entertainment. All three levels of the New York state judiciary rejected the City's contention that a single-use eating or drinking establishment with any adult component fell outside the 60/40 Standard. [13] See **445 City of New York v. Dezer Props., Inc., 95 N.Y.2d 771, 710 N.Y.S.2d 836, 732 N.E.2d 943, 943 (2000) (memorandum) (reasoning that as a matter of statutory interpretation, "the interpretation urged by the City would effectively excise the 'substantial portion' component from the enactment in cases of eating or drinking establishments").

### C. The 2001 Zoning Amendments

As previewed earlier, the adoption of the 60/40 Standard raised the issue of whether the 1995 Regulations applied to establishments that—at least literally—complied with the 60/40 Standard but essentially retained their non-conforming nature. As it did in Dezer Properties, the New York Appellate Division suggested that an adult bookstore's sham compliance with the 60/40 Standard did not place it outside the reach of the 1995 Regulations. See City of New York v. Les Hommes, 258 A.D.2d 284, 685 N.Y.S.2d 49, 50 (1999) (memorandum), rev'd 94 N.Y.2d 267, 702 N.Y.S.2d 576, 724 N.E.2d 368 (1999). The New York Court of Appeals reversed, emphasizing the need to enforce the plain language of the City's guidelines as written—namely, by considering only floor area and stock-in-trade. Les Hommes, 702 N.Y.S.2d 576, 724 N.E.2d at 371-72. Stated differently, because neither the 1995 Regulations nor the City's guidance mentioned other factors that might be germane to a determination of bona fide compliance with the 60/40 Standard, "inject[ing] those considerations into the mix" was improper. Les Hommes, 702 N.Y.S.2d 576, 724 N.E.2d at 371-72. Confronted with these

judicial decisions, the City opted again to amend the Zoning Resolution. [14]

### 1. The 2001 CPC Report and Proposal

On August 8, 2001, the CPC approved an application by the DCP to amend the 1995 Regulations. In substance, the application sought to eliminate the 60/40 Standard principally by amending the definitions of "adult establishment" and "adult eating or drinking establishment." The City Council passed Resolution No. 2096 on October 31, 2001, thereby adopting the CPC's approval of these amendments (the "2001 Amendments"). (See PJA at 379-83.) Like the 1995 Regulations, the 2001 Amendments were also accompanied by a CPC report that explained the amendments and the reasons behind them. (See generally PJA at 709-834 ("2001 CPC Report").)

According to the CPC, the 1995 Regulations needed to be amended "to address attempts by adult establishments to remain in operation through superficial measures which do not alter the character of the establishments as enterprises with a 'predominant, on-going focus on sexually explicit materials or activities,' " as well as "several court rulings [that] have narrowed the scope and application of the [1995 Regulations] in a manner which the [DCP] believes is contrary to the original intent." (2001 CPC Report at 3-4.) The CPC noted that as of 2000, 101—or 74 percent—of the City's 136 adult establishments were 60/40 establishments. (2001 CPC Report at 6.) Out of those 101 establishments, 75 were preexisting establishments **446** that had subsequently adopted 60/40 configurations. (2001 CPC Report at 9-10.) While the total number of adult establishments decreased citywide between 1993 and 2000, Times Square still housed the greatest concentration of adult establishments. (2001 CPC Report at 6-8.)

As with the 1995 Regulations, the 2001 Amendments were referred to the City's community boards, borough boards, and borough presidents for review and comment. Of those voting, twelve community boards voted to approve the proposal, two voted to approve but recommended more restrictive provisions, five—all located in Manhattan—voted against the proposal, and one voiced qualified opposition. (2001 CPC Report at 20-23.) The voting for the borough boards and borough presidents followed a similar pattern, with the Queens borough board and borough president voting in favor of the application, the Brooklyn borough board also voting

in favor, and the Manhattan borough board and borough president voting in opposition. (2001 CPC Report at 23-24.)

Public support for the 2001 Amendments waned in comparison to the 1995 Regulations. At a May 23, 2001 public hearing conducted by the CPC, five speakers testified in favor of the application compared to thirteen who opposed it. (2001 CPC Report at 24.) Broadly speaking, those who supported the proposal lamented the exploitation of the 60/40 Standard by adult establishments and the judicial interpretations of the 1995 Regulations that they claimed undermined the intent of the regulations. (2001 CPC Report at 24-25.) On the other hand, those who testified against the proposed amendments asserted that the record did not demonstrate any correlation between 60/40 establishments and adverse secondary effects, that the proposed amendments were overbroad and raised the specter of bias in enforcement, and that adult establishments had already made substantial financial expenditures in reliance on the 60/40 Standard. (2001 CPC Report at 25-28.)

Nevertheless, the CPC found the proposed amendments (with modifications) appropriate to "clarify certain definitions in the text, in order to effectuate the [CPC's] original intent in response to efforts by the operators of adult establishments to undermine implementation of the 1995 Regulations." (2001 CPC Report at 29.) It emphasized that the 1995 Regulations were adopted to address the negative secondary effects flowing from establishments similar to those described in the DCP Study—that is, establishments "with a predominant, on-going focus on sexually explicit materials or activities." (2001 CPC Report at 30 (quoting 1995 CPC Report at 49).)

With respect to bookstores, the CPC explained that the "substantial portion" qualifier and the "general guideline" that eventually morphed into the 60/40 Standard enabled enforcement officials to distinguish in an objective, non-biased manner between adult bookstores and neighborhood bookstores with a small amount of adult material. (2001 CPC Report at 30-31.) However, it pointed to the increasing clarity that the 60/40 Standard "[was], alone, an insufficient measure of whether a book or video store has a 'predominant on-going focus' on sexually explicit materials" in light of efforts by adult establishment owners to achieve superficial, mathematical compliance while maintaining "a physical lay-out or methods of operation which reflect a predominant focus on the sale of adult materials." [15] (2001 CPC Report at **447** 32-34.) In rejecting the argument that it first needed to demonstrate adverse secondary effects by 60/40

establishments, the CPC noted the lack of any indication that sham compliance somehow ameliorated those secondary effects or transformed adult bookstores into non-adult establishments. (2001 CPC Report at 34-35.)

In contrast with the definition for adult bookstores, the definition for an "adult eating or drinking establishment" did not contain the "substantial portion" language or any consideration of floor area because the DCP Study did not identify any "neighborhood bars or restaurants with only 'incidental' topless or nude entertainment." (2001 CPC Report at 31.) Therefore, the CPC had found "no basis to conclude that the negative secondary effects of adult establishments are any less present where topless or nude dancers frequent only part of the customer-accessible floor space in an eating or drinking establishment." (2001 CPC Report at 31-32.) But the 2001 CPC Report faulted the courts with propagating an erroneous interpretation of the "substantial portion" test that was "plainly inconsistent" with the intent of the 1995 Regulations "that it is immaterial how much floor space in the eating or drinking establishment is used for the presentation of adult entertainment, such as topless dancing." (2001 CPC Report at 35-37 & n.3.)

The 2001 Amendments left intact the basic locational and anti-concentration provisions of the 1995 Regulations applicable to adult establishments. Critically, however, they expanded the reach of the 1995 Regulations to encompass at least some 60/40 establishments. The 2001 Amendments struck the "substantial portion" language from AZR § 12-10's definition of "adult establishment," now defining it as "a commercial establishment which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof ...." (PJRA at 1916 (emphasis added); 2001 CPC Report at 15-16, 38.) AZR § 12-10 now defined an "adult eating or drinking establishment" as one that "regularly features in any portion" of the establishment live performances or films characterized by an emphasis on "specified anatomical areas" or "specified sexual activities," or employees who, as part of their employment, "regularly expose" to patrons "specified anatomical areas." (PJRA at 1917-18 (emphasis added); see 2001 CPC Report at 14-15, 37.) With respect to adult theaters, the 2001 Amendments now clarified that "commercial establishments where [live performances or films characterized by an emphasis on 'specified anatomical areas' or 'sexual activities'] are viewed from one or more individual enclosures." (PJRA at 1918-19 (emphasis added); see 2001 CPC Report at 37.)

As for adult bookstores, the 2001 Amendments left the "substantial portion" language from the 1995 Regulations but established criteria relating to layout and method of operation through which a bookstore that facially complied with the "substantial portion" test would nevertheless fall within the purview of the adult-use regulations. (See 2001 CPC Report at 11-14, 34.) Specifically, the 2001 Amendments **\*448** provided that non-adult materials would not be considered stock-in-trade for purposes of the "substantial portion" assessment if the establishment had any of several enumerated features—namely (1) a layout requiring customers to pass through areas containing adult materials to access non-adult materials; (2) one or more peep booths in which patrons can view adult films or live performances; (3) requiring transactions for non-adult materials to be made in areas with adult materials; (4) offering non-adult materials only for sale but offering adult materials for sale or rental; (5) a greater variety of adult materials than non-adult materials; (6) restricting minors from the bookstore or from any section of the bookstore offering non-adult material; (7) disproportionately larger advertisements of adult materials than non-adult materials; (8) disproportionately larger window displays of adult materials than non-adult materials; or (9) other features relating to layout and method of operation determined by the Commissioner of Buildings to suggest that adult materials are a "substantial purpose of the business conducted" in the establishment. (PJRA at 1920-24.)

The 2001 Amendments also added a specific amortization provision to allow adult establishments that had made financial expenditures to comply with the 60/40 Standard to recoup their investments. The CPC explicitly rejected the alternative course of allowing existing 60/40 establishments to remain indefinitely, noting that 60/40 establishments were never intended to be allowed under the 1995 Regulations, which the 2001 Amendments purported to clarify. (2001 CPC Report at 42-43.) Thus, AZR § 72-41 established a one-year amortization period for any adult establishment existing as of August 8, 2001 in a prohibited location that had made investments in reliance on the 60/40 Standard. (PJRA at 1929-31; see 2001 CPC Report at 43-44.) AZR § 72-41—like AZR § 72-40—afforded such 60/40 establishments an opportunity to apply to the Board of Standards and Appeals at least 120 days before the October 31, 2002 termination date for extensions of time.

Finally, the 2001 Amendments also amended AZR §§ 32-01 and 42-01 to define the locational restrictions by reference

to an adult business's establishment, as opposed to the terms "located" and "existed." (PJRA 1924-25, 1926-28.) The CPC explained that this change would address "interpretive problems where there is a conflict as to priority between two competing establishments." (2001 CPC Report at 40.) Thus, the 2001 Amendments added identical provisions to AZR §§ 32-01 and 42-01 explaining that an adult establishment would be deemed established

> upon the date of a permit issued by the department of buildings therefor, or, in the case of an adult establishment in existence prior to August 8, 2001, as determined by the department of buildings, subject to rules as the department of buildings may prescribe regarding the failure to perform work authorized under a permit or to commence operation pursuant to a permit and the discontinuance of an adult establishment.

(PJRA at 1926, 1928; see 2001 CPC Report at 16-19, 40-41.)

### 2. Legal Challenges to the 2001 Amendments

The 2001 Amendments spawned a fresh wave of federal and state constitutional challenges by 60/40 establishments, including the three federal actions brought by the Club Plaintiffs. [16] While the state court **\*449** litigation resulted in the New York Court of Appeals upholding the constitutionality of the 2001 Amendments in 2017, its "long, complicated, and confusing history" featured three trips through the New York appellate courts. For the People Theatres of N.Y., Inc. v. City of New York, 29 N.Y.3d 340, 57 N.Y.S.3d 69, 79 N.E.3d 461, 463 (2017), cert. denied ––– U.S. ––––, 138 S. Ct. 994, 200 L.Ed.2d 252 (2018) and ––– U.S. ––––, 138 S. Ct. 1000, 200 L.Ed.2d 252 (2018). To provide a better understanding of the arguments and issues at play in these cases—many of which are recycled from the state court litigation—this Court traces the contours of the state court litigation.

On October 29 and 30, 2002—just before the expiration of the one-year termination period—the New York Supreme

Court issued a temporary restraining order enjoining the enforcement of the 2001 Amendments against 60/40 establishments. (4431 Compl. ¶ 52; see also 3732 Compl. ¶ 79.) In late 2003, the New York Supreme Court granted summary judgment in favor of 60/40 establishments challenging the 2001 Amendments. The trial court noted that the City did not offer any evidence justifying the 2001 Amendments, highlighting the City's concession that it had not studied the impact of 60/40 establishments. For the People Theatres of N.Y., Inc. v. City of New York, 1 Misc.3d 394, 768 N.Y.S.2d 783, 785 (N.Y. Sup. Ct. 2003). It also rejected the City's reliance on the DCP Study on the rationale that 60/40 establishments arose after the 1995 Regulations, and thus could not have been studied by the DCP in 1993. For the People Theatres of N.Y., 768 N.Y.S.2d at 786. Thus, the trial court held the 2001 Amendments to be unconstitutional because the City failed to demonstrate that the predominant purpose of the 2001 Amendments was to address negative secondary effects and because the 2001 Amendments were "broader than needed to achieve the City's purpose of ameliorating negative secondary effects." For the People Theatres of N.Y., 768 N.Y.S.2d at 785 (citing Town of Islip, 542 N.Y.S.2d 139, 540 N.E.2d at 218).

The New York Appellate Division reversed and declared the 2001 Amendments constitutional. For the People Theatres of N.Y., Inc. v. City of New York, 20 A.D.3d 1, 793 N.Y.S.2d 356, 371 (2005). The Appellate Division found unpersuasive plaintiffs' contention that the City provided no evidence or study linking 60/40 establishments and the negative secondary effects identified in the DCP Study. It reasoned that the City was not required to conduct its own study of 60/40 establishments, and that the City was entitled to rely on the DCP Study and studies by other municipalities so long as that evidence was reasonably believed to be relevant to the problem at hand. For the People Theatres of N.Y., 793 N.Y.S.2d at 367-68. Accordingly, the Appellate Division upheld the 2001 Amendments because the City reasonably believed that 60/40 establishments retained their essential nature and predominant focus on sexually explicit expression, plaintiffs failed to cast doubt on the City's rationale, and the 2001 Amendments left open sufficient areas for lawful speech. For the People Theatres of N.Y., 793 N.Y.S.2d at 368-71.

A divided New York Court of Appeals agreed that the City proffered enough evidence in the first instance that 60/40 establishments retained their essential nature **\*450** creating negative secondary effects. [17] For the People Theatres of

N.Y. v. City of New York, 6 N.Y.3d 63, 810 N.Y.S.2d 381, 843 N.E.2d 1121, 1131 (2005). However, the majority found that plaintiffs also furnished evidence disputing the City's rationale and remanded for a factual determination as to whether the 60/40 establishments were "so transformed in character that they no longer resemble the kinds of adult uses found ... to create negative secondary effects ... or whether these business' technical compliance with the 60/40 formula is merely a sham ...." For the People Theatres of N.Y., 810 N.Y.S.2d 381, 843 N.E.2d at 1132-33. As relevant here, the Court of Appeals rejected the notion that the City needed to conduct a new study connecting 60/40 establishments with negative secondary effects. For the People Theatres of N.Y., 810 N.Y.S.2d 381, 843 N.E.2d at 1132, 1133.

Following remand and a bench trial, the New York Supreme Court upheld the constitutionality of the 2001 Amendments as they related to adult bookstores and adult eating and drinking establishments. [18] For the People Theatres of N.Y., Inc. v. City of New York, 27 Misc.3d 1079, 897 N.Y.S.2d 618, 625 (N.Y. Sup. Ct. 2010). It noted that the City's burden "was a 'light' one" and that the City had "provided substantial evidence that [plaintiffs'] dominant, ongoing focus is on adult matters." For the People Theatres of N.Y., 897 N.Y.S.2d at 625. The New York Appellate Division once again reversed, vacated the lower court's determination of constitutionality, and remanded with further instructions. In particular, the Appellate Division faulted the trial court's "extremely terse decision" with failing to adequately explain "whether the 60/40 establishments are similar in nature to adult establishments that have been shown by means of empirical data to cause negative 'secondary effects.' " For the People Theatres of N.Y., Inc. v. City of New York, 84 A.D.3d 48, 923 N.Y.S.2d 11, 17-18 (2011).

Following a second remand, the trial court struck down the 2001 Amendments as facially unconstitutional under the federal and state constitutions. [19] For the People Theatres of N.Y., Inc. v. City of New York, 38 Misc.3d 663, 954 N.Y.S.2d 801, 809 (N.Y. Sup. Ct. 2012). The court found "significant and material differences between the 1994 adult entities and 60-40 entities," such that "the current establishments no longer resemble their 1994 predecessors." For the People Theatres of N.Y., 954 N.Y.S.2d at 810. Based on its conclusion that 60/40 establishments did **\*451** not predominantly focus on sexual matters, the court determined that "there [was] no need for the 2001 amendments." For the People Theatres of N.Y., 954 N.Y.S. 2d at 810.

A divided panel of the New York Appellate Division affirmed. The majority restated four criteria it previously identified for assessing whether a 60/40 establishment retained a predominant, ongoing sexual focus—that is, the (1) "presence of large signs advertising adult content"; (2) a "significant emphasis on the promotion of materials 'specified sexual activities' or 'specified anatomical areas' "; (3) the "exclusion of minors from the premises on the basis of age"; and (4) "difficulties in accessing nonadult materials." For the People Theaters of N.Y. v. City of New York, 131 A.D.3d 279, 14 N.Y.S.3d 338, 346 (2015) (citation and quotation marks omitted). The Appellate Division concluded as an evidentiary matter that the City satisfied only the second factor for both adult bookstores and adult drinking and eating establishments, and thus failed to carry its burden. [20] For the People Theaters of N.Y., 14 N.Y.S.3d at 346-49.

On June 6, 2017—almost fifteen years after the state court litigation commenced—the New York Court of Appeals unanimously reversed, holding that the City demonstrated that the 60/40 establishments "retained a predominant focus on sexually explicit materials or activities." For the People Theatres of N.Y., Inc. v. City of New York, 29 N.Y.3d 340, 57 N.Y.S.3d 69, 79 N.E.3d 461, 463 (2017). The Court of Appeals faulted the lower courts with conflating intermediate scrutiny with the proper evidentiary standard under the burden-shifting framework set forth by the plurality opinion in City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002). For the People Theatres of N.Y., 57 N.Y.S.3d 69, 79 N.E.3d at 475. It explained that the lower courts held the City to an erroneously high burden of proof in applying a "rigidly mechanical approach" to assessing the predominant focus of 60/40 establishments. For the People Theatres of N.Y., 57 N.Y.S.3d 69, 79 N.E.3d at 475. Based on its agreement that the City satisfied the second factor identified by the Appellate Division, it affirmed that "the City had relevant evidence reasonably adequate to support its conclusion that the adult establishments retained a predominant, ongoing focus on sexually explicit activities or materials." For the People Theatres of N.Y., 57 N.Y.S.3d 69, 79 N.E.3d at 475-76.

## II. The Club Plaintiffs' and Bookstore Plaintiffs' Actions

Following the New York Court of Appeals' decision in For the People Theatres, the City agreed not to enforce the 2001 Amendments against Plaintiffs while the state court plaintiffs sought re-argument before the New York Court of Appeals and certiorari before the U.S. Supreme Court.

(4431 Compl. ¶¶ 64-68; 3732 Compl. ¶¶ 88-92.) The New York Court of Appeals denied re-argument on September 12, 2017, though it purportedly left the motion by the adult bookstores unresolved. (4431 Compl. ¶ 67; 3732 Compl. ¶ 88.) On February **\*452** 20, 2018, the Supreme Court denied certiorari, bringing the state court litigation to a close. (4431 Compl. ¶ 69; 3732 Compl. ¶ 93.)

A. The Plaintiffs

These actions are brought by plaintiffs that would not be considered "adult establishments" under the 1995 Regulation but would apparently be so classified under the 2001 Amendments. The Club Plaintiffs are comprised of the following entities. Plaintiffs 725 Eatery, Corp. and 689 Eatery, Corp. own and operate gentlemen's clubs located in the Times Square area of Manhattan—respectively, Platinum Dolls and Satin Dolls. (4431 Compl. ¶¶ 4-5.) Plaintiffs 59 Murray Enterprises, Inc., AAM Holding Corp., West 20th Enterprises Corp., and INS Ventures Ltd. also own and operate gentlemen's clubs scattered across New York City—respectively, New York Dolls in the Tribeca area of Manhattan (now known as "Flashdancers Downtown"), Private Eyes in Manhattan's Hell's Kitchen (now known as "Flashdancers NYC"), VIP Club New York in Manhattan's Flatiron District, and Vixen in the Ridgewood area of Queens. (Second Amended & Supplemental Complaint, ECF No. 26, 02cv4432 ("4432 Compl."), ¶¶ 7-10; PJA at 266.) Finally, Plaintiffs Club at 60th, Inc. and Jacaranda own or operate Sapphire, a gentlemen's club located in Manhattan. (Second Amended Complaint for Declaratory and Injunctive Relief Under 42 U.S.C. § 1983, ECF No. 42, 02cv8333 ("8333 Compl."), ¶¶ 7-8, 10-16.) The Club Plaintiffs are all 60/40 establishments who, under AZR § 32-01 or AZR § 42-01, would be required to terminate under the Zoning Resolution based on their current location. (4431 Compl. ¶¶ 4-5; 4432 Compl. ¶¶ 7-10; 8333 Compl. ¶¶ 7-8, 10-16; PJA at 228-31, 248-50, 262-63, 266-69, 284-85, 298-99.)

The Bookstore Plaintiffs are 336 LLC, Chelsea 7 Corp., Gotham Video Sales & Distribution Inc., Rainbow Station 7 Inc., Video Lovers Inc., Vishara Video, Inc., Explore DVD LLC, Vishans Video, Inc., 725 Video Outlet Inc., Jaysara Video, Inc., DCD Exclusive Video Inc., and 557 Entertainment Inc. As discussed, the Bookstore Plaintiffs operate bookstores in Manhattan, Brooklyn, and Queens that contain private viewing booths in which patrons may discreetly view sexually explicit films on a screen within the enclosed booth, including those that may be judged by society as deviant. (3732 Compl. ¶¶ 10-28, 95-99; PJA 1619-21.) The

Bookstore Plaintiffs offer non-adult information and retail stock, as well as some adult-oriented information. (3732 Compl. ¶ 31; PJA at 1617, 1644.) Like the Club Plaintiffs, the Bookstore Plaintiffs would be required to terminate under the City's adult-use regulations based on their location. (3732 Compl. ¶¶ 10-28; PJA at 1628-29, 1645, 1663-64.)

The defendants in these actions are the City, Mayor Bill de Blasio, and Commissioner of Buildings Melanie E. La Rocca. Defendant de Blasio succeeded defendant Michael Bloomberg, who was Mayor when the Club Plaintiffs commenced their actions. Defendant La Rocca succeeded defendant Rick D. Chandler, who was Commissioner of Buildings when the operative complaints in these actions were filed. Both individual defendants, who are automatically substituted for their predecessors under Rule 25(d) of the Federal Rules of Civil Procedure, are the principal municipal officers charged with enforcing the Zoning Resolution. (4431 Compl. ¶ 9; 3732 Compl. ¶¶ 35-36.) Finally, the City is responsible for drafting and enacting the Zoning Resolution through its various departments and agencies. (3732 Compl. ¶ 33-34.)

**\*453** B. The Claims

[2] Plaintiffs assert causes of action under 42 U.S.C. § 1983 to vindicate the alleged deprivations of their First Amendment and Fourteenth Amendment rights. [21] Though the operative complaints (especially those filed by the Club Plaintiffs) are engorged by legal arguments and conclusions more appropriate for a brief, they advance materially the same theories when stripped to their core. Accordingly, this Court reviews them in the aggregate.

The central theme that undergirds the Club Plaintiffs' and Bookstore Plaintiffs' complaints is that the 2001 Amendments, if enforced, would decimate—and have already dramatically reduced—adult-oriented expression. For instance, the Club Plaintiffs allege that the fifty-seven adult eating or drinking establishments existing at the time the City adopted the 2001 Amendments have now been culled to as few as twenty such establishments. (4431 Compl. ¶¶ 76-80.) And for their part, the Bookstore Plaintiffs claim that of the roughly forty adult bookstores with booths that existed at the time of the 2001 Amendments, only twenty to twenty-five bookstores currently exist. (3732 Compl. ¶¶ 96, 100; PJA at 1626, 1649.) These bookstores would be considered "adult establishments" under the 2001 Amendments based on the presence of booths, but might not have been considered

"adult establishments" under the 1995 Regulations so long as they limited their booths to a portion of their establishment. (3732 Compl. ¶¶ 96, 100; PJA at 1624.) Of these bookstores, virtually none are located in permissible areas. (3732 Compl. ¶ 97.)

The other side of the equation, according to Plaintiffs, is that the number of adult establishments that would need to relocate if the City enforced the 2001 Amendments dwarfs the number of potential permissible sites for adult establishments that the regulations leave open, especially when factoring in the anti-concentration requirements. (4431 Compl. ¶ 81, 108-110; 3732 Compl. ¶¶ 101-102.) Plaintiffs maintain that this "musical chairs" scenario is exacerbated by the fact that the permissible areas for relocation have only been shrinking since 1995 (when the City last assessed potential alternative sites) based on the subsequent re-zoning of previously allowable sites into prohibited zones and changes in the number and location of sensitive receptors.[22] (See 4431 Compl. ¶¶ 82-96; 3732 Compl. ¶¶ 104-127.) Moreover, Plaintiffs aver that the potential areas where adult establishments would be nominally permissible consist largely of remote or undeveloped areas in the City unsuitable for retail commercial enterprises, such as areas designated for amusement parks or heavy industry or areas containing toxic **\*454** waste. (See 4431 Compl. ¶¶ 97-107; 3732 Compl. ¶¶ 140-158.)

Accordingly, Plaintiffs claim that the 2001 Amendments violate their First Amendment free speech rights by suppressing protected expression without any concomitant reduction in secondary effects and by failing to provide sufficient alternative avenues for adult expression. (4431 Compl. ¶¶ 48-50, 135-169; 3732 Compl. ¶¶ 164-168.) Separately, the Club Plaintiffs claim that by singling out non-conforming adult establishments for termination, the City's mandatory termination provisions violate the Fourteenth Amendment's equal protection guarantees and also constitute an invalid content-based restriction in violation of the First Amendment. (4431 Compl. ¶¶ 179-194.) Finally, the Bookstore Plaintiffs also assert a cause of action for deprivation of property under the Fourteenth Amendment's Due Process Clause. (3732 Compl. ¶¶ 173-174.)

Plaintiffs also challenge the constitutionality of the provisions of the 2001 Amendments that key AZR §§ 32-01 and 42-01's locational and anti-concentration provisions of the adult use regulation to the date that a business receives a permit from the DOB. (4431 Compl. ¶¶ 118-119; 3732

Compl. ¶¶ 131-134.) In substance, they allege that the process for adult establishments to obtain a permit from the DOB differs from the process for non-adult establishments in two significant ways. First, adult establishments may not use a self-certification procedure that substantially expedites the DOB approval process. (4431 Compl. ¶¶ 115-116; 3732 Compl. ¶ 135.) Second, permit applications by adult establishments must be reviewed by the City's legal counsel for zoning compliance, for which there is no time limit. (4431 Compl. ¶ 116.) The result is that permit applications by adult establishments may take over a year—if ever—to resolve, further deterring adult establishments from attempting to relocate. (4431 Compl. ¶ 117; 3732 Compl. ¶ 135; see also, e.g., PJA at 300.)

According to Plaintiffs, the amendments to AZR §§ 32-01 and 42-01 are also problematic because they give sensitive receptors such as schools or churches a de facto veto over an adult use, through which a sensitive receptor that opposes an adult establishment may establish priority ahead of the adult establishment by simply obtaining a permit while the adult establishment waits (possibly forever) for approval of its application.[23] (4431 Compl. ¶¶ 119-126; 3732 Compl. ¶¶ 136-139.) Based on the foregoing, Plaintiffs contend that the City's permitting scheme constitutes an impermissible prior restraint on speech in violation of the First Amendment and deprives them of equal protection of the laws in violation of the Fourteenth Amendments. (4341 Compl. ¶¶ 116, 118, 198-202; 3732 Compl. ¶¶ 169-172.)

