UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
HC2, INC.,

                 Plaintiff,                    1:20-cv-03178-LJL

        -against-

ANDREW DELANEY,

                 Defendant.
--------------------------------------------------------------------x

<u>DEFENDANT'S MEMORANUM OF LAW IN OPPOSITION TO MOTION TO DISMISS</u>

**Table of Contents**

PRELIMINARY STATEMENT…………………………………………………………………..1

STATEMENT OF FACTS………………………………………………………………………..1

ARGUMENT…………………………………………………………………………….....5

I.       THE LEGAL STANDARD………………………………………………………….....5

II.      THE COUNTERCLAIMS AS A WHOLE ARE GENERALLY SUFFICIENT…………6

III.     HC2 SUBSTITUTES ITS OWN FACTS FOR DELANEY'S……………………………7

IV.      COUNTERCLAIMS   ONE   (FRAUDULENT   INDUCEMENT)   AND   TWO
(FRAUDULENT MISREPRESENTATION) ARE VALID……………………………………..8

V.       COUNTERCLAIM THREE (WHISTLEBLOWER RETALIATION) IS VALID……...10

VI.      COUNTERCLAIM   FOUR   (BREACH   OF   CONFIDENTIAL   RELATIONSHIP)   IS
VALID…………………………………………………………………………………...13

VII.     COUNTERCLAIM   FIVE   (INTENTIONAL   INFLICTION   OF   EMOTIONAL
DISTRESS) IS VALID………………………………………………………………………..14

VIII.    COUNTERCLAIM SIX (INVASION OF PRIVACY) IS VALID……………………..16

IX.      COUNTERCLAIM SEVEN (FAILURE TO PAY N.Y. SICK LEAVE) IS VALID……16

X.       COUNTERCLAIM VIII (DEFAMATION PER SE) IS VALID………………………..17

XI.      COUNTERCLAIM IX (ABUSE OF PROCESS) IS VALID……………………………23

XII.     DELANEY WITHDRAWS RULE 11 SANCTIONS CLAIM………………….………24

CONCLUSION…………………………………………………………………………..……24

## Table of Authorities

*Abdullahi v. Pfizer, Inc.,* 562 F.3d 163 (2d Cir. 2009)……………………………...……………………5

*Arista Records LLC v. Doe*……………………………………………………………………......6

*B & M Linen, Corp. v. Kannegiesser, USA, Corp.,* 679 F. Supp. 2d 474 (S.D.N.Y. 2010)………..10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)……………………………….……….……6

*Boyd v. Nationwide Mut. Ins.,* 208 F.3d 406 (2d Cir. 2000)…………………………………23

*Burrow By and Through Burrow v. Postville Cmty. Sch. Dist.*, 929 F. Supp. 1193 (N.D Iowa 1996)…………………………………………………………………………………………..14

*Conley v. Gibson*, 355 U.S. 41 (1957)……………………...……………………………………6

*Copantitla v. Fiskardo Estiatorio Inc.*, 788 F. Supp. 2d 253 (S.D.N.Y. 2011)……………………11

*Front, Inc., v. Philip Khalil*, No. 19, 2015 WL 750965 (N.Y. Feb. 24, 2015)……………………18

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204 (S.D.N.Y. 2007)……………………………………………………………………………………..…..9

*Murphy v. Board of Educ. of Rochester City School Dist.,* 420 F. Supp. 2d 131 (W.D.N.Y. 2006)……………………………………………………………………………………..…24

*Robledo v. No. 9 Parfume Leasehold*, No. 12-CV-3579 (ALC)(DF), 2013 WL 1718917 (S.D.N.Y. Apr. 9, 2013)…………………………………………………………………………………..11

*Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988)……………………….…………6

*Tonra v. Kadmon Holdings, Inc.* 405 F. Supp. 3d 576 (S.D.N.Y. 2019)…………………………11

*Travis v. Alcon laboratories, Inc.*, 202 W. Va. 369, 382 (W. Va. Sup. Ct. App. 1998)…………...14

*U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605 (S.D.N.Y. 2008)……………5

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104 (2d Cir. 2008)……………………………………………………………………………………...5

*Yukos Capital S.A.R.L. v. Feldman*, No. 15-CV-4964 (LAK), 2016 WL 4940200 (S.D.N.Y. Sep. 14, 2016)……………………………………………………………………………18, 22, 34

**<u>Other authorities</u>**

Executive Order Number 202 of Gov. Andrew Cuomo (March 7, 2020)…………………………………………………………………...……...….2

Fair Labor Standards Act………………………………………………………12

Fed. R. Civ. P. R. 8(a)……………………………………………………..…..7

Fed. R. Civ. P. R. 11……………………………………………………..…..24

Fed. R. Civ. P. R. 12(b)(6)………………………………………...6, 7, 23

New York City Earned Sick Time Act……………………………………...16

N.Y. Civ. Rights L. §§ 50 and 51……………………………………………16

N.Y. Labor Law § 740 and § 215……………………………….…………...3, 10

PRELIMINARY STATEMENT

1.      Firstly, while repeating its standard line that counterclaim plaintiff Andrew Delaney's ("Delaney") counterclaims dated May 13, 2020, unlike its own claims, are "nonsensical"[1] (p. 1), this is just a personal opinion and not a legal argument.

2.      Secondly, on a motion to dismiss all allegations have to be accepted to be true. HC2's motion should be rejected, and this lawsuit should proceed to discovery.

3.      Finally, this is not a motion for summary judgment.    Instead of arguing that Delaney has not stated counterclaims, HC2 is arguing that Delaney's counterclaims cannot be proven with admissible evidence.  The Court cannot make such a determination, which would be tantamount to a ruling on a motion for summary judgment, based upon HC2's conclusory assertions that it is impossible for Delaney to prove his case.

