UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

HC2, INC.,                                           1:20-cv-03178-LJL

            Plaintiff,                       DEFENDANT'S FIRST
                                                     AMENDED ANSWER AND
      -against-                              COUNTERCLAIMS_____

ANDREW DELANEY,                                      **JURY TRIAL DEMANDED**

            Defendant.
-------------------------------------------------------------------x

Pursuant to the Court's Order dated July 17, 2020 granting Defendant leave to re-plead its counterclaims against Plaintiff with a deadline of August 14, 2020, Andrew Delaney, by his attorney Robert Rotman, Esq., hereby re-pleads and responds to the complaint of Plaintiff dated April 22, 2020 as follows:

<u>ANSWER</u>

Defendant specifically responds to the individually numbered allegations of Plaintiff's complaint as follows:

1.      The allegations in paragraph 1 are denied.

2.      The allegations in paragraph 2 are denied except that Defendant admits that "Delaney, along with two other HC2 employees, began working on the Project at HC2's facility in New York City," on September 30, 2019.

3.      The allegations in paragraph 3 are denied.

4.      The allegations in paragraph 4 are denied.

5.      The allegations in paragraph 5 are denied.

1

6.     The allegations in paragraph 6 are denied.

7.     The allegations in paragraph 7 are denied.

8.     The allegations in paragraph 8 are denied.

9.     The allegations in paragraph 9 are denied.

10.    The allegations in paragraph 10 are denied.

11.    The allegations in paragraph 11 are denied.

12.    The allegations in paragraph 12 are denied.

13.    The allegations in paragraph 13 are denied.

14.    The allegations in paragraph 14 are admitted.

15.    The allegations in paragraph 15 are denied.

16.    The allegations in paragraph 16 are denied.

17.    The allegations in paragraph 17 are admitted.

18.    The allegations in paragraph 18 are denied.

19.    The allegations in paragraph 19 are denied except admitted that on September 30, 2019, Delaney started work on the document review.

20.    The allegations in paragraph 20 are denied.

21.    The allegations in paragraph 21 are admitted.

22.    The allegations in paragraph 22 are denied.

23.    The allegations in paragraph 23 are denied.

2

24.     The allegations in paragraph 24 are denied.

25.     The allegations in paragraph 25 are denied.

26.     The allegations in paragraph 26 are denied.

27.     The allegations in paragraph 27 are denied.

28.     The allegations in paragraph 28 are denied.

29.     The allegations in paragraph 29 are denied.

30.     The allegations in paragraph 30 are denied.

31.     The allegations in paragraph 31 are denied.

32.     The allegations in paragraph 32 are denied.

33.     The allegations in paragraph 33 are denied.

34.     The allegations in paragraph 34 are denied except that Delaney admits he was an at-will employee.

35.     The allegations in paragraph 35 are denied.

36.     The allegations in paragraph 36 are denied.

37.     The allegations in paragraph 37 are denied.

38.     The allegations in paragraph 38 are denied.

39.     The allegations in paragraph 39 are denied.

40.     The allegations in paragraph 40 are denied.

41.     The allegations in paragraph 41 are denied.

42.     The allegations in paragraph 42 are denied.

43.     The allegations in paragraph 43 are denied.

44.     The allegations in paragraph 44 are denied.

45.     The allegations in paragraph 45 are denied.

46.     The allegations in paragraph 46 are admitted.

47.     The allegations in paragraph 47 are denied.

48.     The allegations in paragraph 48 are denied.

49.     The allegations in paragraph 49 are denied.

50.     The allegations in paragraph 50 are denied.

51.     The allegations in paragraph 51 are admitted.

52.     The allegations in paragraph 52 are denied.

53.     The allegations in paragraph 53 are denied.

54.     The allegations in paragraph 54 are admitted.

55.     The allegations in paragraph 55 are denied.

56.     The allegations in paragraph 56 are denied.

57.     The allegations in paragraph 57 are denied.

58.     Defendant denies that Plaintiff is entitled to any of the relief sought in its prayer for relief.  Each and every allegation of the complaint not elsewhere responded to is hereby expressly denied.

## FIRST DEFENSE

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(2), Defendant asserts the defense of lack of subject-matter jurisdiction and the defense of lack of personal jurisdiction.

Plaintiff did not properly serve the complaint on him.

## SECOND DEFENSE

Plaintiff has no standing to sue, and therefore the complaint should be dismissed with prejudice.[1]

## THIRD DEFENSE

The complaint fails to state a claim upon which relief can be granted.

## FOURTH DEFENSE

The complaint is unconstitutionally vague and is not clear about who, what, or when they are referring to.

## FIFTH DEFENSE

The complaint violates Defendant's rights under the First Amendment to the United States Constitution.[2]  Defendant has a right to make public health and labor law petitions against Plaintiff which are in the public interest.

