UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
HC2, INC.,

                    Plaintiff,                            1:20-cv-03178-LJL

        -against-

ANDREW DELANEY,

                    Defendant.
-------------------------------------------------------------------x

<u>DEFENDANT'S MEMORANUM OF LAW IN OPPOSITION TO MOTION TO DISMISS RE-FILED COUNTERCLAIMS</u>

**Table of Contents**

PRELIMINARY STATEMENT……………………………………………………………… 1

FACTS…………………………………………………………………………………… 2

HC2'S STATEMENT OF FACTS MISREPRESENTS THE FACTS…………………......…… 2

ARGUMENT……………………………………………………………………....…… 4

I.        THE LEGAL STANDARD…………………………………………………… 4

II.       COUNTERCLAIM ONE (WHISTLEBLOWER RETALIATION) IS VALID………… 5

III.      COUNTERCLAIM TWO (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) IS VALID……………………………………………………………… 14

IV.      COUNTERCLAIM THREE (BREACH OF CONFIDENTIAL RELATIONSHIP) IS VALID…………………………………………………………………....… 19

V.       COUNTERCLAIM FOUR (ABUSE OF PROCESS) IS VALID……………………….. 21

CONCLUSION………………………………………………………………….…… 25

**Table of Authorities**

*Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009) ………………………...…………… 4

*Arista Records LLC v. Doe*, 604 F.3d 120 (2d Cir. 2010) ...………...…………….....….......... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) …………………………….…………..… 4, 20

*Conley v. Gibson*, 355 U.S. 41 (1957) ………………...……………………….……………… 4

*Cotrone v. Consolidated Edison Co. of N.Y., Inc.,* 2008 NY Slip Op 03099 (1st Dept 2008) …. 12

*Doe v. Frank*, 951 F.2d 320 (11th Cir. 1992) ………………...........……………………………… 18

*Fough v. Aug. Aichhorn Ctr. for Adolescent Residential Care, Inc.,* 30 N.Y.S.3d 677 (N.Y. App. Div. 2016) …………………………………………………………………….…...………… 13

*Knighton v. Municipal Credit Union*, 2009 NY Slip Op 30204(U) (N.Y. Sup. Ct. 1/12/2009) .... 10

*McGhan v. Eversol,* 608 F. Supp. 277, 285 (S.D.N.Y. 1985) …………………………………... 16

*Peace v. KRNH, Inc.*, 12 A.D.3d 914 (3d Dep't 2004) ……………………….………………… 12

*Pugliese v. Actin Biomed LLC*, 2013 NY Slip Op 03746 (1st Dep't 2013) ………………… 12-13

*Remba v. Federation Employment and Guidance Service*, 76 N.Y.2d 801 (1990) ……………... 12

*Rodgers v. Lenox Hill Hosp.*, 211 A.D.2d 248 (N.Y. App. Div. 1995) ...………………………... 10

*Segarra v. Federal Reserve Bank of N.Y.,* No. 14-1714 (2d Cir. 2015) ………………………… 10

*Stroock & Stroock & Lavan v. Beltramini*, 157 A.D.2d 590 (1990) ………………………..…… 22

*Webb-Weber v. Community Action For Human Services, Inc. et al.,* 2014 NY Slip Op 03428 (N.Y. May 13, 2014) …...………………………………………………………………….………… 5, 11

**Other authorities**

Executive Order No.202 of Gov. Andrew Cuomo (March 7, 2020) ……………………..…… 8

Executive Order No.202.4 of Gov. Andrew Cuomo (March 16, 2020) …………………….... 8

Executive Order No.202.6 of Gov. Andrew Cuomo (March 18, 2020) …………………….… 8

Executive Order No.202.7 of Gov. Andrew Cuomo (March 19, 2020) …………………….… 9

Fed. R. Civ. P. R. 12(b)(6) ……...…………………………………………………............ 4

Hire Counsel's Contract Employee Conduct Rules ……………………………..……………..8

Hire Counsel Handbook for Temporary Employees ……………………….………………... 8

H.R. 6074 the Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020
(March 6, 2020) ……...……………………………………………………………..… 9-10

N.Y. Labor Law § 740 and § 215 ...……………………………………….……5, 6, 9, 10, 12

Paul, Weiss, Rifkind, Wharton & Garrison LLP Coronavirus: Employment Law Considerations
and Practical Guidance for Employers (March 10, 2020) ………………………………… 10

The Centers for Disease Control and Prevention Interim Guidance for Businesses and Employers
(March 2, 2020) …...………………………………………………………………...……9-10

## PRELIMINARY STATEMENT

1.      Plaintiff/counterclaim defendant HC2, Inc. ("HC2") has made two unsupportable claims of breach of contract and faithless servant doctrine.  That does not stop it from belittling defendant/counterclaim plaintiff Andrew Delaney ("Delaney") for "only" asserting four counterclaims against it. (Dkt. No. 82 HC2's memorandum of law in support of motion to dismiss ("M.D.") p. 1)   While repeating that Delaney's counterclaims are "threadbare" (M.D. p. 4), HC2's two claims are literally a few sentences contained in 2-3 short paragraphs.

2.      With a team of seven lawyers from two major law firms located in California, Florida, New Jersey, and New York, some of whom are not admitted to practice law in New York, HC2's motion to dismiss has little to offer and is a self-contradictory attempt to deny the factual allegations in Delaney's counterclaims with no evidence and to attempt to re-write history with incorrect information.

3.      Regarding Delaney's amended whistleblower retaliation counterclaim, while defense attorneys always argue that public health concerns raised under the whistleblower statutes are too *de minimis* in scope to trigger their protections, this is a poor argument in the instance of a growing pandemic threat with rapid person-to-person transmission rates as was the case with the COVID-19 coronavirus in New York City in March 2020.  This is an early employment case involving the coronavirus in New York.  N.Y.S. public policy also supports not dismissing Delaney's whistleblower complaint.