Ultimately, Plaintiffs seek to enjoin Defendants from enforcing the 2001 Amendments, as well as a judgment declaring the 2001 Amendments to be facially unconstitutional. (See 4431 Compl., at 62; 4432 Compl., at 61; 8333 Compl., at 61-62; 3732 Compl., at 60.) The Club Plaintiffs also seek declaratory and injunctive relief relating to the termination provisions codified at AZR §§ 52-77 and 72-41. (See 4431 Compl., at 62; 4432 Compl., at 61; 8333 Compl., at 61-62.) Finally, all Plaintiffs seek attorney's fees under 42 U.S.C. § 1988. (See 4431 Compl., at 62; 4432 Compl., at 61; 8333 Compl., at 62; 3732 Compl., at 61.)

**\*455** C. Procedural History

The Club Plaintiffs originally filed their actions in 2002 and subsequently moved for preliminary injunctive relief and summary judgment in late 2002 and early 2003. (ECF No. 13, 02cv4431; ECF No. 11, 02cv8333.) Following the New York Supreme Court's initial invalidation of the 2001 Amendments

in late 2003, however, this Court administratively closed the Club Plaintiffs' cases on September 26, 2003 on consent of the parties but allowed the cases to be reopened for good cause on petition by any party. (ECF No. 43, 02cv4431.) The Club Plaintiffs' actions lay dormant for the next fifteen years while the constitutionality of the 2001 Amendments ping-ponged through the New York state courts.

By Order dated April 23, 2018, this Court reopened the Club Plaintiffs' actions following a request by the Club Plaintiffs for a conference. (ECF No. 51, 02cv4431; ECF No. 12, 02cv4432; ECF No. 40, 02cv8333.) The Bookstore Plaintiffs commenced their action days later. (See ECF No. 1, 18cv3732.) Following the granting of several extensions, Plaintiffs simultaneously filed their motions for preliminary injunctions. (ECF No. 78, 02cv4431; ECF No. 32, 02cv4432; ECF No. 57, 02cv8333; ECF No. 27, 17cv3732.) The parties jointly informed this Court that they did not believe an evidentiary hearing to be necessary and that no party requested such a hearing. (See ECF No. 117, 02cv4431; ECF No. 81, 02cv4432; ECF No. 105, 02cv8333; ECF No. 69, 17cv3732.) Accordingly, this Court resolves the preliminary injunction motions on the parties' briefs, documentary exhibits, and stipulations of fact. See trueEx, LLC v. MarkitSERV Ltd., 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017) (deeming parties' explicit waiver of an evidentiary hearing as "consent[ing] to the making of findings entirely on the paper record before the Court" (citations omitted)); accord Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) (noting that a party "may, of course, waive its right to an evidentiary hearing, but it is not entitled to have the court accept its untested representations as true if they are disputed" (internal citations omitted)).

### DISCUSSION

#### I. Matters Considered

 **[3]**    **[4]**    **[5]** In the Second Circuit, courts "routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief," including affidavits, depositions, and sworn testimony. Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases); accord Park Irmat Drug Corp. v. Optumrx, Inc., 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (citation omitted) (explaining that in deciding a motion for a preliminary injunction, a "court may consider the entire record[,] including affidavits and other hearsay evidence"). As the Supreme Court has observed, "the decision of whether to award preliminary injunctive relief is

often based on 'procedures that are less formal and evidence that is less complete than in a trial on the merits.' " Mullins, 626 F.3d at 51-52 (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). Nonetheless, "motions for preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact." Davis v. N.Y.C. Hous. Auth., 166 F.3d 432, 437-48 (2d Cir. 1999).

 **[6]** Based on the foregoing principles, this Court considers the evidentiary record submitted by the parties, though it addresses three additional matters in greater detail. First, Plaintiffs request that this Court take judicial notice of over eighty plaintiffs exhibits, categorized as follows: **\*456** (1) City Council resolutions amending the City's Zoning Resolution; (2) provisions of the AZR; (3) provisions of the New York City Administrative Code pertinent to the City's permitting scheme; (4) DOB materials, including directives, OPPNs, bulletins, handbooks, and rules; (5) portions of the legislative history of the 2001 Amendments, which includes the DCP's application, reports accompanying the application, and transcripts of City Council and CPC hearings; (6) portions of the case record for state court challenges to the 2001 Amendments, including maps and studies admitted into the evidentiary record; (7) portions of the DCP's website; (8) studies purporting to demonstrate the uniqueness of Manhattan; and (9) stipulations and agreements between the parties to stay enforcement of the 2001 Amendments. (See PJA at 339-47, 1685-90; PJRA at 1882-90.) Each set of plaintiffs also requests that this Court take judicial notice of certain adjudicative facts.

Rule 201 of the Federal Rules of Evidence authorizes courts to, at any stage of the proceeding, "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (d). While a court has discretion to take judicial notice of a fact, it "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c).

This Court need not take judicial notice of the documentary exhibits because it can consider those documents as part of the record on these motions. To the extent that Plaintiffs seek judicial notice of adjudicative facts contained within those documentary exhibits, they have not identified such facts. Cf. Wright & Miller, 21B Fed. Prac. & Proc. Evid. § 5107.1 (2d

ed. 1995) (advising that though the rule "does not state what the request for judicial notice must contain in order to make judicial notice mandatory[,] [a]t a bare minimum, the request should specify precisely the adjudicative fact that the court should notice, state whether [the] fact can be noticed as a matter of common knowledge, and, if not, cite the court to some source of reasonably indisputable accuracy in which the noticed fact may be found" (footnote omitted)).

[7] Absent additional specificity from Plaintiffs, this Court declines the invitation to sift through the record to divine what facts Plaintiffs seek to establish. See Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 327 F. Supp. 3d 673, 688 (S.D.N.Y. 2018) (reiterating that " '[j]udges are not like pigs, hunting for truffles buried in' the record" (citation omitted) (alteration in original)). In any event, as discussed above, courts may consider even inadmissible evidence in assessing the propriety of preliminary injunctive relief, be it in the form of affidavits or documentary evidence. Accord Flores v. Town of Islip, 2019 WL 1515291, at *2 (E.D.N.Y. Apr. 8, 2019) (concluding that "at a threshold level, declarations, depositions, and other documentary evidence may be considered at the preliminary injunction stage"). Thus, the documents subject to Plaintiffs' judicial notice request may properly be considered.

As for the Plaintiffs' proffered adjudicative facts, this Court will take judicial notice of the fact that the 2001 Amendments have not been enforced against any of the Plaintiffs through the present date. The record contains a Litigation Management Agreement dated September 25, 2017 between the Club Plaintiffs and Defendants making such a representation. (PJA at 1462-64.) Similarly, the Bookstore Plaintiffs **\*457** and Defendants entered into a Stipulation and Agreement dated August 2, 2017 that reflects the City's forbearance from enforcing the 2001 Amendments. (PJA at 1879-80.) Finally, the parties have stipulated to the accuracy of this fact. (See Stipulation re Club Plaintiffs' Judicial Notice Requests ("Club Plaintiffs' Stipulation"), ¶ 4(a); Stipulation Relating to Judicial Notice ("Bookstore Plaintiffs' Stipulation"),[24] ¶ 2.)

[8] On the other hand, this Court declines to take judicial notice of the Club Plaintiffs' proposed fact that

> [t]he City's analysis, in response to the constitutional challenge to the [1995 Regulations], that there were in excess

of 500 potential sites to which adult establishments could relocate under the [1995 Regulations], did not include consideration of the 500-foot buffer zone being imposed around all then-existing and new adult establishments.

(PJA at 345.) As an initial matter, the Club Plaintiffs simply make this assertion in their opening and reply briefs without making any effort to point this Court to a source from which this fact may be "accurately and readily determined." Fed. R. Evid. 201(b). But even setting that aside, this Court's independent review of the Plaintiffs' Joint Appendix reveals some ambiguity in the veracity of this fact. (Compare PJA at 1446 (representation in City's appellate brief before the New York Court of Appeals that the DCP "also took into account ... the requirement that an adult establishment be located a 500-foot distance from ... other adult establishments"), with PJA at 1457 (deposition testimony by the DCP's then–Director of Zoning and Urban Design that the DCP made no effort to analyze the impact of adult establishments on the location of other adult establishments).) Against this backdrop, judicial notice would be improper.[25] This Court has reviewed the remainder of Plaintiffs' requests for judicial notice and to the extent not expressly addressed herein, denies them as unnecessary to its disposition of the preliminary injunction motions without prejudice to renewal at a later time.

Second, though the parties have submitted expert affidavits and analyses, as well as other affidavits that border on lay opinion testimony, such evidence has been considered on the basis that courts may consider inadmissible evidence in context of a preliminary injunction. E.g., Flores, 2019 WL 1515291, at *2 (citing, inter alia, Mullins, 626 F.3d at 52). Third, the parties have stipulated that various documents are true and accurate copies of the originals.[26] (See Club Plaintiffs' Stipulation ¶¶ 1-2, 5; Bookstore Plaintiffs' Stipulation ¶¶ 1, 3.) The parties also stipulate that the portions of the City's Administrative Code submitted as Exhibits 16-19 to the Club Plaintiffs' **\*458** request for judicial notice were repealed in 2008, and that since 2008, "there is no legal provision imposing a specific number of days in which DOB is to issue a building alteration permit following approval of all construction documents or plans and following submission of a proper and complete application for such a permit." (Club Plaintiffs' Stipulation ¶ 4(c)(d).)

## II. Legal Standard

**[9]** A preliminary injunction has been characterized as an "extraordinary and drastic remedy" that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 9, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). A party seeking a preliminary injunction must typically establish (1) the likelihood of irreparable harm in the absence of injunctive relief; (2) either a likelihood of success on the merits, or sufficiently serious questions going to the merits of its claims to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor; and (4) that a preliminary injunction is in the public interest. N.Y. ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015); see also Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010).

**[10]** **[11]** **[12]** But where, as here, "a preliminary injunction is sought against government action taken in the public interest pursuant to a statutory or regulatory scheme, the less-demanding 'fair ground for litigation' standard is inapplicable, and therefore a 'likelihood of success' must be shown." Forest City Daly Hous., Inc. v. Town of N. Hempstead, 175 F.3d 144, 149 (2d Cir. 1999) (citation omitted); accord Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd., 598 F.3d 30, 35 n.4 (2d Cir. 2010) (discussing three limited exceptions to the general preliminary injunction standard). This "higher standard reflects the judicial deference toward 'legislation or regulations developed through presumptively reasoned democratic processes.' " Forest City Daly Hous., 175 F.3d at 149 (citation omitted). Fundamentally, the "purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." Trump v. Int'l Refugee Assistance Project, —— U.S. ——, 137 S. Ct. 2080, 2087, 198 L.Ed.2d 643 (2017) (internal citation omitted).

## III. Analysis

### A. Irreparable Injury

**[13]** **[14]** Irreparable harm has been described as the "single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citations and quotation marks omitted). A plaintiff must demonstrate that absent preliminary injunctive relief, it is likely to "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Habitat for Horses v. Salazar, 745 F. Supp. 2d 438, 448 (S.D.N.Y. 2010) (quotation mark omitted) (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)). Nevertheless, a plaintiff "need only show a 'threat of irreparable harm, not that irreparable harm already [has] occurred.' " Airbnb, Inc. v. City of New York, 373 F. Supp. 3d 467, 480 (S.D.N.Y. 2019) (alterations in original) (quoting Mullins, 626 F.3d at 55).

**[15]** Defendants do not dispute the presumption that a movant has established **\*459** irreparable harm in the absence of injunctive relief where, as here, the claims involve an alleged deprivation of a constitutional right. See Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984). Indeed, as the Second Circuit has reaffirmed, "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."[27] N.Y. Progress & Protection PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Thus, assuming that the 2001 Amendments—which purportedly impose a direct limitation on speech—violate the Constitution, Plaintiffs have demonstrated irreparable harm. Accord Monserrate v. N.Y. State Senate, 695 F. Supp. 2d 80, 90 (S.D.N.Y. 2010).

### B. Likelihood of Success on the Merits

**[16]** **[17]** To establish a likelihood of success on the merits, Plaintiffs "need not show that success is an absolute certainty," but only that "the probability of [their] prevailing is better than fifty percent." Airbnb, Inc., 373 F. Supp. 3d at 480 (alteration in original) (quoting Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988)). Further, Plaintiffs need not demonstrate a likelihood of success on the merits of every claim—rather, they need only "show a likelihood of success on the merits of at least one of [their] claims." L.V.M. v. Lloyd, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (citations omitted). Because this Court finds that Plaintiffs are more likely than not to succeed on the merits of their First Amendment free speech claims—the crux of their complaints—it does not address their alternative theories for finding the 2001 Amendments unconstitutional. See Eve of Milady v. Impression Bridal, Inc., 957 F. Supp. 484, 487 (S.D.N.Y. 1997) (declining to address other claims based on finding that certain claims "provide a basis for granting a preliminary injunction").

### 1. Legal Principles

**[18]** **[19]** The First Amendment to the U.S. Constitution prohibits Congress from making laws abridging the freedom of speech. U.S. Const. amend. I. The First Amendment's protections apply to the states and municipalities like the City through the Due Process Clause of the Fourteenth Amendment. See Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (collecting cases). As a prefatory matter, this Court also notes that while Plaintiffs carry the burden of persuading this Court that they are entitled to a preliminary injunction, Mazurek, 520 U.S. at 972, 117 S.Ct. 1865, Defendants bear the burden of justifying the governmental infringement on speech protected by the First Amendment, Nakatomi Invs., Inc. v. City of Schenectady, 949 F. Supp. 988, 991 (N.D.N.Y. 1997); see United States v. Playboy Entmt. Grp., Inc., 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000), **\*460** N.Y. Youth Club v. Town of Harrison, 150 F. Supp. 3d 264, 272 (S.D.N.Y. 2015). [28]

**[20]** **[21]** **[22]** The Second Circuit has explained that "[a]t the heart of our First Amendment jurisprudence lies the concern that if the government were able to impose content-based burdens on speech, it could effectively drive certain ideas or viewpoints from the marketplace." Mastrovincenzo v. City of New York, 435 F.3d 78, 97-98 (2d Cir. 2006) (quotation marks omitted) (quoting Hobbs v. County of Westchester, 397 F.3d 133, 148 (2d Cir. 2005)). Thus, content-based restrictions on speech are presumptively invalid and must withstand strict scrutiny. See Mastrovincenzo, 435 F.3d at 98 & n.15 (explaining that a content-based restriction must "serve[ ] a compelling governmental interest, [be] necessary to serve the asserted [compelling] interest, [be] precisely tailored to serve that interest, and [be] the least restrictive means readily available for that purpose" (citation omitted) (third alteration in original)). On the other hand, "regulations of expressive activity that are not based on content" trigger only intermediate scrutiny. Mastrovincenzo, 435 F.3d at 98 (citation omitted). In other words, content-neutral regulations may "limit the time, place, or manner of expression—whether oral, written, or symbolized by conduct—even in a public forum, so long as the restrictions are reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information." Mastrovincenzo, 435 F.3d at 98.

In the context of First Amendment challenges to adult entertainment zoning regulations, this Court is also guided by the Supreme Court's secondary-effects doctrine developed by Young v. American Mini Theatres, City of Renton v. Playtime Theatres, and their progeny. [29] In its seminal Young decision, the Supreme Court upheld Detroit's zoning ordinance for adult films against First Amendment and Fourteenth Amendment challenges, explaining that "[r]easonable regulations of the time, place, and manner of protected speech, where those regulations are necessary to further significant governmental interests, are permitted by the First Amendment." [30] **\*461** Young, 427 U.S. at 63 n.18, 96 S.Ct. 2440 (majority). Thus, it held that apart from treating "adult theaters differently from other theaters and the fact that the classification is predicated on the content of the material shown in the respective theaters, the regulation of the place where such films may be exhibited does not offend the First Amendment." Young, 427 U.S. at 63, 96 S.Ct. 2440. A plurality of the Court also upheld the ordinance on equal protection grounds, concluding that because "what is ultimately at stake is nothing more than a limitation on the place where adult films may be exhibited, ... the city's interest in the present and future character of its neighborhoods adequately supports its classification of motion pictures" based on "the nature of its content." Young, 427 U.S. at 70-72, 96 S.Ct. 2440 (plurality) (footnote omitted).

The Supreme Court built upon this framework in Renton, which it viewed as "largely dictated by [its] decision in [Young]." Renton, 475 U.S. at 46, 106 S.Ct. 925. Under Renton, the Supreme Court first characterized the ordinance at issue as a time, place, and manner regulation because it "does not ban adult theaters altogether, but merely provides that such theaters may not be located within 1,000 feet of [certain sensitive receptors]." Renton, 475 U.S. at 46, 106 S.Ct. 925. After finding the time, place and manner regulation to be content-neutral, the majority framed the relevant inquiry as whether the ordinance "is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." Renton, 475 U.S. at 47-50, 106 S.Ct. 925. A majority of the Supreme Court subsequently reaffirmed Renton's core intermediate scrutiny framework. See Alameda Books, 535 U.S. at 440, 122 S.Ct. 1728 (plurality); Alameda Books, 535 U.S. at 448-49, 122 S.Ct. 1728 (Kennedy, J., concurring in the judgment).

### 2. Application

**[23]** As an initial matter, this Court finds that the City's adult-use regulations are "properly analyzed as a form of

time, place, and manner regulation" because they do not categorically ban adult establishments, but principally restrict their location. Renton, 475 U.S. at 46-47, 106 S.Ct. 925. Following the Supreme Court's lead in Renton, this Court next determines the content-neutrality of the City's adult-use regulations before applying the appropriate level of scrutiny.

### a. Content-Neutrality

 [24]  [25]  [26]  [27]  The "principal inquiry" for content neutrality purposes is "whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." Lederman v. N.Y.C. Dept. of Parks & Recreation, 731 F.3d 199, 202 (2d Cir. 2013) (citation omitted) (alteration in original). An ordinance that regulates "expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." Mastrovincenzo, 435 F.3d at 98 (citation omitted); see also Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("[L]aws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral."). Even if a regulation "has an incidental effect on some speakers or messages but not others," it is content-neutral so long as it "serves purposes unrelated to the content of expression." Ward, 491 U.S. at 791, 109 S.Ct. 2746. Accordingly, "[r]egulations *462 that target 'only [the] potential harmful secondary effects of speech' are ... content-neutral and trigger intermediate, rather than strict, scrutiny." Mastrovincenzo, 435 F.3d at 98 (second alteration in original) (citation omitted).

 [28]  Here, this Court concludes that the City's adult-use regulations are content-neutral. Despite the fact that they apply only to adult establishments, the 1995 Regulations and the 2001 Amendments are at bottom justified by the desire to reduce the adverse secondary effects of adult establishments, based on a fair read of the 1994 DCP Study, the 1995 CPC Report, and the 2001 CPC Report. See Renton, 475 U.S. at 47, 106 S.Ct. 925 (finding ordinance to be content-neutral because it was "aimed not at the content" of adult films shown in adult theaters, "but rather at the secondary effects" of adult theaters on the surrounding community" (emphasis in original)). Stated differently, the purpose of the adult-use regulations is not to suppress adult expression based on its content. Accord Buzzetti, 140 F.3d at 140 (finding the 1995 Regulations to be content-neutral); Stringfellow's of N.Y., 671 N.Y.S.2d 406, 694 N.E.2d at 416-17 (same). This Court's

determination is further bolstered by other courts that have reached the same conclusion in analyzing adult entertainment ordinances. See, e.g., Renton, 475 U.S. at 47-48, 106 S.Ct. 925; Giggles World Corp. v. Town of Wappinger, 341 F. Supp. 2d 427, 430 (S.D.N.Y. 2004).

To be certain, Plaintiffs' assertion that the 2001 Amendments should be considered content-based restrictions on speech that are subject to strict scrutiny has some appeal. For instance, even the Renton majority acknowledged that the ordinances at issue in that case and Young "[did] not appear to fit neatly into either the 'content-based' or the 'content-neutral' category," Renton, 475 U.S. at 47, 106 S.Ct. 925, and its determination that such ordinances are content-neutral is hardly undisputed, see Renton, 475 U.S. at 56-57, 106 S.Ct. 925 (Brennan, J., dissenting) (describing the Renton majority's content-neutrality analysis as "misguided" because the ordinance on its face "imposes special restrictions on certain kinds of speech on the basis of content" (emphasis in original)); Alameda Books, 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring in the judgment) ("The fiction that this sort of ordinance is content neutral—or 'content neutral'—is perhaps more confusing than helpful .... These ordinances are content based, and we should call them so."); Alameda Books, 535 U.S. at 457, 122 S.Ct. 1728 (Souter, J., dissenting) (describing laws applicable "selectively only to speech of particular content" as "content correlated"); TJS of N.Y., Inc. v. Town of Smithtown, 598 F.3d 17, 22 (2d Cir. 2010) (describing the determination of whether zoning ordinances that target adult uses "are in fact content-neutral" as "a tricky question").

And as Plaintiffs point out, the Supreme Court recently reemphasized—albeit in a different context than here—that facially content-based regulations must survive strict scrutiny, even if they are justified without reference to a content-based purpose. Reed v. Town of Gilbert, —— U.S. ——, 135 S. Ct. 2218, 2227-28, 192 L.Ed.2d 236 (2015). In striking down a municipal code that subjected different categories of signs to different restrictions based on the information they conveyed, the Supreme Court explained that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed, 135 S. Ct. at 2227. Thus, courts must first "consider whether a regulation of speech 'on its face' draws distinctions *463 based on the message a speaker conveys" before considering the regulation's purported justifications or motives. Reed, 135 S. Ct. at 2227-28 (citation omitted).

Yet the federal courts of appeals that have considered Reed's impact on the Supreme Court's secondary-effects doctrine have roundly rejected the notion that Reed changed the applicable law for zoning ordinances like the 2001 Amendments. For instance, the Eleventh Circuit acknowledged that "Reed has called into question the reasoning undergirding the secondary-effects doctrine" but nevertheless adhered to the Supreme Court's secondary-effects cases as "directly control[ling]." See Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, 703 F. App'x 929, 935-36 (11th Cir. 2017) (per curiam) (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)); cf. Cricket Store 17, LLC v. City of Columbia, 676 F. App'x 162, 167 (4th Cir. 2017) (affirming district court's content-neutrality determination under the Renton rubric without any discussion of Reed). Likewise, the Seventh Circuit expressed doubts that "Reed upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment, a category the Court has said occupies the outer fringes of First Amendment protection." BBL, Inc. v. City of Angola, 809 F.3d 317, 326 n.1 (7th Cir. 2015); accord Free Speech Coalition, Inc. v. Attorney Gen. U.S., 825 F.3d 149, 161 n.8 (3d Cir. 2016).

Finally, despite Justice Kennedy's differences with the Alameda Books plurality, he endorsed the "central holding of Renton" that "[a] zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny" because zoning regulations—even if content based—"have a prima facie legitimate purpose." Alameda Books, 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring in the judgment). Therefore, irrespective of the precise label that applies to adult-use zoning ordinances, this Court analyzes the 2001 Amendments through the lens of intermediate scrutiny.

b. Narrow Tailoring

 [29]   [30]   [31]   [32]   For the intermediate scrutiny inquiry, the "narrow tailoring requirement is satisfied so long as the ... [content-neutral] regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation," Mastrovincenzo, 435 F.3d at 98 (emphasis removed) (alterations in original) (citation and quotation mark omitted). The regulation need not be "the least restrictive or least intrusive means of [achieving the stated governmental interest]." Hobbs, 397 F.3d at 149 (quoting

Ward v. Rock Against Racism, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). In the free speech context, a "content-neutral 'time, place, or manner' restriction will be considered narrowly tailored unless 'a substantial portion of the burden on speech does not serve to advance its goals.' " Mastrovincenzo, 435 F.3d at 98 (quoting Ward, 491 U.S. at 799, 109 S.Ct. 2746); see TJS of N.Y., 598 F.3d at 22 (describing the adult zoning cases as descended from and "bear[ing] a strong family resemblance" to the time, place, and manner cases). Stated differently, "the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.' " Packingham v. North Carolina, ––– U.S. ––––, 137 S. Ct. 1730, 1736, 198 L.Ed.2d 273 (2017) (citation omitted).

In Alameda Books, the Supreme Court clarified the evidentiary standard for "determining whether an ordinance serves a substantial governmental interest" under Renton. **464** Alameda Books, 535 U.S. at 433, 122 S.Ct. 1728 (plurality). After restating Renton's holding that "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest," a plurality of the Court articulated the following framework: (1) as an initial matter, the "municipality's evidence must fairly support the municipality's rationale for its ordinance"; (2) "[i]f plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings," the municipality satisfies the Renton standard; and (3) "[i]f plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." Alameda Books, 535 U.S. at 438-39, 122 S.Ct. 1728. Though this evidentiary burden is not a high bar, "[t]his is not to say that a municipality can get away with shoddy data or reasoning." Alameda Books, 535 U.S. at 438, 122 S.Ct. 1728; accord Alameda Books, 535 U.S. at 451, 122 S.Ct. 1728 (Kennedy, J., concurring in the judgment) (stating that "very little evidence is required" to allow municipalities "latitude to experiment").

Before applying these principles to the 2001 Amendments, this Court briefly discusses Justice Kennedy's concurrence in Alameda Books given its importance to Plaintiffs' briefs. In relevant part, Justice Kennedy agreed with the correctness of the plurality's evidentiary framework but argued that the

plurality gave short shrift to the antecedent question of "what proposition ... a city need[s] to advance in order to sustain a secondary-effects ordinance." Alameda Books, 535 U.S. at 449, 122 S.Ct. 1728 (Kennedy, J., concurring in the judgment). He emphasized that "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." Alameda Books, 535 U.S. at 449, 122 S.Ct. 1728. Put another way, a municipality may not propose to "reduce secondary effects by reducing speech in the same proportion," but rather, the "rationale of the ordinance must be that it will suppress secondary effects—and not by suppressing speech." Alameda Books, 535 U.S. at 450, 122 S.Ct. 1728.

 [33] While the Second Circuit has not weighed in, other courts of appeals have—without extensive analysis—regarded Justice Kennedy's concurrence as the controlling opinion under the rule articulated by Marks v. United States, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). See, e.g., Connection Distrib. Co. v. Holder, 557 F.3d 321, 361-62 (6th Cir. 2009); Ben's Bar, Inc. v. Vill. of Somerset, 316 F.3d 702, 722 (7th Cir. 2003); SOB, Inc. v. County of Benton, 317 F.3d 856, 862 n.1 (8th Cir. 2003); Ctr. for Fair Pub. Pol'y v. Maricopa County, 336 F.3d 1153, 1161 (9th Cir. 2003); Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 337 F.3d 1251, 1264 (11th Cir. 2003). Marks provides that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks, 430 U.S. at 193, 97 S.Ct. 990 (quotation marks omitted). This rule only applies when "one opinion is a logical subset of other, broader opinions"—that is, "only when the narrow opinion is the common denominator representing the position approved by at least five justices." United States v. Alcan Aluminum Corp., 315 F.3d 179, 189 (2d Cir. 2003) (quoting **\*465** King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)).

Concededly, the precedential import of Justice Kennedy's concurrence is somewhat unclear, despite the general consensus among the federal circuit courts. For one thing, the "common denominator representing the position approved by at least five justices" is arguably the plurality's evidentiary framework, the soundness of which Justice Kennedy expressly noted. Alcan Aluminum Corp., 315 F.3d at 189. But in any event, this Court does not understand Justice Kennedy's concurrence to have fundamentally altered

the Supreme Court's secondary-effects framework. Accord Ctr. for Fair Pub. Pol'y, 336 F.3d at 1163 (collecting cases "explicitly stat[ing] that Justice Kennedy's separate decision did little, if indeed anything, to the traditional Renton framework"); see also Ben's Bar, 316 F.3d at 721 (describing the difference between Justice Kennedy's concurrence and the plurality opinion as "quite subtle"). Rather, this Court views the concurrence's "how speech will fare" discussion as clarifying or restating familiar analytical principles, including that a time, place, and manner regulation must leave open adequate alternative channels for the regulated speech. Accord Alameda Books, 535 U.S. at 443, 122 S.Ct. 1728 (plurality) (considering concurrence's views as "simply a reformulation of the requirement that an ordinance warrants intermediate scrutiny only if it is a time, place, and manger regulation and not a ban"); World Wide Video of Wa., Inc. v. City of Spokane, 368 F.3d 1186, 1195 (9th Cir. 2004) ("Conceptually, this question dovetails with the requirement that an ordinance must leave open adequate alternative avenues of communication.").