STATEMENT OF FACTS

4.      This is one of the first cases involving issues arising out of the "COVID-19" coronavirus in the United States.

5.      From September 30, 2019-January 3, 2020 and February 18, 2020-March 17, 2020, Delaney, a gig economy worker, worked for HC2, a job agency, on a Thai language document review for a foreign corporation.

6.      On November 28, 2019 (Thanksgiving holiday), Delaney unexpectedly received an email to his personal email account from a well-connected, influential tax lawyer who Delaney

---

[1] "'Mr. Delaney's nonsensical and meritless counterclaims are utterly false,' said HC2 counsel Ron Rossi in an email to Law360 on Thursday."
https://www.law360.com/articles/1273923/wilmerhale-toyota-agent-hit-by-atty-s-20m-virus-countersuit

1

knew from years ago from the Harvard Club of Thailand and who was on the other side of the review (the "Thai email").

7.      From around November 29, 2019-December 2, 2019, Delaney complained to HC2 and its agents about the disclosure of his private information and involvement in this document review and the misappropriation of the Thai email to the foreign corporation and applied for new work.[2]

8.      On March 7, 2020 – 10 days before he was fired – New York State Governor Andrew Cuomo declared a state of emergency.[3]

9.      On March 17, 2020, at 11:27 AM EST, Delaney emailed HC2 and its agents copied to his co-workers and complained to them that workers were coming into the office with flu-like symptoms and asked if he could either work remotely or if they could stay at home with pay while still being on the document review.

10.     At 11:40 AM EST (12 minutes after Delaney's email), Michael Posada of the law firm was the first to respond by emailing two of his colleagues "Subject:  FW: Work conditions." (Exhibit A attached to the Rotman declaration in opposition to the motion to dismiss (the "Posada email/Hartstein email"))

---

[2] Contrary to the motion to dismiss' false narrative that "Counterclaimant's allegations of harm stemming from the alleged disclosure of his involvement are belied by his allegation that he did not apply for other work or leave the review until over a month later, on January 3, 2020" (emphasis added)[2] (p. 19), on December 2, 2020 Delaney immediately began to apply for other opportunities.  Proving how HC2 literally makes things up, paragraph 10 of Defendant's verified answer and counterclaims states: "After being double-crossed by HC2 and the law firm, Delaney immediately applied for other work and left."

[3] On March 7, 2020, Gov. Cuomo issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York.  It stated "January 30, 2020, the World Health Organization designated the novel coronavirus, COVID-19, outbreak as a Public Health Emergency of International Concern."
https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york

11.      However, HC2 <u>redacted the entire Posada email</u>.[4]

12.      But the possible content in the Posada email is suggested by the next email in the chain which is at 11:55 AM EST (28 minutes after Delaney's email) in which Brian Hartstein of HC2 emailed the law firm: "Can we fire him?  Just a thought."[5]

13.      At 12:17 PM EST (50 minutes after Delaney's email), Hartstein emailed Joan Davison, Asnes, and Patti Ayala of HC2 saying "Please see below…this guy caused this."

14.      In its Exhibit A to its motion to dismiss, HC2 presents a single standalone email from Denise Asnes of HC2 sent at 1:10 PM EST (103 minutes after Delaney's email).

15.      This was in order to support HC2's after-the-fact argument that the document review was "suspended", not "terminated,"[6] even though Asnes herself states:  "We are requesting all team members to gather their belongings and depart the facility in an orderly fashion since the project is effectively ending." (Exhibit A to HC2's motion to dismiss)

16.      <u>After</u> he was terminated,[7] Delaney contacted a New York labor lawyer, Christopher Davis, who advised him that in his opinion this was an unlawful termination in violation of N.Y. Labor Law § 740 and § 215.

---

[4] This was the only document produced by HC2 marked "Redacted" rather than "Privileged" or "Confidential" i.e. there is no legal basis for the redaction.  On June 1, 2020, Delaney's counsel emailed HC2's counsel requesting the unredacted Posada emails but HC2 refused to even answer.

[5] The redacted Posada email and the Hartstein email, which were the first responses to Delaney's coronavirus email, show an immediate desire to terminate him after his complaint.

[6] In any case, this is an issue for the trier of fact.

[7] On p. 1 of its motion to dismiss HC2 falsely states with its usual zero proof "…Counterclaimant decided to recast himself as a whistleblower.  A status he conferred upon himself by virtue of the fact that, on March 17, 2020, on what turned out to be the last day of work, he had complained that three workers had come into the office that day with what he characterized as 'flu-like symptoms'."  The only reason March 17, 2020 "turned out to be the last day of work" was not a coincidence but was <u>because</u> of Delaney's complaint.  The emails show that HC2 and the law firm

3

17.     On March 30, 2020, HC2's general counsel Zannikos sent an email to Davis stating that "Hire Counsel lawfully terminated his employment." It further stated: "We hope that this email clarifies….the circumstances around Hire Counsel's decision to terminate his employment."[8]

18.     On April 15, 2020, Delaney filed a *John Doe* complaint against the corporation and two others in the Eighteenth Judicial Circuit Court of Florida in Brevard County which at the time was his present and foreseeable refuge residence pending the uncertain outcome of the coronavirus.

19.     On April 22, 2020, HC2 filed the complaint in this case in the Southern District of New York naming Andrew Delaney individually as defendant including requests for a temporary restraining order ("TRO") and preliminary injunction ("PI") and proposed *ex parte* order to show cause seeking emergency relief.