## SIXTH DEFENSE

---

[1] Defendant was led to believe he was working jointly for "Hire Counsel, Inc." but this entity, if it even exists at all, is not registered as d/b/a in New York State where Defendant was working.

[2] https://law.yale.edu/sites/default/files/area/center/liman/document/50-4_cover.pdf

There was no employment agreement between Plaintiff and Defendant.

## SEVENTH DEFENSE

The information referred to in the complaint was not confidential, was shared with third persons on the other side and was therefore not privileged.

The ethical rules also prohibit a lawyer from knowingly assisting a client's crime or fraud.

## EIGHTH DEFENSE

Plaintiff is not entitled to equitable relief since "he who comes into equity must come with clean hands" ("he who seeks Equity must do Equity").  Plaintiff firstly misused Defendant's confidential personal information in violation of his privacy rights, and secondarily filed this false complaint against him.

## NINTH DEFENSE

The complaint should be dismissed due to Plaintiff's fraud.

## TENTH DEFENSE

Defendant is entitled to protection under applicable whistleblower laws.

## COUNTERCLAIMS

As its re-pleading of its counterclaims, Defendant hereby withdraws six counterclaims against Plaintiff for fraudulent inducement, fraudulent misrepresentation, invasion of privacy, failure to pay N.Y. sick leave, defamation per se, and sanctions without prejudice and hereby re-asserts four counterclaims for whistleblower retaliation, breach of confidentiality, intentional infliction of emotional distress, and abuse of process against Plaintiff.

## PARTIES

1.      Plaintiff/Counterclaim Defendant HC2, Inc. ("HC2") is incorporated in the District of Columbia and has its principal place of business in Chicago, Illinois.

2.      Defendant/Counterclaim Plaintiff Andrew Delaney ("Delaney") is a resident of the State of New York.

## JURISDICTION AND VENUE

3.      Jurisdiction is based on 28 U.S.C. § 1332 because (1) the amount in controversy exceeds $75,000 and (2) all plaintiffs are of different citizenship than all defendants.

4.      Venue is proper in this District under 28 U.S.C. § 1391(b) because it is a judicial district in which any defendant resides and because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## FACTS

5.      This is one of the first employment law cases involving issues arising out of the "COVID-19" coronavirus in the United States.

6.      From September 30, 2019-January 3, 2020 then again from February 18, 2020-March 17, 2020, Delaney, a document reviewer in the gig economy, worked for HC2, a job agency, on a Thai language document review for Wilmer, Cutler, Pickering, Hale & Dorr LLP (the "law firm"), and Toyota Motor Corporation (the "corporation").   The three-way agreement dated September 19, 2019 among HC2, the law firm, and the corporation was publicly e-filed unsealed online by HC2 on May 22, 2020 as Exhibit E to the Declaration of HC2 general counsel Stephanos Zannikos and is still publicly available to anyone.  (Attachment 6 to Dkt. No. 45)

7.    The document review was being run out of and with servers based at the corporation in Japan to guarantee it absolute control and investigated high risk issues in Thailand of years of dangerous corrupt practices which were ongoing.  This investigation posed criminal and pecuniary risk to well-placed persons in the Thai establishment.   The risks are not simply Delaney's subjective opinion, but Thailand has been ranked as one of the most dangerous countries for expat Americans.[3]

8.    On November 28, 2019 (Thanksgiving holiday), Delaney out of the blue and unexpectedly received a suspicious email to his personal email account from a well-connected, influential tax lawyer whose professional interests were potentially at risk from the investigation (the "Thai email").  To Delaney, based on years of experience, business is not done this way in Thailand.

9.    From November 29, 2019-December 2, 2019, Delaney complained to HC2 and its agents, including Michael Posada of the law firm who was the U.S. point man for the review, about the misuse of his private information and involvement in this document review and the misappropriation of the Thai email to the corporation.

10.    On January 20, 2020, the first patient in the United States was diagnosed with the coronavirus.  The disease was starting to spread rapidly especially to New York.

11.    On March 7, 2020 – 10 days before Delaney was fired – New York State Governor Andrew Cuomo declared a state of emergency.[4]

---

[3] https://www.forbes.com/sites/priceonomics/2017/03/21/ranking-the-most-dangerous-countries-for-americans-to-visit/#2992fede28a7

[4] https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york

12.     As of March 17, 2020, there were 6,300 coronavirus cases in New York and 13 deaths.

13.     The physical set-up of a document review center is similar to a call center.  Delaney sat several inches away from the other two reviewers in a small office with no windows.  During this period, HC2 did nothing to institute social distancing or survey workers about working remotely.

14.     In early March 2020, the other document review agencies in New York City were having reviewers test positive and were going remote and closing their offices.[5]  But HC2's HR department simply emailed workers[6] to commute with wipes and to watch President Trump's speech on TV.