4.      HC2 maintains that the other three counterclaims – breach of confidentiality, intentional infliction of emotional distress, and abuse of process – "all remain premised on nothing more than a combination of speculation, attorney conjecture, and privileged litigation statements."

1

(M.D. p. 1)  As for the "privileged litigation statements", in both its previous opposition papers and in this motion to dismiss neither of HC2's national law firms even pretends that any of its false statements about Delaney and claims against him were anything other than lies.  Delaney's other three claims are based on facts not speculation or, to coin a phrase, "attorney conjecture".

5.       On a motion to dismiss all allegations have to be accepted to be true.  HC2's motion should be rejected, and this lawsuit should proceed to discovery.

<u>FACTS</u>

6.       The facts are stated in paragraphs 5-27 of the re-filed counterclaims and are hereby re-stated herein.

7.       While HC2 is nominally the named plaintiff in this case, it is just the agent and front party for what HC2's newly added attorneys refer to as the "three-tier structure" of Toyota Motor Corporation ("Toyota"), its lawyers Wilmer, Cutler, Pickering, Hale & Dorr LLP ("Wilmer Hale"), and HC2 itself.

<u>HC2's STATEMENT OF FACTS MISREPRESENTS THE FACTS</u>

8.       In its statement of facts, HC2 tries to reduce Delaney's five pages of detailed factual allegations consisting of 22 paragraphs (Dkt. No. 74 Defendant's first amended answer and counterclaims ("Am. Answer.") pp. 7-12) to a few sentences as reductivism to diminish his counterclaims.  (M.D. pp. 2-3) This is because HC2 cannot deny Delaney's facts so chooses to skate over them.  More misquotes/mis-cites are at paragraphs 28, 36, 39, 51, 53, and 55 *infra*.

9.       HC2 states that Delaney "worked with several others from HC2's on site document review center in Manhattan."  (M.D. p. 2) But Delaney only worked with two other Thai document

reviewers, not "several".  In addition to the Thai project, there were approximately two dozen other document reviewers working on other document reviews at 360 Lexington Avenue under the same exact working conditions in terms of sick workers there, physical distancing, etc.

10.     HC2 says that when Delaney sent the email on March 17, 2020 "employers were evaluating the rapidly changing circumstances and deciding how best to respond."  (M.D. p. 2) However, as alleged in the counterclaims, the other document review agencies had already moved to remote and closed their offices.  (Am. Answer. footnote 5) Delaney's whole point is that HC2's management did not know what was going on in the Manhattan office and was doing nothing to respond to the daily rapidly developing and growing public health and safety risks.

11.     HC2 now says: "Counterclaimant was not fired for sending that email.  Nor was he singled out in any way."  (M.D. p. 2) This contradicts HC2's argument that Delaney's complaint only pertained to himself and not other office workers.   The emails make clear that Delaney was singled out.  Ultimately, this is for the trier of fact to decide.

12.     While whenever it is convenient such as the preliminary injunction ("PI") HC2 states that it alone was Delaney's employer, when it comes to the whistleblower claim it washes its hands of what happened and blames it on Toyota and Wilmer Hale.  "On the same day, [Wilmer Hale] decided not to move to a remote document review, but to suspend the review for the time being." (M.D. p. 3)   This is an attempt to blame someone else.  The motion to dismiss then says: "Asnes' email also informed the team that it had sought authorization from [Wilmer Hale] to let the team work remotely, and that HC2 would notify Counterclaimant directly if, and when, the review could resume in New York." (M.D. p. 3) But this isn't a quote from the Asnes email and it isn't what it said.  What the Asnes email said was that "the client" (Toyota) had not authorized remote work.  Days and weeks after March 17, 2020 when it claims the Thai "project in NYC"

3

was only suspended, it still refused to allow remote work.  In his deposition, HC2 general counsel Stephanos Zannikos testified that the project had not resumed in New York or anywhere else. Based on information and belief, this document review has not resumed.

13.     HC2 then says: "Over the next several weeks, Counterclaimant made a series of escalating demands made directly to [Wilmer Hale]'s managing partners and to senior executives of [Toyota]." (M. D. p. 3)

## ARGUMENT

I.     LEGAL STANDARD

14.     On a motion to dismiss, the Court must assume that all of the facts alleged in the counterclaims are true, construe those facts in the light most favorable to the counterclaim plaintiff, and draw all reasonable inferences in favor of the counterclaim plaintiff.  *See Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 169 (2d Cir. 2009).

15.     Detailed factual allegations are not required in order for a complaint to survive a Fed. R. Civ. P. R. 12(b)(6) motion; the plaintiff need merely "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

16.     In *Arista Records LLC v. Doe*, 604 F.3d 120-121 (2d Cir. 2010), the Second Circuit explained that it would be "impermissible" to require a plaintiff to plead any "specific evidence or extra facts beyond what is needed to make the claim plausible."

17.     HC2 has not met its burden of showing that Delaney has failed to plead claims for relief that are plausible on their face under *Twombly* and *Arista Records*.

## II.   COUNTERCLAIM ONE (WHISTLEBLOWER RETALIATION) IS VALID

18.     The counterclaims allege that HC2 unlawfully retaliated against Delaney after he raised a complaint with it under N.Y. Labor Law § 740 and § 215. Section 740(2) prohibits employers from retaliating against a whistleblower who discloses or threatens to disclose an employer's practices that present "a substantial and specific danger to the public health or safety." (Am. Answr. para 20)

19.     Although citing the N.Y. Court of Appeals holding in *Webb-Weber v. Community Action For Human Services, Inc. et al.,* 2014 NY Slip Op 03428 (N.Y. May 13, 2014) at 3, in his re-filed counterclaims Delaney nevertheless specified certain laws, rules, and regulations violated. *See* Mintz Levin article about *Webb-Weber*: "Employees Need Not Identify Specific Law, Rule or Regulation Violation in Pleading Retaliation Claim Under New York's Whistleblower Statute."[1]

20.     HC2 argues that: "As an initial matter, the amended counterclaim relies on the same insufficient allegations that the Court previously rejected." (M.D. p. 5) This is false.  There is no comparison between the original and the amended counterclaim.   Moreover, the Court's order dated July 17, 2020 did not state "insufficient allegations" as the basis for dismissing the whistleblower retaliation counterclaim.