 [34] Applying these principles here, Defendants' stated interest of reducing the negative secondary effects of establishments with predominant, ongoing focus on adult-oriented expression certainly qualifies as a "substantial governmental interest." See Alameda Books, 535 U.S. at 436, 122 S.Ct. 1728 (finding that "reducing crime is a substantial government interest"); Renton, 475 U.S. at 50, 106 S.Ct. 925 (regarding a municipality's "interest in attempting to preserve the quality of urban life [as] one that must be accorded high respect" (quoting Young, 427 U.S. at 71, 96 S.Ct. 2440 (plurality))); Buzzetti, 140 F.3d at 140 ("[C]oncerns similar to those advanced by New York City, such as preventing crime, maintaining property values, and preserving the quality of urban life and the character of city neighborhoods, constitute 'substantial governmental interest[s].' " (second alteration in original)). Thus, the pertinent question is whether the 2001 Amendments are sufficiently tailored to that interest.

The Club Plaintiffs contend that the 2001 Amendments fail to satisfy the narrow tailoring requirement based on the lack of evidence of new or continuing secondary effects from 60/40 establishments. In particular, they rehash the argument raised in the For the People Theatres litigation that the DCP never studied the secondary effects of 60/40 establishments and that in fact, some individuals testified to their belief that 60/40 establishments did not result in any significant impacts. In this Court's view, the Club Plaintiffs ask too much of Defendants, who need only demonstrate that the

2001 Amendments promote the City's interest in reducing secondary effects more effectively than if they did not exist.

Defendants have met their burden of providing evidence that supports a link between the regulated speech and the asserted secondary effects. Alameda Books, 535 U.S. at 441, 122 S.Ct. 1728 (plurality). The DCP Study certainly demonstrates *466 some nexus between deleterious secondary effects and establishments with a predominant, ongoing focus on adult-oriented expression—both through its survey of the experiences of other municipalities as well as its own surveys and analysis. And the 2001 CPC Report, which cites to judicial determinations that mechanical compliance with the 60/40 Standard leaves the essentially non-conforming nature of the adult business intact, fairly supports the underlying rationale for the 2001 Amendments that 60/40 establishments may still have a predominant and ongoing focus on adult-oriented expression. (2001 CPC Report at 33-35.) Cf. City of Erie v. Pap's A.M., 529 U.S. 277, 296-97, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (relying on findings in judicial opinions and the municipality's own findings). Therefore, Defendants had a reasonable basis to infer that regulating the location of 60/40 establishments would alleviate the negative secondary effects associated with establishments with a predominant, ongoing focus on sexual activity or materials.

[35] Although the Club Plaintiffs correctly observe that certain individuals opposed the 2001 Amendments because they did not perceive any negative secondary effects from 60/40 establishments, (see, e.g., 2001 CPC Report at 23, 25-26), the First Amendment does not require a municipality to "conclusively prove its theory for establishing ... a connection" between the regulated speech and the secondary effects sought to be abated. White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 170 (2d Cir. 2007). Likewise, the Club Plaintiffs' suggestion that the City must furnish evidence linking 60/40 establishments with secondary effects runs afoul of the notion that "a city need not prove that such a link exists or prove that its ordinance will be effective in suppressing secondary effects." White River, 481 F.3d at 171. Because Defendants have shown that they "relied on some evidence 'reasonably believed to be relevant' to the problem of negative secondary effects" in enacting the 2001 Amendments, they have "demonstrate[d] that [they] further[ ] a substantial government interest." White River, 481 F.3d at 171 (citation omitted).

c. Reasonable Alternative Channels

[36] In the adult entertainment context, the Second Circuit has reaffirmed that "whether the challenged restriction leaves open adequate alternative avenues of communication" requires "an assessment of available other locations, and whether those alternatives afford a reasonable opportunity to locate and operate such a business." TJS of N.Y., 598 F.3d at 21-22 (citing Hickerson, 146 F.3d at 107-08 and Buzzetti, 140 F.3d at 140-41). A municipality need not "identify the exact locations to which adult establishments may locate, 'as opposed to identifying the general areas that remain available and proving that such areas contain enough potential relocation sites that are physically and legally available to accommodate the adult establishments.' " TJS of N.Y., 598 F.3d at 22 n.4 (quoting Hickerson, 146 F.3d at 107).

[37] This availability inquiry centers on "whether proposed sites are physically and legally available, and whether they are part of an actual commercial real estate market in the municipality." TJS of N.Y., 598 F.3d at 27. Though this determination is fact dependent and somewhat nebulous, the Second Circuit has summarized some of the relevant considerations. These factors include the (1) "pragmatic likelihood of [sites] ever becoming available to a generic commercial enterprise," which connotes "genuine possibility"; (2) "accessibility to the general public"; (3) "the surrounding infrastructure"; and (4) *467 "whether the sites are suitable for some generic commercial enterprise." TJS of N.Y., 598 F.3d at 27-28 (citations and quotation marks omitted) (alteration in original).

[38] [39] [40] [41] Availability does not mean that the acquisition or use of land must be profitable or commercially practicable, and sites are not rendered unavailable simply by being " 'already occupied by existing businesses,' not 'currently for sale or lease' or otherwise not 'commercially viable,' " TJS of N.Y., 598 F.3d at 27 (quoting Renton, 475 U.S. at 53-54, 106 S.Ct. 925). Similarly, the fact that a site must be developed or is located in an industrial or manufacturing zone does not make it unsuitable. TJS of N.Y., 598 F.3d at 28; see Renton, 475 U.S. at 53, 106 S.Ct. 925 (finding reasonable alternative avenues of communication based on "acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is criss-crossed by freeways, highways, and roads" (citation omitted)). On the other hand, land may be excluded as unavailable if "the physical features of a site or the manner

in which it has been developed are 'totally incompatible with any average commercial business,' or the site lacks the basic infrastructure that is a precondition to private development." TJS of N.Y., 598 F.3d at 28 (citations omitted) (emphasis in original). In other words, the touchstone is whether "sites are part of the commercial market generally," irrespective of whether they meet the needs of adult businesses specifically. TJS of N.Y., 598 F.3d at 28.

[42] [43] With respect to the temporal dimension of this prong, the Second Circuit held that "courts must consider the adequacy of alternatives available at the time the ordinance is challenged." TJS of N.Y., 598 F.3d at 22. In other words, a court "should account for circumstances as they exist at the time the court issues its judgment, or as close as is practicable to that time ...." TJS of N.Y., 598 F.3d at 23. As the Second Circuit observed, the "First Amendment does not allow courts to ignore post-enactment, extralegal changes and the impact they have on the sufficiency of alternative avenues of communication." TJS of N.Y., 598 F.3d at 23. It reasoned that the First Amendment inquiry must "be attuned to [the] realities" that "[t]he alternatives available when a statute is passed can disappear" or that "if a municipality opens up new land to development, the availability of alternative sites might very well increase." TJS of N.Y., 598 F.3d at 23.

[44] [45] Finally, this Court rejects Plaintiffs' unsupported contention that the availability of adequate sites must, as a categorical matter, be considered on a county-by-county basis —namely, that Defendants must demonstrate the presence of sufficient alternative avenues for adult expression in Manhattan. See Hickerson, 146 F.3d at 108 n.5 (rejecting argument that "the First Amendment requires proof of adequate available sites on a borough-by-borough basis" as "without foundation and unsupported by case law"); cf. Mastrovincenzo, 435 F.3d at 101 (explaining that the "requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand"). Whatever the merits of Plaintiffs' arguments as to Manhattan's uniqueness with respect to real estate, entertainment, or culture, (e.g., PJA at 161-211), the First Amendment simply "does not guarantee the right to communicate one's views at all times and places and in any manner that may be desired," Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). With these *468 guiding principles in mind, this Court turns to the current alternative relocation sites throughout the City.

Defendants submit a declaration by the DCP's Executive Director along with analyses completed by the DCP as to the areas in each borough where adult establishments could relocate. (Declaration of Anita Laremont, ECF No. 102 ("Laremont Decl."), ¶¶ 1, 11.) This analysis purports to account for encumbered lots unlikely to be developed for commercial use, lots located within 500 feet of sensitive receptors or existing adult establishments, and lots subject to rezoning. (Laremont Decl. ¶ 11.) The DCP's analysis concludes that over 2,800 lots larger than 2,500 square feet exist in which adult establishments may be located, which appears to represent 2.8% of the City's land. (Laremont Decl. ¶ 11 & n.7.) By borough, the DCP identified 36 lots in Manhattan, over 700 lots in Brooklyn, nearly 1,000 lots in Queens, over 550 lots in the Bronx, and over 550 lots in Staten Island that could accommodate adult businesses. (Laremont Decl. ¶¶ 12-13, 16-19; Stipulation Among All Parties re Certain Undisputed Facts, ECF No. 118, 02cv4431.) According to the DCP, these areas are transit-accessible and have established patterns of commercial development. (Laremont Decl. ¶¶ 14, 16-19.)

This Court also recognizes that courts assessing the constitutionality of the 1995 Regulations and the 2001 Amendments have found that they allowed sufficient alternative channels for communication. Buzzetti, 140 F.3d at 140-41; Stringfellow's of N.Y., 671 N.Y.S.2d 406, 694 N.E.2d at 418-19; see For the People Theatres of N.Y., 793 N.Y.S.2d at 371 (concluding without analysis that "sufficient area is available so that the amendments do not have the effect of suppressing, or greatly restricting access to, lawful speech". In particular, the DCP estimated that as of 1995, nearly 5,000 acres of unencumbered land—or 500 sites of over 10,000 square feet—representing 4% of the City's land area remained available for the 148 establishments that would need to relocate under the 1995 Regulations. (See Karnovsky Decl. ¶ 71.) And as of 2001, the DCP calculated that 101 displaced establishments would have had roughly 4,800 unencumbered acres and 450 sites in which to relocate. (Karnovsky Decl. ¶¶ 72-73.) Nonetheless, the available percentage of the municipality's land area or acreage are not necessarily dispositive. Cf. MJ Entmt. Enters., Inc. v. City of Mount Vernon, 328 F. Supp. 2d 480, 485 (S.D.N.Y. 2004) (recognizing that "there is no bright line test for how much land ensures reasonable alternative avenues of communication"); T & A's, Inc. v. Town Bd. Of Town of Ramapo, 109 F. Supp. 2d 161 173-74 (S.D.N.Y. 2000) (same).

On this preliminary record, this Court is skeptical that the 2001 Amendments leave open sufficient alternative avenues of communication. With respect to the outer boroughs, the DCP generated a map for each borough identifying the areas allowing and prohibiting adult establishments as October 31, 2018. (See Laremont Decl., Exs. D-G.) For areas permitting adult establishments, the DCP distinguished between privately owned lots with non-transportation or utility land uses and lots that were either publicly owned or had transportation or utility land uses, such as John F. Kennedy International Airport and LaGuardia Airport. Compared to the maps the DCP created in connection with the 1995 Regulations, the 2018 maps appear to offer slightly less available space for adult entertainment.

But the City's maps do not seem to indicate how the amount of available land would be affected by the requirement that adult establishments be located at least **\*469** 500 feet from sensitive receptors or other adult establishments. Accord Cochran v. Town of Marcy, 143 F. Supp. 2d 235, 238 (N.D.N.Y. 2001) (issuing preliminary injunction in part based on "substantial questions ... as to whether any locations exist within the Town to which plaintiff's business could legally relocate"). Indeed, the DCP's analysis concedes that when accounting for the impact of an adult establishment on the location of other adult establishments, only a maximum of thirteen adult establishments could co-exist in Manhattan,[31] even though the DCP identified thirty-six lots in Manhattan. (Laremont Decl. ¶ 15.) When extrapolated to the City as a whole, this statistic suggests that not assessing the effect of the AZR's anti-concentration provisions may lead to a substantial overestimation of the alternative avenues for speech. See TJS of N.Y., 598 F.3d at 22 n.4 (requiring a municipality to prove at minimum that the "general areas that remain available ... contain enough potential relocation sites that are physically and legally available").

The maps submitted by the Club Plaintiffs' expert, Michael Berzak, support this intuition. (See PJA at 19-46.) As Berzak explains, his maps demonstrate the effect of subsequent zoning changes for each borough. And for Manhattan, Berzak's maps progressively superimpose the effect of subsequent zoning changes, existing sensitive receptors and adult establishments, sites unavailable for any commercial use, and the AZR's anti-concentration provisions. (PJA at 2, 9-13.) A review of Berzak's Manhattan maps—which Defendants do not appear to refute—indicates that the potential alternative sites for adult businesses to relocate has substantially diminished since 1995, and there is no reason

to believe that this result would not similarly be felt in the outer boroughs. Based on this evidence, this Court finds that Plaintiffs have sufficiently demonstrated at this stage that the enforcement of the 2001 Amendments will deny them adequate alternative channels to offer their adult expression.

C. Balance of Hardships and the Public Interest

[46] [47] The preliminary injunction inquiry also requires courts to "balance the competing claims of injury[,] ... consider the effect on each party of the granting or withholding of the requested relief, and pay particular regard [to] the public consequences in employing the extraordinary remedy of preliminary relief." Amarin Pharma, Inc. v. U.S. Food & Drug Admin., 119 F. Supp. 3d 196, 237-38 (S.D.N.Y. 2015) (internal citations and quotation marks omitted). Because "[t]hese factors merge when the Government is the opposing party," Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 436 (E.D.N.Y. 2018) (quoting Nken v. Holder, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)), this Court considers them in tandem.

[48] [49] [50] This Court determines that the balance of hardships weighs in favor of Plaintiffs and the issuance of preliminary injunctive relief would not disserve the public interest. Many of the Club Plaintiffs and Bookstore Plaintiffs have submitted affidavits attesting to the hardship they may face if the 2001 Amendments were enforced, including the loss of their businesses, the potential breach of their contracts and leases, the possibility that their employees will lose their jobs, the threat of criminal prosecution, and the financial and time costs of relocation. (See PJA at 227-311, **\*470** 1616-1669.) Moreover, granting the requested relief would not result in any harm to Defendants, who have already refrained from enforcing the 2001 Amendments for eighteen years. While this Court credits Defendants' contention that the 2001 Amendments are designed to abate the pernicious secondary effects of adult establishments, it also recognizes that the City "does not have an interest in the enforcement of an unconstitutional law."[32] N.Y. Progress & Prot. PAC, 733 F.3d at 488 (quotation marks omitted) (quoting Am. Civil Liberties Union v. Ashcroft, 322 F.3d 240, 247 (3d Cir. 2003)). Rather, as this circuit has recognized, "securing First Amendment rights is in the public interest." N.Y. Progress & Prot. PAC, 733 F.3d at 488; see also Ligon v. City of New York, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013) ("[T]he public interest lies with the enforcement of the Constitution.").

## CONCLUSION

The adult-use regulations that are the subject of these now-revived constitutional challenges are a throwback to a bygone era. The City's landscape has transformed dramatically since Defendants last studied the secondary effects of adult establishments twenty-five years ago. As Proust might say, the "reality that [the City] had known no longer existed," and "houses, roads, [and] avenues are as fugitive, alas, as the years." Marcel Proust, Swann's Way, in Remembrance of Things Past (C.K. Scott Moncrieff trans., 1922) (1913).

This Court reiterates that its determination of this motion says nothing about whether Plaintiffs will in fact succeed on the merits of their claims. However, for the reasons stated above, Plaintiffs' motions for preliminary injunctions are granted. Defendants are enjoined from enforcing the 2001 Amendments pending a final judgment on the merits. Cf. Whole Woman's Health v. Hellerstedt, —— U.S. ——, 136 S. Ct. 2292, 2307, 195 L.Ed.2d 665 (2016) (reiterating the propriety of an injunction prohibiting the enforcement of a facially unconstitutional statute). Because Defendants do not identify any "costs or damages" they may incur if wrongfully enjoined, this Court waives the Rule 65(c) bond requirement in its discretion. Accord Christian Fellowship Ctrs. of N.Y., Inc. v. Vill. of Canton, 377 F. Supp. 3d 146, 167 n.16 (N.D.N.Y. 2019); see Rex Medical L.P. v. Angiotech Pharms.

(US), Inc., 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) ("It is well-settled that a district court has 'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm [to the non-movant].' " (citations omitted)).

The parties in all four actions are directed to appear for a status conference on October 31, 2019 at 11:00 a.m. and to file a joint status report by October 24, 2019 detailing their respective positions on how to proceed with the balance of this action. Counsel are further directed to confer with each other prior to the conference regarding all of the subjects to be considered pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and to outline their discovery plan pursuant to that Rule in their joint status report.

The Clerk of Court is directed to terminate the motions pending at ECF No. 78 **\*471** in 02cv4431, ECF No. 32 in 02cv4432, ECF No. 57 in 02cv8333, and ECF No. 27 in 18cv3732 and file a copy of this Opinion & Order on all four dockets.

SO ORDERED.

### All Citations

408 F.Supp.3d 424

### Footnotes

1   The Club Plaintiffs' operative complaints contain materially identical recitations of the facts and legal theories. Likewise, Defendants filed an identical set of documents in opposition to Plaintiffs' motions for preliminary injunction in all four actions. (See ECF Nos. 101, 102, 103, 105, 02cv4431; ECF Nos. 58, 59, 60, 62. 02cv4432; ECF Nos. 83, 84, 85, 87, 02cv8333; ECF Nos. 50, 51, 52, 54, 18cv3732.) For the sake of simplicity, this Opinion & Order cites to the 4431 Complaint when referring to the Club Plaintiffs' identical allegations and to the ECF numbers corresponding to the 02cv4431 docket when referring to documents submitted by Defendants.

2   The five categories proposed by the CPC were adult bookstores, adult motion picture theaters, peep show providers, topless bars, and massage parlors. (DCP Study at 31.)

3   The TSBID's review of data for assessed property values is somewhat inconclusive on this issue, remarking that "while it may be that the concentration of adult use establishments has a generally depressive effect on the adjoining properties ... we do not have sufficient data to prove or disprove this thesis." (DCP Study at 40-41 (ellipses in original).)

4   For each of the six areas—two in Manhattan and one in each of the other boroughs—the DCP compared survey blockfronts containing at least one adult use with similar control blockfronts without any adult uses. Three of the areas studied contained only one adult use. (DCP Study at 47.)

5   Twenty-three out of twenty-eight community organizations responded, compared with seventy out of ninety-seven businesses. The sample sizes for real estate brokers, police officers, and sanitation department officials were comparatively smaller—namely, thirteen real estate brokers in total and one police officer and sanitation department official for each survey area. (See DCP Study at 48-51.)

6   There is nothing inherently problematic with the DCP Study's reliance on studies conducted by other municipalities. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ("The First Amendment does not require a city ... to conduct new studies or produce new evidence independent of that already generated by

7   other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.").

7   To be certain, the DCP acknowledged that especially for the study areas with only one adult establishment, "the DCP survey did not yield conclusive evidence of a direct relationship between the adult use and the urban ills affecting the community." (DCP Study at 62; cf. 4431 Compl. ¶ 13.) However, it attributed this result to "the fact that, in a city as dense and diverse as New York, it is difficult to isolate specific impacts attributable to any particular land use"—an issue that also plagued other municipal studies. (DCP Study at 62.)

8   The parties have submitted over 2,000 pages of affidavits and documentary evidence in connection with Plaintiffs' motions. This record includes the PJA and the sequentially numbered Plaintiffs' Joint Reply Appendix in Support of Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Preliminary Injunction ("PJRA"). These materials may be found at ECF Nos. 80-96, 98, and 112-115 in case number 02cv4431; ECF Nos. 34-51, 54, and 69-72 in case number 02cv4431; ECF Nos. 59-75, 80, and 97-100 in case number 02cv8333; and ECF Nos. 29-45, 47, and 61-64 in case number 18cv3732. For the sake of simplicity, this Court cites to the record page when referring to a document that is part of the PJA or PJRA unless expressly stated otherwise.

9   The version of the 1995 CPC Report submitted by the parties does not appear to attach the DCP analysis, nor does it cite to any particular document.

10  "Specified sexual activities" were defined as "(i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals pubic region, buttock, anus or female breast." (PJA at 352.) "Specified anatomical areas" were defined as "(i) less than completely concealed and opaquely concealed: (a) human genitals, pubic region, (b) human buttock, anus, or (c) female breast below a point immediately above the top of the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed." (PJA at 353.) As the 1995 CPC Report explains, these terms were "used in most zoning ordinances throughout the country." (1995 CPC Report at 6.)

11  In a similar vein, the terms "regularly" and "characterized by an emphasis" were meant to circumscribe the applicability of the proposed regulations to establishments "that have a principal focus on sexual activities or anatomy as entertainment" and those "that have adult entertainment on a frequent, on-going basis." (1995 CPC Report at 51-52.)

12  Separately, a bookstore would also be considered an "adult book store" if a "substantial portion," defined as "at least 40 percent of the book store's total [accessible stock]," was "comprised of adult materials." (PJA at 503.)

13  Notably, although the New York Appellate Division rejected the City's argument that the 60/40 Standard did not apply to any single-use establishment with an adult component, it found that the establishment nevertheless "failed to prove compliance with the [60/40 Standard]" despite having only 28 percent of its total floor space dedicated to adult entertainment because it failed to comply was, "as a matter of law, a sham" that left the non-conforming nature essentially intact. City of New York v. Dezer Props., Inc., 259 A.D.2d 116, 697 N.Y.S.2d 41, 45 (1999), rev'd 95 N.Y.2d 771, 710 N.Y.S.2d 836, 732 N.E.2d 943 (2000). The New York Court of Appeals reversed, holding that whether the establishment actually complied with the 60/40 Standard was not properly before the Appellate Division and consequently could not be reached by the high court. Dezer Props., 710 N.Y.S.2d 836, 732 N.E.3d at 943.

14  OPPN # 6/98 was itself superseded by OPPN # 1/00. (See PJA at 506.) OPPN # 1/00 "stated explicitly that it was intended to address the Court of Appeals decision in Les Hommes. and that it 'sets forth additional considerations or factors not specifically set forth in [the prior OPPN] to assure that the adult use provisions are not undermined by sham efforts at compliance." City of New York v. Warehouse on the Block, Ltd., 183 Misc.2d 489, 703 N.Y.S.2d 900, 901-02 (N.Y. Sup. Ct. 2000) (alteration in original). Nonetheless, because it is immaterial to this Court's decision and because the parties do not address it in their briefing or even appear to have included it in the record, this Court declines to consider it.

15  The CPC detailed some of these tactics, which include buying inexpensive instructional videos, martial arts films, or cartoons in bulk and leaving opened cartons of titles on the floors or "stacked haphazardly on shelves without any attempt at organization or categorization." (2001 CPC Report at 32-33.) As indicia of a predominant focus on the sale of adult materials, the CPC cited layouts requiring customers to pass through an adult section to reach a non-adult section, a greater selection of adult material than non-adult material, or layouts requiring customers to consummate any transactions in adult sections of the establishment. (2001 CPC Report at 33.)

16  A fourth action brought by owners and operators of another gentlemen's cabaret, captioned Pulse Nite Club, Inc. v. City of New York, was voluntarily dismissed on April 26, 2018. (See ECF No. 3, 02cv6193.)

17  The dissent disagreed that the 2001 Amendments functioned merely as a clarification of the 1995 Regulations, instead characterizing them as creating "new law." For the People Theatres of N.Y., 810 N.Y.S.2d 381, 843 N.E.2d at 1134 (Kaye, C.J., dissenting). Similarly, because it saw 60/40 establishments as fundamentally different from the pre-1995

adult establishments, it argued that the 2001 Amendments could not be justified by reference to the 1995 Regulations. For the People Theatres of N.Y., 810 N.Y.S.2d 381, 843 N.E.2d at 1136.

18    The trial court found the 2001 Amendments unconstitutional with respect to adult theatres and entered a permanent injunction. The City did not appeal this portion of the judgment.

19    In a separate dicta section, the court doubted that "an 18 year old study of the negative effects of the 100% entities can be applied to the current 60-40 entities without determining the actual negative secondary effect of these institutions today." For the People Theatres of N.Y., 954 N.Y.S.2d at 810. It lambasted the City's "fictionalized reliance on the [DCP Study]" and remarked that the 2001 Amendments should have been struck down as urged by the New York Court of Appeals' dissent. For the People Theatres of N.Y., 954 N.Y.S.2d at 810.

20    The dissenters took issue with the majority's "mechanical and mathematical approach" in considering the factors the Appellate Division previously identified. For the People Theaters of N.Y., 14 N.Y.S.3d at 355-56. In their view, the City only needed to demonstrate that the essential nature of the 60/40 establishments—i.e., a predominant, ongoing focus on sexually explicit materials or activities—had not changed to sustain the 2001 Amendments. For the People Theaters of N.Y., 14 N.Y.S.3d at 354, 358 (Andrias, J., dissenting).

21    Section 1983 provides a private right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must "allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Defendants do not dispute that Plaintiffs may properly bring their claims under § 1983.

22    In connection with the 1995 Regulations, the DCP generated maps of the permissible areas where adult establishments could relocate. (3732 Compl. ¶¶ 104-106.) These maps represented that approximately 4 percent of its total area remained available for adult uses. (3732 Compl. ¶ 107; accord 4432 Compl. ¶¶ 86-87; 8333 Compl. ¶¶ 87-88.)

23    Though not specifically addressed in the Zoning Resolution, a sensitive receptor is also deemed established based on the date the DOB issues a permit. (Declaration of DOB Deputy Borough Commissioner Rodney Gittens, ECF No. 103 ("Gittens Decl."), ¶ 16.)

24    The Club Plaintiffs' Stipulation is docketed at ECF No. 119 in 02cv4431, ECF No. 79 in 02cv4432, and ECF No. 104 in 02cv8333. The Bookstore Plaintiffs' Stipulation is docketed at ECF No. 67 in 18cv3732.

25    In any event, the Club Plaintiffs and Defendants have stipulated that the maps the City generated in the mid-1990s "did not depict the then-existing adult businesses or the 500' buffer areas around them where new adult uses were prohibited, as [indicated] in the asterisked footnote on those maps." (Club Plaintiffs' Stipulation ¶ 4(b).) The asterisked footnote referenced in paragraph 4(b) states that "[r]estrictions from existing adult entertainment uses [are] not shown. (See PJA at 1811-15.)

26    These are Exhibits 1-53, 2A-5A, and 82-88 to the Club Plaintiffs' request for judicial notice; Exhibit H to the Gittens Declaration, submitted by Defendants; Exhibits I-L to the Devine Declaration, submitted by Defendants; and Exhibits 54-81 to the Bookstore Plaintiffs' request for judicial notice.

27    In abrogating the presumption of irreparable injury that courts in this circuit routinely applied to copyright infringement claims, the Second Circuit has explained that courts "must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm." Salinger, 607 F.3d 68, 80 (2d Cir. 2010) (citing eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 393-94, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)). Although the Second Circuit suggested that eBay would equally "with equal force to an injunction in any type of case," it still limited its holding to the copyright infringement context. Salinger, 607 F.3d at 78 & n.7 (emphasis in original). Thus, absent precedent from the Supreme Court and Second Circuit directly on point, this Court joins others in this district that have continued to presume irreparable injury based on an alleged constitutional deprivation. See, e.g., Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253, 276 (S.D.N.Y. 2019); Airbnb, Inc., 373 F. Supp. 3d at 498.

28    The Club Plaintiffs appear to argue that in the First Amendment context, a plaintiff seeking a preliminary injunction must be deemed likely to prevail unless the government shows that plaintiffs' proposed less restrictive alternatives would be less effective than the statute, citing to the Third Circuit's decision in Reilly v. City of Harrisburg, 858 F.3d 173, 180 (3d Cir. 2017). This Court finds Reilly to be inapplicable to the extent the Club Plaintiffs argue that Defendants must show that less restrictive alternatives would be less effective than the 2001 Amendments. For that proposition, Reilly quoted the Supreme Court's decision in Ashcroft v. ACLU, 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). But Ashcroft dealt with a content-based restriction on speech, and those must use the least restrictive means available in order to

survive strict scrutiny. Because this Court determines that the 2001 Amendments are content-neutral—or at least properly analyzed under intermediate scrutiny—this proposition has no application here.

29 The Club Plaintiffs advance several "tests" drawn from disembodied snippets of various opinions by the Supreme Court and individual Justices under which the 2001 Amendments purportedly fail. In this Court's view, the Supreme Court's jurisprudence with respect to time, place, and manner regulations more generally, and adult zoning ordinances in particular, is largely consistent. Accordingly, it declines the Club Plaintiffs' invitation to analyze the constitutionality of the 2001 Amendments separately under each of these "tests."