20.     On April 22, 2020, the Court denied HC2's request for *ex parte* relief and ordered the parties to meet and confer on a briefing schedule for HC2's application for a TRO and PI.

21.     On April 24, 2020, Delaney voluntarily withdrew and sealed the Florida *John Doe* complaint.

22.     On April 29, 2020, the TRO hearing, the Court rejected HC2's proposed TRO order and entered its own TRO.

---

partner had decided at 12:15 PM EST (48 minutes after Delaney's coronavirus email) to continue the document review in Los Angeles, the HC2 center for it, and London, where there were four Thai reviewers, but not in New York, where Delaney was located.  This was not an accident.  The motion to dismiss admits this "the document review had been suspended in New York" (p. 13).  It was clearly targeted at Delaney.

[8] This did not stop HC2 from fabricating in the complaint and the motion to dismiss that Delaney had not been terminated.  *See* footnote 10 to the counterclaims.

23.     On May 6, 2020, the Court held a telephone status conference.

24.     On May 7, 2020, the Court so ordered a Case Management Plan and set a briefing schedule for the PI.

25.     On May 13, 2020, Delaney filed an answer to the complaint and counterclaims against HC2.

26.     On May 22, 2020, HC2 filed a motion for a PI.

27.     On May 26, 2020, the Court heard oral arguments for and against HC2's PI application and reserved decision to be issued by telephone conference the next day.

28.     On May 27, 2020, the Court denied HC2's motion for a PI and found that HC2 had not met its burden for a PI based on two independent reasons in that HC2 failed to show a likelihood of success on the merits and failed to demonstrate a threat of irreparable harm.

29.     On June 3, 2020, HC2 filed a motion to dismiss Delaney's counterclaims.

<u>ARGUMENT</u>

I.     <u>LEGAL STANDARD</u>

30.     On a motion to dismiss, the Court must assume that all of the facts alleged in the counterclaims are true, construe those facts in the light most favorable to the counterclaim plaintiff, and draw all reasonable inferences in favor of the counterclaim plaintiff.  *See Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 169 (2d Cir. 2009); *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.,* 517 F.3d 104, 115 (2d Cir. 2008); *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605, 606 (S.D.N.Y. 2008).

31.     Judgment on the pleadings is appropriate only where all material facts are undisputed and "a judgment on the merits is possible merely by considering the contents of the pleadings."  *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

## II.     THE COUNTERCLAIMS AS A WHOLE ARE GENERALLY SUFFICIENT

32.     After arguing for the last two months about the illegality of Delaney's mentioning anything about his work, and after itself using synthetic defined terms in its complaint and redacting most of the content from the documents it produced, HC2 is now saying that the counterclaims are not pled with sufficient particularity to put it on notice of the claims against it. Delaney has scrupulously avoided making too specific allegations that might be deemed to breach confidentiality.

33.     Detailed factual allegations are not required in order for a complaint to survive a Fed. R. Civ. P. R. 12(b)(6) motion; the plaintiff need merely "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

34.     In *Twombly*, the Supreme Court held that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint" *Id.* at 563 (emphasis added).

35.     In *Arista Records LLC v. Doe*, 604 F.3d 120-121 (2d Cir. 2010), the Second Circuit explained that it would be "impermissible" to require a plaintiff to plead any "specific evidence or extra facts beyond what is needed to make the claim plausible."

36.     HC2 argues that Delaney's claims for breach of a confidential relationship, intentional infliction of emotional distress, and invasion of privacy must all be dismissed because

it has a different interpretation of the Thai email i.e. that it knows more than Delaney does about a Thai communication.  (p. 3)

37.   Application of the legal standards set forth above supports the general denial of the motion to dismiss and the specific denial as to these three claims.

38.   HC2 has not met its burden of showing that Delaney has failed to plead claims for relief that are plausible on their face under *Twombly* and *Arista Records*.

39.   HC2 does not contend that the counterclaims omit elements required by Fed. R. Civ. P. R. 8(a).

40.   Fed. R. Civ. P. R. 12(b)(6) on which HC2's motion to dismiss is based applies only when a party advances a defense, by motion, of "failure to state a claim upon which relief can be granted," and is not about whether Delaney can meet the evidentiary standards applicable upon summary judgment or at trial.

III.   HC2 SUBSTITUTES ITS OWN FACTS FOR DELANEY'S

41.   A perfect example of how HC2 misrepresents the facts is the section of its motion to dismiss titled "Facts Alleged in the Counterclaim[9] (sic)" (pp. 3-4).

42.   Instead of quoting the actual language of the counterclaims, HC2 instead falsely presents the "Facts" section of the answer and counterclaims.

43.   HC2 even attributes to Delaney's "Facts" a quote from its own complaint: (p. 4)

- Later that same day, the Law Firm Customer suspended the document review and did not authorize remote work for Counterclaimant or any of the other New York reviewers. (Compl. ¶ 21.)

[9] There are nine counterclaims, not one.  But this singular "counterclaim" goes to the heart of HC2's misrepresentation and misquoting of facts.

44.     This quote <u>from its own complaint</u> paragraph 21 is what HC2 calls "a summary of the operative facts as alleged in the Counterclaim (sic)." (p. 3)

IV.   <u>COUNTERCLAIMS ONE (FRAUDULENT INDUCEMENT) AND TWO (FRAUDULENT MISREPRESENTATION) ARE VALID</u>

45.     The counterclaims adequately plead fraud by omission or silence by stating what the omissions were (paragraphs 24-26 of the counterclaims), that HC2 was responsible for them, the context and the manner in which they misled Delaney (paragraph 19 of the counterclaims states:  "These misrepresentations or material omissions of fact were made for the purpose of inducing Delaney  to rely on it and them, Delaney justifiably relied on it and them in agreeing to work and continuing  to work on the document review, and he was injured as a result of that reliance."), and what HC2 obtained by the fraud (paragraph 25 of the counterclaims:  "HC2 was only interested in making a 'cut' of Delaney's work….").