15.     After working continuously under these deteriorating conditions since February 18, 2020, on March 17, 2020, at 11:27 AM EST, Delaney emailed HC2 and its agents copied to his co-workers and complained to them that workers were coming into the office with flu-like symptoms and asked if they could either work remotely or short of that if they could stay at home with pay while still being on the document review.[7]

---

[5] Prior to March 17, 2020, Tower Legal Solutions had one person test positive, closed all offices, and went to remote work only.  Epiq Systems, Inc. had one employee test positive at its 48th Street office in Manhattan, closed all offices, and went to remote only.  KL Discovery, Inc. had one employee test positive and went to all remote.  Update Legal, Inc. went to remote.  Special Counsel moved all of its over 1,000 reviewers to remote in early March.  HC2 was not following the market practice of the agencies at the time of his complaint.

[6] On March 5, 2020, HC2 sent out an email subject "Inform - COVID-19 & Seasonal Flu – Update" stating:  "Due to the nature of our business, we will continue to operate all our locations, but continue to take precautionary measures, such as reducing the number of contractors per review room."  However, this did not happen and the number of contractors per review room was not reduced.

[7] Delaney came into the office wearing a mask, latex gloves, and goggles which he bought on his own.  As he suffers from severe eczema, his hands were badly hurt from wearing the gloves at his computer all day.

16.     At 11:40 AM EST (13 minutes after Delaney's email), Posada was the first to respond by emailing two of his colleagues "Subject:  FW: Work conditions." (Exhibit A attached to this pleading (the "Posada email/Hartstein email"))

17.     However, HC2 redacted the entire Posada email.[8]

18.     But the possible content in the Posada email is suggested by the next email in the chain which is at 11:55 AM EST (a mere 28 minutes after Delaney's email) in which Brian Hartstein out of HC2's Los Angeles office (8:55 AM PT) mailed the law firm: "Can we fire him? Just a thought."[9]

19.     At 12:17 PM EST (50 minutes after Delaney's email), Hartstein (9:17 PT) emailed Joan Davison, Denise Asnes, and Patti Ayala of HC2 saying "Please see below…this guy caused this."

20.     At 1:02 PM (95 minutes after Delaney's email), Delaney received an email stating that remote work was not an option.[10]

21.     A few minutes after that, at 1:10 PM EST (103 minutes after Delaney's email), Asnes emailed Delaney and the two other Thai reviewers in the New York office saying that they were terminated:  "We are requesting all team members to gather their belongings and depart the facility in an orderly fashion and exit our environment since the project is effectively ending… We

---

[8] This was the only document produced by HC2 marked "Redacted" rather than "Privileged" or "Confidential" *i.e.* there is no legal basis for the redaction.  On June 1, 2020, Delaney's counsel emailed HC2's counsel requesting the unredacted Posada emails but HC2 refused to even answer.

[9] The redacted Posada email and the Hartstein email, which were the first responses to Delaney's coronavirus email, show an immediate desire to terminate him after his complaint.

[10] Now, HC2 shamelessly claims it was offering Delaney remote work.

will continue to monitor the efforts of Congress in helping to off-set the impact of lost work." HC2 was already pointing its ex-employees in the direction of the government for any possible relief.

22.      Delaney was clearly and immediately terminated in unlawful retaliation for his whistleblower notification about the office conditions and for criticizing HC2's HR department.

23.      The termination email made no mention of COVID-19 or any public health and safety concerns and was purely project management and client retention driven.

24.      On March 30, 2020, Zannikos sent an email to Delaney's then-settlement counsel stating that "Hire Counsel lawfully terminated his employment…. We hope that this email clarifies…the circumstances around Hire Counsel's decision to terminate his employment."[11] (Attachment 26 to Dkt. No. 45)

25.      On April 15, 2020, Delaney filed a *John Doe* complaint against the corporation and two others in the Eighteenth Judicial Circuit Court of Florida in Brevard County which at that time was his present and foreseeable refuge residence pending the uncertain outcome of the coronavirus (the "Florida *John Doe* complaint").

26.      On April 22, 2020, HC2 filed the complaint in this case in the Southern District of New York naming Delaney individually as defendant including a request for a preliminary injunction ("PI"). Knowing that Delaney would file a public health and employment case against it, HC2 and its lawyers cooked up this bogus lawsuit accusing him of extortion and stealing documents. HC2 and its lawyers knew perfectly well that it was physically impossible for Delaney to steal or download documents and that there were no hard copies of anything. The complaint

---

[11] This did not stop HC2 from fabricating in the complaint and the motion to dismiss that Delaney had not been terminated.

accused Delaney of "threatening to and publicly disclosing confidential and privileged information he obtained during his employment with HC2 as a contract attorney" (paragraph 1 and repeated in paragraphs 6, 7, 29, and 43), of "carrying out his scheme to extort a significant payment from the Corporate  Client" (paragraph 31), of "[a]s Delaney freely admits[12], …. [d]isclos[ing] in the State Court Complaint, the confidential and attorney-client privileged information, notwithstanding his contractual and ethical obligations" (paragraph 39), and of "[c]ontinuing to possess and not return any and all documents in any form he acquired during and as a result of his employment with HC2" (paragraph 57(i))  <u>without a shred of evidence</u>.  HC2 also exposed Delaney as the *John Doe* in the Florida *John Doe* complaint (paragraph 9).