21.     HC2 cites as an "insufficient allegation" "that his March 17, 2020 email to HC2 and [Wilmer Hale] spurred the alleged retaliation." (M.D. p. 5)   In his counterclaim, Delaney provided probative evidence that HC2 retaliated against him 103 minutes after he sent the March 17, 2020 email.  Only 28 minutes after Delaney sent that "insufficient" email, Brian Hartstein emailed: "Can we fire him?  Just a thought."   These are factual issues for the jury.  Also, the merit

---

[1]   https://www.mintz.com/insights-center/viewpoints/2226/2014-05-employees-need-not-identify-specific-law-rule-or-regulation

of allowing this case to proceed to discovery is exemplified in that the Posada/Hartstein email dated March 17, 2020 cited in the whistleblower retaliation claim was obtained by Delaney through the limited PI document production.  Delaney should have the opportunity for full discovery for this and the other three claims.

22.     HC2 then wrongly argues that the "sole basis for Counterclaimant's allegations that he engaged in a protected activity under NYLL § 740" was the March 17, 2020 email.  (M.D. p. 5) In the interim 103 minutes before he was fired, Delaney did not have the leisure to make additional reports while he was waiting for a response.  Anyway, this email started a process of what HC2 admits was Delaney's escalating complaints which it was determined to put an end to. *See* para 13 *supra*.  It is part of the evidence that Delaney engaged in a protected activity by raising uncontradicted public health and safety concerns about the conditions in HC2's Manhattan office and about remote work. This was not subjective malingering on Delaney's part. From March 17, 2020-April 14, 2020, Delaney continued to complain to Toyota, Wilmer Hale, and HC2 about the unhealthy office conditions and refusal to offer remote which HC2 argued in the complaint wasn't allowed under its alleged employment agreement with him.

23.     HC2 tries to minimize Delaney's March 17, 2020 email and contradicts its own pleadings by now claiming that "this email alone is his purported whistleblower complaint." (M.D. p. 5) This is inconsistent with HC2's pleadings which allege that after March 17, 2020 Delaney continued and escalated his complaints. There was not only "this email alone". *See, for* example, paragraphs 5, 6, 23, 25, and 41 of HC2's complaint.  (Dkt. No. 1) Paragraph 23 states: "Nonetheless, Delaney sent multiple emails on March 17 and 18 to [Wilmer Hale] and [Toyota] falsely claiming that he had been wrongfully terminated for expressing concerns about COVID-19." (emphasis added) This did not end on March 17, 2020 which is part of the reason HC2 is

suing Delaney.  Paragraph 25 reads: "<u>On March 18, Delaney responded to [Wilmer Hale]'s email,</u> <u>this time accusing its attorneys of colluding with [Toyota] to terminate him in retaliation for raising</u> <u>concerns about workplace safety. He forwarded his email to [Toyota] immediately thereafter</u>." (emphasis added) Paragraph 41 reads: "…. <u>he raised his complaints directly to [Wilmer Hale] and</u> <u>[Toyota]</u>…. on <u>March 17, March 18 and March 27</u>, in violation of his Employment Agreement." (emphasis added)

24.     Mindbogglingly, HC2 says:  "It is wild speculation to suggest that proximity to possibly ill co-workers somewhere in the office created a 'quantum of dangerous activity' so serious that it posed a substantial and specific danger to 'public health or safety'." (M.D. p. 9) But this is how the deadly COVID-19 virus spreads.  That is why there was important guidance and rules from state and federal authorities calling for physical distancing of workers at the workplace and requiring that sick workers stay at home.  HC2 never even purports to have complied with any coronavirus safety and preventative law, rule, or regulation.

25.     HC2 then tries to diminish Delaney's public health complaint that HC2 was not maintaining safe and healthy office conditions and made no changes to the closed physical work environment during the coronavirus as mere "personal grievances".  (M.D. p. 6) COVID-19 was not a "personal grievance" of Delaney.  HC2 had no managers on site at that time and the concerns raised by Delaney about lack of social distancing at work and workers coming into the office with flu-like symptoms were legitimate health risks.  On March 17, 2020, Joan Davison and Patti Ayala were in Chicago, Hartstein was in Los Angeles, Denise Asnes was in Philadelphia, Michael Posada was in Washington, D.C., and Nathan Croumer was in Dayton, Ohio.

26.     HC2 now says that "his March 17, 2020 email still does not report any HC2 activity or practice that could have violated any law, rule, or regulation." (M.D. p. 6) This is merely HC2's

incorrect opinion.  This report and his later emails about the coronavirus conditions in the 360 Lexington Avenue office are exactly the type of activity protected by the statute.  If a concern about the unhealthy and unsafe office conditions involving a deadly fast-spreading virus is not sufficient to be protected, it is hard to imagine what would be a protected activity.  This is pure sophistry.

27.     HC2 then maintains: "His attorney's conjecture that this email 'criticized HC2's HR Department's lack of measures to seriously address the coronavirus issues in the office,' adds nothing." (M.D. p. 6) Doing so was part of his whistleblower complaint.