30 To be sure, while the Court omitted any mention of alternative channels of expression from its articulation of the relevant legal standard, a plurality of the Court observed that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." Young, 427 U.S. at 71 n.35, 96 S.Ct. 2440 (plurality).

31 Defendants do not appear to have included a current map reflecting the permissible areas for relocation in Manhattan.

32 Of course, this Court's "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." trueEx, LLC, 266 F. Supp. 3d at 720 n.108; see also Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4975566, 84 Fed. R. Evid. Serv. 198

2010 WL 4975566
United States District Court,
E.D. Texas,
Marshall Division.

FIRST AMERICAN CORELOGIC, INC., Plaintiff,

v.

FISERV, INC., Intellireal, LLC, Interthinx, Inc.,
Lender Processing Services, Inc., Precision Appraisal
Services, Inc., Real Data, Inc., Realec Technologies,
Inc., Zillow, Inc., American Flood Research, Inc.,
Electronic Appraiser, Inc., Espiel, Inc., Defendants.

Civil Action No. 2:10–CV–132–TJW.
|
Dec. 2, 2010.

**Attorneys and Law Firms**

Fabio Elia Marino, Orrick Herrington & Sutcliffe, Menlo
Park, CA, Roger Brian Craft, Eric Hugh Findlay, Findlay
Craft, Tyler, TX, for Plaintiff.

Michael E. Jones, Allen Franklin Gardner, Michael E. Jones,
Potter Minton PC, Tyler, TX, Autumn N. Nero, Perkins
Coie LLP, Madison, WI, Ramsey M. Al-Salam Perkins Coie,
LLP, Christopher Schenck, Riddell Williams PS, Karl J.
Quackenbush, Riddell Williams PS, Seattle, WA, Elizabeth L.
Derieux, Sidney Calvin Capshaw, III, Capshaw Derieux, LLP,
Longview, TX, Ian L. Saffer, Ryan D. Phillips, Townsend
Townsend & Crew LLP, Denver, CO, John Michael Pickett,
Young Pickett & Lee, Texarkana, TX, Erik Paul Belt, Irene
Hurtado, Lee Carl Bromberg, Mccarter & English, LLP,
Boston, MA, Amy P. Mohan, Christopher J. Richart, Claudia
Wilson Frost, Jeffrey Lance Johnson, Pillsbury Winthrop
Shaw Pittman, Houston, TX, Harry Lee Gillam, Jr., Gillam &
Smith, LLP, Marshall, TX, for Defendants.

### MEMORANDUM OPINION AND ORDER

T. JOHN WARD, District Judge.

## I. Introduction

**\*1** Before the Court are the Motion for Protective Order
by First American CoreLogic, Inc. ("CoreLogic") (Dkt. No.
75) and CoreLogic's Opposed Motion to Reclaim Certain
Privileged Documents Filed Under Seal and Submitting
for In Camera Review. (Dkt. No. 86.) The Court, having

considered the motions and the arguments of counsel,
DENIES CoreLogic's Motion for Protective Order (Dkt. No.
75 .) and DENIES CoreLogic's Opposed Motion to Reclaim
Certain Privileged Documents. (Dkt. No. 86.)

## II. Factual and Procedural Background

The present case arises out of a patent infringement claim
filed by CoreLogic against multiple defendants. [1] The two
motions addressed in this Order arise out of a single motion
filed by CoreLogic seeking a protective order. In CoreLogic's
motion for protective order (Dkt. No. 75) it claims that
from July 2009 until February 2010 Robert Walker and
Renjie Chen assisted CoreLogic's in-house counsel with
a pre-filing investigation of the current litigation. This
investigation included learning about the patent-in-suit, the
infringing products, and CoreLogic's litigation strategy. Then
in February 2010, CoreLogic claims both Walker and Chen
quit working with CoreLogic and went to work for Lender
Processing Services, Inc. ("LPS")—one of the defendants in
this litigation. Now Defendant LPS claims Walker and Chen
may be persons knowledgeable about its accused products
and LPS may potentially use them as witnesses in this
case. CoreLogic's obvious concern is CoreLogic's potential
privileged or protected information that Walker and Chen may
have knowledge and could potentially disclose to Defendant
LPS. Therefore, CoreLogic filed a motion for protective order
(Dkt. No. 75) and asks the Court to prevent LPS or its counsel
from communicating with Walker or Chen in connection with
this present litigation. Defendant LPS opposes this motion
and argues that although it agrees that LPS should not be able
to discover the privileged information that Walker or Chen
possess, LPS states that less restrictive protective measures
are available.

In CoreLogic's motion for protective order, however, when
attempting to bolster its argument that Walker and Chen were
privy to privileged communications at CoreLogic, CoreLogic
attached as exhibits to its motion a declaration and six emails
to illustrate a sample of the privileged communications of
which Walker and/or Chen had participated. (*See* Dkt. No.
75, Dyer Decl., ¶¶ 1–6, Exs. 1–6.) CoreLogic freely admitted
in its motion that the emails were privileged. But CoreLogic
did not submit the exhibits *in camera;* instead, CoreLogic
attached the exhibits under seal. In addition to attaching
the exhibits under seal, CoreLogic served a copy of the
privileged emails and declaration to every defendant in the
present lawsuit. Further, nowhere in CoreLogic's motion for
protective order did it state or indicate that it intended to

First American CoreLogic, Inc. v. Fiserv, Inc., Not Reported in F.Supp.2d (2010)

Case 1:20-cv-03178-LJL Document 58-1 Filed 05/27/20 Page 40 of 80

2010 WL 4975566, 84 Fed. R. Evid. Serv. 198

the exhibits for *in camera* review or for the "Court's eyes only ." Only after Defendant LPI filed its response to CoreLogic's motion for protective order, pointing out that CoreLogic had waived its privilege to those documents by attaching them as exhibits and serving them on the parties, did CoreLogic claim that it meant to file the exhibits *in camera*.

**\*2** This course of conduct by the parties led CoreLogic to later file its second motion addressed by this Order, which is CoreLogic's Motion to Reclaim Certain Privileged Documents Filed Under Seal and Submitting for In Camera Review. (Dkt. No. 86.) In this motion CoreLogic claims that it inadvertently filed the declaration and emails under seal and that it meant to file them *in camera*. Therefore, the motion requests the Court to grant CoreLogic's request to reclaim these documents from the Court's files under seal so that they may be lodged with the Court for *in camera* review. Defendant LPS, and at least one other defendant, oppose this motion and argue that CoreLogic's disclosure was not inadvertent and that CoreLogic waived its privilege to those documents and has also created a subject matter waiver.

## III. Analysis

### A. Plaintiff's Motion to Reclaim Certain Privileged Documents

The Court holds that CoreLogic has waived its attorney-client and/or work product protection with respect to the seven documents it disclosed to Defendants by attaching the documents under seal as exhibits to its motion for protective order and serving the documents on all parties. But the Court does not find a subject-matter waiver, thus CoreLogic has only waived its attorney-client privilege for the seven privileged documents it produced.

#### 1. Legal Standard

The attorney-client privilege prevents disclosure of communications between an attorney and client that were made while seeking or rendering legal services. *Upjohn Co. v. United States,* 449 U.S. 383, 395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Disclosure, however, of attorney-client communications to a third party who lacks a common legal interest waives the attorney-client privilege. *In re Auclair,* 961 F.2d 65, 69 (5th Cir.1992). In 2008, Congress created a new rule of evidence, Federal Rule of Evidence 502, which addresses inadvertent disclosures of privileged information. Rule 502(b) states:

**Inadvertent disclosure.**—When made in a Federal proceeding or to a Federal office or agency, the disclosure does not operate as a waiver in a Federal or State proceeding if:

(1) the disclosure is inadvertent;

(2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and

(3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Defendants also allege that CoreLogic's alleged waiver creates a subject-matter waiver. The new Federal Rule of Evidence 502 also addresses subject-matter waiver. Rule 502(a) states:

**Disclosure made in a Federal proceeding or to a Federal office or agency; scope of a waiver.**—When the disclosure is made in a Federal proceeding or to a Federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:

**\*3** (1) the waiver is intentional;

(2) the disclosed and undisclosed communications or information concern the same subject matter; and

(3) they ought in fairness to be considered together.

In determining whether the privilege applies or has been waived, the burden is on the party asserting the privilege to demonstrate that the privilege applies. *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,* 218 F.R.D. 125, 134 (E.D.Tex.2003). In addition, the party asserting the privilege must prove that waiver did not occur. *Id.*

#### 2. Discussion

At the outset, before discussing CoreLogic's inadvertent disclosure argument, the Court briefly notes that if CoreLogic did not inadvertently disclose the documents, then the privilege was waived to those documents. In the present case, Corelogic filed the privileged exhibits and declaration under seal and then served them on all the defendants. If the documents had been filed *in camera* with the Court then the privilege would not have been waived because the documents

2010 WL 4975566, 84 Fed. R. Evid. Serv. 198

would not have been disclosed to any third parties except the Court. But the documents were not filed *in camera*—they were filed under seal and then served on the defendants. [2] Filing under seal is not the same as filing *in camera*. Filing under seal protects the documents from view of the public. On the other hand, filing documents *in camera* protects the documents from view of the public and also other parties in the case—only the Court can view the documents. Therefore, filing the documents under seal and serving them on the defendants has the same effect as disclosing documents to a third party and thus waiving the privilege. Hence, CoreLogic's only chance in retaining the privilege with respect to those documents is to succeed in its argument that the documents were inadvertently filed under seal instead of *in camera*.

Regarding CoreLogic's inadvertent disclosure argument, as noted above, Federal Rule of Evidence 502(b) outlines the federal rule for inadvertent disclosure of privileged information. Before Federal Rule of Evidence 502(b) was signed into law, the Fifth Circuit considered a five factor test in determining whether disclosure of privileged information was inadvertent: (1) the reasonableness of precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. *Alldread v. City of Grenada*, 988 F.2d 1425, 1433 (5th Cir.1993). In determining whether the inadvertent disclosure exception is satisfied under the new Rule 502(b), the Rule's Advisory Committee Notes state that Rule 502(b) "does not explicitly codify that test, because it is really a set of non-determinative guidelines that vary from case to case." Fed. R. Ev id. 502, Advisory Committee Notes. But the Advisory Committee Notes also state that the "rule is flexible enough to accommodate any of those listed factors." *Id.*

**\*4** In this Court's view, the unique facts of the present case are not what Congress or the Advisory Committee had in mind when drafting Rule 502(b). Rule 502(b) and the previous five factor test outlined above were designed primarily to cope with the increasingly common problem in massive discovery where thousands or millions of documents are produced and a few privileged documents are "inadvertently" disclosed along with the millions of other documents. [3] This case, however, does not involve the inadvertent disclosure of documents along with millions of other documents. Instead, Corelogic filed the privileged exhibits and declaration under seal and then served on all the defendants. Hence, Defendant LPS, in essence, argues

that CoreLogic *advertently* disclosed the documents to the defendants and thus waived its privilege.

The Court does not find the old five factor test particularly useful in the present case because it was created primarily for a different situation. [4] The Court, therefore, need not apply that test in this unique case. Indeed, the Advisory Committee Notes state that Rule 502(b) "does not explicitly codify that test" because the factors are non-determinative guidelines an d that Rule 502(b) is flexible. Fed.R.Evid. 502, Advisory Committee Notes. Rather, the Court considers the text of Rule 502(b) in the present case. [5] The text of Rule 502(b) plainly states that one of the three requirements for the inadvertent disclosure exception to apply is that "the disclosure is inadvertent." Thus, the *disclosure* itself, not the *waiver* of the privilege, must have been inadvertent. [6]

Keeping the text of Rule 502(b) in mind, CoreLogic has not met its burden of proof in showing that the disclosure of the seven documents was inadvertent. CoreLogic only provides an affidavit by one of its attorneys stating that the documents were inadvertently filed under seal and were intended to be lodged with the court for *in camera* review only. Thus, CoreLogic's reasoning is that because the documents were inadvertently filed under seal then they were inadvertently disclosed. On the other hand, there is no indication in CoreLogic's original motion for protective order, which attached the privileged documents, that those documents were intended to be reviewed *in camera*. The motion never states the words *"in camera"* at any point and the motion does not include any language indicating that the documents were to be viewed by the Court's eyes only. Therefore, CoreLogic has not satisfied its burden of proof with only an affidavit b y one of its own attorney's stating that it meant to file *in camera*—especially given that the affidavit was only filed several weeks after Defendant LPS filed a pleading indicating that CoreLogic had waived its privilege. Under the facts of this case, the Court is not willing to set a precedent allowing an exhibit to be considered as filed *in camera* when the party first filed the exhibit under seal (and served the other parties with the documents), and then later merely filed an affidavit claiming the exhibit was supposed to be *in camera*. [7]

**\*5** Although the Court holds that the privilege for the seven documents has been waived by CoreLogic's disclosure, the Court does not hold that CoreLogic's disclosure creates a subject-matter waiver. Federal Rule of Evidence 502(a) governs subject-matter waiver in a Federal proceeding and

2010 WL 4975566, 84 Fed. R. Evid. Serv. 198

it states that if the attorney-client privilege or work product protection has been waived regarding a communication "the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if: (1) the waiver is intentional...." In the present case, CoreLogic has met its burden of proof that its waiver of the privilege was not intentional. CoreLogic may have advertently disclosed documents that consequently waived its privilege, but CoreLogic was not intending to waive its privilege. As CoreLogic states in its affidavit, CoreLogic mistakenly filed its documents under seal and should have filed them *in camera* in order to maintain its privilege. CoreLogic's motion for protective order even states that the privileged exhibits attached to the order "are intended to remain confidential and privileged." (Dkt. No. 75, at 11.) This supports the Court's finding: although CoreLogic may have accidently waived its privilege regarding documents that were advertently attached under seal and disclosed to third parties, CoreLogic did not intend to waive its privilege. Thus, the Court holds there is not a subject-matter waiver, and the attorney-client privilege and/or work product protection are only waived for the seven documents attached under seal to CoreLogic's motion for protective order. (*See* Dkt. No. 76., Dyer Decl., Exs. 1–6.)

**B. Plaintiff's Motion for Protective Order**

The Court holds that Co re Lo g ic's motion for protective order should be denied, and the parties are ordered to meet and confer to discuss a solution to safeguard CoreLogic's privileged communications that are possessed by Walker and Chen.

*1. Legal Standard*

Federal Rule of Civil Procedure 26(c) gives the Court the power to issue protective orders. Rule 26(c) states:

A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending.... The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(A) forbidding the disclosure or discovery;

...

(D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters.

Further, "Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that [t]he burden is upon the movant to show the necessity of its issuance." ', *In re Terra Int'l, Inc.,* 134 F.3d 302, 306 (5th Cir.1998).

*2. Discussion*

CoreLogic moves this Court for a protective order preventing LPS or its counsel from communicating with Walker and Chen in connection with the present action. CoreLogic states:

> **\*6** The highly unusual circumstances, and the improper, untrustworthy and suspicious nature of Walker's and Chen's activities prior to jumping ship from CoreLogic to LPS, demand significant protective measures be imposed to prevent the disclosure of CoreLogic's privileged information. CoreLogic believes that the only way to adequately safeguard its privileged information is to prohibit Walker and Chen from communicating with anyone at LPS, or its counsel for this case, regarding the issues related to the current litigation.

(Dkt. No. 75, at 13.) The Court disagrees with a protective order stretching as far as CoreLogic requests because CoreLogic has not met its burden of showing the necessity of the protective order. Further, CoreLogic has not pointed to any binding caselaw that is on point that would allow for such relief as CoreLogic requests.

LPS is entitled to discover any factual, non-privileged information that Walker or Chen may have acquired while at CoreLogic .[8] *See* Fed.R.Civ.P. 26(b); *Upjohn,* 449 U.S. at 395 ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."). In addition, LPS is clearly entitled to have discussions with Walker and Chen regarding LPS's own products. Because CoreLogic's proposed protective order would deny LPS discovery to these types of information, the Court will not grant such a protective order.

First American CoreLogic, Inc. v. Fiserv, Inc., Not Reported in F.Supp.2d (2010)

Case 1:20-cv-03178-LJL  Document 58-1  Filed 05/27/20  Page 43 of 80

2010 WL 4975566, 84 Fed. R. Evid. Serv. 198

CoreLogic's privileged information can be protected by less restrictive measures. LPS has a policy prohibiting employees from accessing, using or disclosing any proprietary information or other trade secret belonging to a former employer, and Walker and Chen have signed acknowledgments of that policy. LPS has also offered to conduct depositions of Walker and Chen for the sole purpose of determining the boundaries of their knowledge and whether they possess any relevant, non-privileged information. The Court does not hold here whether these or other measures are appropriate. Instead, at this time, the Court only denies CoreLogic's request to completely wall Walker and Chen from communicating with LPS or its counsel in connection with the present action. The parties, LPS and CoreLogic, are ordered to meet and confer for the purpose of determining an adequate solution to protect CoreLogic's privileged information [9] while still allowing LPS to discover factual, non-privileged information from its employees Walker and Chen. Further, the Court has observed from the briefing that there has been some dispute regarding what is required to satisfy the "Meet and Confer" requirement in good faith. Before meeting and conferring as the Court has ordered above, the attorneys for the parties are ordered to read Local Court Rule CV–7(h). [10]

### III. Conclusion

Therefore, the Court, having considered the motions and the arguments of counsel, DENIES CoreLogic's Motion for Protective Order (Dkt. No. 75.) and DENIES CoreLogic's Opposed Motion to Reclaim Certain Privileged Documents. (Dkt. No. 86.) CoreLogic has waived its privilege regarding the seven privileged documents it produced along with its motion for protective order, but the Court does not find a subject-matter waiver. Further, the parties are ordered to meet and confer to discuss a solution to safeguard CoreLogic's privileged communications that are possessed by Walker and Chen. Of course the denial of CoreLogic's Motion for Protective Order (Dkt. No. 75) is without prejudice to request a more limited protective order if no solution is reached after meeting and conferring with Defendant LPS.

**\*7** It is so ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 4975566, 84 Fed. R. Evid. Serv. 198

### Footnotes

1    The defendants include Fiserv, Inc., Intellireal, LLC, Interthingx, Inc., Lender Processing Services, Inc., Precision Appraisal Services, Inc., Real Data, Inc., Realec Technologies, Inc., Zillow, Inc., American Flood Research, Inc., Electronic Appraiser, and Inc., Espiel, Inc.

2    Note, however, that Local Court Rule CV–5(a)(7) states that the counsel filing the documents under seal "is responsible for serving documents under seal to opposing counsel, and may do so in electronic form."

3    *See* Fed.R.Evid. 502, Advisory Committee Notes; 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 5445 (1st ed., Supp.2010).

4    Even applying the old five factor test, the Court would reach the same result. The first two factors, particularly, point in favor of waiving the privilege regarding the declaration and the six emails because the disclosure was not inadvertent. First, CoreLogic has not shown, as the party with the burden of proof, any reasonable precautions taken to prevent disclosure. Filing the documents under seal is not a reasonable precaution to prevent disclosure when, in fact, CoreLogic was actually disclosing the documents to the opposing parties. Second, CoreLogic has not shown it attempted to remedy the disclosure in an adequate amount of time. Although it did attempt to reclaim the documents from the defendants a few weeks after it disclosed them, this was only done after Defendant LPS filed a response pointing out that CoreLogic had waived its privilege. The final three factors do not point in favor of one side or another.

5    Federal Rule of Evidence 502 is new and neither the parties nor the Court has identified any binding authority in this Circuit or District that specifically interprets Rule 502(b) as applicable to this case. Further, few appellate courts, if any, have had a chance to interpret the rule.

6    It has long been the general rule that "[a]n intent to waive one's privilege is not necessary for such a waiver to occur." *In re Grand Jury Invest. Of Ocean Transp.,* 604 F.2d 672, 675 (D.C.Cir.1979).

7    The Court is not holding so far that a document first filed under seal can never later be considered to have been filed *in camera.* Perhaps, for example, this situation may be different if CoreLogic had discussed in its motion for protective

2010 WL 4975566, 84 Fed. R. Evid. Serv. 198

order that the documents were filed *in camera* to be considered by the Court, but then accidently filed the documents under seal and served them to the parties.

8 Of course, discovery of CoreLogic's confidential information may be subject to some sort of protective order, but Defendants would still be entitled to some form of discovery of any information that is not privileged.

9 As discussed above in this Order, CoreLogic has waived its privilege with respect to the privileged documents it attached as exhibits and served on the parties in its motion for protective order. But since the Court did not find a subject matter waiver, CoreLogic still has protection of other privileged information of which Walker or Chen may possess or have knowledge.

10 Particularly, the parties should pay attention to the portion that states "[i]n any discovery-related motion, the substantive component requires, at a minimum, a personal conference, *by **telephone** or **in person,*** between *the lead trial counsel **and** any local counsel* for the movant and *the lead trial counsel **and** any local counsel* for the non-movant." Local Court Rule CV–7(h) (emphasis added).

---

**End of Document**                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 1837133
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

KINGSWAY FINANCIAL SERVICES, INC., Plaintiff,

v.

PRICEWATERHOUSECOOPERS
LLP, et al., Defendants.

No. 03 Civ. 5560RMBHBP.
|
June 27, 2007.

*OPINION AND ORDER*

PITMAN, Magistrate J.

I. *Introduction*

 **\*1** Defendant John Dore ("Dore") moves for an Order compelling production of an April 25, 2003 email and attached memorandum, Bates numbered WS-Search-3-002239 through 41 (the "4-25-03 E-Mail"), from a Kingsway Financial Services, Inc. ("Kingsway") executive to Kingsway's counsel, on the ground that any protection afforded by the attorney-client privilege has been waived. For the reasons set forth below, Dore's motion is granted.

II. *Facts*

  A. *Background*
The facts relevant to this particular dispute can be briefly stated.

The parties in this case entered into a protective order which provided, among other things, that the inadvertent production of purportedly privileged documents would not operate as a waiver of any applicable privilege. On or about August 2006, plaintiff produced the 4-25-03 E-Mail at issue as part of a production of electronic documents. On or about November 30, 2006, Dore utilized the 4-25-03 E-Mail in, and attached a copy to, a motion for reconsideration of a decision denying a summary judgment motion in a related action pending in the Illinois state courts in which Dore is the plaintiff. In response, plaintiff submitted a letter to this Court on December 4, 2006 (the "December 4, 2006 Letter"), requesting, *inter alia,* the return of all copies of the 4-25-03 E-Mail on the ground that

it was protected by the attorney-client privilege and had been produced inadvertently. The December 4, 2006 Letter was filed with the Court under seal, as was a copy of the 4-25-03 E-Mail which plaintiff attached as an exhibit therewith (*See* Docket Item 129). Plaintiff served copies of the December 4, 2006 Letter, along with the attached 4-25-03 E-Mail, on all defendants in this action, including Dore.

By Order dated December 28, 2006, I directed all defendants, including Dore, to return all copies of the 4-25-03 E-Mail, to destroy any documents disclosing its contents, to use best efforts to retrieve any such documents filed with any Court, and to make no use of the 4-25-03 E-Mail pending further Order of this Court. This Order was without prejudice to a motion to compel production of the 4-25-03 E-Mail. By Order dated February 8, 2007, I elaborated on my December 28, 2006 ruling, instructing Dore not to refer to the substance of the 4-25-03 E-Mail in any motion to compel its production, unless plaintiff's opposition to such motion mischaracterized the nature of the document.

  B. *The Parties' Arguments*
In support of this motion, Dore argues that the 4-25-03 E-Mail is not protected by the attorney-client privilege due to (1) waiver arising out of plaintiff's deliberate distribution of the 4-25-03 E-Mail to the defendants with its service copies of the December 4, 2006 Letter, and (2) application of the crime/fraud exception to the attorney-client privilege. Plaintiff argues that (1) it did not waive the attorney-client privilege with respect to the 4-25-03 E-Mail because its initial production of the e-mail was subject to a non-waiver agreement and it has filed all motions concerning the e-mail with under seal, and (2) the crime/fraud exception to the attorney-client privilege is inapplicable. Plaintiff does not, however, respond to Dore's assertion that it waived the attorney-client privilege by distributing the 4-25-03 E-Mail in its service copies to the defendants.

III. *Analysis*

  A. *Attorney-Client Privilege*

1. *Choice of Law*
 **\*2** The complaint asserts federal claims based on the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10-b-5 promulgated thereunder, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, as well as common law claims of negligence and fraud based on diversity and supplemental

jurisdiction. While Rule 501 of the Federal Rules of Evidence requires the application of federal privilege law to federal question claims and state privilege law to state law claims, *Bondi v. Grant Thornton Int'l,* 04 Civ. 9971(LAK), 2006 WL 1817313 at *2 (S.D.N.Y. June 30, 2006), *citing Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 441 (S.D.N.Y.1995) and *G-I Holdings, Inc. v. Baron & Budd,* 01 Civ. 0216(RWS), 2005 WL 1653623 (S.D.N.Y. July 13, 2005), the Federal Rules of Evidence do not specify which law is to be applied where a proceeding includes claims based on both federal and state law. *See Jaffee v. Redmond,* 518 U.S. 1, 15 n.15 (1996) (noting "disagreement concerning the proper rule in cases [where] relevant evidence would be privileged under state law but not under federal law"); 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 501.02[2][c] (Joseph M. McLaughlin ed., 2d ed. 2006) ("Rule 501 is not clear on which rule should be followed" where state and federal law claims are raised in same action). Nonetheless, the law is clear in this Circuit that federal privilege law should be applied to evidence relevant to both federal and state law claims. *See von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987); *Bayne v. Provost,* 359 F.Supp.2d 234, 238-39 (N.D.N.Y.2005); *Boss Mng. Co. v. Hugo Boss AG,* 97 Civ. 8495(SHS)(MHD), 1999 WL 47324 at *1 (S.D.N.Y. Feb. 1, 1999). Here, because the 4-25-03 E-Mail is relevant to both plaintiff's federal and common law claims, I conclude that the present motion is governed by principles of federal law.

### 2. *Waiver*

The standards applicable to attorney-client privilege issues in federal question cases are well settled. In order "[t]o invoke the attorney-client privilege, a party must demonstrate that there was (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Constr. Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996). "The privilege is intended to encourage clients to be forthcoming and candid with their attorneys so that the attorney is sufficiently well-informed to provide sound legal advice." *United States v. Adlman,* 68 F.3d 1495, 1499 (2d Cir.1995); *see Upjohn Co. v. United States,* 449 U.S. 383, 390 (1981).

The attorney-client privilege is not absolute, however, and may be waived through, among other things, the voluntary

disclosure of a privileged communication to a third party, especially a litigation adversary. *See In re Horowitz,* 482 F.2d 72, 81 (2d Cir.1973) (disclosure of a privileged communication to a third party eliminates attorney-client privilege); *NXIVM Corp. v. O'Hara,* 241 F.R.D. 109, 138 (N.D.N.Y.2007) ("Once a party allows an adversary to share in an otherwise privileged document, the need for the privilege disappears[.]" (internal quotation marks omitted)); *Spanierman Gallery, Profit Sharing Plan v. Merritt,* 00 Civ. 5712(LTS)(THK), 2003 WL 22909160 at *2 (S.D.N.Y. Dec. 9, 2003) (attorney-client privilege automatically waived by disclosure to third-party); *In re Kidder Peabody Sec. Litig.,* 168 F.R.D. 459, 468-69 (S.D.N.Y.1996) (disclosure of privileged communications in report used to support position in litigation constitutes waiver of the attorney-client privilege); *Bowne of N.Y. City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 478-79 (S.D.N.Y.1993) (disclosure of privileged communication to adversary constitutes a waiver of the attorney-client privilege); *see also United States v. Jacobs,* 117 F.3d 82, 91 (2d Cir.1997) (voluntary public disclosure of privileged communication constitutes a waiver of the attorney-client privilege).