46.     The motion to dismiss then incorrectly states that "Counterclaimant fails, however, to allege facts sufficient to demonstrate that, at the time these alleged misrepresentations were made (whenever that was), HC2 believed them to be false." (p. 8)

47.     Paragraph 24 of the counterclaims states: "Firstly, HC2 fraudulently misrepresented that its office would be a safe and 'healthful' working environment.  This representation was known to be false when it was made or made recklessly without knowledge of its truth.  HC2 had Delaney come into the office during the coronavirus despite the unlawful, unsafe, and unhealthy public health issues present there."

48.     Paragraph 25 of the counterclaims avers: "Secondly, HC2 fraudulently misrepresented that this was a normal document review which would not involve any dangerous issues or personal risks to Defendant.  This was either because HC2 was only interested in making

a 'cut' of the Delaney's work and had no idea what the document review was about or what was happening in Asia, or that it knew but deliberately did not disclose this to Delaney."

49.     Paragraph 26 of the counterclaims further avers: "HC2 knew perfectly well the risks of having Delaney's information and work be with the foreign company."

50.     The cases cited by HC2 that there needs to be a specific "time", which was adequately alleged to be between the times he was solicited on September 13, 2019 until the time he started on September 30, 2019, are inapposite because Delaney alleged  misrepresentations through omission or silence.

51.     HC2 misquotes an opinion of the United States District Court for the Southern District of New York:  "Furthermore, when alleging fraud based on concealment by omission, 'the complaint must allege: (1) what the omissions were (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud.'  *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007)" (p. 7)

52.     However, what the *Manhattan Motorcars* holding <u>actually says</u> is:  "In the case of fraudulent concealment or omission, <u>where the plaintiff is unable to specify the time and place</u> <u>because no act occurred,</u> the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud." (emphasis added)

53.     The motion to dismiss conveniently leaves out the words "where the plaintiff is unable to specify the time and place because no act occurred" because they contradict its argument

that Delaney had to specify the time and place, which is not logically possible in an allegation, as here, of fraudulent concealment or omission.

54.     The motion to dismiss' citation of *B & M Linen, Corp. v. Kannegiesser, USA, Corp.,* 679 F. Supp. 2d 474, 482 (S.D.N.Y. 2010)("'Defendants made certain representations with respect to the manner in which they would handle their operations' is too vague to satisfy Rule 9")(p. 7) is similarly misplaced because here Delaney has alleged more than vague "certain representations".

55.     HC2 's contends that "[e]ach of the alleged misrepresentations is also not actionable because Counterclaimant's work for HC2 was governed by an employment agreement." (p. 8)

56.     These claims are independent of any employment agreement.

57.     Also, Delaney did not counterclaim for breach of contract so the fraud claims did not "restate" any contract claim. (pp. 8-9)

58.     While the motion to dismiss argues "Counterclaimant has failed to allege facts that lead to any inference, much less the required strong inference, that HC2 acted with the requisite fraudulent intent" (p. 2), Delaney did allege such intent:  "This was either because HC2 was only interested in making a 'cut' of the Delaney's work and had no idea what the document review was about or what was happening in Asia, or that it knew but deliberately did not disclose this to Delaney." (paragraph 25 of the counterclaims)

V.     COUNTERCLAIM THREE (WHISTLEBLOWER RETALIATION) IS VALID

59.     The motion to dismiss seeks to dismiss Delaney's whistleblower claim under N.Y. Labor Law § 740 and § 215 on the grounds that "HC2 did not 'terminate' Counterclaimant, but instead advised him that the document review had been suspended in New York." (p. 13)   As

corroboration that the document review had been terminated, Zannikos testified at his deposition that it has not resumed in New York or anywhere else.

60.     Moreover, in a motion to dismiss, the facts as stated in the counterclaims have to be taken as true.

61.     But the motion to dismiss goes on: "his allegations cannot be accepted as true and the document's plain language controls." (p. 14)

62.     As per paragraph 14 *supra*, HC2 also ignores the earlier and later email chains showing an almost immediate desire and decision to terminate Delaney.

63.     HC2's contention that Delaney was still working for it without pay is not credible, in Asnes' words:  "We will continue to monitor the efforts of Congress in helping to off-set the impact of lost work."  HC2 was already pointing its ex-temporary workers in the direction of the government for any compensation.

64.     In addition, the motion to dismiss miscites *Tonra v. Kadmon Holdings, Inc.* 405 F. Supp. 3d 576, 586 (S.D.N.Y. 2019), for the proposition that "[T]he employee's complaint to the company must identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct."  (p. 12)

65.     But *Tonra* holds: "At the pleadings stage of the case, the complaint 'need not specify the actual law, rule or regulation violated....'" *Id.* At 586.

66.     The motion to dismiss also cites *Copantitla v. Fiskardo Estiatorio Inc.*, 788 F. Supp. 2d 253 (S.D.N.Y. 2011) but that case was in the context of a motion for summary judgment.

67.     It also cites *Robledo v. No. 9 Parfume Leasehold*, No. 12-CV-3579 (ALC)(DF), 2013 WL 1718917 (S.D.N.Y. Apr. 9, 2013), for the proposition that:  "Counterclaimant has not

11

alleged that HC2's conduct violated any specific provision of the Labor Laws or that his complaint on March 17 was related to such a violation." *Id*. at *7.