27.     On May 22, 2020, HC2 filed a motion for a PI.  In it, HC2 posted Delaney's resume which he had submitted to them confidentially in September 2019 as part of his employment application on the case docket as exhibit 1 to docket no. 44 (the declaration of Michael R. Heyison).

COUNT ONE
<u>WHISTLEBLOWER RETALIATION</u>

28.     The allegations of paragraphs 1 through 27 are re-alleged and incorporated herein by reference.

29.     HC2 unlawfully retaliated against Delaney after he raised a complaint with it under N.Y. Labor Law § 740 and § 215.  Section 740(2) prohibits employers from retaliating against a whistleblower who discloses or threatens to disclose an employer's practices that present "a substantial and specific danger to the public health or safety."

30.     In early-mid March 2020, the coronavirus was spreading virally through New York City.  The other job agencies had reviewers test positive, went remote, and closed their offices (*see*

_____

[12] Of course, as HC2 well knows, Delaney never "freely admitted" to any such thing.

12

footnote 4 *supra*).   On March 16-17, 2020, Delaney observed three workers at HC2's 360 Lexington Avenue office who were coming into the office with clear flu-like symptoms.   HC2's pay policy created an incentive for document reviewers to come to work even if they were sick which was aggravated by the worsening economy.   Since there was no management or law firm representative at 360 Lexington Avenue at that time, in an email "Subject: Work conditions" sent to them on March 17, 2020 at 11:27 AM EST, Delaney wanted to bring the unsafe and unhealthy office conditions to their urgent attention and to ask for remote work or alternatively to stay at home with pay while still being on the document review.   Delaney also criticized HC2's HR Department's lack of measures to seriously address the coronavirus issues in the office.   Since the first U.S. case, there had been no changes whatsoever to the physical work environment, including his continuing to work several inches apart from other reviewers.

31.   Minutes after Delaney sent the email, Posada emailed two of his colleagues. However, <u>the Posada email was completely redacted</u>.   A mere 28 minutes after Delaney's email, Hartstein of HC2 emailed Nathan Croumer (Wilmer Hale's Discovery Attorney Manager): "Can we fire him?  Just a thought."   Hartstein later emailed: "Please see below…this guy caused this." 103 minutes after Delaney's email, Asnes emailed him and the two other Thai reviewers in the New York office saying that they were terminated.   This was further corroborated by Zannikos' email of March 30, 2020.

32.   HC2's subsequent actions were an effective admission that it retaliated against him. None of its responses evince any concern about addressing the public health and safety issues raised by Delaney's complaint.   Realizing that it had violated the law, HC2 "changed its story"

(including in the complaint) that Delaney was "suspended" not terminated.[13]   The Zannikos deposition subsequently confirmed that the document review has not restarted in New York or anywhere.

33.   HC2 illegally retaliated against Delaney for making a public health and safety complaint.[14]  None of the people involved in terminating him literally within minutes were in New York:  Davison and Ayala were in Chicago, Asnes was in Philadelphia, Hartstein was in Los Angeles, Posada was in Washington, D.C., and based on Internet sources Croumer was in Dayton. Firing him relatively immediately, they had no idea about and did not spend any time inquiring whether Delaney's concerns were valid or not or trying to address the issue of sick workers in the New York office.  The bringing of this baseless action is further retaliation for his whistleblower complaint.  HC2 even posted his resume online on this docket without his consent.

34.   In 2014, the N.Y. Court of Appeals held that "for pleading purposes, the complaint need not specify the actual law, rule or regulation violated, although it must identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct."   *Webb-Weber v.*

---

[13] Paragraph 23 of the complaint falsely states: "HC2 never terminated the Employment Agreement or took any other action to terminate Delaney's employment by HC2."

[14] On March 10, 2020, Paul, Weiss, Rifkind, Wharton & Garrison LLP advised:  "Employers should keep in mind that the bedrock legal obligations that they owe their employees at all times remain in force during an infectious disease outbreak: the duty to provide a safe and healthy work environment…. and the duty to protect the privacy of employees."   Paul, Weiss further opined:  "In addition to taking reasonable measures to minimize the risks at the worksite, an employer should not retaliate against employees who, in good faith and reasonable belief, voice their concerns relating to the coronavirus."
https://www.paulweiss.com/practices/litigation/employment/publications/coronavirus-employment-law-considerations-and-practical-guidance-for-employers?id=30833

*Community Action For Human Services, Inc. et al.*, 2014 NY Slip Op 03428 (N.Y. May 13, 2014) at 3.[15]

35.     Notwithstanding the foregoing and reserving the right to add additional laws, rules, or regulations, this counterclaim asserts that Plaintiff's activities, policies, and practices violated:

36.     On February 14, 2020, the N.Y.C. Health Department issued guidance for N.Y.C. businesses and employers.[16]  It stated: "Promote physical distancing.  Emphasize that staff must stay home if sick. Staff who arrive to work sick or become sick at work should be sent home immediately" "— including keeping 6 feet of distance between themselves and others whenever possible."  HC2 did not do any of this even when Delaney's complaint cited the presence of sick workers at the workplace.