28.     Next HC2 argues that of the laws, rules, or regulations cited by Delaney "[n]one gives foundation to his Labor Law whistleblower claims." (p 6) It completely mischaracterizes these and omits to mention Gov. Andrew Cuomo's Executive Order No. 202 (March 7, 2020) (declaration of state of emergency) ("a disaster is impending in New York State"). With the usual distortion, it says that "Counterclaimant does now allege that HC2 violated…… the HC2 employment agreement dated December 28, 2016."  (M.D. p. 6) As it knows perfectly well, Delaney did not invoke the employment agreement but merely pointed out that it cross-referenced the Handbook and the Rules. (Am. Answr. para 41) They are rules incorporating and implementing federal and state law which applied to all workers, not only Delaney, and which HC2 keeps trumpeting the importance of.  *Cf.* paragraph 18 of HC2's complaint. (Dkt. No. 1)

29.     Next, HC2 says: "His contention that 'HC2 was ignoring the governor's executive orders mandating remote work' is disingenuous and meaningless." (M.D. p. 7) This is again empty rhetoric.   HC2 was ignoring the governor's executive orders which commenced March 7, 2020. HC2 states that the governor had not yet issued executive order 202.6 (mandating 50% remote work) when Delaney wrote his March 17, 2020 email.  However, on March 16, 2020 (order 202.4),

the governor directed local governments to reduce their workforce by 50% and to allow nonessential employees to work at home and it was reported that this would be extended to businesses which it was.  On March 19, 2020 (order 202.7), the governor ordered businesses to decrease their in-office workforce by 75%. Work from home is extremely common in the document review world.   HC2 asserts in the motion to dismiss and elsewhere that Delaney was never terminated, that he was still on the Thai project, and that it continued to communicate with him about work.  After March 18, 2020, HC2 continued to write to Delaney that "remote work is not an option."  (Am. Answr. para 20) As Delaney expects the evidence to show, HC2 refused to allow work from home despite the almost universal move to remote in the document review industry and ultimately continued to resist in the days and weeks after March 17, 2020 during which it was emailing updates and "the next steps" to him.  For example, on March 27, 2020, Ayala emailed Delaney "Subject: Next Step – Re: Follow Up – Andrew Delaney – COVID 19": "Unfortunately, remote work for your project – not only in New York but in all other sites as well – is not available at this time." (Am. Answr. para 39) Before that on March 19, 2020, Ayala emailed Delaney about "the review" and said that "remote review" was "extremely challenging" in other words unavailable (attachment 23 to Dkt. No. 45) HC2's actual violation of the governor's executive orders mandating remote work was unlawful.

30.     Regarding the Depts. of Health and the CDC, HC2 says this "guidance" does not qualify as a law, rule, or regulation under NYLL § 740. (M.D. p. 7) Although called "interim guidance", the Depts. of Health's rules are detailed and prescriptive, and the governor's orders make clear they are mandatory.  On January 26, 2020, Sen. Charles E. Schumer (N.Y.) asked the Administration to declare a public health emergency and "called for a broad and swift response to the COVID-19 outbreak" which led to H.R. 6074 (the Coronavirus Preparedness and Response

Supplemental Appropriations Act, 2020) on March 6, 2020, Title III of which provides for a "CDC-wide activities and support program." (Exh A hereto) The Occupational Safety and Health Administration ("OSHA") has also been enforcing CDC guidance.  Compliance with these FAQ's or guidelines is *prima facie* evidence that an employer has taken adequate steps to protect employees. Moreover, none of the cases HC2 cites involve NYLL § 740.  The *Segarra* case is a lower court decision which was appealed involving a financial whistleblower and which is inapposite.  *Segarra v. Federal Reserve Bank of N.Y.,* No. 14-1714 (2d Cir. 2015).  *See Rodgers v. Lenox Hill Hosp.,* 211 A.D.2d 248 (N.Y. App. Div. 1995)(denying motion to dismiss where plaintiff showed "that numerous laws, operating procedures, and protocols had actually been violated" including "the EMS Operating Guide").

31.     In a footnote, HC2 writes off the legal publication from the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP dated March 10, 2020, which Delaney's counterclaim cited, as "an attorney marketing publication".  (M.D. footnote 4) Paul, Weiss' unbiased opinion about what the law required on March 10, 2020 is influential and supports that HC2 was not following the law.  For example, Paul, Weiss said that employers have a general duty under the Occupational Safety and Health Act (OSH Act) General Duty Clause (GDC) to furnish a workplace free from recognized hazards that may cause death or serious harm to their employees and prohibits an employer from retaliating against workers for raising concerns about safety and health conditions. *See Knighton v. Municipal Credit Union*, 2009 NY Slip Op 30204(U) (N.Y. Sup. Ct. 1/12/2009) ("the court finds there is no bar to the assertion of such a [general duty-based] cause of action").

32.     HC2 then goes back to arguing with Delaney's facts.  It says: "it remains utter speculation that HC2 did anything to violate even this advisory guidance." (M.D. p. 8) While part of its effort to minimize the N.Y.C. Dept. of Health and the CDC, it is uncontradicted that HC2

actually did not follow their rules.  In all its pleadings, HC2 never counters that Delaney's complaints were untrue or that it took any public health and safety measures during the coronavirus.  HC2 did not take any public health and safety measures at the 360 Lexington Avenue office and did not change the physical distancing in Delaney's office where he worked several inches from his two colleagues in a small windowless office. (Am. Answr. para 13) Delaney had a right to make a public health and safety report to it and not to face retaliation for doing so.  HC2's reaction to his email was purely retaliatory and did not evince any interest in the substance of his complaints such as lack of health and safety measures, sick workers in the office, physical changes to the work environment, social distancing, gloves and masks, etc.  Delaney's notification to HC2 was not based on "speculation" (M.D. pp. 8-9) but instead on his and others in the office's first-hand knowledge and direct observations of what HC2 actually did or failed to do.  Only HC2's management was left to speculation because none of them were in New York at that time.