**\*3** Here, plaintiff has unquestionably waived any attorney-client privilege which may have existed with respect to the 4-25-03 E-Mail. Plaintiff does not dispute that it disclosed the E-Mail to its adversaries by attaching it to the copies of the December 4, 2006 Letter served on its adversaries.[1] Nor does plaintiff assert that its attachment of the E-Mail to the service copies was in any way inadvertent.[2] Indeed, plaintiff's attachment of the E-Mail to the service copies was evidently deliberate. In light of these considerations, plaintiff's disclosure of the 4-25-03 E-Mail constitutes a waiver of the attorney-client privilege.[3]

### IV. *Conclusion*

For all the foregoing reasons, Dore's motion to compel production of the 4-25-03 E-Mail is granted.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1837133

Footnotes

2007 WL 1837133

1    While plaintiff argues that it filed the December 4, 2006 Letter and attached 4-25-03 E-Mail with the Court under seal, it does not address Dore's argument that any protection afforded by the attorney-client privilege was waived through plaintiff's attaching the 4-25-03 E-Mail to the service copies of the December 4, 2006 Letter.

2    Although plaintiff argues that its initial disclosure of the 4-25-03 E-Mail in discovery was inadvertent and subject to a non-waiver agreement, plaintiff does not make these assertions with respect to its disclosure as an attachment to the December 4, 2006 Letter.

3    My finding of waiver of any attorney-client privilege with respect to the 4-25-03 E-Mail obviates the need to address the applicability of the crime/fraud exception.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Pisarri v. Town Sports International, LLC, 2nd Cir.(N.Y.), February 4, 2019

626 F.3d 47
United States Court of Appeals,
Second Circuit.

Edward D. MULLINS, et al., Plaintiff–Appellees,

v.

CITY OF NEW YORK and The New York City
Police Department, Defendant–Appellants.

Docket No. 08–1839–cv.
|
Argued: Sept. 22, 2010.
|
Decided: Nov. 16, 2010.

**Synopsis**

**Background:** Police sergeants brought action against city and police department, alleging systematic violation of their overtime rights under Fair Labor Standards Act (FLSA). The United States District Court for the Southern District of New York, Shira A. Scheindlin, J., 554 F.Supp.2d 483, entered order granting sergeants preliminary injunction restraining defendants from conducting internal affairs investigation concerning statements made during course of litigation, and defendants appealed. The Court of Appeals, 307 Fed.Appx. 585, remanded, and on remand, the District Court, 634 F.Supp.2d 373, again entered order granting preliminary injunction. Defendants appealed.

**Holdings:** The Court of Appeals, Pooler, Circuit Judge, held that:

[1] as a matter of first impression, district courts may consider hearsay evidence in determining whether to grant preliminary injunction;

[2] sergeants demonstrated substantial likelihood of success on merits of their FLSA retaliation claim; and

[3] sergeants would suffer irreparable harm absent preliminary injunction.

Affirmed.

West Headnotes (8)

[1]    **Federal Courts**    Preliminary injunction;
      temporary restraining order

      The Court of Appeals reviews the grant of preliminary injunctive relief for abuse of discretion.

      33 Cases that cite this headnote

[2]    **Injunction**    Hearsay

      Hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction.

      56 Cases that cite this headnote

[3]    **Injunction**    Grounds in general;  multiple
      factors

      Generally, a party seeking a preliminary injunction must demonstrate that it will suffer irreparable harm absent injunctive relief and either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party.

      49 Cases that cite this headnote

[4]    **Injunction**    Injunctions Against
      Enforcement of Laws and Regulations

      When a party seeks a preliminary injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the applicant must typically show a likelihood of success on the merits, a serious question going to the merits is usually insufficient, even if the balance of hardships tips decidedly in the applicant's favor.

      37 Cases that cite this headnote

**[5]**  **Labor and Employment**  🔑  Wages and Hours

A plaintiff alleging retaliation under the FLSA must establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. Fair Labor Standards Act of 1938, § 15(a)(3), 29 U.S.C.A. § 215(a)(3).

122 Cases that cite this headnote

**[6]**  **Labor and Employment**  🔑  Causal connection;  temporal proximity

**Labor and Employment**  🔑  Other adverse actions

Although the application of pre-existing disciplinary policies to a plaintiff without more does not constitute adverse employment action, as required to establish a prima facie case of retaliation under the FLSA, a causal connection between an adverse action and a plaintiff's protected activity may be established through evidence of retaliatory animus directed against a plaintiff by the defendant, or by showing that the protected activity was closely followed in time by the adverse action. Fair Labor Standards Act of 1938, § 15(a)(3), 29 U.S.C.A. § 215(a)(3).

123 Cases that cite this headnote

**[7]**  **Injunction**  🔑  Adverse employment actions

Police sergeants demonstrated substantial likelihood of success on merits of their FLSA retaliation claim against police department, as required to obtain preliminary injunction restraining department from conducting internal affairs investigation concerning statements made during course of litigation in sergeants' lawsuit against department and city alleging violation of FLSA's overtime provisions; department initiated investigation into veracity of sergeants' deposition statements one day after receiving transcripts, and department's purported need to

immediately investigate allegations of perjury by sergeants was not legitimate, non-retaliatory reason for its investigation. Fair Labor Standards Act of 1938, § 15(a)(3), 29 U.S.C.A. § 215(a)(3).

2 Cases that cite this headnote

**[8]**  **Injunction**  🔑  Adverse employment actions

Police sergeants would suffer irreparable harm absent preliminary injunction restraining police department from conducting internal affairs investigation concerning statements made during course of litigation in sergeants' lawsuit against department and city alleging violation of FLSA's overtime provisions; threat of retaliation would result in sergeants withdrawing from litigation rather than testifying and facing internal investigation. Fair Labor Standards Act of 1938, § 15(a)(3), 29 U.S.C.A. § 215(a)(3).

23 Cases that cite this headnote

**Attorneys and Law Firms**

**\*48** Stephen P. Younger, (Clay J. Pierce and A. Leah Vickers, on the brief) Patterson Belknap Webb & Tyler LLP, New York, NY; Gregory K. McGillivary, Woodley & McGillivary (on the brief), Washington, DC; Andrew Quinn, Quinn & Mellea, LLP (on the brief), White Plains, NY, for Plaintiff–Appellees.

Karen M. Griffin (of counsel), Andrez Carberry, Francis F. Caputo (on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, for Defendant–Appellants.

Before: POOLER, KATZMANN, and HALL, Circuit Judges.

**Opinion**

POOLER, Circuit Judge:

New York City and the New York City Police Department appeal from an order of United States District Court for the Southern District of New York (Scheindlin, *J.*) entered on March 21, 2008, and amended on April 10, 2008, preliminarily enjoining them from investigating and disciplining Plaintiff–Appellees based upon Plaintiff–Appellees' testimony or participation in this lawsuit. We

conclude that hearsay testimony is admissible to support the issuance of a preliminary injunction, and the district court did not abuse its discretion in granting preliminary injunctive relief to Plaintiff–Appellees based in part on such evidence.

## BACKGROUND

Plaintiff–Appellees are approximately 4300 current and former New York City police sergeants who filed suit against the **\*49** City of New York (the "City") and the New York City Police Department ("NYPD") on April 19, 2004, claiming systematic violations of their overtime rights under the Fair Labor Standards Act of 1938 ("FLSA"). Because of the sheer volume of plaintiffs, the parties agreed in May of 2005 to limit depositions to "test plaintiffs"—individuals from seventeen job categories, who would be organized into three groups.

The record reflects that, at some point in January 2006, NYPD's outside counsel, Seyfarth Shaw LLP, met with Charles Campisi, Chief of the "Internal Affairs Bureau" ("IAB"), as well as other high level IAB officials and NYPD lawyers regarding the "topic of deposition testimony." On January 19, 2006, Seyfarth Shaw sent transcripts from depositions of the first group of test plaintiffs to Appellants. The next day, the NYPD ordered lieutenants from IAB to collect command logs, memo books, activity reports, overtime slips, and requests for leave reports from all of the test plaintiffs as well as individuals who worked with them. Some of the IAB document collectors were plaintiffs in this lawsuit—they were promoted to lieutenants after the action was filed. The pool of plaintiffs from whom documents were collected included both those who had been deposed and those who had not.

Counsel for the test plaintiffs immediately objected to the use of IAB to collect documents on the ground that certain plaintiffs understood IAB's involvement to mean they were under investigation. Sergeant Paul Capotosto, Citywide Secretary of the Sergeants Benevolent Association, described the document collection process as a "raid." During his testimony at the preliminary injunction hearing, Sergeant Capotosto chronicled at least a dozen phone calls he received from worried plaintiffs, who expressed concern to him that the NYPD was retaliating against them for their participation in the lawsuit. Among these callers was IAB Lieutenant Ed Heim, a plaintiff in this action, who described being "forced" to collect documents from other plaintiffs and communicated

his apprehension to Sergeant Capotosto about the NYPD's approach. Another sergeant referred to IAB's actions as "goon tactics."

Testimony at the preliminary injunction hearing about the unusual nature of the process used to collect documents confirmed that plaintiffs' concerns were not unfounded. Sergeant Anthony Lisi of the Emergency Services Unit of the NYPD testified that document collection is typically conducted by Administrative Lieutenants or Integrity Control Officers assigned to a particular command. In addition, Sergeant Brian Coughlan, Sergeant Supervisor of Detectives in the Bomb Squad, testified that IAB is involved in most cases only when an officer is being arrested or removed from his post.

In March 2006, shortly after the document collection, IAB sent an Integrity Control Officer to attend the deposition of Sergeant Edward Scott. As of his deposition date, Sergeant Scott, who was a plaintiff in the lawsuit against the City and NYPD, had given no testimony in connection with the action. Sergeant Scott, who testified by affidavit at the preliminary injunction hearing, explained that Integrity Control Officers do not normally attend depositions and he was, therefore, "surprised and concerned" by the officer's presence. He also testified that he found the officer's presence to be "intimidating." When Sergeant Scott's retirement was administratively deferred pending resolution of an unspecified "disciplinary matter" some months later, it came to light that he was under investigation for testimony he had given during his deposition. Sergeant **\*50** Scott stated that, at the time, "I believed that if I withdrew from this FLSA lawsuit, the City would close its investigation into my deposition testimony."

When discovery concluded with respect to the first group of test plaintiffs, these plaintiffs moved for summary judgment on their claims. On November 6, 2007, the district court granted partial judgment in favor of the City and NYPD. See *Mullins v. City of New York,* 523 F.Supp.2d 339 (S.D.N.Y.2007). Specifically, the district court held that under Department of Labor rules in effect before August 23, 2004, certain sergeants were "bona fide executives" under FLSA, and were therefore exempt from overtime. *Id.* at 359. The court also identified material questions of fact concerning whether certain sergeants were exempt from overtime after the August 2004 change in Department of Labor regulations, and ordered a trial to resolve this question. *Id.* at 360–61.

Three months later, in February 2008, the NYPD ordered Sergeant Anthony Cioffi, a member of the first group of test plaintiffs, to submit to a "GO–15" interview at the office of Charles Campisi, Chief of IAB. A GO–15 is an interview in connection with allegations of serious misconduct or corruption. As a preamble to the GO–15, an IAB lieutenant identified the "official Department investigation" as "Criminal Case Number 06975," and noted that the "complainant" was "the law firm of Seyfarth Shaw LLP." Sergeant Cioffi was informed that the interview was part of an investigation into his alleged violations of NYPD regulations relating to testimony given during his deposition; there were two charges—perjury and false statements. Sergeant Capotosto, who attended Sergeant Cioffi's GO–15 in his capacity as a representative of the Sergeants Benevolent Association, testified that Chief Campisi himself was at the interview when he arrived. Sergeant Capotosto also testified that it was unusual for a GO–15 to take place at Chief Campisi's office; in fact, in the hundreds of GO–15s with which he had been involved, Sergeant Capotosto could not recall a single interview that took place at the Chief's office.

At the beginning of the GO–15, Sergeant Cioffi was informed that his failure to answer the department's questions would "subject [him] to department charges, which would result in [his] dismissal from the Police Department." During the course of the GO–15, which was purported to be limited to "questions specifically directed and narrowly related to the performance of [Cioffi's] duties," Sergeant Cioffi was questioned for four hours about specific responses he gave at his deposition and was asked to account for certain inconsistencies in his testimony. Many of the questions were phrased as accusations of wrongdoing. For example, he was asked, "Sergeant, one area I want to know is I feel in your testimony for a fact you minimize your supervisory responsibilities. Can you explain to me why you would do that?" Sergeant Cioffi explained that any differences between his November 15, 2005 testimony and his February 12, 2008 responses at the GO–15 interview could be attributed to the "duress" he felt during his November 2005 deposition, which he attributed to opposing counsel's "abrasiveness." The district court would later aptly observe that "[t]he transcript of the interrogation reveal[ed] lieutenants seeking concessions and modifications of testimony, rather than an investigation of a willful assertion of a material fact known to be false." *Mullins v. City of New York,* 634 F.Supp.2d 373, 389 (S.D.N.Y.2009).

The day after the GO–15, Appellees submitted a letter to the district court requesting an order temporarily restraining the NYPD from "retaliating against plaintiffs **\*51** due to their testimony in the ... action and attempting to coerce plaintiffs to alter their sworn deposition testimony." The district court held a hearing on February 21, 2008, and issued a temporary restraining order ("TRO") on March 6, 2008. The TRO enjoined Appellants from "(1) engaging in any further investigation of Sergeant Anthony Cioffi relating to his testimony or participation in this matter; (2) pursuing any disciplinary proceedings against plaintiff Cioffi based on his February 12, 2008, interrogation; and (3) investigating or disciplining any plaintiff in this matter based on his or her testimony or participation in this lawsuit."

Within days after the TRO issued, Plaintiff–Appellees learned of the pendency of the investigation of Sergeant Scott. They notified the district court immediately. On March 20, 2008, the district court extended the TRO for an additional ten days, and on March 21, the district court converted the TRO into a preliminary injunction. *See Mullins v. City of New York,* 554 F.Supp.2d 483, 484, 494 (S.D.N.Y.2008).

The City and the NYPD appealed the district court's grant of injunctive relief, and by summary order dated January 27, 2009, we remanded to the district court for additional fact finding and analysis. Pursuant to that remand, the district court held a two-day hearing in April 2009.

During the hearing, the district court accepted hearsay statements from sergeant representatives of the Sergeants Benevolent Association, many of which are chronicled above. Those representatives testified largely about the impact of IAB's actions on plaintiffs. Their testimony details calls and emails from plaintiffs expressing general concern that the NYPD was going to retaliate against them for participating in this lawsuit. Some of the representatives' testimony also described discussions with plaintiffs who were reticent to submit to depositions in light of the investigations of Sergeants Cioffi and Scott. Sergeant Scott himself recalled that five sergeants had specifically told him that they were considering dropping out of the lawsuit after observing the NYPD's actions with respect to him. Sergeant Brian Coughlan testified that he would be concerned if the injunction were removed, and that before the injunction issued, "there was talk ... that guys were going to back out" of the lawsuit.

On June 9, 2009, the district court issued an opinion and order upholding the award of injunctive relief. *See Mullins v. City of New York,* 634 F.Supp.2d 373 (S.D.N.Y.2009).

For the reasons set forth below, we affirm.

## DISCUSSION

### I. Standard of Review

 [1]   We review the grant of injunctive relief for abuse of discretion. *SEC v. Dorozhko,* 574 F.3d 42, 45 (2d Cir.2009). A district court abuses its discretion "when (1) its decision rests on an error of law ... or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Kickham Hanley P.C. v. Kodak Ret. Income Plan,* 558 F.3d 204, 209 (2d Cir.2009) (internal quotation marks and citation omitted). Appellants argue that the district court abused its discretion in granting an award of preliminary injunctive relief because some of its findings of fact are clearly erroneous. Appellants contend that these findings are unsupported by sufficient evidence because they are based on hearsay testimony. We disagree.

The Supreme Court has observed that the decision of whether to award preliminary **\*52** injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Consonant with this view, six of our sister circuits have permitted district courts to rely on hearsay evidence for the limited purpose of determining whether to award a preliminary injunction. *See Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 718 (3d Cir.2004) ("It is well established that a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." (internal quotation marks and citation omitted)); *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1170–71 (7th Cir.1997); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,* 51 F.3d 982, 985 (11th Cir.1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction...."); *Sierra Club, Lone Star Chapter v. FDIC,* 992 F.2d 545, 551 (5th Cir.1993) (Courts at preliminary injunction stage "may rely on otherwise inadmissible evidence, including hearsay evidence." (citation

omitted)); *Asseo v. Pan Am. Grain Co.,* 805 F.2d 23, 26 (1st Cir.1986); *Flynt Distrib. Co. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction ... makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may even give inadmissible evidence some weight...."); *see also Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1363 (9th Cir.1988) (en banc).

Additionally, although it is a question of first impression in this Circuit, the lower courts routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief. *See, e.g., United States v. Buddhu,* No. 08 Civ. 0074, 2008 WL 2355930, at \*1 n. 2 (D.Conn. June 5, 2008) ("In considering a motion for a preliminary injunction, the Court may rely on affidavits, depositions, and sworn testimony, even when they include hearsay." (citations omitted)); *López Torres v. New York State Bd. of Elections,* 411 F.Supp.2d 212, 226 n. 17 (E.D.N.Y. Jan.27, 2006) ("Plaintiffs finally raised the argument that the hearsay rule does not apply during a hearing on a motion for preliminary injunction. The issue was briefed and I ruled in their favor." (citations omitted)); *Zeneca Inc. v. Eli Lilly & Co.,* No. 99 Civ. 1452, 1999 WL 509471, at \*2 (S.D.N.Y. July 19, 1999); *Fisher v. Goord,* 981 F.Supp. 140, 173 n. 38 (W.D.N.Y.1997) (citing cases); *SEC v. Musella,* 578 F.Supp. 425, 427–28 (S.D.N.Y.1984) (noting that a court need not discount hearsay evidence presented in an application for a preliminary injunction if such evidence is found to be "inherently trustworthy").

 [2]   We agree with these courts and conclude that hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction. The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage. To hold otherwise would be at odds with the summary nature of the remedy and would undermine the ability of courts to provide timely provisional relief. Accordingly, we conclude that the district court committed no error in considering, and relying on, hearsay testimony from the sergeants.

### II. The Standard for Injunctive Relief

 [3]   [4]   Generally, a party seeking a preliminary injunction must demonstrate that it will suffer irreparable harm absent injunctive **\*53** relief and either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships

tips decidedly in favor of the moving party. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 34–35 (2d Cir.2010). However, when a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits—a serious question going to the merits is usually insufficient, even if the balance of hardships tips decidedly in the applicant's favor. *Monserrate v. N.Y. State Senate,* 599 F.3d 148, 154 (2d Cir.2010); *accord NAACP v. East Haven,* 70 F.3d 219, 223 (2d Cir.1995) (applying likelihood test where plaintiff attempted to enjoin hiring of police officers and firefighters). In this case, we need not decide whether the higher standard applies, or whether, as Appellees urge, this case ought to be classified as an exception to the general rule, because we find that Appellees have demonstrated a likelihood of success on the merits.

### A. Likelihood of Success on the Merits

**[5]  [6]**  FLSA provides that it is "unlawful for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [FLSA]." 29 U.S.C. § 215(a)(3). FLSA retaliation claims are subject to the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 876 (2d Cir.1988). Thus, a plaintiff alleging retaliation under FLSA must first establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000). An employment action disadvantages an employee if "it well might have 'dissuaded a reasonable worker from making or supporting [similar] charge[s]....' " *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (citations omitted). Although the application of pre-existing disciplinary policies to a plaintiff "without more, does not constitute adverse employment action," *Joseph v. Leavitt,* 465 F.3d 87, 91 (2d Cir.2006), a causal connection between an adverse action and a plaintiff's protected activity may be established "through evidence of retaliatory animus directed against a plaintiff by the defendant," *Johnson v. Palma,* 931 F.2d 203, 207 (2d

Cir.1991) (internal quotation marks and citation omitted), or "by showing that the protected activity was closely followed in time by the adverse action," *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) (citation omitted).

Once the plaintiff establishes a prima facie case of FLSA retaliation, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason for the employment action." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000) (citation omitted). If the defendant meets this burden, the plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the **\*54** employment action." *Id.* (internal quotation marks, citation and alterations omitted).

**[7]**  In this case, no party disputes that the filing of a FLSA lawsuit for overtime is a "protected activity." There is likewise little doubt the evidence considered by the district court was sufficient to support the court's finding that the NYPD's actions in response to receipt of transcripts of deposition testimony disadvantaged Appellees. An IAB investigation, like that to which Sergeant Cioffi was subjected, carries with it a possibility of termination, *see* Patrol Guide § 206–13; indeed, Sergeant Cioffi was advised at the outset of the GO–15 that he would be fired if he did not answer IAB's questions. In addition, the NYPD indefinitely postponed Officer Scott's retirement pending resolution of the inquiry into his deposition testimony. Further, all IAB allegations appear as part of the ordinary course in an officer's Central Personnel Index—regardless of whether the officer is later exonerated. These notations affect an officer's level of discipline for future infractions and can complicate an officer's request for transfers or promotions.

Regarding the causal connection between the NYPD's actions and Appellees' participation in this lawsuit, we think the link is self-evident, and the district court did not err in concluding as much—IAB investigated the veracity of testimony given by the sergeants as part of the lawsuit. Moreover, the sequence, timing and nature of events only reinforces the connection. The day after the NYPD received transcripts from the depositions of certain test plaintiffs, IAB was dispatched to collect documents from the first group of plaintiffs. As testimony indicated, this was unusual in and of itself, because such documents are typically collected by Administrative

Lieutenants or other officers in the individual precincts—not IAB.

About seven weeks after the document collection, Sergeant Scott was scheduled to be deposed. Though he had given no testimony in connection with the lawsuit up to that point, an IAB officer appeared to observe his deposition. When Sergeant Scott was set to retire some months later, he was informed that his retirement was being held up by a pending "disciplinary matter," which turned out to be an investigation into his deposition testimony. Then, three months after the district court issued its summary judgment order, the NYPD ordered Sergeant Cioffi to submit to a GO–15 interview regarding his deposition testimony. Testimony at the preliminary injunction hearing revealed that even if it had not been unusual for the NYPD to investigate an employee based upon deposition testimony in connection with a pending lawsuit, this GO–15 interview was unusual because it took place at the office of the Chief of IAB.

Appellants have attempted to rebut Appellees' prima facie case by arguing that allegations of perjury by members of the NYPD are time-sensitive and significant enough to warrant immediate investigations, even if the investigations must be conducted during the pendency of an action. We cannot conclude that the district erred in rejecting this argument. In the first instance, Appellants collected documents from *all* of the test plaintiffs, and even individuals who worked with them—not just those plaintiffs they suspected of perjury. Further, the NYPD sent an IAB officer to Sergeant Scott's deposition *before* there was any basis on which to conclude he had given false testimony, since up to that point, he had provided no testimony at all. Were these events alone insufficient to support an award of preliminary injunctive relief, the underlying timeline **\*55** seriously undermines Appellants' insistence on the time-sensitive nature of their investigations. The NYPD received copies of the sergeants' deposition transcripts in January 2006. Yet the NYPD appears to have done nothing for almost a year. Then, although they apparently concluded in December 2006 that Sergeant Cioffi had given false testimony at his deposition, the NYPD waited until February 2008 to order him to appear for a GO–15. Nothing about this timeline speaks of urgency.

### B. Irreparable Harm

[8] "Unchecked retaliation subverts the purpose of the FLSA" and "the resulting weakened enforcement of federal law can *itself* be irreparable harm in the context of a preliminary injunction application"; however, a plaintiff "must show some evidence of actual chill that would be cured by the requested injunction." *Hui Lin v. Great Rose Fashion, Inc.,* No. 08 Civ. 4778, 2009 WL 1544749, at \*21 (E.D.N.Y. June 3, 2009) (internal quotation marks omitted) (citing inter alia, *Bennett v. Lucier,* 239 Fed.Appx. 639, 640 (2d Cir.2007)). Thus, we have held that "[a] retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights ... or from providing testimony for the plaintiff in [his] effort to protect [his] own rights. These risks may be found to constitute irreparable injury." *Holt v. Continental Group, Inc.,* 708 F.2d 87, 91 (2d Cir.1983).

Sergeant Lisi testified that he was concerned about IAB, and that he expressed these concerns to his union, which told him that it was doing everything possible to protect the plaintiffs. He testified that he would "absolutely" have "concerns" if the injunction were lifted, and that he feared retribution from IAB. From this and other testimony, which was not rebutted, the district court concluded that "the evidence presented clearly shows that absent injunctive relief numerous plaintiffs would likely (and reasonably) withdraw from this litigation rather than testify and face a line-by-line IAB interrogation." *Mullins v. City of New York,* 634 F.Supp.2d 373, 391 (S.D.N.Y.2009). There was no error in this conclusion. The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred. We have held that the "risk" of deterrence is sufficient to satisfy the irreparable harm standard. *See Holt,* 708 F.2d at 91.

Moreover, it is clear that the preliminary injunction has minimized the harm to Appellees and continues to be necessary to protect the sergeants so long as the legal proceedings are ongoing. Appellees submitted evidence to the district court that numerous plaintiffs were "extremely concerned" about testifying just before the commencement of the trial relating to the first group of test plaintiffs. Only after plaintiffs' attorneys explained that the preliminary injunction protected plaintiffs from retaliatory investigations did those sergeants decide to continue with the lawsuit. Thus, as the district court concluded, "the March 21 Injunction countered the witness intimidation that resulted from the pattern of IAB investigations," and the evidence plainly showed "that numerous plaintiffs would likely abandon this suit rather than testify" in the event that the district court "were to lift the preliminary injunction." *Mullins,* 634 F.Supp.2d at 393.

Mullins v. City of New York, 626 F.3d 47 (2010)
Case 1:20-cv-03178-LJL    Document 58-1    Filed 05/27/20    Page 55 of 80
16 Wage & Hour Cas.2d (BNA) 1636

Because we find that the district court did not abuse its discretion in finding either that Appellees are likely to succeed on the merits of their FLSA retaliation claim, or that Appellees have established that irreparable harm is likely to flow from the putative FLSA violation absent injunctive **\*56** relief, we need not reach the merits of Appellees' claim that Appellants' conduct also violated the First Amendment of the United States Constitution. "[P]rinciples of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case." *Higazy v. Templeton,* 505 F.3d 161, 179 n. 19 (2d Cir.2007) (citing

cases). We have considered Appellants' remaining arguments and conclude that they are without merit.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the order of the district court.

**All Citations**

626 F.3d 47, 16 Wage & Hour Cas.2d (BNA) 1636

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    8

152 F.Supp.3d 127
United States District Court, S.D. New York.

PARK IRMAT DRUG CORP., Plaintiff,

v.

OPTUMRX, INC., Defendant.

15 Civ. 8930 (JSR)
|
Signed 01/12/2016

**Synopsis**

**Background:** Pharmacy brought action in state court against pharmacy benefit manager (PBM), asserting claims for breach of contract, equitable estoppel, tortious interference with business relations, and antitrust violations under New York's Donnelly Act. PBM removed the action based on diversity. Subsequently, pharmacy filed motion for temporary restraining order and preliminary injunction enjoining PBM from terminating pharmacy from PBM's retail pharmacy network during the pendency of litigation.

**[Holding:]** The District Court, Jed S. Rakoff, J., held that pharmacy failed to show substantial likelihood of success on the merits.

Motion denied.

West Headnotes (22)

**[1]** **Injunction** Extraordinary or unusual nature of remedy

**Injunction** Clear showing or proof

A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. Fed. R. Civ. P. 65.

**[2]** **Injunction** Grounds in general; multiple factors

Party seeking a preliminary injunction must show irreparable harm and either likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Fed. R. Civ. P. 65.

1 Cases that cite this headnote

**[3]** **Injunction** Public interest considerations

District court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction. Fed. R. Civ. P. 65.

2 Cases that cite this headnote

**[4]** **Injunction** Extraordinary or unusual nature of remedy

A preliminary injunction is never awarded as of right. Fed. R. Civ. P. 65.

**[5]** **Injunction** Discretionary Nature of Remedy

Whether to grant a preliminary injunction rests in the sound discretion of the district court. Fed. R. Civ. P. 65.

**[6]** **Injunction** Hearsay

**Injunction** Scope of inquiry and matters considered

In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence. Fed. R. Civ. P. 65.

4 Cases that cite this headnote

**[7]** **Injunction** Relation or conversion to preliminary injunction

Standard for granting a temporary restraining order and a preliminary injunction are identical. Fed. R. Civ. P. 65.

**[8]** **Injunction** Clear, likely, threatened, anticipated, or intended injury

**Injunction** 🔑 Irreparable injury

**Injunction** 🔑 Recovery of damages

To establish irreparable harm, necessary to issuance of preliminary injunction, movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages. Fed. R. Civ. P. 65.