68.     However, as per *Tonya* above, this is not required at the pleading stage.

69.     Also, *Robledo* is distinguishable because that was a case under the Fair Labor Standards Act (the "FLSA") where in the proposed amended complaint the plaintiff did not assert "that Defendants retaliated against Plaintiff (or any other proposed named plaintiff) for asserting a statutory rights under the FLSA", whereas here Delaney alleged retaliation.

70.     HC2 additionally argues about Delaney's March 17, 2020 notification that "the alleged harm that results from the complained of violation (whatever it is), must affect the public-at-large, not just the individual employee." (p. 3)

71.     However, on the face of it, his notification was a general public health complaint applicable to all HC2's employees at 360 Lexington Avenue, not only to himself.

72.     HC2 argues that Delaney fails to allege any policy violation, despite his alleging that "HC2 also did not comply with paragraph 604 of its own Handbook which states: 'Report immediately to your supervisor any indications that the environment is not being maintained in a safe and healthful fashion.'" (paragraph 31 of the counterclaims)

73.     The fact that Delaney made a general public health complaint is proven by the fact that HC2 terminated all Thai document reviewers in the New York office, not only Delaney.

74.     The termination email made no mention of COVID-19 or any public health and safety concerns and was purely project management and client retention driven.

12

75.     Since the counterclaims alleged that "document review is similar to a call center", Delaney's complaint was also relevant to coronavirus office closures at other agencies where they were starting to have workers test positive.[10] (paragraph 13 of the counterclaims)

76.     The importance of employers' inadequate responses to the coronavirus as a public health issue is highlighted by New York Attorney General Letitia James' investigation of Amazon, Inc.[11]

77.     Finally, HC2 states: "Finally, Counterclaimant has failed to plausibly allege that HC2 took adverse action against him as a result of his March 17 email" (p. 13), which is flatly untrue since it is clear that he was immediately fired after sending out the email.  If there is anything that should be conceded it is that the defendant-counterclaimant suffered an adverse action against him 103 minutes after he sent his email raising safety concerns.  His immediate termination was not stated to be related to any safety or COVID-19 concerns.

VI.     COUNTERCLAIM  FOUR  (BREACH  OF  CONFIDENTIAL  RELATIONSHIP)  IS VALID

---

[10] Prior to March 17, 2020, Tower Legal Solutions had one person test positive, closed all offices, and went to remote work only.  Epiq Systems, Inc. had one employee test positive at its 48th Street office in Manhattan, closed all offices, and went to remote only.  KL Discovery, Inc. had one employee test positive and went to all remote.  Update Legal, Inc. went to remote.  Special Counsel moved all of its over 1,000 reviewers to remote in early March.  HC2 was not following the market practice of the agencies at the time of his complaint.  In its emails after Delaney's complaint HC2 does not evince any real concern about the coronavirus.

[11] "NYC Amazon workers interviewed as part of AG Letitia James' probe into 'inadequate' coronavirus response", N.Y. Daily News, June 12, 2020 ("James is investigating whether Smalls' axing was an act of illegal retaliation. She's also looking into whether Amazon failed to follow health protocols by not providing workers with enough protections during the pandemic, which has killed more than 17,000 city residents.").
https://www.nydailynews.com/coronavirus/ny-coronavirus-state-attorney-general-amazon-protections-20200612-mbpucxoosjcfroyisjfbj6rh6i-story.html

78.     HC2's motion to dismiss denies there was any confidential relationship between HC2 and Delaney.[12]  But in his deposition, HC2's general counsel testified to the contrary.[13]

79.     Demonstrating HC2's continuing violation of Delaney's confidentiality and privacy rights and its own policies for resume submissions,[14] even after he filed an answer and counterclaims on May 13, 2020 and while continuing the blocking of 46 of the 48 exhibits to Rotman's declaration, on May 22, 2020 HC2 posted Delaney's resume on the case docket as exhibit 1 to docket no. 44 (the declaration of Michael R. Heyison).[15]

80.     HC2 through its counsel has been relentlessly uber-protective of its own client's confidentiality while it has been reckless with regard to Delaney's.

## VII.   COUNTERCLAIM   FIVE   (INTENTIONAL   INFLICTION   OF   EMOTIONAL DISTRESS) IS VALID

81.     HC2 argues that Delaney cannot make a claim for intentional infliction of emotional distress regarding the disclosures about him to the other side because he continued to work there ignoring that he immediately complained about it when it happened at the end of November 2019.

---

[12] While the motion to dismiss states that Delaney "hedges by accusing HC2 as well as nonparties Law Firm Customer and the Corporate Client of the disclosure" (footnote 5), HC2's failure to stop the outrageous actions of another may itself be outrageous. See *Travis v. Alcon laboratories, Inc.*, 202 W. Va. 369, 382 (W. Va. Sup. Ct. App. 1998); *Burrow By and Through Burrow v. Postville Cmty. Sch. Dist.*, 929 F. Supp. 1193, 1210 (N.D Iowa 1996).

[13] "Q    Did HC2 have an obligation to protect Mr. Delaney's privacy and confidentiality?  A    There may be legal obligations on the company to protect personal information that belongs to Mr. Delaney." Zannikos deposition dated May 19, 2020 at p. 34.

[14] *Cf.* footnote 15 to Delaney's counterclaims ("'Hire Counsel uses Human Resource personal information for limited purpose that includes complying with employment related laws and regulations as well as for payroll purposes.'). https://www.hirecounsel.com/wp-content/uploads/2018/12/Hire-Counsel-Global-GDPR-Data-PrivacyPolicy_120618.pdf").