37.     On March 2, 2020, the Centers for Disease Control and Prevention (the "CDC") issued Interim Guidance for businesses and employers.[17]  The guidance states that "[e]mployers are responsible for providing a safe and healthy workplace" and recommended "separating sick employees."  HC2 failed to follow proper guidelines provided by public health agencies, such as the N.Y.C. Health Department and the CDC, or to track and prevent the spread of the coronavirus among workers.  HC2 did not even ask the identity or location of the sick workers in Delaney's complaint but just fired him.[18]

---

[15] https://casetext.com/analysis/employees-need-not-identify-specific-law-rule-or-regulation-violation-in-pleading-retaliation-claim-under-new-yorks-whistleblower-statute?PHONE_NUMBER_GROUP=C&sort=relevance&resultsNav=false&q=

[16] NYC Health, "2019 Novel Coronavirus (2019-nCoV) FAQ for Businesses and Employers," (Feb. 14, 2020) https://www1.nyc.gov/assets/doh/downloads/pdf/imm/novel-coronavirus-faq-for-businesses.pdf;

[17] Centers for Disease Control and Prevention, "Interim Guidance for Businesses and Employers." https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html

38.     On March 7, 2020, in Executive Order No. 202, Gov. Cuomo declared a state of emergency in New York.

39.     On March 18, 2020, the governor issued Executive Order No. 202.6 providing that "All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 50% no later than March 20 at 8 p.m." (emphasis added) The next day on March 19, 2020, he ordered businesses to decrease their in-office workforce by 75%.   Work from home is extremely common in the document review world and in fact 90% of the reviews on which Delaney worked from 2006-2019 were remote.  As Delaney expects the evidence to show, HC2 refused to allow work from home despite the widespread move to remote in the document review industry which it continued to resist in the days and weeks after March 17, 2020 during which it was emailing updates and "the next steps" to him.  For example, on March 27, 2020, Ayala emailed Delaney "Subject:  Next Step – Re: Follow Up – Andrew Delaney – COVID 19" "Unfortunately, remote work for your project – not only in New York but in all other sites as well – is not available at this time."  (Attachment 24 to Dkt. No. 45) *See also* footnote 5 *supra*.  HC2 was ignoring the governor's executive orders mandating remote work.

40.     On June 12. 2020, the importance of employers' inadequate responses to the coronavirus as a public health issue is highlighted by N.Y. Attorney General Letitia James' investigation of Amazon, Inc.[19]

---

[19] "NYC Amazon workers interviewed as part of AG Letitia James' probe into 'inadequate' coronavirus response", N.Y. Daily News, June 12, 2020 ("James is investigating whether Smalls' axing was an act of illegal retaliation. She's also looking into whether Amazon failed to follow health protocols by not providing workers with enough protections during the pandemic, which has killed more than 17,000 city residents."). https://www.nydailynews.com/coronavirus/ny-coronavirus-state-attorney-general-amazon-protections-20200612-mbpucxoosjcfroyisjfbj6rh6i-story.html

41.     In terms of "rules" violated, the employment agreement dated December 28, 2016 which HC2 alleges governed their relationship states: "Contract Professional will adhere to the Hire Counsel Handbook for Temporary Employees and the Contract Employee Conduct Rules which describes important information about HC." (Attachment 1 to Dkt. No. 45) (emphasis added) Paragraph 604 of HC2's own Handbook states: "Report immediately to your supervisor any indications that the environment is not being maintained in a safe and healthful fashion." (emphasis added) However, when Delaney made such a report, HC2 fired him.

42.     Paragraph 113 further states: "Should the Company need to terminate your employment because of reorganization, job elimination, economic downturns, or lack of work, the Company will try to give you as much advance notice as is practical."  Delaney received no advanced notice and was told to exit the premises immediately.  This is further proof that his termination was retaliatory.

43.     As a result of HC2's retaliatory and other unlawful acts, Delaney is entitled to injunctive relief, reinstatement to the same position or to an equivalent position, compensation for lost salary and benefits, and recoupment of reasonable costs, disbursements, and attorney's fees in an amount to be proven at trial of not less than $1,000,000.

COUNT TWO
BREACH OF CONFIDENTIAL RELATIONSHIP

44.     The allegations of paragraphs 1 through 27 are re-alleged and incorporated herein by reference.

45.     For the tort of breach of confidential relationship, a cause of action consists of the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship.