33.    HC2 then cites only the second half of the sentence the *Webb-Weber* decision, that "[for pleading purposes, the complaint need not specify the actual law, rule or regulation violated, although] it must identify the particular activities, policies, or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct." (M.D. p. 8) The re-filed counterclaims sufficiently identify HC2's particular activities, policies, or practices.  Delaney's complaints went to HC2's activities, policies, and practices of not allowing remote work, of not restricting sick employees from coming into the office and of incentivizing them to come to work, of not implementing any physical distancing, of not reducing the number of workers per room, of not mandating the wearing of masks and/or gloves, and of not even being aware of the public health and safety violations at 360 Lexington

Avenue.  Also, HC2's pay policy incentivized employees to report into work even when they were sick otherwise they would not be paid. (Am. Answr. Para 30)

34.    Incredibly and really proving Delaney's point, HC2 then states that it "sent the entire document review team home within hours of Counterclaimant's email, eliminating the need for social distancing in the workplace." (M.D. footnote 5) This is an admission to an unlawful activity, policy, or practice and that HC2 did not implement social distancing, which HC2 earlier says was "speculative".  The idea that HC2 "sent" the "entire document review team home" in 103 minutes so that it did not have to comply with the law goes to the heart of Delaney's complaint against it for retaliation and illustrates that its idea of compliance is to fire people (while calling it "sending them home" so it cannot be accused of taking an adverse employment action).  What HC2 is really saying here is: "You are fired so that we don't have to comply with the law if you report something."

35.    HC2 then cites a string of § 740 cases for the proposition that the employer's conduct has to be of "the type of violation which creates a substantial and specific danger to the public health or safety" (M.D. p. 9) without checking whether they had been overturned on appeal and without applying them to this case.  In March 2020, COVID-19 was the preeminent public health and safety issue in New York City.  The cases cited are distinguishable.  Also, none of these cases are in the COVID-19 pandemic context.  *Cotrone* involved leaving tanker trunks with hazardous materials unattended on a public street.  *Cotrone v. Consolidated Edison Co. of N.Y., Inc.,* 2008 NY Slip Op 03099 (1st Dept 2008).  *Remba v. Federation Employment and Guidance Service*, 76 N.Y.2d 801 (1990), involved an allegation of white-collar crime.  *Peace v. KRNH, Inc.*, 12 A.D.3d 914 (3d Dep't 2004) involved a plaintiff writing about respiratory treatment of a patient that had not been performed where there was no harm.  In the last case, *Pugliese v. Actin*

*Biomed LLC*, 2013 NY Slip Op 03746 (1st Dep't 2013), <u>HC2 cites the lower court decision without noting that it had been reversed on appeal</u>.  In *Pugliese*, the First Department found that the "amended complaint alleged violations of specific FDA regulations in connection with clinical trials of an experimental drug, and some of those violations, if true, would present a substantial and specific danger to public health and safety."  *See also Fough v. Aug. Aichhorn Ctr. for Adolescent Residential Care, Inc.,* 30 N.Y.S.3d 677 (N.Y. App. Div. 2016) (denying motion to dismiss § 740 claim).

36.   HC2 continues to <u>misquote</u> and attempt to minimize Delaney's whistleblower counterclaim by stating that "Counterclaimant's report that, in his lay opinion, his co-workers might have had 'flu-like' symptoms – speculation itself – in no way conveys that HC2 had an activity, policy, or practice in violation of a law, rule, or regulation *which created* a 'substantial and specific danger to public health or safety'." (M.D. p. 9)  Delaney's email did not say that his co-workers "<u>might have</u> had" "flu-like symptoms" (emphasis added) – he said they <u>did have them</u> and cited the specific indications:  "I have been coming into work during the coronavirus but there are at least 3 people in the office who have clear flu-like symptoms – coughing, sneezing, runny nose – who are at the office, both yesterday & today.  This office is quite a closed environment.  Obviously, this poses a public health risk."  (attachment 20 to Dkt. No. 45) It was not "speculation" but was based on Delaney's direct observations and describing the flu-like symptoms.  Paragraph 32 of the counterclaims quotes the N.Y.C. Health Department: "Promote physical distancing.  Emphasize that staff must stay home if sick. Staff who arrive to work sick or become sick at work should be sent home immediately."

37.   HC2 again goes back to trying to stick the blame on Wilmer Hale by saying that "HC2 and [Wilmer Hale] suspended the project literally within hours of Counterclaimant's email

completely obviates any 'substantial and specific danger to the public health or safety' caused by proximity amongst members of the review team." (M.D. p. 10) This is an admission that Delaney's complaints were valid and well-founded in the first place. However, similar to paragraph 34 *supra*, HC2's way of compliance with public health and safety is to fire people. But the whistleblower retaliation law prohibits this.

III. <u>COUNTERCLAIM TWO (BREACH OF CONFIDENTIAL RELATIONSHIP) IS VALID</u>

38.     HC2 returns to its theme of trying to minimize Delaney's counterclaims in the case of his counterclaim for breach of confidential relationship. It says that "Counterclaimant now repeats the same fanciful allegation that HC2 disclosed his identity 'to the other side', asserts that his resume was posted to the public docket during the PI briefing, and claims that HC2 'exposed' him as the *John Doe* plaintiff in the Florida *John Doe* complaint." (M.D. p. 12)

39.     Starting with the first, Delaney did not "repeat" the allegation that HC2 disclosed and misused his information but provided new allegations and did not use the vague phrase "the other side" as again inventively misquoted by HC2. (Am. Answr. paras 7-8) HC2's statement that this allegation is "fanciful" is consistent with its attitude at the time which was to hope that it would disappear. However, Wilmer Hale and its project point man Posada believed that it was true since they and HC2 actually knew what was going on in Thailand and Japan.

40.     In the amended counterclaims, Delaney explained that: "The document review was being run out of and with servers based at [Toyota] in Japan to guarantee it absolute control and investigated high risk issues in Thailand of years of dangerous corrupt practices which were ongoing. This investigation posed criminal and pecuniary risk to well-placed persons in the Thai establishment. The risks are not simply Delaney's subjective opinion, but Thailand has been

14

ranked as one of the most dangerous countries for expat Americans.  On November 28, 2019 (Thanksgiving holiday), Delaney out of the blue and unexpectedly received a suspicious email to his personal email account from a well-connected, influential tax lawyer whose professional interests were potentially at risk from the investigation (the 'Thai email')." (Am. Answr. para 7-9) As will be shown at trial, the Thai email was sent the day after Toyota unexpectedly resumed production of the Prius automobile in Thailand which was implicated in lobbying and bribery and was an effort by the lawyer-payor in question to secure Delaney's help to unfreeze "fees" and "payments" in the amount of millions of Baht that were owed to his firm.