**[9]** **Injunction** 🔑 Hospitals, pharmacies, and health care professionals

Pharmacy failed to show substantial likelihood of success on the merits in action against pharmacy benefit manager (PBM) concerning PBM's termination of pharmacy from its retail pharmacy network as a result of pharmacy's filling mail-order prescriptions in violation of prescription drug services agreement, and thus, pharmacy was not entitled to temporary restraining order and preliminary injunction enjoining PBM from terminating pharmacy from PBM's retail pharmacy network during the pendency of litigation. Fed. R. Civ. P. 65.

1 Cases that cite this headnote

**[10]** **Contracts** 🔑 Implied agreements

Under New York law, a contract cannot be implied in fact where there is an express contract covering the subject matter involved.

**[11]** **Contracts** 🔑 Construction to give validity and effect to contract

Under New York law, a contract must be interpreted so as to give effect to, not nullify, its general or primary purpose.

**[12]** **Contracts** 🔑 Effect in general; enforcement in general

**Contracts** 🔑 Certainty as to Subject-Matter

Under New York law, before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic

standard that makes its meaning clear; the conclusion that a party's promise should be ignored as meaningless is at best a last resort.

**[13]** **Principal and Agent** 🔑 Imputation to Principal in General

Under New York law, a principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have been communicated to the principal.

**[14]** **Contracts** 🔑 Waiver

No-waiver clauses are valid and enforceable under New York law.

**[15]** **Contracts** 🔑 Acts or Omissions Constituting Breach in General

Under New York law, to sustain a claim for breach of the implied covenant of good faith and fair dealing, the claimant must allege and show that the other party exercised a contractual right malevolently, for its own gain as a part of a purposeful scheme designed to deprive claimant of the benefits under the contract.

**[16]** **Federal Civil Procedure** 🔑 Alternate, Hypothetical and Inconsistent Claims

**Pretrial Procedure** 🔑 Dismissal of part of action or as to some of parties

New York law requires dismissal of claim for breach of implied covenant of good faith and fair dealing where the claim derives from the same set of facts as a breach of contract claim.

**[17]** **Estoppel** 🔑 Essential elements

Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon

by the other party; and (3) knowledge of the real facts.

**[18]  Estoppel** 🔑 Essential elements

Under New York law, parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions.

**[19]  Estoppel** 🔑 Application in general

Under New York law, the doctrine of equitable estoppel is to be invoked sparingly and only under exceptional circumstances.

**[20]  Torts** 🔑 Business relations or economic advantage, in general

To prevail on a claim for tortious interference with business relations in New York, a party must prove: (1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with the third party.

**[21]  Antitrust and Trade Regulation** 🔑 Tying Agreements

The elements of an illegal per se tying claim in antitrust action are: (1) that the tying arrangement affects a substantial amount of interstate commerce; (2) the two products are distinct; (3) the defendant actually tied the sale of the two products; and (4) the seller has appreciable market power in the tying market. Sherman Act, § 1 as amended, 15 U.S.C.A. § 1.

**[22]  Antitrust and Trade Regulation** 🔑 Cartels, Combinations, Contracts, and Conspiracies in General

To prove a violation of section of Sherman Act prohibiting contracts or conspiracies in restraint of trade or commerce, a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**Attorneys and Law Firms**

**\*129** Matthew L. Cantor, David Alan Scupp, Hamsa Ananthi Mahendranathan, Constantine Cannon, LLP, New York, NY, for Plaintiff.

**\*130** Michael H. Bernstein, John T. Seybert, Sedgwick LLP, New York, NY, for Defendant.

OPINION

JED S. RAKOFF, U.S.D.J.

By "bottom-line" order dated December 15, 2015, this Court denied plaintiff's motion for a temporary restraining order and preliminary injunction enjoining defendant from terminating plaintiff from defendant's retail pharmacy network during the pendency of this litigation. This Opinion explains the reasons for that ruling.

Plaintiff Park Irmat Drug Corp. ("Irmat") is a pharmacy located in midtown Manhattan. Defendant OptumRx, Inc. ("Optum") is one of the largest Pharmacy Benefit Managers ("PBMs") in the United States, providing coverage for prescription drugs to over 65 million members. By way of general background on the workings of the industry, PBMs such as Optum are third-party administrators of prescription drug programs, responsible for managing the pharmacy benefits for health plans, negotiating drug discounts with drug manufacturers, developing lists of approved drugs for reimbursement, and processing pharmacies' and patients' prescription drug claims. In this capacity, PBMs build networks of pharmacies through which their members

can purchase prescription medications at "covered" (i.e., discounted) rates. In order to gain access to a PBM's pharmacy network, pharmacies often contract with third-party Pharmacy Services Administrative Organizations ("PSAOs") that serve as a single point of contact for the PBMs and negotiate and contract with PBMs on the pharmacies' behalf.

Optum administers two types of pharmacy networks, a "retail" pharmacy network (which consists of some 65,000 pharmacies) and a "mail-order" pharmacy network. To participate in Optum's mail-order network, pharmacies must meet a specialized set of requirements, including being accredited by the Utilization Review Accreditation Commission as a mail service pharmacy, as well as by the National Association of Boards of Pharmacy as a Verified Internet Pharmacy Practice Site. Optum contends that it requires these accreditations to ensure that mail-order pharmacies have the appropriate controls and processes in place to safely dispense medication to patients by mail. Optum also owns and operates its own mail-order pharmacy.

Irmat has been a member of Optum's pharmacy network since at least 2006. Complaint ("Compl") SI 4, ECF No. 7. In July 2012, however, Irmat entered into an agreement with the PSAO AccessHealth (the "Irmat/AccessHealth Agreement") in order to gain continued access to over 100 third-party payor networks, including Optum's, from which Irmat's customers receive prescription drug coverage. At that time, AccessHealth had a pharmacy network agreement in place with Optum (the "Prescription Drug Services Agreement") to which Irmat became subject. The parties appear to agree that the Prescription Drug Services Agreement did not prohibit the provision of mail-order pharmacy services except with respect to Medicare Part D patients—to whom Irmat did not provide such services "as a general matter." *Id.* ¶ 39.

Beginning in 2011, Irmat began developing a niche practice in dermatology and, over the next several years, expanded this practice by participating in programs sponsored by certain dermatological drug manufacturers, under which such manufacturers would cover some or all of customers' co-pays. *See* Affidavit of Victor Falah dated Nov. 12, 2015 ("Falah Aff.") ¶¶ 15-16, ECF No. 17. As a result, Irmat's business grew substantially and, in 2013, it began filling prescriptions via mail order. **\*131** Irmat's revenue from Optum members has increased from approximately $2 million in 2012 to a projected $33 million in 2015. *See* Affidavit of Christopher O'Keefe dated Nov. 12, 2015 ("O'Keefe Aff.") ¶ 7, ECF

No. 18. At the time of the filing of its motion, mail orders represented 80% of Irmat's business, *see* Falah Aff. ¶ 16, and sales to Optum members accounted for 27% of Irmat's sales overall, *see* O'Keefe Aff. ¶ 5.

In February 2015, AccessHealth and Optum entered into a new pharmacy network agreement (the "2015 Agreement"), with AccessHealth purporting to act on behalf of its participating pharmacies in its capacity as their agent. *See* Falah Aff., Ex. 3. Section 3.10 of the 2015 Agreement prohibits such pharmacies from engaging in mail-order fulfillment except upon advance written approval of Optum, and § 5.2.4 of the 2015 Agreement authorizes Optum to "terminate, suspend or revoke any Pharmacy location from participating under this Agreement immediately upon written notice to Company and Pharmacy if ... (v) Pharmacy engages in mail fulfillment in violation of Section 3.10 without Administrator's written authorization."

In apparent contravention of its separate agreement with Irmat, AccessHealth never furnished Irmat a written summary of the terms and conditions of the 2015 Agreement. *See* Falah Aff. ¶¶ 19-20. As a result, Irmat contends, it had no knowledge of the terms of the Agreement until it was advised by Optum by letter dated August 10, 2015 that Irmat was filling mail-order prescriptions in violation of the 2015 Agreement. *See* Falah Aff., Ex. 4; Falah Aff. ¶ 24. Optum requested that Irmat confirm within ten business days that it would cease the prohibited activity. In response, by letter dated August 17, 2015, Irmat requested "a 90-day delay in any action by Optum" and argued that it and its patients "would be irreparably harmed if termination occurs." *Id.,* Ex. 5. On September 16, 2015, Optum advised Irmat via email that while Irmat must "remain in compliance with the retail agreement, including the no mail prohibition," nonetheless, if it wished to avoid termination, it could apply to Optum's mail-order pharmacy network. *Id.,* Ex. 6. Irmat, in turn, requested that Optum allow it to continue dispensing medication by mail while it applied for the necessary accreditations to join Optum's mail-order pharmacy network. *Id.,* Ex. 7. By letter dated September 28, 2015, Optum advised Irmat that it would be terminating Irmat for cause, effective November 30, 2015. *Id.,* Ex. 8.

On November 12, 2015, Irmat filed a complaint against optum in New York State Supreme Court for breach of contract, equitable estoppel, tortious interference with business relations, and antitrust violations under New York's Donnelly Act. *See* Declaration of Michael H. Bernstein dated

Nov. 24, 2015 at ¶ 3, ECF No. 24. On November 13, 2015, Irmat filed the instant motion. *Id.* ¶¶ 4-5. That same day, Optum filed a notice of removal on diversity grounds pursuant to [28 U.S.C. § 1446](#) and the action was assigned to this Court. Ultimately, on consent of the parties, the Court issued a scheduling order setting a briefing schedule on plaintiff's motion and staying the termination of Irmat from Optum's pharmacy network until a hearing was held. Order dated Nov. 23, 2015, ECF No. 22.

[1] [2] [3] [4] [5] [6] [7] A court may issue a preliminary injunction and temporary restraining order pursuant to [Rule 65 of the Federal Rules of Civil Procedure.](#) "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* [520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)](#) (per ***132** curiam) (internal quotation mark omitted). A party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* [598 F.3d 30, 35 (2d Cir.2010)](#) (internal quotation marks omitted). In addition, "the court must ensure that the public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger v. Colting,* [607 F.3d 68, 80 (2d Cir.2010)](#) (quoting *eBay Inc. v. MercExchange, L.L.C.,* [547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)](#)). A preliminary injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.,* [555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)](#), and whether to grant such relief "rests in the sound discretion of the district court," *JSG Trading Corp. v. Tray–Wrap, Inc.,* [917 F.2d 75, 79 (2d Cir.1990)](#). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Johnson v. Newport Lorillard,* [2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003).](#) [1]

[8] "To establish irreparable harm, the movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.,* [51 F.3d 328, 332 (2d Cir.1995)](#) (internal quotation marks omitted); *Brenntag Int'l Chems., Inc. v. Bank of India,* [175 F.3d 245, 249 (2d Cir.1999)](#) (irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied").

Irmat makes a facially compelling case that Optum's termination of it from its pharmacy network represents an existential threat to its business. Irmat contends that losing the ability to service Optum members (who account for 27% of Irmat's sales overall) will have spill-over effects on the rest of its business. According to Irmat, most dermatologists—not wanting to bother with determining which pharmacies can fill which prescriptions for which patients—do not make referrals to particular pharmacies based on a patient's coverage, but rather refer their patients to one or two pharmacies that accept all major insurance providers. *See* O'Keefe Aff. SI 11. Thus, Irmat submits that most dermatologists will simply stop referring patients to Irmat altogether if Irmat is terminated from Optum's network. These losses, Irmat contends, are not quantifiable and will not be easily recaptured even if Irmat ultimately prevails in this litigation, since referring dermatologists will have moved on to other pharmacies. [2]

Optum responds that any losses Irmat might suffer are quantifiable, pointing to ***133** the fact that Irmat, in its papers, calculates the amount of revenues it derives from Optum members and the percentage of prescriptions from its top physician referrers that were made out for Optum members. But being able to break down actual revenues and referrals is a much simpler task than assessing the extent to which termination from Optum will affect Irmat's non-Optum business. And Optum does not attempt to rebut Irmat's assertion that termination from Optum's network will result in dermatologists opting not to refer Irmat altogether. As such, given the significant difficulties inherent in attempting to quantify the impact that termination from Optum's network will have on Irmat's business, the Court finds that Irmat has met its burden of showing an actual and imminent injury for which it lacks an adequate remedy at law. *See Salinger,* [607 F.3d at 81](#) ("Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure ....").

[9] [10] Turning to the merits, however, the Court finds that plaintiff has failed to show a likelihood of success on the merits on any of its claims. Plaintiff's first cause of action is for breach of contract. Rather than argue that Optum has breached any of the written contracts between the parties discussed above, Irmat argues that the parties entered into an implied-in-fact contract, as evidenced through their conduct,

by which Irmat would provide pharmacy services to Optum's members and, in return, Optum would reimburse Irmat for the drugs that it dispenses to those members. Under this supposed implied-in-fact contract, Irmat was not prohibited from providing mail-order pharmacy services to Optum members and never agreed that doing so would constitute grounds for termination. "A contract cannot be implied in fact where there is an express contract covering the subject matter involved." *Julien J. Studley, Inc. v. New York News, Inc.,* 70 N.Y.2d 628, 629, 518 N.Y.S.2d 779, 512 N.E.2d 300 (1987). Thus, as part and parcel of its breach-of-contract argument, Irmat argues that it is not bound by the terms of the 2015 Agreement between Optum and its agent AccessHealth —which made it a terminable offense for a "retail" pharmacy to provide mail-order services to Optum members—because it had no notice of it and did not ratify it.

Irmat's argument that it is not bound by the 2015 Agreement ultimately fails. But before progressing any further in the analysis of the 2015 Agreement, the Court must address an oddity with respect to that agreement that emerged after briefing and oral argument on the instant motion. In the 2015 Agreement, AccessHealth "warrants that it has the authority to enter into th[e] Agreement as the agent for and on behalf of each Pharmacy identified on Exhibit A" and that "that each Pharmacy identified on Exhibit A has agreed to be bound by and comply with all of the terms and conditions of this Agreement." Falah Aff., Ex. 3, § 3. Exhibit A, however, by defendant's own admission, was not attached to the contract and perhaps never existed. *See* Declaration of Jake McCreary dated Dec. 15, 2015 ("McCreary Decl.") ¶ 3. According to McCreary, a supervisor of pharmacy network operations at Optum who assists in the administration or the 2015 Agreement, "it has been the practice or the parties throughout their relationship to rely on data sent to OptumRx by AccessHealth to identify the pharmacies enrolled in the AccessHealth PSAO and participating in the OptumRx pharmacy network pursuant to the Contract." *Id.* AccessHealth has identified Irraat as such a pharmacy throughout the relevant period. *Id.* ¶¶ 4-9.

The Court finds that the missing exhibit does not render the 2015 Agreement fatally indefinite for three independent and alternative **\*134** reasons. *First,* while AccessHealth purports in § 3 of the Agreement to act on behalf of the pharmacies listed on Exhibit A, its description of whom it represents is not so limited elsewhere in the Agreement. Indeed, the 2015 Agreement "is made and entered into by and between [Optum] ... and [AccessHealth] *as attorney-*

*in-fact on behalf of its Participating Pharmacies."* Falah Aff., Ex. 3, at 1 (emphasis added). AccessHealth similarly represented in the Recitals section of the Agreement that it "has the authority to enter into this Agreement as the agent for and on behalf of its Participating Pharmacies." Id. Recital D. "Pharmacy" and "Pharmacies," in turn, are defined to mean "each or all the eligible pharmacy or pharmacies, pharmacy chains and/or pharmacy locations participating in [Optum's] network in accordance with the Agreement, addenda, exhibits, subsequent amendments, etc. and as specified on Exhibit A." *Id.* ¶ 1.30. [3]

At first glance, it is unclear whether "and as specified on Exhibit A" is intended to characterize the pharmacies described in the preceding language or is, rather, intended to represent one of several sets of pharmacies that constitute a "Pharmacy" (and, in turn, a "Participating Pharmacy") under the 2015 Agreement. But to adopt the former interpretation (such that "Pharmacies" refers only to those pharmacies specified on Exhibit A) would read the language "participating in [Optum's] network in accordance with the Agreement, addenda, exhibits, subsequent amendments, etc." out of the definition. To give those words effect, a pharmacy not listed on Exhibit A must at least be capable of qualifying as a Pharmacy under the Agreement; otherwise, the definition could have referred simply to "eligible pharmacy or pharmacies, pharmacy chains and/or pharmacy locations, as specified on Exhibit A," and left it at that. *See Olin Corp. v. Am. Home Assurance Co.,* 704 F.3d 89, 99 (2d Cir.2012) (under New York law, "[a]ny interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible" (internal quotation marks omitted)).

 [11]   Notably, on the signature page of the 2015 Agreement, immediately above the signature of the signatory for AccessHealth, the "Chain Codes" 605 and 630 are listed. Plainly then, Chain Code 605, of which Irmat is a member, *see* McCreary Decl. ¶ 4, is an "eligible ... pharmacy chain[ ] ... participating in [optum]'s network in accordance with the Agreement." As such, regardless of the absence of Exhibit A, AccessHealth entered into the 2015 Agreement in its capacity as Irmat's agent (among many other pharmacies). Such an interpretation is particularly warranted in light of the well-settled principle that a "contract must be interpreted so as to give effect to, not nullify, its general or primary purpose." *Smith v. City of Buffalo,* 120 A.D.3d 1588, 1589, 992 N.Y.S.2d 816 (N.Y.App.Div. 4th Dep't 2014) (internal quotation mark omitted).

[12]  *Second,* and alternatively, even if the 2015 Agreement could be read to have intended to bind only those Pharmacies identified on Exhibit A, the absence of Exhibit A would not in and of itself render the Agreement invalid. Rather, "[b]efore rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear. The conclusion that a party's promise should be ignored as meaningless is at best a last resort."  **135** *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989) (citation and internal quotation marks omitted); *see also 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.,* 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 575 N.E.2d 104 (1991) ("[W]here it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain."); *Matter of Wallace v. 600 Partners Co.,* 86 N.Y.2d 543, 547–48, 634 N.Y.S.2d 669, 658 N.E.2d 715 (1995) ("[C]ourts may as a matter of interpretation carry out the intention of a contract by transposing, rejecting, or supplying words to make the meaning of the contract more clear ... in those limited instances where some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part."). While these principles are generally applied to supply, for example, a missing price term or, in the case of the *Wallace* doctrine, to correct an absurd scrivener's error, the principles are equally applicable to the situation at bar where the contracting parties failed to attach an important exhibit. Here, the reference to Chain Codes 605 and 630 on the signature page of the 2015 Agreement supplies the "extrinsic standard" or "objective method" by which the Court can hold the parties to the bargain they struck. In other words, rather than toss the 2015 Agreement as meaningless —"a last resort"—the Court may properly under New York law interpret the references to "Exhibit A" in the Agreement to refer to those pharmacies (such as Irmat) in Chain Codes 605 and 630.

*Third,* and finally, even if the 2015 Agreement were interpreted to bind no Pharmacies at the time of execution because of the missing exhibit, the 2015 Agreement explicitly contemplates that pharmacies will be added to the Optum network *subsequent to* the execution of the 2015 Agreement. *See* Falah Aff., Ex. 3, § 3.4.3 ("[AccessHealth] shall provide [Optum] with at least fifteen (15) days written notice prior to adding a new Pharmacy Location for use in providing

Covered Prescription Services to Members, which new Pharmacy location shall satisfy and comply with all terms and conditions of this Agreement .... On a monthly basis [AccessHealth] will provide a complete list of Pharmacies as of the end of the month as well as a summary list of new and former Pharmacies processed during the previous calendar month."). The fact that that mechanism is in place, and that Optum treated Irmat as an active pharmacy under the 2015 Agreement by virtue of the information provided to it by AccessHealth, *see* McCreary Decl. ¶¶ 5-9, further undermines any argument that Irmat cannot be bound by the 2015 Agreement simply because Exhibit A was not attached to the Agreement.

[13]  Returning to the arguments made in the briefing, Irmat's argument that it is not bound by the 2015 Agreement because it had no notice of it and did not ratify it is unpersuasive. Under black-letter agency law, a principal need not have notice to be bound by his agent. "It is well-settled that the principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have been communicated to the principal." *Farr v. Newman,* 14 N.Y.2d 183, 187, 250 N.Y.S.2d 272, 199 N.E.2d 369 (1964); *Minskoff v. Am. Express Travel Related Servs. Co.,* 98 F.3d 703, 708 (2d Cir.1996) ("Under general principles of agency, the authority of an agent 'is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him.'"). Here, Irmat's agreement with AccessHealth  **136** provides that "[AccessHealth] shall have the authority to negotiate and enter into prospective Payor Agreements for the provision of Covered Pharmacy Services to Covered Persons. [Irmat] agrees that [AccessHealth] has the sole and exclusive right to bind [Irmat] to [Payor Plans], provided that [Irmat] may ... opt out of Payor Plans as described in Section 5.2." Falah Aff., Ex. 1, § 5.1. Section 5.2 of the Agreement, in turn, contemplates that Irmat may "opt out of Payor Agreements available within the network selected by [Irmat]," although it will initially be "automatically enrolled in all Payor Agreements available under [said] network." *Id.* § 5.2. As such, Irmat, by the plain language of its own contract with AccessHealth, agreed to be bound to agreements entered into by AccessHealth on Irmat's behalf unless it opted out of such agreements, regardless of whether Irmat would have agreed to those terms in the first instance. *See Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.,* 241 F.Supp.2d 246, 260 (S.D.N.Y.2002) ("It is black letter law that an agent binds his principal when he enters into

a contract within the scope of his authority."); *E. River Sav. Bank v. Samuels,* 284 N.Y. 470, 480, 31 N.E.2d 906 (1940) ("When an agent contracts in the name of his principal, the principal contracts and is bound ....").

Though it would appear that Irmat's authorization of AccessHealth to bind it could not be clearer, Irmat argues that AccessHealth did not have "*carte blanche* to bind Irmat to agreements as AccessHealth saw fit," Plaintiff's Reply Brief ("Pl. Reply Br.") at 5 (ECF No. 29), seizing on a provision of the Irmat/AccessHealth Agreement that requires AccessHealth to "furnish [Irmat] a written summary of the terms and conditions of each Payor Agreement for which [AccessHealth] *proposes* that [Irmat] participate." Falah Aff., Ex. 1, § 2.1 (emphasis added). But the word "proposes" cannot bear the weight plaintiff assigns to it in light of § 5 of the Agreement. An obligation to furnish a summary of terms is not tantamount to a requirement that Irmat ratify those terms for an agreement to be effective. The absence of any ratification procedure in the Irmat/AccessHealth Agreement defeats such an interpretation, for if the parties intended such a limitation on AccessHealth's ability to bind Irmat, they almost certainly would have provided for one explicitly. And given that the Agreement allows for Irmat to opt out of Payor Agreements that it does not wish to participate in, the use of the word "proposes" in § 2.1 is not remotely inconsistent with the framework established by § 5.[4] That AccessHealth allegedly failed to furnish Irmat with a written summary of the terms and conditions of the 2015 Agreement, in apparent contravention of § 2.1 of their agreement, may very well provide-Irmat with a viable breach-of-contract claim against AccessHealth. But it does not provide Irmat with a breach-of-contract claim against Optum.[5]

**[14]** Irmat also argues that Optum waived any contractual right to terminate **\*137** Irmat for providing mail-order pharmacy services, in light of the fact that Optum reimbursed Irmat for over 200,000 prescriptions throughout the country from February 2013 through October 2015, without objection until August 2015. *See* O'Keefe Aff. ¶ 7. Noting that claims submitted by Irmat reflect less than two hundredths of one percent of the claims processed by Optum during that period, Optum responds that it did not know that Irmat was filling mail orders in violation of the 2015 Agreement until it conducted an investigation in mid-2015. But the Court need not wade into this factual dispute because the 2015 Agreement explicitly provides that "[t]he failure of any party to insist in any one or more instances upon performance of any terms or conditions of this Agreement shall not be

construed as a waiver ... and the obligations of such party with respect thereto shall continue in full force and effect." Falah Aff., Ex. 3, § 11.3. Such "[n]o-waiver clauses are valid and enforceable" under New York law, and therefore Irmat's waiver argument fails. *Am. Movie Classics Co. v. Time Warner Entm't, L.P.,* 2005 WL 3487852, at \*12 (N.Y.Sup.Ct.2005). Irmat argues that the 2015 Agreement's no-waiver provision is inapplicable for the same reasons it argues that it is not bound by the 2015 Agreement generally, but that argument fails for the same reasons stated above.

**[15]** Finally, Irmat claims that Optum acted in violation of the implied covenant of good faith and fair dealing by (1) prohibiting the provision of mail-order pharmacy services without notifying Irmat directly or seeking its consent; (2) demanding that Irmat cease providing mail-order services within 10 days or face termination; and (3) deciding to terminate Irmat despite Irmat's willingness to apply to Optum's mail-order pharmacy network. While "even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement," *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 302, 765 N.Y.S.2d 575 (N.Y.App.Div. 1st Dep't 2003), "[t]o sustain a breach of the implied covenant claim, the claimant must allege and show that the other party exercised a [contractual] right malevolently, for its own gain as a part of a purposeful scheme designed to deprive [claimant] of the benefits under the contract," *Wilmington Trust Co. v. Strauss,* 2006 WL 3076611, at \*8 (N.Y.Sup.Ct.2006) (internal quotation marks omitted).

**[16]** Irmat has failed to show that it is likely to be able to demonstrate that Optum acted with the requisite bad faith to support such a theory of breach. Again, plaintiff's effort to pin its agent's failure to notify it of the 2015 Agreement on Optum is not well-taken. As for Optum's decision to terminate Irmat from its network, it was Irmat's choice to continue breaching the 2015 Agreement upon being notified of its breach rather than to cease filling mail-order prescriptions from Optum members while its application to Optum's mail-order pharmacy network remained pending. While Optum perhaps has not acted with the greatest generosity toward Irmat under the circumstances, it cannot be the case that Optum's decision to act on its contractual right to terminate Optum in the face of Irmat's continued breach constitutes bad faith. Although Irmat suggests that Optum pursued such termination in an effort to squash competition, these allegations are conclusory and are further undermined by the undisputed fact that Optum

invited Irmat to apply to its mail-order pharmacy network as part of the parties' correspondence. *Ferguson v. Lion Holding, Inc.,* 478 F.Supp.2d 455, 469 (S.D.N.Y.2007) ("[C]onclusory allegations **\*138** of a party's failure to act in good faith alone are insufficient ..."). [6]

At bottom, Irmat is seeking to replace the written agreement between the parties with an unwritten, implied-in-fact contract with terms more favorable to Irmat. That it cannot do. As such, plaintiff has failed to show a likelihood of success on its breach-of-contract claim.

**[17]    [18]    [19]** With its second cause of action, Irmat argues that Optum is precluded by the doctrine of equitable estoppel from terminating Irmat from its network. Here, too, Irmat fails to show a likelihood of success on the merits. "Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *In re Vebeliunas,* 332 F.3d 85, 93–94 (2d Cir.2003) (citation omitted). The "doctrine is to be invoked sparingly and only under exceptional circumstances." *LoCiciro v. Metro. Transp. Auth.,* 288 A.D.2d 353, 355, 733 N.Y.S.2d 477 (N.Y.App.Div.2d Dep't 2001) (internal quotation marks omitted).

Irmat argues that it is likely to succeed on this claim because it relied to its detriment on Optum's reimbursement of its mail-order sales to Optum members from 2013 to 2015, substantially expanding its business from 20 to 208 employees and spending millions of dollars to expand its operations. Optum argues that equitable estoppel is unavailable because Irmat has a contractual relationship with Optum that governs the parties' relationship. *See Kopelowitz & Co. v. Mann,* 2009 WL 1037734, at \*11 (N.Y.Sup.Ct.2009) ("Claims for equitable estoppel that are duplicative of dismissed breach of contract claims are properly dismissed."). Irmat appears to concede the point on reply, assuming that the Court finds an enforceable contract between Optum and Irmat. *See* Pl. Reply Br. at 8 n.16. But, in any case, Irmat has failed to demonstrate that it is likely to be able to show (1) that Optum concealed anything from Irmat; (2) that Optum intended Irmat to act on any such concealment

or misrepresentation, or (3) that Irmat lacked "the means of knowledge of the true facts." To the contrary, Irmat knew it was in Optum's pharmacy network and knew that it was obligated under the Irmat/AccessHealth agreement to "comply with the policies and procedures" of Optum. Falah Aff., Ex. 1, Recitals; *id.* ¶ 8.1. Irmat does not even plead that it lacked the means to know the true facts—an understandable omission given that its own agent executed the agreement at issue.