[15] In so doing, HC2 violated the protective order in this case.  It marked the document at the top "CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER" but nonetheless filed it on the public docket.

82.     This overlooks the fact that, once the other side already knew about his involvement, the "cat was out of the bag" and the damage was already done and irreversible.

83.     Delaney's fear and distress was in connection with his safety upon his inevitable eventual return to Thailand and his continuing business relationships there.

84.     Additionally, HC2 and the law firm assured Delaney that they would be conducting an investigation.

85.     Delaney did not have to quit as a precondition for suing for intentional infliction of emotional distress.

86.     HC2's and its agents' conduct was reckless in connection with the protection of Delaney's identity.[16]

87.     HC2 states "Counterclaimant refers generally to 'the other side' without ever alleging who the 'other side' is" (p. 18) when Delaney clearly alleged that this was to "persons on the other side of the review" in Thailand (paragraph 8 of the counterclaims), when Delaney gave the law firm a copy of the Thai email on November 29, 2019, and when the Thai email was also requested and produced in Defendant's document production sent May 13, 2020 at pp. D4-D5.[17] Delaney expects the evidence to show that the other side are well-connected and influential lawyers and local business people looking out for the corporation's interests in Thailand and constantly seeking to curry favor with it.  Some knowledge of doing business in Thailand is required to understand this.  Disrupting these delicate networks have caused emotional distress to Delaney's personal safety and business relationships there.

---

[16] *See* footnote 12 *supra*.

[17] In fact, HC2 used the Thai email produced by Delaney as an exhibit to its own filings.

88.     HC2's argument that "Finally, Counterclaimant cannot maintain a claim for IIED with respect to HC2's statements in this litigation, which are protected by litigation privilege" is inapplicable (p. 19).  Delaney is not basing the intentional infliction claim solely on "statements in this litigation".  Allegations of HC2's and its agents' outrageous conduct are merely exacerbated by the litigation but are not borne by it.

VIII.   COUNTERCLAIM SIX (INVASION OF PRIVACY) IS VALID

89.     Delaney did not make a common law invasion of privacy claim against HC2, which is what most of HC2's argument is about as to Counterclaim Six, but invoked that "N.Y. Civ. Rights L. §§ 50 and 51 protect Delaney's identity from unauthorized commercial use and recognize a person's right to be left alone." (paragraph 44 of the counterclaims)

90.     This allegation is sufficient to sustain the claim and to survive the motion to dismiss.

IX.     COUNTERCLAIM SEVEN (FAILURE TO PAY N.Y. SICK LEAVE) IS VALID

91.     HC2 argues that it does not have to pay Delaney for his accrued sick time because amendments to Section 196-b have not taken effect yet.

92.     However, the revised New York City Earned Sick Time Act requiring employers to pay employees working in New York City 40 hours of paid sick leave per year took effect on April 1, 2014. (paragraph 48 of the counterclaims)

93.     The law states that employers of five or more employees are required to provide employees with one hour of paid sick leave for every 30 hours worked, with a maximum requirement of 40 hours of paid sick leave per calendar year.

94.     Employers cannot circumvent this by firing employees and also must provide current employees with notice of entitlement to leave, and must describe the amount and terms of sick leave, including any right to unpaid leave, which HC2 failed to do.

95.     This is a well-pled claim and violation of the New York City statute is an issue of fact for the jury.

X.     COUNTERCLAIM VIII (DEFAMATION PER SE) IS VALID

96.     The defamation started with an over-the-top pre-litigation Goliath to David demand letter from HC2 attorney Marc E. Kasowitz to Delaney's counsel dated April 20, 2020 demanding that Delaney "return and not retain any and all documents or information in whatever form, electronic or otherwise, which Mr. Delaney learned of or obtained from his employment with HC2".  This approach was continued in the allegations in the complaint in this case of extortion and theft.  This was subsequently seized upon by third party new sources and defended as a fair and accurate summary of the allegations in the complaint.  At the TRO hearing on April 29, 2020 and the PI hearing on May 26, 2020, HC2 produced no evidence probative of such allegations. HC2 is a sophisticated party with the forensic analysis tools to be able to prove such malfeasance had it occurred.

97.     The defamatory statements are clearly contained in the cited paragraphs of the complaint and other documents.

98.     There was no need to repeat the content of the paragraphs as shown in the quotations below.

99.     Also, the counterclaims clearly allege that HC2 and its attorneys defamed Delaney when they falsely accused him of extortion, of threatening to disclose and also of actually disclosing and admitting to disclosing privileged and confidential information, of stealing and

17

continuing to retain and not return documents, and of being unethical.  (paragraphs 16 and 50-55 of the counterclaims)

100.    Delaney cited specific statements made by HC2:

*Direct quotes or references contained in counterclaims*

(1)    extortion (footnote 12 of the counterclaims) – paragraph 31 of HC2's complaint states: "Finally, the lawyer who was assisting Delaney in carrying out his scheme to extort a significant payment from the Corporate  Client, is the same lawyer who signed and caused to be filed the State Court Complaint."

(2)    stolen information (footnote 4 and paragraph 51 of the counterclaims) – on April 20, 2020, prior to this litigation being commenced, Marc E. Kasowitz emailed Delaney's Florida counsel "Under the Employment Agreement, Mr. Delaney was and is prohibited from using, removing, copying, secreting, discussing or disclosing the information in the complaint, prohibitions which he has egregiously violated.  Of course, you are also not permitted to make any use whatsoever of this misappropriated -that is, stolen -- information."[18]

(3)    continuing to possess documents (footnote 17 of the counterclaims) - "[p]aragraph 57(i) requests an order preventing Defendant/Counterclaim Plaintiff from '[c]ontinuing to possess and not return any and all documents in any form he acquired during and as a result of his employment with HC2'.  The word 'continuing' is a clear statement that he had documents."