46.     In his deposition, HC2's general counsel admitted that HC2 had a duty to protect Delaney's confidentiality and privacy.[20]

47.     First, HC2 breached the confidential relationship with Delaney when it and its agents misused information about him.  The only way these individuals in Thailand could have known about Delaney's work on this review was by a disclosure from it.  HC2 never had the right to disclose anything about Delaney to third parties.  Delaney, who is a Thai, intends to return to Thailand and did not want his involvement in this controversial review to become known there.  By agreeing to have the servers and review based with the corporation which was the target of the investigation in Japan and giving its agents Delaney's personal information, HC2 was responsible for these leaks and disclosures *ab initio*.  After Delaney complained about this on November 29, 2019-December 2, 2019, no remedial action was taken nor was there any follow-up hoping it would go away.

48.     Second, demonstrating HC2's continuing violation of Delaney's confidentiality and privacy rights and its own policies for resume submissions,[21] even after he filed an answer and counterclaims on May 13, 2020 and while continuing the blocking of 46 of the 48 exhibits to Rotman's declaration, on May 22, 2020 HC2 posted Delaney's resume on the case docket as exhibit 1 to docket no. 44 (the declaration of Michael R. Heyison).  In so doing, HC2 violated the protective order in this case.  It marked the document at the top "CONFIDENTIAL SUBJECT TO

---

[20] "Q     Did HC2 have an obligation to protect Mr. Delaney's privacy and confidentiality? A     There may be legal obligations on the company to protect personal information that belongs to Mr. Delaney." Zannikos deposition dated May 19, 2020 at p. 34.   (exhibit A to Dkt. No. 47 Declaration of Ronald Rossi)

[21] "Hire Counsel uses Human Resource personal information for limited purpose that includes complying with employment related laws and regulations as well as for payroll purposes." https://www.hirecounsel.com/wp-content/uploads/2018/12/Hire-Counsel-Global-GDPR-Data-PrivacyPolicy_120618.pdf").

PROTECTIVE ORDER" but nonetheless filed it on the public docket.  Over two months later, HC2 has never made any effort to seal this confidential and protected document.

49.     Third, HC2 also purposely "exposed" Delaney as the *John Doe* plaintiff in the Florida *John Doe* complaint.  In paragraph 9 of its complaint HC2 discloses:  "The State Court Complaint names the plaintiff as 'John Doe,' but the allegations in that complaint -- including allegations quoting HC2's emails to Delaney regarding suspension of the Project -- leave no doubt whatsoever that Delaney is the unnamed plaintiff."[22]  This violated the Eleventh Circuit's policy allowing a plaintiff to proceed anonymously if the plaintiff possesses "a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings" and which the Florida court allowed.  *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992).  HC2 and the corporation did not go through any legal procedure to oppose the *John Doe* filing but simply made the disclosure based on the confidential records in their possession from Delaney. In an employer-employee relationship such as this where there was a background check, the employer has supreme access to the employee's personal information.

50.     HC2 through its counsel has been relentlessly uber-protective of its own client's confidentiality while it has been reckless with regard to Delaney's.

51.     As a result of its tortious acts, HC2 is liable to pay Delaney damages in an amount to be proven at trial of not less than $1,000,000.

COUNT THREE
INTENTIONAL INLICTION OF EMOTIONAL DISTRESS

52.     The allegations of paragraphs 1 through 27 are re-alleged and incorporated herein by reference.

---

[22] This is of course a ridiculous statement because only HC2, the law firm, and the corporation would have known this due to their possession of Delaney's information – not everyone in the world.  It is they who advertised this to the world.

53.     There was a systematic and continuous effort to commit outrageous acts against Delaney.

54.     On November 28, 2019, it was learned that HC2's first extreme and outrageous action was to allow the disclosure of Delaney's confidential and personal information to opposing lawyers and lobbyists in Thailand without his consent.  This was because HC2 only cared about its "Corporate Customer's" interests *i.e*. its own business advantage at the expense of Delaney.

55.     On March 17, 2020, HC2's second act was to terminate Delaney for making a public health and safety complaint about the conditions at its 360 Lexington Avenue office in the middle of the worst crisis in New York history.  The fact that this was a legitimate health/safety complaint was never contradicted.   After Delaney complained about his termination, HC2, the law firm, and the corporation worked in concert by filing this case to try to preempt a lawsuit from him with baseless accusations pulled out of their hat.  As corroboration that they are working in concert, plaintiff's counsel always seems to know everything that is happening with the Florida case, even though they are not representing anyone in that action.  As a matter of fact, they are seeking a finding under different evidentiary rules in Florida to use collaterally in this case.  All of the legal actions by these three parties are carefully orchestrated to force Delaney to fight litigation in disparate jurisdictions.  Address checks have been placed on Delaney in Nebraska by investigators.  Even after Delaney voluntarily dismissed and agreed to seal the Florida *John Doe* complaint as sought by HC2 and the corporation, HC2's "Corporate Customer" filed a motion and insisted on having an evidentiary hearing to re-litigate the same PI issues that were addressed at this Court's PI hearing.  This is in order to get "two bites at the apple."  The sole purpose of this is for the corporation to try to obtain findings of fact in Florida to use in "HC2's" case in New York.  HC2's law firm Kasowitz's Miami office is intimately involved in this group litigation

effort and has communicated regularly with Defendant's counsel in the instant New York action, even though the partner there is not admitted to practice in New York and did not file a notice of appearance here.