41.    HC2 now says: "His allegation that he had received an email from people who could only have known about him 'by a disclosure from HC2' is utter speculation that deserves no credit."  (M.D. p. 12) The phone calls and emails back and forth with Wilmer Hale and Posada, which Delaney intends to introduce at trial, will leave no doubt that they agreed with Delaney that his allegations were true.  As to the identity-involvement-information-work-product leak, the *John Doe* exposure, and the unsealed resume posting, each act in isolation was a violation in its own right but when viewed in conjunction evince a pattern of entitlement and no concern for protecting Delaney's identity.  Even HC2's motion to dismiss does not assert that these were mistakes but that it had a right to do these acts.

42.    HC2 says that Delaney's personal information "at issue, including his identity, is not protectable confidential information."  (M.D. p. 13) HC2 has a broad view of confidentiality when it comes to itself and its clients but a very narrow view as to Delaney's.  Delaney asserted that not only his personal information but also his identity, involvement, and work-product were misused in violation of HC2's confidentiality obligations to him.  This is because Toyota, which wanted to continue its lucrative corrupt business practices in Thailand, was looking for a way to

torpedo the investigation which it eventually accomplished.  The counterclaims explain that: "The only way these individuals in Thailand could have known about Delaney's work on this review was by a disclosure from it." (Am. Answr. para 47) This has to be accepted as true and is for the ultimate factfinder to decide.

43.     *McGhan v. Eversol,* 608 F. Supp. 277, 285 (S.D.N.Y. 1985) has nothing to do with the breach of confidential relationship in this case.  *McGhan* involved a claim for misappropriation of ideas:  "In order for an idea to be susceptible to a claim of misappropriation, two essential elements must be established: the requisite legal relationship must exist between the parties, and the idea must be novel and concrete."   There was no claim for breach of confidential relationship.

44.     Regarding Delaney's second instance of breach of confidential relationship, HC2 does not deny that it posted his resume unsealed on the public docket in this case and never made any effort to seal it in violation of the protective order that it itself sought.  It marked the document at the top "CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER."   This shows HC2's outrageous conduct and complete disregard for the Court's protective order.  Now, it says that Delaney's information "is not protectable confidential information."  But as per footnote 20 of the counterclaims, even Zannikos of HC2 disagreed with this in his deposition: "Q Did HC2 have an obligation to protect Mr. Delaney's privacy and confidentiality? A There may be legal obligations on the company to protect personal information that belongs to Mr. Delaney." Zannikos deposition dated May 19, 2020 at p. 34. (exhibit A to Dkt. No. 47 declaration of Ronald Rossi)

45.     Footnote 20 of the counterclaims also plausibly asserts that in posting Delaney's resume online HC2 violated its own policy on resume submissions and its published privacy policy:  "Hire Counsel uses Human Resource personal information for limited purpose that includes complying with employment related laws and regulations as well as for payroll purposes."

HC2 obtained the resume which it posted online from Delaney's confidential HR files and not from discovery in this case.  (Am. Answr. Para 50) The truth is that HC2 deliberately posted Delaney's resume as attachment 1 to Dkt. No. 44 as a way of publicly damaging him.  Delaney is a private person and has no Internet presence whatsoever.  This was part of HC2's campaign to ruin Delaney's professional reputation and future employment prospects.  Delaney has been unemployed since he worked at HC2.  If the shoe were on the other foot, HC2 would be filing a motion for contempt against Delaney for violating the Court's protective order.

46.     While suing Delaney for allegedly disclosing anything about Toyota, HC2 then falsely states that: "Counterclaimant has failed to allege any injury from such disclosure."  (M.D. p. 13) Regarding the misuse of his information, Delaney alleged the real threat that this posed to himself, his property, and his related parties in Thailand:  "Delaney, who is a Thai, intends to return to Thailand and did not want his involvement in this controversial review to become known there." (Am. Answr. para 47) Regarding HC2's illegal posting of his resume on the docket, which it brushes aside as unimportant while continuing the blocking of 46 of the 48 exhibits to Rotman's declaration that are publicly available documents on the worldwide web, Delaney has a right to privacy and not to have his resume available to everyone in the world.

47.     Finally, HC2 says "counterclaimant's assertion is frivolous that HC2 'exposed' him as the Florida *John Doe* plaintiff." (M.D. p. 13) Ridiculously, HC2's lawyers, who are not admitted to practice law in Florida, now state that: "Counterclaimant's use of a pseudonym in this action was <u>impermissible</u> under Florida law." (emphasis in original) (M.D. p. 13)  In fact, as explained in the counterclaims, what HC2 did violated the Eleventh Circuit's policy allowing a plaintiff to proceed anonymously if the plaintiff possesses "a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings" and

17

which the Florida court allowed.   *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992).  (Am. Answr.
para 49) The Florida court has as of this date continued to allow Delaney's *John Doe* status.
Neither HC2 nor its "three-tier structure" of Toyota, Wilmer Hale, and HC2 ever made an
application to the Florida court to oppose Delaney's *John Doe* status in Florida.  Instead, while
demanding that the whole case be sealed, HC2 unilaterally exposed Delaney as the *John Doe* in
its April 22, 2020 complaint in this case and subsequently including by its lawyer Ronald Rossi to
the media.  Now it pronounces *ex cathedra*: "Furthermore, Counterclaimant's desire for anonymity
in Florida could in no way interfere with HC2's ability to enforce its rights in this action…."  (M.D.
p. 13-14) In other words, HC2 unilaterally decided that its supposed interests overrode Delaney's
right to confidentiality – exactly Delaney's point.  Delaney's *John Doe* status in the Florida *John
Doe* case had nothing to do with its "ability to enforce its rights in this action" and the exposure of
him was purely gratuitous calculated to undermine Delaney's confidentiality as a litigant.   The PI
arguments by HC2 earlier in this case show that it was not happy that Delaney filed as a *John Doe*
– which it told this Court was motivated by Delaney's desire to make it difficult for HC2 to find
out about the Florida filing  – and was therefore determined to expose him.