**[20]** Nor has Irmat met its burden of showing a likelihood of success on its third cause of action for tortious interference with business relations. "To prevail on a claim for tortious interference with business relations in New York, a party must prove (1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; **\*139** and (4) that the defendant's interference caused injury to the relationship with the third party." *Amaranth LLC v. J. P. Morgan Chase & Co.,* 71 A.D.3d 40, 47, 888 N.Y.S.2d 489 (N.Y.App.Div. 1st Dep't 2009). Irmat argues that Optum's termination of Irmat from its pharmacy network will interfere with its business relationships with customers, dermatologists, and drug manufacturers. It further contends, summarily, that "Optum's termination of Irmat is not in its member's [sic] interests ... or in pursuit of legitimate business objectives" and that the purpose of the termination is "to el[i]minate a competitor in violation of antitrust law." Plaintiff's Opening Brief ("Pl. Br.") at 16, ECF No. 15. Optum responds that it simply has chosen to terminate Irmat from its network because Irmat refused to stop breaching the governing network agreement. While a violation of New York's Donnelly Act (assuming *arguendo* that one has occurred) would constitute a crime under New York law, the New York Court of Appeals has emphasized that "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 192, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004). Irmat has not pled nor argued that Optum's conduct is directed at parties other than Irmat itself, so its claim is defective in this regard. *See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.,* 455 Fed.Appx. 102, 106–07 (2d Cir.2012) (affirming dismissal of tortious interference with business relations claim because defendant's allegedly wrongful conduct "was directed at [plaintiff], rather than [the third party]," such

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

that plaintiff's "allegations could not satisfy the wrongful means element even if they did sufficiently allege tortious conduct"). And Irmat's allegation that Optum acted "with the sole purpose of harming Irmat" is conclusory. Compl. ¶ 86. In any case, in order to show a likelihood of success on the merits of its tortious interference claim, plaintiff would need to show a likelihood of success on the merits of its antitrust claims, which, as explained below, plaintiff has failed to do.

Turning to those claims, the Donnelly Act tracks the federal Sherman Act, prohibiting "[e]very contract, agreement, arrangement or combination whereby [a] monopoly ... is or may be established or maintained, or whereby [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service ... is or may be restrained." N.Y. Gen. Bus. Law § 340(1); *see also Anheuser–Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 520 N.E.2d 535 (1988) (the Donnelly Act "should generally be construed in light of Federal precedent"). Irmat argues that the 2015 Agreement violates the Donnelly Act in two ways: (1) by "negatively" tying retail pharmacy services to mail-order pharmacy services; and (2) as an unreasonable restraint on trade.

 **[21]**  The elements of an illegal *per se* tying claim are: "(1) that the tying arrangement affects a substantial amount of interstate commerce; (2) the two products are distinct; (3) the defendant actually tied the sale of the two products; and (4) the seller has appreciable market power in the tying market." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 133 n. 5 (2d Cir.2001), *overruled on other grounds, In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24 (2d Cir.2006). As an initial matter, though Optum does not brief the viability of a "negative tying" theory in general, such a theory is far from well-established. A few courts have recognized that "[i]n addition to outlawing 'positive' ties likely to restrain competition, Section **\*140** 1 [of the Sherman Act] also forbids 'negative' ties—arrangements conditioning the sale of one product on an agreement *not* to purchase a second product from competing suppliers." *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1178 (1st Cir.1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010). But plaintiff fails to cite a case in the Second Circuit or a decision of a New York state court that has accepted or applied the theory. *See Posa, Inc. v. Miller Brewing Co.,* 642 F.Supp. 1198, 1209 (E.D.N.Y.1986) (noting that plaintiffs had failed to "cite[ ] any case authority for the

proposition that such a negative tie is unlawful"). And Irmat cites no case in which a practice like defendant's has been found to constitute tying. Indeed, at a minimum, "tying" is an awkward fit on these facts since Optum is not offering products in the traditional sense of the word, or preventing Irmat from purchasing the "tied" product from a competitor. Rather, on plaintiff's theory, Optum is unlawfully forcing Irmat to choose between Optum's own pharmacy networks.

The Court need not resolve the viability of plaintiff's negative tying theory on this motion, because even assuming the theory would be viable on the facts pled, the theory is based on a mistaken factual premise. According to Optum, Irmat's contention that "Optum has forced its pharmacies that participate in Optum's 'retail' pharmacy network to refrain from providing mail order pharmacy services" is factually incorrect. Defendant's Brief ("Def. Br.") at 22 (guoting Pl. Br. at 17), ECF No. 25. To the contrary, Optum explains:

> A pharmacy that meets the credentialing requirements of both the retail and mail networks is welcome to participate in both. It does not have to choose one or the other. If the pharmacy meets the credentialing requirements of the retail network, it may dispense in the retail setting. If it meets the additional requirements of the mail network, it can dispense in both retail and mail settings.

*Id.; see also* Declaration of Kerri Tanner dated Nov. 24, 2015 ("Tanner Decl.") ¶ 8 ("Optum [ ] permits pharmacies in its mail pharmacy network to also dispense medications when they are face-to-face with their customers. Thus, a pharmacy in the mail pharmacy network is effectively a participant in both the retail and mail pharmacy networks."), ECF No. 23.

In response, Irmat points to the 2015 Pharmacy Manual, which provides that "Mail Order Pharmacies do not qualify for participation in the Administrator Retail Pharmacy networks as a Retail Pharmacy." Tanner Decl., Ex. D at 109. While it is difficult (albeit not impossible [7] ) to reconcile that provision with Optum's representations to the Court, Optum's position in this litigation is unequivocal: "There is no prohibition against a properly credentialed pharmacy participating in both the mail-order and retail pharmacy

networks." Def. Br. at 10 n.6. Even if it were the case that a pharmacy could not *technically* belong to both networks, Optum's substantive point that a pharmacy in its mail-order network is not prevented from dispensing medication face-to-face in a retail capacity remains unrebutted. Irmat fails to identify any action that a pharmacy in Optum's retail pharmacy network can take that a pharmacy in Optum's mail-order pharmacy network cannot. Put differently, Irmat appears unlikely to be able to show that **\*141** Optum is negatively tying membership in the retail network to membership in the mail-order network because a properly credentialed pharmacy can dispense medication both by mail and in a retail capacity (*i.e.*, in-store). This is borne out by the fact that Irmat is desperately trying to gain admission to Optum's mail-order network and has not indicated anywhere in its papers that it believes that obtaining such admission will have any negative effect whatsoever on its retail operations. Because the Court finds that plaintiff has failed to show a likelihood of success on the merits on its tying claim on this ground, the Court need not reach defendant's arguments as to antitrust standing and market definition.

 [22] Irmat's claim that Optum and AccessHealth have restrained competition in violation of the Donnelly Act by entering into the 2015 Agreement appears similarly weak. Under the Sherman Act (which the parties look to), to make out such a claim "plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 386 F.3d 485, 506 (2d Cir.2004). Irmat argues that the 2015 Agreement unreasonably restrains trade in the market for mail-order pharmacy services to Optum members by allowing Optum to terminate retail pharmacies for providing mail-order pharmacy services. Given that the 2015 Agreement was entered into *on behalf of* Irmat by its agent AccessHealth, Irmat is placing itself in the position of arguing that an agreement to which it is a party unreasonably restrains trade, i.e., Irmat is essentially accusing itself of violating the Donnelly Act. While the parties fail to brief this issue, the Court is skeptical that Irmat will be able to prevail on such a claim given this posture. Nor has plaintiff demonstrated that it is likely to be able to show that the Agreement *unreasonably* restrains trade or "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market," rather than merely an adverse effect on plaintiff's balance sheet. *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 543 (2d Cir.1993).[8]

Irmat has thus failed to show a likelihood of success on the merits on any of its claims. However, under this Circuit's case law, if the balance of hardships tipped decidedly in plaintiff's favor, injunctive relief would be warranted if plaintiff could make the lesser showing of "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Citigroup Glob. Mkts., Inc.,* 598 F.3d at 35. Though the Court indicated in its December 15 bottom-line order that the balance of hardships tips in plaintiff's favor, on reflection it finds that the balance of hardships do not tip *decidedly* in plaintiff's favor. With respect to this factor, Irmat argues that while it "will suffer irreparable harm without an injunction, Optum will suffer none." Pl. Reply Br. at 10. However, the "balance of hardships" requirement would be superfluous if it could be met simply by virtue of making the already-required showing of irreparable harm. *See Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 58 (2d Cir.1979) ("A 'balance of hardships tipping decidedly toward the party requesting the preliminary relief must mean real hardship from the denial of relief Pendente lite not merely the showing of difficulty of measurement **\*142** which may suffice to constitute 'irreparable damage' where a plaintiff shows probable success."). While plaintiff faces a significant hardship in the form of potentially irreparable harm to its business upon termination, the requested injunction would impose some hardship on Optum insofar as it would force Optum to bear risks related to Irmat acting as a mail-order pharmacy without the accreditations required by Optum for the purported purpose of patient safety. Tanner Decl. ¶ 7; Transcript of Proceedings held on Dec. 11, 2015 at 15 ("Optum doesn't have any reassurance that Irmat is qualified and is not going to do something that could potentially be a danger to patient care that Optum may ultimately be responsible for not doing proper credentialing."), ECF No. 37.[9]

Perhaps more significantly, to a large extent the hardship Irmat faces is one of its own making. Though Irmat was purportedly unaware of the 2015 Agreement prior to being notified by Optum that it was in breach of it, Irmat continued to breach the 2015 Agreement months after being advised that it would face termination if it did not cure its breach. Significantly, Optum did not simply advise Irmat that it was terminating it. Rather, Optum gave Irmat the opportunity to cure its breach and, on September 16, 2015, advised Irmat that it could apply to Optum's mail-order pharmacy network if it wanted to continue filling mail orders from Optum members. At that time, Irmat had a choice: (1) it could continue

breaching the 2015 Agreement (to the extent it was bound by that agreement) while it obtained the required credentials and hope that Optum would change its mind in the course of negotiations or that it would succeed in obtaining injunctive relief in litigation; or (2) it could cease filling mail-order prescriptions from Optum members while its application to Optum's mail-order pharmacy network remained pending (thereby obviating the need for this litigation), but otherwise continue to be a member of Optum's retail pharmacy network. While that choice may not have been an attractive one for Irmat—indeed, the second option surely would have been disruptive to Irmat's mail-order business (though presumably not as disruptive as full-scale termination)—it was a choice nonetheless. Irmat chose to continue breaching and, under the circumstances, the Court does not see how the balance of hardships could be said to tip *decidedly* in plaintiff's favor. *Columbus Rose Ltd. v. New Millennium Press*, 2002 WL 1033560, at *10 (S.D.N.Y. May 20, 2002) (where party had "deliberately sailed in harm's way" and "the hardship of

which it complains [was] significantly of its own making," hardship argument was not credited); *Warner Bros. Entm't v. Glob. Asylum, Inc.*, 2012 WL 6951315, at *22 (C.D.Cal. Dec. 10, 2012) (where "hardship" was one of defendant's "own making," such hardship "carrie[d] little weight with the Court" in the balance of hardships analysis). Even if the balance of hardships did tip decidedly in plaintiff's favor, however, the Court would still find that plaintiff had not raised sufficiently serious questions going to the merits to warrant injunctive relief. [10]

**\*143** In sum, for the foregoing reasons, the Court, in its December 15, 2015 Order, denied plaintiff's motion for a temporary restraining order and preliminary injunction.

## All Citations

152 F.Supp.3d 127

## Footnotes

1    "The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F.Supp.2d 577, 580 (S.D.N.Y.2002).

2    In support of this proposition, Irmat points to its recent experience with customers from the state of Georgia. Because of a new Georgia state licensing requirement, Irmat briefly ceased providing mail-order services to customers in Georgia in June 2015. *See* O'Keefe Aff. ¶¶ 14-15. As a result, dermatologists in Georgia found alternative pharmacies to refer patients to. *Id.* ¶ 16. Though Irmat resumed the provision of such services in August 2015, "the vast majority of dermatologists that had previously referred patients to Irmat did not revert back to doing so." Plaintiff's Opening Brief ("Pl. Br.") at 10, ECF No. 15.

3    "Participating Pharmacies" is not a defined term in the 2015 Agreement.

4    Because the Court finds that AccessHealth would had actual authority to bind Irmat, it need not reach the issue of whether, in the absence of such actual authority, Irmat would still be bound by the 2015 Agreement on a theory of apparent authority.

5    Irmat argues that Optum's 2015 Pharmacy Manual (which describes the necessary accreditations for mail-order pharmacies), and Optum's prohibition on providing mail-order pharmacy services, were not clearly incorporated by reference into Irmat's own separate agreement with AccessHealth. This argument is a red herring that the Court need not reach. The dispositive point, for purposes of plaintiff's breach-of-contract claim, is that the *2015 Agreement* entered into on Irmat's behalf by AccessHealth is a valid contract that binds Irmat.

6    Plaintiff s implied covenant theory faces another hurdle that renders its success unlikely, *viz.*, "New York law requires dismissal of an implied covenant claim where the claim derives from the same set of facts as a breach of contract claim," as it does here. *FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F.Supp.2d 224, 231 (S.D.N.Y.2009).

7    The relevant provision in the 2015 Pharmacy Manual could be reasonably read to mean that a mail-order pharmacy does not qualify for participation in Optum's retail pharmacy network merely by virtue of being a mail-order pharmacy, rather than as completely foreclosing the possibility of a pharmacy participating in both networks.

8    Irmat asserts in a footnote, without any explanation, that the 2015 Agreement constitutes a per se illegal "group boycott," but Irmat fails to explain who is boycotting what. Pl. Br. at 19 n.7. The word "boycott" does not even appears in its complaint. This argument is made far too summarily to warrant the Court's consideration.

9    While Irmat dismisses these justifications as pretextual, this contention, at present, lacks evidentiary support.

10    A court assessing a motion for a preliminary injunction must "ensure that the 'public interest would not be disserved' by the issuance" of such an injunction. *Salinger*, 607 F.3d at 80. Here, plaintiff has failed to show that an injunction is

warranted and, as such, the Court need not address the public interest. However, to the extent the issue has not been entirely obviated, the Court finds the public interest to be a neutral factor. On the one hand, termination will result in the disruption of medical services to many of Irmat's customers. On the other hand, at present, Irmat lacks the accreditations as a mail-order pharmacy that Optum contends it requires to ensure that "pharmacies in its mail pharmacy network have the appropriate controls and processes in place to safely and effectively dispense medications by mail." Tanner Decl. ¶ 7. The public has an interest in uninterrupted *and* safe medical care and, as such, the public interest would not clearly be served or disserved by the issuance of the requested injunction.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3498634
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

VRINGO, INC., et ano., Plaintiffs,

v.

ZTE CORPORATION, et ano., Defendants.

No. 14–cv–4988 (LAK).
|
Signed June 3, 2015.

**Attorneys and Law Firms**

Karl Geercken, Amber Wessels–Yen, Alston & Bird LLP, for Plaintiff.

Paul A. Straus, Robert F. Perry, King & Spalding LLP, for Defendants.

MEMORANDUM OPINION

LEWIS A. KAPLAN, District Judge.

 **\*1** This action arises out of a non-disclosure agreement ("NDA") between Vringo, Inc. and another (collectively, "Vringo") and ZTE Corporation and another (collectively, "ZTE") for the purpose of exploring a potential settlement of worldwide patent infringement litigation. The complaint alleges, among other things, that ZTE disclosed confidential information in breach of the NDA. The matter now is before the Court on Vringo's motion for a preliminary injunction.

*Facts*

*The Parties and the Worldwide Patent Infringement Litigation*

Vringo is engaged in the innovation, development, and monetization of intellectual property and mobile technologies. It holds an intellectual property portfolio of more than 600 patents and patent applications covering telecommunications infrastructure, internet search, and mobile technologies. [1]

In August 2012, Vringo purchased a patent portfolio from Nokia Corporation, including at least several patents that have been declared essential to wireless communications standards and are therefore necessary for the operation of telecommunications equipment. [2] The parties agree that Vringo must grant licenses to practice those essential patents on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions. [3]

ZTE, headquartered in Shenzhen, China, designs, develops, manufactures, and sells telecommunications products and equipment. [4] It claims to be one of the five largest smartphone manufacturers in China and one of the ten largest worldwide. [5]

ZTE allegedly has been selling telecommunications equipment covered by Vringo's patents without a license for several years. [6] Beginning in October 2012, Vringo initiated patent infringement litigation against ZTE in Australia, Brazil, France, Germany, India, Malaysia, the Netherlands, Romania, Spain, and the United Kingdom, perhaps among other places. [7]

*The Non–Disclosure Agreement*

In late 2013, ZTE and Vringo agreed to meet to discuss possible settlement of the international patent litigation. [8] Vringo believed that the "only way to create an environment for productive discussions with good faith settlement offers was ... to exchange information setting forth the parties' respective positions" pursuant to a non-disclosure agreement ("NDA"). [9] Accordingly, on November 26, 2013, Vringo sent a proposed NDA to ZTE. [10] ZTE returned it to Vringo on December 9, 2013, signed and initialed by ZTE's chief intellectual property counsel and dated effective as of December 6, 2013. [11] It was signed and initialed also by Vringo's chief operating officer.

As spelled out in the formal agreement, the NDA served to allow Vringo and ZTE to "explore a potential settlement of some portion of or all of the outstanding litigation as well as any other disputes." [12] It specified that "any and all statements made, positions taken, or documents used or exchanged by either Party during the course of the Discussions" constituted "Confidential Information." It detailed also an agreement that no party would use Confidential Information "in any existing or future judicial or arbitration proceedings" or "for [their] commercial

advantage, dispute advantage, or any other purpose." [13] In relevant part, paragraph 2 of the NDA provided:

> **\*2** "In order to facilitate the Discussions, the Parties hereby agree ... that any and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ('Confidential Information') *shall be confidential, inadmissible, and without prejudice and shall not be used or referenced in any way by any Party in any existing or future judicial or arbitration proceedings or made the subject of any public comment or press release.* In addition, each Party agrees not to disclose information covered by this Agreement to any of its personnel or representatives except on a strictly 'need to know' basis, or to any third party, and *not to use such information for its commercial advantage, dispute advantage, or any other purpose* .... Each Party further agrees that it will take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized hereunder to have any such information." [14]

The NDA contemplated the possibility that a governmental entity or another stranger to the agreement might seek access to Confidential Information. In the event that one of the parties received a request for such information from a governmental entity or a third party, whether via a discovery request or a subpoena, the NDA provided that the recipient must (i) "maintain the confidentiality of the Confidential Information;" (ii) "timely seek a protective order ... that would afford the Confidential Information the highest level of confidential treatment possible;" and (iii) "notify the other Party within three business days of receiving the initial request for Confidential Information." [15]

The NDA stated also "that money damages may not be a sufficient remedy for any breach of this Agreement and that, in addition to all other remedies to which it may be entitled, the Parties will be entitled to seek equitable relief, including injunction and specific performance, for any actual or threatened breach of the provisions of this Agreement." [16] Finally, the NDA was to "be governed by and construed and enforced in accordance with the laws of the State of New York" and "binding upon the parties hereto in the United States and worldwide." [17]

*The Settlement Meeting*

The parties met on December 10, 2013—the day after ZTE returned the executed NDA to Vringo—to discuss a possible resolution of the patent litigation. [18] Vringo there made a 40–page presentation to ZTE, which, among other things, included its settlement proposal. [19] Each and every page of the presentation stated: "CONFIDENTIAL—VRINGO/ZTE SETTLEMENT DISCUSSIONS SUBJECT TO NDA." [20] But no settlement was reached.

*Chinese Litigation*

On February 21, 2014, ZTE initiated an antitrust lawsuit in Shenzhen, China, claiming that Vringo had abused its market position by refusing to license its essential patents on FRAND terms and conditions. [21] ZTE's complaint— filed just over two months after ZTE executed the NDA— specifically relied on Vringo's Confidential Information. It stated: "In the second price quotation in December 2013, the Defendant [Vringo] actually intended to charge the Plaintiff USD [Redacted] for its standard-essential patents' portfolio license ...." [22] Moreover, ZTE attached Vringo's December 10, 2013 presentation as an exhibit to the complaint itself. [23]

**\*3** Vringo long remained entirely unaware of the Shenzhen litigation. It was not until June 26, 2014—more than four months after the lawsuit was initiated—that it received a copy of the complaint and supporting documents from the Shenzhen court on its own initiative and learned that ZTE had disclosed Confidential Information in its Shenzhen filing. [24]

*European Commission Litigation*

On April 10, 2014, ZTE filed another complaint against Vringo, on that occasion with the European Commission ("EC"). [25] Vringo received a copy of the complaint on May 15, 2014 from the EC with the opportunity to respond. [26] As mentioned, Vringo then still was entirely unaware of the Shenzhen litigation. So, on June 4, 2014, Vringo requested "a waiver from ZTE to allow Vringo to disclose any information that constitutes Confidential Information (as defined in clause 2 of the Vringo/ZTE Non–Disclosure Agreement) to the European Commission in connection with ZTE's complaint." [27] ZTE did not respond before Vringo was required to answer the EC complaint. [28] Consistent with its

obligations under the NDA, Vringo redacted any Confidential Information from its EC response. [29]

On June 24, 2014, a week after Vringo's EC submission, ZTE responded to Vringo's letter. [30] ZTE wrote that it "considered [Vringo's] request to waive clause 2 of the Non–Disclosure Agreement concluded between ZTE and Vringo on 6 December 2013 ('the NDA')" and could "only agree to such a waiver under ... two conditions ." [31] *First,* "[t]he waiver should be made reciprocal, meaning that Vringo, Inc ....should also waive the confidentiality obligations under the NDA on ZTE Corporation." [32] *Second,* "the reciprocal confidentiality waiver only concerns the information exchanged under the NDA that is of direct relevance to the complaint ZTE has filed with the European Commission in April 2014." [33] In other words, ZTE took the position that the NDA remained in force and in effect, that disclosure to the EC was permitted only by written agreement, and that Vringo could disclose Confidential Information to the EC only if it permitted ZTE to do so.

*NDRC Investigation*
On January 13, 2015, Vringo received a letter from the Bureau of Price Supervision and Anti–Monopoly of China's National Development and Reform Commission ("NDRC") stating that the NDRC had initiated an investigation after "receiv[ing] a claim that your corporation has violated 'Anti–Monopoly Law of P.R. China.' " [34] The following week, the NDRC informed Vringo that its investigation was "based on complaints which contain prima fac[i]e evidence of ... anticompetitive behavior of your company." [35] While discovery remains ongoing, ZTE now has admitted that it "submitted the December 10, 2013 presentation to the NDRC in or about April 2014." [36]

*This Action*
Vringo commenced this action on July 2, 2014 for breach of the NDA, and moved by order to show cause for a temporary restraining order ("TRO") and a preliminary injunction on July 3, 2014. Vringo sought injunctive relief (1) requiring that ZTE withdraw the Shenzhen complaint and all of its supporting documentation, (2) enjoining ZTE from any further litigation in Shenzhen or any other court in the Guangdong Province of China regarding the same or similar claims, (3) requiring that ZTE withdraw any Confidential Information provided to any other court or tribunal and

notify Vringo of any such circumstances, and (4) enjoining ZTE from referencing any Confidential Information in any pending or future litigation.

 **\*4** Following argument on July 7, 2014, the Court granted a TRO much more limited than the one Vringo had sought. It restrained ZTE "from using, referencing, or disclosing any Confidential Information, as defined in Paragraph 2 of the [NDA] ... in any manner inconsistent with the terms of that [NDA]." [37] By agreement of the parties, the TRO has remained in effect. [38]

Vringo filed an amended complaint on August 13, 2014, asserting additional claims for fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and unfair competition. The amended complaint alleges that ZTE executed the NDA to elicit the Confidential Information only to use it for its commercial advantage in the Shenzhen lawsuit, perhaps among other places. Vringo, however, does not rely on this allegation in its motion for a preliminary injunction. [39]

On April 6, 2015, the Court granted Vringo's motion for partial judgment on the pleadings to the extent that it determined that the parties entered into the NDA and that ZTE's actions in disclosing the Confidential Information breached its obligations under the NDA. [40] That same day, the Court granted ZTE's motion for judgment on the pleadings to the extent that it dismissed Vringo's unfair competition claim but denied the ZTE motion in all other respects. [41]

*Discussion*

*I. Preliminary Injunction Standard*
In the Second Circuit, a litigant seeking a preliminary injunction must:

"either show that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest, *Winter v. NRDC,* 555 U.S. 7, 20, 129 S.Ct 365, 172 L.Ed.2d 249 (2008); or he may show irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary

relief,' *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,* 696 F.3d 206, 215 (2d Cir.2012)." [42]

The Court applies the *Winter* standard here because, as will be seen, Vringo has shown an exceptionally high likelihood of success on the merits and the Court therefore need not examine the 'serious questions' standard.

Additionally, where, as here, a party seeks a preliminary injunction that is "mandatory," *i.e.,* "alter[s] the *status quo* by commanding some positive act," a heightened showing is necessary. [43] In this Circuit, "a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." [44]

### II. Likelihood of Success on the Merits

#### A. ZTE Violated the Unmistakably Clear Terms of the NDA

Not very much need be said with respect to ZTE's violation of the terms of the NDA. This Court already has found that "the pleadings establish the existence and terms of the NDA and defendants breach thereof." [45]

**\*5** Nonetheless, a few points warrant elaboration.

*First,* paragraph 2 of the NDA defined "Confidential Information" as "any and all statements made, positions taken or documents used or exchanged by either Party during the course of the Discussions." [46] Vringo's December 10, 2013 presentation—both the written presentation and the discussion that occurred at the meeting—clearly and unmistakably was Confidential Information under the NDA. Moreover, bold lettering on each and every page of the written presentation identified it as such: "Confidential–Vringo/ZTE Settlement Discussions Subject to NDA." [47]

*Second,* the NDA clearly and unmistakably prohibited ZTE's disclosure of this Confidential Information. The NDA expressly provided that such Confidential Information "shall not be used or referenced in any way by any Party *in any existing or future judicial or arbitration proceeding."* [48] Yet ZTE voluntarily disclosed Confidential Information when it initiated the judicial proceeding in China a mere two months after agreeing not to use or reference such information., even

in judicial proceedings. Indeed, ZTE itself admitted that it "included certain materials relating to the December 2013 meeting between the parties" in the Shenzhen complaint. [49]

ZTE nonetheless argues that non-disclosure agreements typically are concluded to prevent parties from disclosing settlement information in contravention of Federal Rule of Evidence 408, not to prevent all use in judicial proceedings of settlement-related information. [50] Even if that were true in general, it would not matter here because these parties agreed in the NDA that the disclosure of Confidential Information *in judicial proceedings* was prohibited with an exception not relevant here. [51] Had the intention been merely to foreclose disclosure of statements made in settlement discussions to the extent provided by Rule 408, ZTE's chief intellectual property counsel, as an executive of one of the five largest smartphone manufacturers in China and one of the ten largest worldwide, easily could have proposed such language in the NDA. He did not. [52]

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." [53] The NDA was clear and unambiguous, and ZTE unmistakably violated its terms.

*Third,* ZTE's conduct in relation to the EC litigation confirms that ZTE was very well aware that the NDA prohibited disclosure, even in judicial proceedings. [54] As described above, Vringo sought ZTE's written permission to disclose certain Confidential Information to the EC when responding to ZTE's complaint to the EC. Of course, unbeknownst to Vringo, ZTE already had filed its Shenzhen complaint with Vringo's Confidential Information by that time. Had ZTE believed that it was permissible to disclose Confidential Information for purposes other than those prohibited by Rule 408, it could have so responded. Instead, it chose to wait until after Vringo was required to submit a response to the EC and then to condition Vringo's disclosure on a reciprocal waiver despite the fact that ZTE already had disclosed Confidential Information in another action. [55]

#### B. The NDA's Confidentiality Provision Is Enforceable

**\*6** ZTE voluntarily executed the NDA and agreed not to use any Confidential Information in any existing or future judicial proceeding. It then met with Vringo, ostensibly for the purpose of discussing settlement, and obtained Confidential Information. Within weeks, it then voluntarily sued Vringo

in Shenzhen and disclosed the Confidential Information it thus elicited in blatant violation of the NDA. It now contends that its conduct nonetheless was permissible on two principal grounds: that (1) Chinese law supposedly required it to disclose the Confidential Information, and (2) the NDA in any case is a contract to suppress evidence that is unenforceable under New York law. Both arguments are entirely without merit.