*Complaint paragraphs 1, 6, 7, 29, 39, and 43 cited in counterclaims paragraph 51*

---

[18] This statement was pre-litigation and is not covered by the litigation privilege.  *Yukos Capital v. Feldman*, 2016 WL 4940200 (S.D.N.Y. Sept. 14, 2016)(qualified privilege for pre-litigation attorney statements);  *Front, Inc., v. Philip Khalil*, No. 19, 2015 WL 750965 (N.Y. Feb. 24, 2015).  In *Yukos*, Judge Kaplan held that the qualified privilege can be overcome by a showing of malice, which Delaney has alleged in this case.

(4)      threatening to disclose privileged and confidential information – the statement in paragraph 1 of the complaint: "This action for injunctive relief and damages arises from Delaney's unlawful and unscrupulous scheme -- in a shocking violation of his duties as a member of the New York bar and of his contractual obligations to his employer, HC2, a legal staffing company -- to try to coerce HC2, HC2's law firm customer (the 'Law Firm Customer') and the Law Firm Customer's corporate client (the 'Corporate Client') to pay him hundreds of thousands of dollars by threatening to and publicly disclosing confidential and privileged information he obtained during his employment with HC2 as a contract attorney."

(5)      threatening to disclose privileged and confidential information – the statement in paragraph 6 of the complaint:   "In the letter, emailed on April 13, Delaney's lawyer threatened to commence legal action and publicly disclose such confidential and privileged information about the Corporate Client that Delaney had obtained during the Project if Delaney's demand was not met by the next day."[19]

(6)      threatening to disclose privileged and confidential information –  the statement in paragraph 7 of the complaint:   "On April 14, the Law Firm Customer sent an email to Delaney's counsel warning him not to contact the Corporate Client again and objecting to Delaney's threat to disclose the Corporate Client's privileged and confidential information."

(7)      unethical - the statement in paragraph 9 of the complaint: "The State Court Complaint names the plaintiff as 'John Doe,' but the allegations in that complaint -- including allegations quoting HC2's emails to Delaney regarding suspension of the Project -- leave no doubt whatsoever that Delaney is the unnamed plaintiff.  Presumably, Delaney filed anonymously to try

---

[19] The face of the letter shows these statements as being untrue.

to conceal his outrageous violation of his ethical duties to the Corporate Client and his flagrant breaches of his obligations to HC2."

(8)     threatening to disclose privileged and confidential information - the statement in paragraph 29 of the complaint:  "On April 13, Delaney's new counsel emailed a letter to the Corporate Client's Chief Executive Officer and Board of Directors, reiterating his demand for a payment and threatening litigation and disclosure of the Corporate Client's privileged and confidential information if his demand was not met by April 14."

(9)     actually disclosing confidential and attorney-client privileged information - the statement in paragraph 39 of the complaint:  "As Delaney freely admits, he disclosed in the State Court Complaint, the confidential and attorney-client privileged information, notwithstanding his contractual and ethical obligations."[20]

(10)     publicly disclosing confidential and attorney-client privileged information and attorney work-product - the statement in paragraph 43 of the complaint: "Delaney has breached this obligation repeatedly since March 17 by, among other things, sending unsolicited and unauthorized emails to the Law Firm Customer and Corporate Client leveling threats and demands and by publicly disclosing the Corporate Client's confidential and attorney-client privileged information and the Law Firm Customer's attorney work-product."

*Statement in the post-counterclaims Zannikos declaration*

(11)     threatening to disclose privileged and confidential information – in paragraph 40 of the Zannikos declaration dated May 15, 2020 he states: "On April 13, Delaney's second attorney emailed a letter to senior officials of the Corporate Client, reiterating Delaney's demand for a payment and threatening litigation and disclosure of the Corporate Client's privileged and

---

[20] Of course, and as they well know, Delaney never "freely admitted" any such thing and this is defamation *per se*.

confidential information if his demand was not met within seven (7) days from the date of the letter."[21]

101.    Thus, HC2 and its attorneys made 11 statements regarding five issues accusing Delaney of crimes and other wrongdoing without a shred of evidence.

102.    These statements were malicious because HC2 and its attorneys knew they were untrue and/or were impossible and/or were gratuitous.

103.    Footnote 18 of the counterclaims states: "From April 23-29, 2020, due to this case, various articles appeared falsely accusing Defendant/Counterclaim Plaintiff of 'extortion' and 'blackmail.'"[22]

104.    These articles – such as attorney using virus to blackmail (April 23, 2020), gagging attorney (April 28, 2020), attorney accused of extorting gets gag order (April 29, 2020), and agent in blackmail suit (May 6, 2020) – have quoted HC2 attorney Ronald R. Rossi which is not covered by any litigation immunity.

105.    Even if there is an absolute privilege in New York, it does not apply in this case because none of the "words and writings" was "material and pertinent to the questions involved"

---

[21] No such threat is contained in the referenced letter nor does Zannikos quote it.