56.     On April 22, 2020, HC2's third act was to file this lawsuit against Delaney and to fabricate malicious lies about him to ruin his professional reputation.  HC2 falsely accused Delaney of "extort[ion]" (paragraph 31 of the complaint), which is a criminal offense since there is no civil extortion under New York law and therefore should never have been alleged in HC2's complaint in the first place, of stealing and not returning documents, and of being unethical.  At the two hearings on April 29, 2020 and May 26, 2020, HC2 <u>did not present a shred of evidence</u> to support these made-up allegations.

57.     On May 22, 2020, HC2's fourth act was to publicly post Delaney's unsealed resume on the public docket in this case.  Delaney submitted this resume to HC2 in September 2019 on the condition that it would be kept confidential and not used without his consent against him as was done here in violation of HC2's own policies on resume submissions (*see* footnote 20 *supra*) and in violation of the judicial protective order that HC2 itself obtained in this case.  The posting of Delaney's resume was the exact same outrageous conduct as HC2's disclosing his involvement to lawyers on the other side last year with the similar self-serving ulterior motive to benefit itself at Delaney's expense.

58.     HC2's fifth act has been to harass Delaney and interfere with his right to peace and quiet.  On July 7, 2020, a day before sending its July 8, 2020 letter, the front desk at Delaney's hotel in Nebraska received what they said was "a suspicious phone call" from someone purporting to know him asking if he was there and his room number and then hanging up.  (Dkt. No. 73 filed July 21, 2020) That letter stated: "Moreover, Mr. Delaney has alleged residency in multiple states

in various court filings and most recently represented that he is residing somewhere in Nebraska." No one else knew that Delaney was in Nebraska which was only mentioned by Defendant's counsel during the PI scheduling hearing on May 6, 2020.  On July 10, 2020, Defendant's counsel reminded HC2's counsel that these acts were probative of Delaney's tort and abuse of process claims against HC2.

59.   As the sixth act, Delaney has been placed by HC2 on the industry DNR ("Do Not Reuse") blacklist which would preclude him from future document review work.  Since his termination, Delaney has not been contacted by any agency about work.

60.   Due to the six above extreme and outrageous actions, Delaney has suffered severe emotional distress.  He was alarmed about threats to his and his related parties' personal safety, business, and property in Thailand; he was worried about contracting the coronavirus at work due to HC2's failure to maintain a safe and healthy office and subsequently; he was abruptly terminated without cause for merely following the guidelines, laws, and HC2's own policies and forced to temporarily relocate during the height of the coronavirus in New York City; he has been forced to litigate including the same issues in separate jurisdictions through the concerted efforts of HC2 and its two agents; and he has been maliciously lied about and had his professional reputation and future employment prospects irreparably damaged.  Delaney has suffered great financial damage and has needed medical care as a direct result of HC2's extreme and outrageous conduct.

61.   In light of the preceding, Delaney, as would anyone, expects immediate additional outrageous actions as part of this concerted campaign to cause him emotional distress.

62.   As a result of the foregoing tortious acts, HC2 is liable to pay Delaney damages in an amount to be proven at trial of not less than $5,000,000.

COUNT FOUR
**ABUSE OF PROCESS**

63.     The allegations of paragraphs 1 through 27 are re-alleged and incorporated herein by reference.

64.     HC2 regularly issued civil process with the intent to do harm without cause or justification and used the process in a perverted manner to achieve a collateral objective.[23]  The abuse of process was also motivated by retaliation.[24]

65.     Ever since he was terminated, HC2, the law firm, and the corporation have been acting in concert to prevent and preempt Delaney from filing legitimate claims against them.

66.     After Delaney was terminated on March 17, 2020 and had no job amidst the height of the coronavirus in New York, as HC2 well knew, he sought refuge in Florida.  After Delaney filed the Florida *John Doe* complaint in Brevard County, rather than filing there or in a Florida federal court, HC2 filed the present action in the Southern District of New York first *ex parte* then on an expedited schedule and demanded that Delaney withdraw the Florida case.  Since it was not a party in Florida, this showed cohesive legal action in what is a group litigation.