48.    The only way HC2 could have exposed Delaney as the *John Doe* was by its
possession and illegal use of his confidential information.  As stated in the counterclaims, in
paragraph 9 of its complaint HC2 says: "The State Court Complaint names the plaintiff as 'John
Doe,' but the allegations in that complaint -- including allegations quoting HC2's emails to
Delaney regarding suspension of the Project -- leave no doubt whatsoever that Delaney is the
unnamed plaintiff."  (Am. Answr. para 49) This makes no sense because only HC2, Toyota, and
Wilmer Hale would have known this due to their possession of Delaney's information – not
everyone in the world. It is HC2 who advertised this to the world as part of its sleazy tactics.

## IV.   COUNTERCLAIM   THREE   (INTENTIONAL   INFLICTION   OF   EMOTIONAL DISTRESS) IS VALID

49.     The motion to dismiss posits that the "amended counterclaim" for intentional infliction of emotional distress "repeats the same empty allegations as before." (M.D. p. 13) However, Delaney has completely restated this counterclaim and detailed six legitimate instances of HC2's extreme and outrageous actions.   HC2 also states that the counterclaims should be dismissed because they are in its opinion a "rambling narrative" (M.D. p. 15) but there are clear delineations of HC2's outrageous conduct.

50.     HC2's first extreme and outrageous action "to allow the disclosure of Delaney's confidential and personal information to opposing lawyers and lobbyists in Thailand without his consent" (Am. Answr. para 54) HC2 emptily says is not plausible.  However, in paragraphs 7, 8, 9, 47, and 54 of the counterclaims Delaney asserts a legitimate claim that he will prove at trial.

51.     HC2's second extreme and outrageous action which "was to terminate Delaney for making a public health and safety complaint about the conditions at its 360 Lexington Avenue office in the middle of the worst crisis in New York history" is completely misstated and misquoted by HC2.  (Am. Answr. para 55) However, in its tendentious "editing" of the counterclaim, HC2 tries to tie this to its "absolutely privileged litigation statements" by stitching together parts of different sentences: "Counterclaimant also again (sic) alleges an IIED claim based upon his alleged termination of employment to 'preempt a lawsuit from him with baseless accusations pulled out of their hat'."  (M.D. p. 14) Delaney was not fired to preempt a lawsuit for unlawful firing.  It is circular and, to be generous, deliberately misquoting which it does all the time.  Delaney said the termination was whistleblower retaliation for his making a public health and safety complaint.  But the motion to dismiss is specious because as HC2 knows perfectly well Delaney never alleged that

the purpose of his termination was to "preempt a lawsuit" from him.  The purpose of this misrepresentation of his second extreme and outrageous act is to try to drag it under the theory that "HC2's litigation statements are absolutely privileged." (M.D. p. 14) The rest of paragraph 55 of the counterclaims never even refers to any "HC2 litigation statements." (M.D. p. 14) The cases HC2 cites about absolute litigation privilege are "absolutely" irrelevant to the second act.  This counterclaim is not for defamation.

52.     The third act which was "to file this lawsuit against Delaney and to fabricate malicious lies about him to ruin his professional reputation" HC2 argues "fails" "for the same reasons."  (M.D. p. 14) The filing of this lawsuit in itself is not privileged. It is an extreme and outrageous act.  Again, this is not a defamation claim.

53.     The fourth act which was to publicly post Delaney's unsealed resume on the public docket in this case HC2 claims "fails, as that activity occurred as part of this litigation."  (M.D. p. 15) HC2 had no privilege to post Delaney's resume unsealed when it was subject to a protective order.  HC2 did this even knowing that the issue of Delaney's identity was a very sensitive matter. The effect of this fourth act, in conjunction with the first act, is not additive but exponential.   It was a blatant and unapologetic violation of this Court's protective order which it does not even deny doing and which is itself extreme and outrageous conduct.  It really is an example of HC2's "anything goes" approach to the whole legal process.  Moreover, HC2's mis-citation of the lower court decision in *Twombly* - which did not end in the S.D.N.Y. but went to the Supreme Court - does not exempt its unlawful posting of Delaney's resume on the docket contrary to this Court's protective order.

54.     HC2 groups together the fifth (HC2's harassing Delaney and interfering with his right to peace and quiet) and sixth (HC2's placing Delaney on the industry DNR ("Do Not Reuse")

blacklist) extreme and outrageous acts and engages in name-calling that they are "diffuse and paranoid". (M.D. p. 15) This mental health diagnosis of paranoia comes from a company that swore that Delaney "stole documents", "threatened" it, "blackmailed" it, and "extorted" it.  HC2's group litigation with Toyota and Wilmer Hale and injection of itself in the Florida action – which its lawyers continue to talk about non-stop and know every confidential detail about – is a matter of provable fact.  HC2 does not even respond to the fifth and sixth acts on the merits but makes the biased assertion that, in its presumably disinterested opinion, "they fall short of a malicious campaign." (M.D. p. 15) These are valid allegations that Delaney's evidence will establish in this case and which are not adequately addressed by HC2's conclusory assertion that they are "fiction" and "speculation". (M.D. p. 15)

## V.    COUNTERCLAIM FOUR (ABUSE OF PROCESS) IS VALID

55.    HC2 opines that Delaney's abuse of process claim is "sensational" and "meager" at the same time. (M.D. p. 16) It mischaracterizes that it is "founded entirely on" two allegations that HC2's injunctive suit was "designed to intimate (sic) him" and then also its "continuation of the case". (M.D. p.  16)

56.    But Delaney alleged that HC2 issued civil process in connection with this set of operative facts with the intent to do harm without cause or justification and used the process in a perverted manner to achieve a collateral objective.  The abuse of process was also motivated by retaliation.