*First,* ZTE argues that Chinese law should govern the interpretation of the NDA and conclusorily claims that "under Chinese law an NDA cannot ... prevent a party from submitting relevant evidence to a court *as they are legally required.*"[56] The argument is frivolous.

To begin with, ZTE does not—and could not—claim that Chinese or any other law *required* it to bring its private lawsuit against Vringo. If in fact Chinese law would have required disclosure of Confidential Information in any such complaint, ZTE could have complied with Chinese law by not filing the action. That course certainly was open to it, and ZTE would have been bound to follow it if that were the only means of discharging the obligation of confidentiality it voluntarily assumed by signing the NDA. In any case, however, there is no persuasive reason to assume that ZTE was faced with such a stark choice.

There is no basis for concluding that ZTE was legally required by Chinese law to disclose the Confidential Information in and with the complaint that it voluntary filed against Vringo. ZTE relies on the declaration of Jianjun Cao, a partner of the Guanghe Law Firm in Guangdong, China, which states that "Chinese law requires proof to be filed with ZTE's complain[t]."[57] But Mr. Cao quite obviously did not claim that Chinese law requires the submission of any and all evidence, no matter the source or its confidentiality. Indeed, Mr. Cao relies on Article 121 of the Chinese Civil Procedure Law, the entirety of which states that a statement of claim must specify the parties' names, genders, ages, etc., "the claim and its supporting facts and grounds," and "evidence and the source thereof."[58] ZTE's suggestion that this basic procedural requirement obligated it to submit to the Shenzhen court Confidential Information which it explicitly had agreed not to use in any future judicial proceeding is nothing more than gamesmanship.

Vringo submitted a declaration from Douglas Clark, a barrister of the High Court of Hong Kong, who has handled, with the assistance of local counsel, hundreds of cases in the People's Republic of China, and written a treatise on patent litigation in China.[59] Mr. Clark explained that "a party has freedom to choose what evidence they file" and "there is no obligation to file all the evidence the Plaintiff relies upon when they file the case."[60] Thus, ZTE's premise that it was obligated under Chinese law to submit the Confidential Information—even assuming that Chinese law applied—is grotesquely overbroad.

**\*7** But even if we assume *arguendo* that Chinese law clearly and unambiguously required the submission of such evidence, that would not be the end of the matter. As "[a] federal court sitting in diversity jurisdiction," the Court must "apply the law of the forum state to determine the choice-of-law."[61] Generally, "[u]nder New York law ... a contract's designation of the law that is to govern disputes arising from the contract ... is determinative if the state selected has sufficient contacts with the transaction."[62] The location of a party's principal place of business is significant and generally suffices on its own to establish sufficient contacts for purposes of New York's choice of law analysis.[63]

There are more than sufficient contacts with New York to enforce the parties' designation that the NDA "shall be governed by and construed and enforced in accordance with the laws of the State of New York."[64] Vringo maintains its principal place of business in New York and sought protection under its laws when entering into the NDA.[65] ZTE knew this, executed the NDA, and then sent it back to Vringo in New York.[66] The parties, in agreeing to have the law of New York govern their contract, selected the laws of a State that has a reasonable relationship and significant contacts to the contract and that choice must be enforced by this Court.

*Second,* ZTE argues that the NDA is unenforceable under New York law because it constitutes an agreement to suppress evidence. The NDA, however, is merely an agreement between two private parties to foreclose the use of certain information in private litigation. Such an agreement is entirely permissible.

As an initial matter, New York recognizes the strong "public policy of encouraging and facilitating settlement."[67] Courts therefore routinely have maintained the confidentiality of "documents ... created specifically and directly as a result of the informal, off-the-record negotiations designed to settle claimant's claim."[68] There can be no doubt that the NDA

was entered into for the explicit purpose of facilitating candid settlement discussions.

Moreover, a private party may release a potential adversary from a private liability so long as it "evince[s] the unmistakable intent of the parties." [69] And New York law expressly permits covenants not to sue private parties. [70] ZTE conceded at argument that it could have signed a general release or a covenant not to sue that would have prevented it from bringing a private lawsuit altogether. [71] The agreement at issue here—to prohibit the parties from using in private litigation certain information obtained during settlement discussions—is considerably less restrictive than either a release or a covenant not to sue. Accordingly, it would be wholly illogical to conclude that ZTE could agree to settle its patent infringement litigation, or that it could agree not to bring any future litigation, but that it could not agree that it would not disclose settlement-related information in private litigation.

**\*8** Of course, as a matter of public policy, such an agreement cannot trump compulsory process in a grand jury investigation or in a criminal case, or perhaps in other areas. But the NDA is not an agreement to suppress evidence. Quite the contrary, the NDA explicitly permits disclosure of Confidential Information upon a request from a governmental entity or third party whether by a discovery request or a subpoena. [72] The party in receipt of the request merely is obligated to seek a protective order to afford the information the highest level of confidential treatment possible and to notify the other party. [73] In other words, the NDA specifically contemplates the possibility of disclosure through compulsory process.

Further, the legal authority on which ZTE relies plainly is distinguishable and inapposite. ZTE cites the First Restatement of Contracts for the proposition that a "[a] bargain that has for its object or consideration the suppression of evidence ... is illegal." [74] But the provision actually reads: "A bargain that has for its object or consideration the suppression of evidence by inducing witnesses to leave the State, by the destruction of documents, or otherwise, is illegal." [75] The NDA, of course, as discussed above, does no such thing.

ZTE relies also on *Cronk v. State of New York*, [76] a 1979 decision by the New York Court of Claims. *Cronk* held that

the court could not be preempted from considering a prior property appraisal where the agreement stating otherwise "was not the product of a meeting of the minds," "worked to the prejudice of the claimant[,] and was the product of an unequal bargaining position." [77] Here, however, the agreement unmistakably was entered for the explicit purpose of furthering settlement discussions, did not work to the prejudice of either party, and was not the product of an unequal bargaining position.

Moreover, *Cronk* specifically recognized that the property appraisal was admissible because it "had been used for purposes other than negotiation and settlement." [78] At most, therefore, *Cronk* stands for the proposition that parties cannot prevent a court from considering legally competent evidence that has been exchanged or used for non-settlement purposes. It therefore is distinguishable from the instant case in which the Confidential Information was disclosed for the sole purpose of facilitating a settlement.

Finally, ZTE cites *Trustees of Leake & Watts Orphan House v. Hoyle*, [79] a 1913 Westchester County case vastly different from this one. As an initial matter, that case was unrelated entirely to settlement or to the facilitation of settlement. Moreover, the court reasoned only that it could not be prevented from examining the terms of the contract itself in an "action between the parties relating to the subject matter of the contract." [80] That reasoning is neither applicable nor persuasive to the instant case.

**\*9** In sum, it was entirely lawful for Vringo and ZTE to agree that they would not use information exchanged in settlement discussions in any judicial proceedings. Vringto is highly likely to prevail on the merits of its breach of contract claim.

### C. ZTE Concedes that its Unclean Hands Defense is Inaccurate

In opposing the preliminary injunction, ZTE argued "[f]irst, and most obviously" that Vringo could not demonstrate a likelihood of success "because, if ZTE breached the NDA with its filing, that would mean plaintiffs themselves breached the same contract by submitting some of the same material to the European Commission." [81] Zhao Wang, the Senior Licensing Director of ZTE, swore under penalty of perjury, that "in the only version of Vringo's response provided to ZTE, the supposedly confidential information is fully redacted," but "[i]nexplicably, rather than withholding this

information from the tribunal (as it now demands of ZTE), Vringo instead withheld it from ZTE." [82]

But the accusation that Vringo redacted the confidential information in the version sent to ZTE but not in the version filed with the EC was based on a demonstrably and now admittedly false claim. Vringo redacted the same information in its response to the EC. [83] Accordingly, ZTE withdrew that allegation and any such inferences. [84]

In an attempt to salvage some portion of its unclean hands argument, ZTE nonetheless claims that Vringo's unredacted disclosures to the EC "are substantially similar in kind to the portions of the Shenzhen Complaint concerning 'the substance of the settlement meeting.' " [85] But ZTE has not identified a single disclosure of Confidential Information by Vringo. Thus, the Court finds that ZTE deliberately violated the terms of the NDA and then—having been caught months later with its hands in the cookie jar—falsely accused Vringo based on no evidentiary support whatsoever.

In these circumstances, Vringo has demonstrated that its likelihood of success on the merits approaches certainty.

### III. Vringo Is Threatened With Immediate and Irreparable Injury

Parties seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." [86] Such injury must be "neither remote nor speculative, but actual and imminent and ... cannot be remedied by an award of monetary damages." [87] Accordingly, the irreparable injury requirement is satisfied here if Vringo, in the absence of a preliminary injunction, probably would suffer injury in the future that could not be undone even if it prevails in this action.

#### A. Vringo Is Highly Likely to Suffer Irreparable Injury Absent a Preliminary Injunction

Vringo is likely to suffer imminent harm absent a preliminary injunction for at least two reasons.

*First,* ZTE has demonstrated that injunctive relief may be the only way to prevent it from disclosing Confidential Information. ZTE has continued to adhere to the view that "the NDA cannot be read to prohibit submission of competent evidence of an antitrust violation" despite the clear and

unequivocal language in the NDA prohibiting such disclosure in private litigation. [88] Nonetheless, ZTE has assured the Court that it "has not shared any confidential materials with any governmental agency, including the NDRC, on or after July 7, 2014, when the TRO went into effect." [89] In other words, the TRO was the reason that ZTE finally began complying with the clear and unequivocal terms of the NDA. Absent injunctive relief, it is likely to continue to disclose Confidential Information in violation of the NDA.

**\*10** *Second,* ZTE's cavalier behavior reinforces the finding of a likelihood of further dissemination of Vringo's Confidential Information absent a preliminary injunction. [90] ZTE blatantly has disregarded its NDA obligations in at least the following ways:

- A mere two months after signing the NDA, ZTE disregarded completely the obligations it had undertaken and filed a lawsuit against Vringo relying on the Confidential Information it had agreed to use or mention in any judicial proceeding.

  - ZTE also disseminated the Confidential Information to China's NDRC, perhaps leading to its investigation against Vringo.

  - Despite having no evidence whatsoever, the senior licensing director of ZTE falsely declared under oath that Vringo secretly disclosed Confidential Information to the EC.

The totality of ZTE's conduct evidences a disregard of its obligations so serious as to suggest the likelihood of future breaches of the NDA whenever ZTE, which is enmeshed in worldwide litigation with Vringo, thinks that disclosures in other *fora* or for other purposes would be to its advantage. The Court therefore finds that further disclosure of Vringo's Confidential Information is likely to occur imminently in the absence of a preliminary injunction.

#### B. The Threatened Harm to Vringo Would be Irreparable

Public disclosure of Vringo's Confidential Information would cause it irreparable injury. Vringo's business depends substantially on the value of its patent portfolio, which it licenses to third parties. [91] The disclosure of Vringo's Confidential Information, including its proposal to settle years of ZTE's alleged patent infringement, would impact the prices others would pay to obtain licenses as well as the prices

its competitors would offer for their licenses.[92] Indeed, once such commercially-sensitive information becomes public knowledge, it can "not be made secret again."[93] In short, the disclosure of that information would have a lasting and immeasurable harm to Vringo's business.

### IV. The Balance of Equities and the Public Interest Favor Appropriate Injunctive Relief

In considering the equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Additionally, in exercising their sound direction, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[94] It is helpful to consider the harm that would befall the parties and the public were the ruling on this motion, either way it is decided, ultimately to prove incorrect or inequitable.

If the Court mistakenly were to deny a preliminary injunction, ZTE would continue to disclose and rely on Vringo's Confidential Information in the Shenzhen litigation and likely to other courts and investigatory authorities, such as the NDRC, resulting in the irreparable injury described above. Vringo entered into the NDA precisely to avoid such a destructive outcome.

**\*11** On the other hand, ZTE would face no comparable harm if a prohibitory preliminary injunction were granted erroneously. Enjoining ZTE from further disclosure of Vringo's Confidential Information would prevent ZTE temporarily from referring to the material it agreed explicitly not to use in judicial proceedings.[95] In comparison to the potential harm to Vringo, there simply is no contest.

Finally, the public interest favors appropriate injunctive relief. The Court recognizes the "need for due regard to principles of international comity" and the importance of issuing anti-suit injunctions "only with care and great restraint."[96] There is no need to belabor the point because, as described in Section V.A, enjoining the proceedings in China is not appropriate at this time. But prohibitory injunctive relief would not prevent the Shenzhen court from evaluating the antitrust action and therefore would not offend the comity owed to the foreign court. Moreover, the general public does not have a right to access this material as "the presumption of access to

settlement negotiations, draft agreements, and conference statements is negligible to nonexistent."[97]

For these reasons, the balance of equities and the public interest favor appropriate injunctive relief. That is not to say, however, that Vringo is entitled to a preliminary injunction as broad as it seeks.

### V. The Scope of the Preliminary Injunction

#### A. The Court Will Not Grant an Anti–Suit Injunction

Vringo seeks to require ZTE to withdraw its Shenzhen complaint and enjoin it from pursuing the same or similar claims in that court or any other court in the Guangdong Province.

*China Trade & Development Corp. v. M.V. Choong Yong*[98] and its progeny provide the standard for determining when a court may enjoin parties before it from commencing or pursuing litigation in foreign jurisdictions. There are two threshold requirements to issuing an anti-suit injunction: (1) the parties in the two litigations must be the same, and (2) resolution of the case before the enjoining court must be dispositive of the actions to be enjoined in the foreign *fora*.[99] If these conditions are met, the court then must consider whether the injunction would "(1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment."[100]

While the parties agree that the first threshold requirement is met in this case, they disagree regarding the second. ZTE argues that an anti-suit injunction would be inappropriate because the determination of this action for breach of the NDA would not preclude a decision on ZTE's antitrust claim.[101] This Court agrees.

A decision holding that ZTE breached the NDA would not necessarily foreclose the antitrust action in the Shenzhen court. Vringo has not demonstrated that ZTE's antitrust claim relies so heavily on the Confidential Information that it necessarily would fail without it. The fact that "ZTE uses Vringo's highly confidential opening offer as the basis for its claims that the offer constitutes an abuse of power"[102] does not foreclose the possibility that ZTE provided or will provide the Shenzhen court with other evidence and reasons

from which it could conclude that Vringo abused its market position in violation of Chinese antitrust laws. The Court at this stage does not have sufficient evidence to find that resolution of this case would dispose of the antitrust case in Shenzhen, China. Accordingly, because Vringo has failed to satisfy the second threshold requirement, it is not appropriate to enjoin the Shenzhen action.

### B. A Prohibitory Injunction Will Sufficiently Protect Vringo

 **\*12**  Vringo requests alternatively that the Court order ZTE to withdraw the Confidential Information from the Shenzhen litigation and to amend its complaint to remove any reference to Confidential Information.

As discussed above, "a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." [103] This Court carefully has considered the requested relief and concludes that a mandatory injunction is not necessary in this case. Although Vringo has demonstrated a near certain success on the merits, a strong likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction would be in the public interest, it has not met the heightened showing to obtain a mandatory injunction.

Vringo likely will suffer irreparable injury from further disclosure of Confidential Information by ZTE or the Shenzhen Court. It therefore is appropriate to prohibit ZTE from any further use or reference of Confidential Information. As for the material already before the Shenzhen court, the parties have requested that the court maintain the confidentiality of all evidence and materials that were submitted, that the hearings not be conducted in public, and that it not publish any decision publicly. [104] There has been no evidence to suggest that the Shenzhen court denied the request or is likely to do so. Accordingly, while a mandatory

permanent injunction may prove appropriate after a trial on the merits, such preliminary relief is not necessary at this time.

### VI. The Bond

Rule 65(c) provides that preliminary injunctions ordinarily should be issued only upon the giving of a bond or other security. In this case, there is no reason to require security as the preliminary injunction merely requires ZTE to abide by the terms of the NDA it entered in December 2013. Moreover, ZTE neither requests a bond nor provides any basis for fixing an appropriate amount of security.

### Conclusion

For the foregoing reasons, Vringo's motion for a preliminary injunction is granted in part and denied in part. Accordingly, pending the final determination of this action, defendants, and all of their subsidiaries, officers, agents, servants and employees and those persons in active concert or participation with any of them who receive actual notice of this order, shall not use, reference, or disclose any Confidential Information, as defined in Paragraph 2 of the Non–Disclosure Agreement entered into between ZTE and Vringo, Inc., dated December 6, 2013, in any manner inconsistent with the terms of that Non–Disclosure Agreement. This includes, but is not limited to, any use, reference, or disclosure of any information provided by Vringo pursuant to the Non–Disclosure Agreement, including the December 10, 2013 presentation, in any existing or future judicial proceeding.

 **\*13**  The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 3498634

---

#### Footnotes

| | |
|---|---|
| 1 | Berger Decl. [DI 5] (hereinafter "Berger Decl. I") ¶ 3. |
| 2 | First Am. Cpt. [DI 52] (hereinafter "FAC") ¶ 14; Wang Decl. [DI 16] ¶ 3. |
| 3 | FAC ¶¶ 15–16; Wang Decl. ¶ 4. |
| 4 | Wang Decl. ¶ 2. |
| 5 | *Id.* |
| 6 | FAC ¶¶ 18–19; Berger Decl. [DI 24] (hereinafter "Berger Decl. II") ¶ 4; *see also* Wang Decl. ¶ 5. |

7    Berger Decl. II ¶ 4; Wang Decl. ¶¶ 5, 7.

8    Berger Decl. II ¶ 5; Wang Decl. ¶ 5.

9    Berger Decl. I ¶ 4; *see also* Wang Decl. ¶ 5.

10   Berger Decl. II ¶ 7.

11   *Id.* ¶ 10; Wang Decl. ¶ 5.

12   FAC Ex. A [DI 52–1] (hereinafter "NDA") ¶ 1.

13   *Id.* ¶ 2

14   *Id.* (emphasis added).

15   *Id.* ¶ 3.

16   *Id.* ¶ 10.

17   *Id.* ¶ 12.

18   Berger Decl. II ¶ 11; Wang Decl. ¶ 6.

19   Berger Decl. I ¶ 6.

20   *Id.*

21   Wang Decl. ¶ 10; Berger Decl. I ¶ 10; FAC ¶ 41.

22   FAC Ex. D (Shenzhen Complaint) [DI 52–4] at 6–7; Berger Decl. I ¶ 7.
     Vringo redacted the Confidential Information from the documents filed before this Court, but it was not redacted in the complaint filed with the Shenzhen court. *See* FAC ¶ 45 n. 2.

23   *See* Berger Decl. I ¶¶ 8–9; *see also* FAC Ex. C (Dec. 10, 2013 Presentation) [DI 52–3]; FAC Ex. E (Shenzhen Evidence List Provided by ZTE) [DI 52–5].

24   Berger Decl. I ¶¶ 7–10.

25   Berger Decl. II ¶ 13.

26   *Id.* ¶¶ 13–14; Chappatte Decl. [DI 28] ¶ 4.

27   Wang Decl. Ex. A (Ltr. from A. Berger, Vringo, to S. Jianfeng, ZTE (June 4, 2014)); Berger Decl. II ¶ 14.

28   Chappatte Decl. ¶ 6; Berger Decl. II ¶ 15.

29   Chappatte Decl. ¶¶ 6, 9, 11–13.

30   Wang Decl. Ex. C (Ltr. from S. Jianfeng, ZTE, to A. Berger, Vringo (June 24, 2014)) [DI 16–3].

31   *Id.*

32   *Id.*

33   *Id.*

34   Ltr. from L. Jian, NDRC, to A. Berger, Vringo (Jan. 12, 2015) [DI 76–1].

35   E-mail from L. Jian, NDRC, to D. Cohen, Vringo (Jan. 21, 2015) [DI 78–1].

36   *See* Mot. for Sanctions [DI 111], Ex. A at 4 (under seal).

37   TRO (July 9, 2014) [DI 13]; *see also* Tr., July 7, 2014, at 26:17–24.

38   DI 13 at 2.

39   Tr., Apr. 7, 2015, at 21:9–23.

40   *See* Order (Apr. 6, 2015) [DI 91].

41   *See* Order (Apr. 6, 2015) [DI 90].

42   *ACLU v. Clapper,* —— F.3d ——, 2015 WL 2097814, at *32 (2d Cir. May 7, 2015).

43   *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995).

44   *Id.* (internal quotation marks and citation omitted); *accord Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir.2011).

45   DI 91 at 1.

46   NDA ¶ 2.

47   Berger Decl. I ¶¶ 6, 9.

48   NDA ¶ 2 (emphasis added).

49   Wang Decl. ¶ 11.

50   Tr., July 7, 2014, at 6:15–22; 35:10–12.
     Rule 408 provides that "conduct or a statement made during compromise negotiations about the claim" "is not admissible ... either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."

51    The qualification refers to the limited exception referred to previously for disclosure pursuant to compulsory process.

52    *See* Berger Decl. II ¶ 10.

53    *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569 (2002).

54    The Court's finding on this issue, like all findings at this stage, is provisional only and may change in light of future evidence.

55    Though it is not necessary to the resolution of this motion, the Court notes that ZTE may have sought by its gambit to obtain immunity for its breach of the NDA in the Shenzhen action. ZTE requested a reciprocal waiver for information exchanged under the NDA "that is of direct relevance to the complaint ZTE has filed with the European Commission." DI 16–3. Both the settlement offer and presentation that ZTE already had disclosed to the Shenzhen court fit that description. In other words, ZTE appears to have taken advantage of Vringo's lack of awareness of the Shenzhen lawsuit and attempted to obtain a waiver that arguably could have provided ZTE immunity for its disclosure of the Confidential Information to the Shenzhen court. In any case, its actions suggest awareness of the wrongfulness of its conduct.

56    ZTE Mem. of Law in Opp'n. to Mot. for Prelim. Inj. [DI 14], at 21 (emphasis added).

57    Cao Decl. [DI 15] ¶ 5.

58    *See* Cao Decl. Ex. A (Civil Procedure Law of the People's Republic of China) [DI 15–1], Art. 121.

59    Clark Decl. [DI 6] ¶¶ 1, 2.

60    Clark Decl. [DI 25] ¶ 9.

61    *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir.2001).

62    *Zerman v. Ball,* 735 F.2d 15, 20 (2d Cir.1984) (citations omitted); *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines,* 230 F.3d 549, 556 (2d Cir.2000) ("New York law is clear [that] in cases involving a contract with an express choice-of-law provision ... a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.").

63    *See Finucane v. Interior Constr. Corp.,* 264 A.D.2d 618, 620, 695 N.Y.S.2d 322, 325 (1st Dept.1999); *cf. Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 366 (2d Cir.2003) (recognizing that "the choice of New York law would be reasonable, and hence enforceable, if [plaintiff's] 'principal place of business' were in New York, creating significant contacts in the state").

64    NDA ¶ 12.

65    See Berger Decl. II ¶ 2.

66    *Id.* ¶ 10; Wang Decl. ¶ 5.

67    *Crow–Crimmins–Wolff & Munier v. Westchester Cnty.,* 126 A.D .2d 696, 697, 511 N.Y.S.2d 117, 119 (2d Dept.1987) (recognizing that "observations made for the stated purpose of arriving at a settlement agreement, and expressly not for litigation ... should likewise generally be protected by the same public policy of encouraging attempts at settlement").

68    *E.g., Randall Elec., Inc. v. State,* 150 A.D.2d 875, 876–77, 540 N.Y.S.2d 901, 902 (3d Dept.1989).

69    *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 515 (2d Cir.2001) (internal quotation marks and citation omitted).

70    *Kamfar v. New World Rest. Grp., Inc.,* 347 F.Supp.2d 38, 50 (S.D.N.Y.2004).

71    Tr., June 7, 2014, at 9:11–24.

72    NDA ¶ 3 (providing that upon such request the party is obligated to "(i) maintain the confidentiality of the Confidential Information," (ii) "timely seek a protective order or other similar means of protection that would afford the information ... the highest level of confidential treatment possible (including but not limited to 'attorneys' eyes only' or a similar designation)," and (iii) "notify the other Party within three business days" of the request).

73    *Id.*

74    DI 14 at 22.

75    RESTATEMENT (FIRST) OF CONTRACTS § 554 (1932).

76    100 Misc.2d 680 (N.Y.Ct.Cl.1979).

77    *Id.* at 683, 687.

78    *Id.* at 683.

79    79 Misc. 301 (N.Y.Sup.Ct.1913).

80    *Id.* at 304.

81    DI 14 at 19–20.

82    Wang Decl. ¶ 14.

83    Chappatte Decl. ¶¶ 9, 11–13.

84   *See* Ltr. from P. Straus, ZTE, to Court (Aug. 5, 2014) [DI 44].

85   *Id.*

86   *Winter,* 555 U.S. at 22 (citations omitted).

In *Winter,* the Supreme Court held that the " 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original) (citations omitted). It did not however elaborate as to what level of certainty is required to establish a likelihood of irreparable harm.

In citing *Winter's* requirement that irreparable injury be *likely* absent an injunction, ZTE goes on to claim that the Second Circuit in *Citigroup Global Markets, Inc. v. VCG Special Opps. Master Fund Ltd.,* 598 F.3d 30 (2d Cir.2010), "held that ... 'likely' means 'a greater than fifty percent probability.' " ZTE Supp. Mem. of Law [DI 40], at 5 n. 4. Again, ZTE has mischaracterized the case law. The Second Circuit there stated the following: "[W]e take VCG's position to be that the standard articulated in these three Supreme Court cases requires a preliminary injunction movant to demonstrate that it is more likely than not to succeed on its underlying claims, or in other words that a movant must show a greater than fifty percent probability of success on the merits." *Citigroup,* 598 F.3d at 34–35. *First,* the statement expressly describes a litigant's position, not that of the Second Circuit. *Second,* the statement relates to the likelihood of success requirement, not irreparable harm. *Third,* the statement—even had it been the Second Circuit's view of the likelihood of irreparable harm (which it was not)—would have been *dicta,* not a holding.

The Court has not identified any requirement that threatened irreparable harm be more likely than not. Nonetheless, there is no need to decide that question because irreparable harm to Vringo is highly likely.

87   *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332 (2d Cir.1995).

88   ZTE Opp'n. to Mot. to Compel [DI 82] at 4.

89   *Id.* at 2.

90   *See EEOC v. KarenKim, Inc.,* 698 F.3d 92, 100–01 (2d Cir.2012) (vacating the district court's denial of injunctive relief because the character of past violations rendered it likely that nothing would prevent the recurrence of misconduct absent a permanent injunction).

91   *See* Berger Decl. I ¶ 11.

92   *Id.*

93   *Ruckelshaus v. Monsanto Co.,* 463 U.S. 1315, 1317 (1983).

94   *Winter,* 555 U.S. at 24 (internal quotation marks and citations omitted).

95   Were the Court erroneously to require ZTE to withdraw its Shenzhen complaint, ZTE would face a delay in its ability to litigate its pending antitrust action against Vringo. ZTE has not asserted that it would be unable to refile its Shenzhen lawsuit against Vringo after a trial on the merits in this case. Nonetheless, the Court need not consider seriously this potential harm to ZTE as it separately has determined that an anti-suit injunction would not be appropriate.

96   *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 35 (2d Cir.1987) (internal quotation marks and citations omitted).

97   *United States v. Glens Falls Newspapers, Inc.,* 160 F.3d 853, 858 (2d Cir.1998).

98   837 F.2d 33 (2d Cir.1987).

99   *Id.* at 36; *see also Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 119 (2d Cir.2007).

100   *Karaha Bodas,* 500 F.3d at 119 (alterations, ellipses, internal quotation marks, and citations omitted).

101   DI 40, at 2–3.

102   Berger Decl. ¶ 7.

103   *Tom Doherty,* 60 F.3d at 34 (internal quotation marks and citation omitted).

104   *See* Vringo Pet. for Confidentiality [DI 55–1]; ZTE Req. for Not Being Heard in Public [DI 57–1].

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.