[22] *See* Exhibit B to the Rotman declaration in opposition to the motion to dismiss which is an email from Jenner & Block LLP to Delaney dated May 12, 2020 defending Crains:  "I serve as national media counsel for Crain Communications, Inc., which owns and operates Staffing Industry Analysts ('SIA')…. Upon receiving your e-mail, I reviewed the public filings in the HC2 lawsuit against you and related materials.  That review has led me to conclude that the SIA news item is a fair and accurate summary of the allegations in the HC2 lawsuit, which is fully protected under New York's very broad fair report privilege as a matter of law. Specifically, and contrary to the suggestion in your email, paragraph 31 in the complaint in the lawsuit expressly alleges that your conduct constituted a scheme to extort money.  Moreover, the complaint, when read in context, plainly accuses you of engaging in conduct that would be fairly characterized as extortion and blackmail by threatening to disclose confidential and privileged information unless you were paid a large sum of money to which you allegedly had no legal entitlement. Both the original Law360 article, which expressly characterized the complaint as alleging that your conduct constituted extortion and blackmail, and the subsequent SIA news item referencing the Law360 article, fall within the scope of the fair report privilege, which is highly protective of news organizations' lay summaries of legal proceedings.  Of course, the SIA news item was merely a fair summary of the content of the public pleadings, and did not express any view on the truth or falsity of the allegations made against you in those pleadings."

to the litigation. *Yukos Capital S.A.R.L. v. Feldman*, No. 15-CV-4964 (LAK), 2016 WL 4940200, at *4 (S.D.N.Y. Sep. 14, 2016).

106.    HC2 only sued Delaney for breach of contract and faithless servant doctrine and none of the above words and writings are pertinent to the questions involved here.

107.    In fact, HC2 filed a civil case against Delaney but the defamatory statements allege, or are calculated to accuse him of, criminal conduct such as extortion and theft.

108.    HC2 and its attorneys are sophisticated and knew that that they were publicly accusing Delaney of extortion, theft, and being unethical which would be republished in the media.[23]

109.    A perfect example of how HC2 and its lawyers' false accusations about  Delaney were republished and interpreted is the attached April 30, 2020 article in "The National Law Review" ("NLR") by the law firm Sheppard, Mullen, Richter & Hampton LLP "6 Steps to Protect Your Trade Secrets During Covid-19 Layoffs."[24]

110.    The present action is one of only two cases cited by the NLR article as footnote 3: "[3] See, e.g., *HC2 Inc. v. Delaney*, Case No. 1:20-cv-03178 (U.S. District Court for the Southern District of New York) (defendant, a former employee of a legal staffing company, allegedly attempted to extort hundreds of thousands of dollars from its clients by threatening to release confidential information after a document review project was suspended as a result of the COVID-19 pandemic)."

---

[23] *See, e.g.*, "Judge to Hear Request in Legal Staffing Lawsuit Over Alleged Extortion" (April 29, 2020). https://www2.staffingindustry.com/site/Editorial/Daily-News/Judge-to-hear-request-in-legal-staffing-lawsuit-over-alleged-extortion-Law360-53635

[24] https://www.natlawreview.com/article/6-steps-to-protect-your-trade-secrets-during-covid-19-layoffs

111.    This language, enabled by HC2 and its lawyers, is even more defamatory than HC2's statements.[25]

112.    *Yukos* and the Second Circuit's holding in *Boyd v. Nationwide Mut. Ins*., 208 F.3d 406 (2d Cir. 2000) distinguish between a case on a 12(b)(6) motion and disposing of a case on summary judgment and declined to dismiss the defamation claim.  2016 WL 4940200, at *7 ("a plaintiff may allege facts suggestive enough to warrant discovery, even where those facts alone would not establish a cause of action for defamation")

## XI.    COUNTERCLAIM IX (ABUSE OF PROCESS) IS VALID

113.    HC2 incorrectly states that: "The sole basis for Counterclaimant's abuse of process claim is HC2's request for injunctive relief set out in paragraph 57 of the Complaint." (p. 22)

114.    HC2 is mischaracterizing the pleadings again.

115.    Paragraph 58 referring to HC2's request for injunctive relief is only one part of the abuse of process counterclaim.

116.    Paragraph 59 states that: "[t]he sole purpose of this complaint was to deter Delaney from pursuing legitimate public health and employment claims against the HC2." (referring to the whole "complaint")

117.    The very filing of the complaint in this case in the Southern District of New York in the first place when there was a pending action in Florida was an abuse of process and designed to intimidate Delaney, to force him to litigate in distant jurisdictions, to incur costs, and to force him to not pursue legitimate claims of right which occurred after the issuance of process.

118.    The continuation of this case is a further example of abuse of process.

_____

[25] The text of the NLR article where the footnote appears reads "In addition, a competitor could hire the laid-off employee to benefit from her insider knowledge of her former employer's trade secrets.  Of course, in these times during which job openings are scarce, it also is possible that a laid-off employee will attempt to sell his former employer's trade secrets as a source of income because he is unable to find a new job.[3]"

119.    HC2 mixes up and tries to apply absolute immunity for defamation to the abuse of process counterclaim.

120.    *See Murphy v. Board of Educ. of Rochester City School Dist.,* 420 F. Supp. 2d 131, 135 (W.D.N.Y. 2006) (awarding attorney's fees to defendant and finding that the "plaintiff brought and pursued this litigation in bad faith, for the improper purpose of attacking the District and school administrators about matters that had nothing to do with the original basis for this lawsuit, i.e., plaintiff's transfer from one school to another without loss of pay or benefits").

XII.    <u>DELANEY WITHDRAWS RULE 11 SANCTIONS CLAIM</u>

121.    Delaney reserves the right to refile a request for sanctions as a separate motion in the future.

<u>CONCLUSION</u>

122.    For the foregoing reasons, it is respectfully submitted that HC2's motion to dismiss should be denied.

Dated: June 17, 2020                    Respectfully submitted,

By:/s/Robert Rotman_____
Robert Rotman
*Attorney for Counterclaim Plaintiff*
305 West 24th Street Apt. 17R
New York, NY 10010
(646) 606-4867
rrotmanlaw@gmail.com

24