67.     The very filing of the complaint in this case in the Southern District of New York in the first place when there was a pending action in Florida was an abuse of process and designed to intimidate Delaney making outrageous allegations seeking a temporary restraining order ("TRO") on default, to force him to litigate in multiple jurisdictions, to incur costs, and to force him to not pursue legitimate claims of right which occurred after the issuance of process.

68.     The continuation of this case is a further example of abuse of process.

69.     HC2 falsely represented to the Court that Delaney "extorted" it and the corporation – when there is no civil extortion in New York - and stole and retained documents when it knew

---

[23] *See Murphy v. Board of Educ. of Rochester City School Dist.,* 420 F. Supp. 2d 131, 135 (W.D.N.Y. 2006).

[24] Retaliation can be a collateral objective.  *See Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994)

perfectly well this was impossible and which it never even brought up at the hearings.  It merely made up these allegations to mislead the Court and to unsuccessfully try to obtain an *ex parte* TRO against him on April 22, 2020 without any notice to him of the application so that its false representations would be unopposed and uncontradicted.

70.     The proceedings both in Florida and New York show coordination, information-sharing, and joint presentation of witnesses and evidence among HC2, the law firm, and the corporation.  When this Court could not reach a finding that the Florida *John Doe* complaint was confidential, HC2 intensified its coordination with non-party Toyota's Florida counsel to procure a desirable ruling albeit under different evidentiary standards.[25]

71.     After Delaney went to great care to file anonymously, both HC2 and the corporation also unethically went out of their way to expose Delaney as the *John Doe* in the Florida case.  As per the Court's findings in the May 27, 2020 ruling, Delaney had reasons for filing as a *John Doe.*[26]

72.     HC2, acting in concert with the corporation's Florida counsel, has continued to falsely propound that Delaney sold trade secrets.  This issue was picked up by "The National Law Review" in a story citing this case "6 Steps to Protect Your Trade Secrets During Covid-19 Layoffs".[27]  HC2's counsel is collaborating with the corporation's counsel in Florida to obtain a

---

[25] As further proof of this, one of the partners at the Kasowitz law firm "representing HC2" is a partner in its Miami office who is not admitted in New York and who has not filed a notice of appearance in this action.  Of course, this would not be the first time that this law firm had a complaint made against it. https://campaignforaccountability.org/donald-trumps-attorney-marc-kasowitz-hit-with-ethics-complaints/

[26] "Number four, that is further supported by the fact that Delaney filed the complaint as a 'John Doe.' Although HC2 seeks to attach a negative inference to that fact, the more logical inference -- and the one I make -- is that Delaney sought to resolve the dispute without attracting attention to himself because becoming known as a contract lawyer who files complaints against contract lawyer companies that offer employment is not a particularly good way of getting hired in the future." (Tr. p. 18)

[27] https://www.natlawreview.com/article/6-steps-to-protect-your-trade-secrets-during-covid-19-layoffs

finding in this regard to be used collaterally in this action.  The corporation and by extension HC2 represented to the Florida court that the basis for a finding of confidentiality was "trade secrets".

73.     On July 7, 2020, HC2 had persons call and make inquiries about him at his address in Nebraska and on July 8, 2020 sent a letter to Delaney's counsel referring to its "research" about him and attempting to fish for information as to his whereabouts.

74.     As a result of its intentional tortious acts, HC2 is liable to Delaney in an amount to be proven at trial of not less than $1,000,000.

JURY DEMAND

75.     Delaney asserts his rights under the Seventh Amendment to the United States Constitution and demands, in accordance with Fed. R. Civ. P. Rule 38, a trial by jury on all issues.

PRAYER FOR RELIEF

WHEREFORE, Defendant/Counterclaim Plaintiff respectfully requests the following relief:

1.     That the claims asserted in Plaintiff's complaint be dismissed with prejudice.
2.     That Defendant/Counterclaim Plaintiff be awarded all compensatory, economic, special, and punitive damages of at least $8,000,000.
3.     That Defendant/Counterclaim Plaintiff be awarded actual damages.
4.     That Defendant/Counterclaim Plaintiff be awarded costs, attorneys' fees and expenses.
5.     That the Defendant/Counterclaim Plaintiff be awarded pre-judgment and post-judgment interest.
6.     That Defendant/Counterclaim Plaintiff be awarded such other relief as the Court shall deem just and proper.

Dated: July 31, 2020                    Respectfully submitted,
                                        By:/s/Robert Rotman_____
                                        Robert Rotman, Esq.
                                        305 West 24th Street Apt. 17R
                                        New York, NY 10010
                                        (646) 606-4867
                                        rrotmanlaw@gmail.com
                                        *Attorney for Defendant/Counterclaim Plaintiff*

<u>VERIFICATION</u>

I hereby declare under penalty of perjury that I have read the foregoing Defendant's First Amended Answer and Counterclaims, and that the allegations contained therein are true to the best of my knowledge.

Dated: July 31, 2020                                    /s/Andrew Delaney_____
       New York, NY                                    Andrew Delaney, Esq.