57.    HC2 says that: "As a matter of law, service of a complaint and summons, even with malicious intent, is insufficient to support a cause of action for abuse of process." (M.D. p. 16) To clarify, Delaney's allegation was that HC2 filed the case in New York when HC2 knew he was

not in New York in the middle of a pandemic and dumped the complaint by email on his Florida attorney who informed HC2's counsel he was not authorized to accept it.  The abuse of process was the out-of-state filing when it knew Delaney was not there.  The method of service is merely an appurtenant act which exacerbates and further illustrates the abuse of process.  HC2 cherrypicked one fragment of our allegation and declared it permissible.  The case cited by HC2, *Stroock & Stroock & Lavan v. Beltramini*, 157 A.D.2d 590, 591 (1990), is distinguishable because it was "founded entirely upon plaintiff's service of a summons and complaint." But the counterclaim does not contend "that the mere issuing of process" gave rise to an abuse of process claim.  What Delaney asserts is that: "Ever since he was terminated, HC2, [Wilmer Hale], and [Toyota] have been acting in concert to prevent and preempt Delaney from filing legitimate claims against them."  (Am. Answr. para 65) His argument is that part of the abuse of process was suing him in New York when there was a pending case in Florida.  This was designed to achieve a collateral objective after the New York process was issued, that is, to obtain findings of fact that Delaney breached confidentiality and stole trade secrets for the purpose of having a threat against him and destroying him and his reputation. (Am. Answr. para 55) When this objective failed in New York, HC2 redoubled its efforts in Florida albeit under potentially more favorable evidentiary standards to itself. The purpose of this was to "force him [as an individual] to litigate in multiple jurisdictions, to incur costs, and to force him to not pursue legitimate claims of right which occurred after the issuance of process." (Am. Answr. para 67) This collateral objective has obvious value to HC2 since it has offered to trade a finding in Florida as a bargaining chip in negotiations for the resolution of this action.  As a reminder, this despite representations that HC2 "is not a party to the Florida action."

58.     HC2 stated that it "is not a party to the Florida Action" but, as alleged, it has been coordinating with its group litigation parties Toyota and Wilmer Hale to force Delaney to fight fake lawsuits in multiple jurisdictions. (M.D. p. 17)  It is HC2 and its litigation partners – including HC2's lawyers who continue to threaten Delaney about a December 9, 2020 evidentiary hearing about sealing the complaint there – who filed a motion to re-open the Florida *John Doe* case so that they could use it collaterally in this case.  HC2's lawyers have made no secret of this.

59.     HC2 also tries to dredge up its old argument that "any statements in HC2's Complaint or in a judicial proceeding are absolutely privileged…" (M.D. p. 17)  However, Delaney's argument is that HC2's bad faith proposed *ex parte* temporary restraining order ("TRO"), TRO, and PI applications – which were denied - were based on exaggerated misrepresentations to the Court.  In this regard, the abuse of process counterclaim is analogous to a malicious prosecution claim that is brought after the prosecutor loses the case.  HC2 has no immunity from an abuse of process claim based on any litigation privilege.  It has to be accountable for its manifold abuses of the legal process.   HC2 cites a string of inapplicable cases involving defamation.

60.     HC2's motion to dismiss <u>does not even address</u> the other three abuse of process allegations and therefore they must be sustained.  All of these acts "occurred after the issuance of process."

61.     First, HC2 does not address Delaney's abuse of process allegation that:  "After Delaney went to great care to file anonymously, both HC2 and [Toyota] also unethically went out of their way to expose Delaney as the *John Doe* in the Florida case. As per the Court's findings in the May 27, 2020 ruling, Delaney had reasons for filing as a *John Doe*." (Am. Answr. para 71)

23

62.     Second, it ignores our unchallenged allegation that HC2, acting in concert with Toyota's Florida counsel, has continued to falsely propound that Delaney sold trade secrets. This was picked up by "The National Law Review" in a story citing this case "6 Steps to Protect Your Trade Secrets During Covid-19 Layoffs". (Am. Answr. para 72) HC2's counsel is collaborating with Toyota's lawyer in Florida to obtain a finding in this regard to be used collaterally in this action. Toyota and by extension HC2 represented to the Florida court that the basis for a potential future finding of confidentiality was "trade secrets".   This allegation is not based on HC2's statements in this litigation but rather to newspaper stories and what happened in Florida outside this litigation.   Inasmuch as HC2 keeps saying that it "is not a party to the Florida action" (M.D. p. 17), it is therefore not entitled to any litigation privilege in that case.   In its opinion, this Court held that: "The opposition cites media coverage, and the post counterclaim's Zannikos declaration, but none of that is in the counterclaim. I should have said, the opposition cites media coverage and the post complaint Zannikos declaration, but none of that is pleaded in the counterclaim. Likewise, references to the Florida action -- which appear in the opposition brief -- are not pleaded in the counterclaim."  (July 17, 2020 Tr. at 7:14-20) In the amended and re-filed counterclaim for abuse of process, Delaney added the Florida case and the media stories such as "The National Law Review" article which HC2 does not even address.  (Am. Answr. para 72)

63.     Third and finally for the three abuse of process allegations not addressed, the motion to dismiss contains no mention of or reason for dismissing the allegation that: "On July 7, 2020, HC2 had persons call and make inquiries about him at his address in Nebraska and on July 8, 2020 sent a letter to Delaney's counsel referring to its 'research' about him and attempting to fish for information as to his whereabouts." (Am. Answr. para 73) This is valid and uncontradicted.

24

<u>CONCLUSION</u>

64.     For the foregoing reasons, it is respectfully submitted that HC2's motion to dismiss should be denied in its entirety.

Dated:  August 31, 2020                          Respectfully submitted,


                                                 By:/s/Robert Rotman_____
                                                 Robert Rotman
                                                 *Attorney for Counterclaim Plaintiff*
                                                 305 West 24th Street Apt. 17R
                                                 New York, NY 10010
                                                 (646) 606-4867
                                                 rrotmanlaw@gmail.com

25