UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
HC2, Inc. d/b/a/ Hire Counsel,

        Plaintiff,

    -against-                            1:20-cv-03178-LJL

Andrew Delaney,

        Defendant.
----------------------------------------------------------x

<u>Declaration of Andrew Delaney</u>

       I, ANDREW DELANEY, hereby declare under the penalty of perjury as follows:

    1.     I am the Pro Se Defendant in the above-captioned action.  I have appealed the order purporting to terminate me from the case.

    2.     I submit this declaration in support of my motion to recuse the judge, U.S.D.J. Liman, in the above-referenced matter.

    3.     Attached as Exhibit A is a true and correct copy of Judge Liman's decision and order, dated December 18, 2020, in which he dismissed all of my amended counterclaims.  In that decision, Judge Liman wrote:  "However, if the allegations of the complaint are assumed to be true, and at this stage they must be, Delaney committed very serious misconduct against HC2 and its clients."

Dated: December 20, 2021

                         Respectfully submitted,
                         /s/Andrew Delaney
                         Pro Se Defendant
                         330-340 Baychester Avenue
                         Bronx, New York 10475
                         orchrd@hotmail.com

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                         :

HC2, Inc.,                                  :

                 Plaintiff,          :

                                  :             20-cv-3178 (LJL)

        -v-                       :

                                  :          OPINION AND ORDER

ANDREW DELANEY,                :

                                :

               Defendant.        :

                                :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff, Counterclaim-Defendant, HC2, Inc. ("HC2"), moves, pursuant to Fed. R. Civ.

P. 12(b)(6), to dismiss the amended counterclaims at Dkt. No. 74 ("Amended Counterclaims")

against it filed by Defendant, Counterclaim Plaintiff, Andrew Delaney ("Delaney").  *See* Dkt.

Nos. 81 and 82.

      For the following reasons, the motion is granted.

## BACKGROUND

      The following facts are taken from the answer and the Amended Counterclaims and the

documents incorporated therein, and the paragraphs of the complaint that are admitted, all of

which are assumed to be true for purposes of this motion only.

      Delaney is a New York resident and lawyer admitted to practice in New York.  HC2,

which also does business under the name Hire Counsel, is a legal staffing agency incorporated in

the District of Columbia with its principal place of business in Chicago, Illinois.

      From September 30, 2019 to January 3, 2020 and again from February 18, 2020 to March

17, 2020, Delaney worked on an at-will basis for HC2 on a Thai language document review

project (the "Project") for a law firm (the "Law Firm") and its client (the "Client").  Dkt. No. 74

¶ 6.   Pursuant to a three-way agreement, dated September 25, 2019, the Law Firm and the Client agreed to retain HC2 to provide attorneys proficient in Japanese and Thai languages to work on the Project, and HC2 agreed to maintain the confidences of the Law Firm and the Client in connection with such project.  *Id*.; Dkt No. 45-6.  According to Delaney, the Project involved the review of documents related to an investigation of corrupt practices in Thailand.  Dkt. No. 74 ¶ 7.  Delaney worked on the Project from a document review center in New York City, sitting "several inches away from the other two reviewers in a small office with no windows."  *Id*. ¶ 13.

Delaney makes a series of complaints about his treatment during his employment with HC2.  On November 28, 2019, he "out of the blue and unexpectedly received a suspicious email to his personal email account from a well-connected, influential tax lawyer whose professional interests were at risk from the investigation."  *Id*. ¶ 8.  From November 29, 2019 to December 2, 2019, he complained to HC2 and to the Law Firm "about the misuse of his private information and involvement in th[e] document review."  *Id*. ¶ 9.

On March 5, 2020, after a State of Emergency had been declared by New York Governor Andrew Cuomo as a result of the Covid-19 pandemic, HC2 sent an email to employees with the subject line "Inform—COVID 19 & Seasonal Flu—Update," stating: "Due to the nature of our business, we will continue to operate all our locations, but continue to take precautionary measures, such as reducing the number of contractors per review room."  *Id*. ¶ 14 n.6.  But throughout early March, Delaney alleges, HC2 "simply emailed workers to commute with wipes and to watch President Trump's speech on TV" and did not reduce the number of contractors per review room.  *Id*. ¶ 14.[1]

---

[1] By this email, HC2 was allegedly referring to a speech delivered by President Trump on March 13, 2020, in which the President announced that he had declared a national emergency and given broad new authority to the Secretary of the Department of Health and Human Services to address

On March 17, 2020, Delaney came to the office "wearing a mask, latex gloves, and goggles which he bought on his own." *Id.* ¶ 15 n.7. That day and the previous day, he observed three workers at the office with "clear flu-like symptoms." *Id.* ¶ 30.

In the late morning of March 17, 2020, Delaney emailed HC2 and the Law Firm, copying his co-workers, complaining that "workers were coming into the office with flu-like symptoms," and asking "if they could either work remotely or short of that if they could stay at home with pay while still being on document review." *Id.* ¶¶ 15, 30. The email (with redactions) read as follows:

> Dear [representative of the Law Firm] & Hire Counsel: I have been coming in to work during the coronavirus but there are at least 3 people in the office who have flu-like symptoms—coughing, sneezing, runny nose—who are at the office, both yesterday & today. This office is quite a closed environment. Obviously this poses a health risk. I wear a mask and gloves but except for my two [redacted] colleagues others are not.

> 'Patti Ayala' of Hire Counsel HR sent two emails, the first saying that clients in some cases were still requiring us to come into the office but that we employees should make our 'own choice' as to whether we felt like coming into the office or not & the second telling us to listen to the president's speech. Frankly, these emails were extremely unhelpful & seemed to shift the responsibility to the employees.

> We have asked for a remote work option which many other similarly confidential cases & projects have. The agency, the law firm, & the client are [redacted]. I care about the case & doing a good job but do not feel that the working environment is safe. Contrary to HC HR, this is not my problem or merely my perception. I believe we should be either allowed to work from home or be paid to stay at home. Thank you for your attention.

Dkt. No. 74-2.

Delaney's email was sent at 11:27 a.m. An hour and a half later, at 1:02 p.m., HC2 responded to Delaney's email by stating that remote work was not an option. Dkt. No. 74 ¶ 20.

---

the pandemic. *See* Dkt. No. 95-10.

Shortly thereafter, HC2 sent an email to Delaney and the two other Thai language reviewers in the office stating as follows:

> Team, we understand and appreciate everyone's concerns regarding the work environment and well-being of those around you. Most importantly, we understand the need for an immediate response regarding remote work. At this time, the client is electing to suspend work on the case in NYC effective immediately. Please note that remote work has not been authorized for this project, as of now. If a decision to re-start the project in NYC is made, we will contact you—directly. We are requesting all team members to gather their belongings and depart the facility in an orderly fashion and exit our environment since the project is effectively ending. You will be compensated for your time today. We will continue to monitor the efforts of Congress in helping to off-set the impact of lost work.
>
> We appreciate your efforts and will be back in touch.

Dkt No. 39-4.

Between Delaney's 11:27 a.m. email and HC2's response at 1:02 p.m., HC2 representatives and a Law Firm representative had email correspondence about Delaney's email. Most of the email correspondence is redacted. In a portion attached to the Amended Counterclaims that is not redacted, and that precedes the HC2 email to Delaney and others announcing that work was being suspended in the New York office, an HC2 representative asks a Law Firm representative: "Can we fire him? Just a thought." Dkt. No. 74-2. The exhibits to the Amended Counterclaims do not contain a copy of any email responding to this query.

Delaney and HC2 thereafter disputed the basis and consequences of the Project's suspension and the termination of Delaney's employment. On March 30, 2020, in response to a series of emails from Delaney that "reflect[ed] a misunderstanding about his employment situation and status," Dkt. No. 45-26, HC2 sent an email to Delaney's lawyer, reminding Delaney that he had obligations under his employment agreement and the HC2 employee handbook:

On Friday, March 27, 2020, we received a series of emails from Mr. Delaney that appear to reflect a misunderstanding about his employment situation and status, and we felt it was necessary to address a couple of points that he made in his emails to ensure we have a clear understanding.  In his email, he mentioned that he was not an employee of Hire Counsel.  While that may currently be true, he certainly was an employee of Hire Counsel while assigned to work on the Wilmer Hale project in New York.  Hire Counsel hired him to service its client, Wilmer Hale, and he was paid by Hire Counsel as a W-2 employee.  He worked onsite at a Hire Counsel facility using a Hire Counsel computer.  His direct supervisor during the project was also a Hire Counsel employee.  He was also subject to a Hire Counsel employment agreement, which he had signed, and an employee handbook that he acknowledged.

. . . .

Mr. Delaney was not illegally terminated.  Hire Counsel lawfully terminated his employment—and the employment of two other reviewers—when the services performed by Hire Counsel at its New York facility were legitimately suspended by Wilmer Hale due to health concerns over the COVID-19 outbreak.

*Id*.

Two weeks later, on April 15, 2020, Delaney filed a complaint under the pseudonym *John Doe* against the Client and two others in state court in Florida (the "Florida Action"), the state in which Delaney was then residing.  Dkt. No. 74 ¶ 25.  According to the allegations of HC2's complaint in this action, which Delaney denies, the Florida Action alleged that HC2 had engaged in unlawful business practices and retaliatory termination in connection with the Project.

One week later, HC2 filed its complaint in this action, alleging claims for breach of contract and "faithless servant," and seeking preliminary and permanent injunctive relief.  *Id*. ¶ 26; *see* Dkt No. 1.  HC2 alleged that the Law Firm had "suspended the Project as the number of COVID-19 infections in New York City was increasing at an alarming rate, while it considered whether, given the highly confidential subject matter of the Project, it wished to continue the Project remotely," Dkt. No. 1 ¶ 3, and that Delaney, apparently disgruntled with that decision, had "set out to manufacture a false claim" that his employment had been terminated for his

having raised concerns about the potential for exposure to COVID-19," *id*. ¶ 5.  HC2 complained

that Delaney, directly and through counsel—but without authorization and in breach of his

employment agreement—had emailed the Client, its Chief Executive Officer, and its Board of

Directors with the "unfounded accusations" of retaliation, had recited information belonging to

the Client that was confidential and subject to the attorney-client privilege, and had "threatened

to commence legal action and publicly disclose . . . confidential and privilege information about

the [Client] that Delaney had obtained during the Project" if Delaney's demand that he be paid

$450,000 was not met the next day.  *Id*. ¶ 6.  HC2 further complained that, after the $450,000

payment was not made, Delaney had followed through on the threat by filing the *John Doe*

complaint in the Florida Action which, HC2 alleged, disclosed the Client's confidential and

privileged information and information protected by the attorney work-product doctrine.  *Id*. ¶ 8.

HC2's complaint stated that the contents of the Florida Action "leave no doubt" that Delaney is

the *John Doe* plaintiff in the Florida Action.  *Id*. ¶¶ 9, 31.  HC2 alleged that Delaney's conduct

violated his employment agreement with HC2 and the employment rules and policies by which

he agreed to be bound.  The complaint also alleged that Delaney violated his duties as a member

of the New York bar.  *Id*. ¶ 1.

On May 22, 2020, HC2 filed a motion for a preliminary injunction.  *See* Dkt. No. 43.  In

support of its application, HC2 submitted the declaration of the Law Firm's General Counsel,

Michael R. Heyison, which attached as an exhibit Delaney's resume.  *See* Dkt. No. 44-1.  The

declaration noted that, as of the resume reflected, Delaney was a lawyer admitted to practice in

the State of New York, who had graduated from Harvard Law School and named a prominent

New York law firm as one with which he had been associated.  *Id*.  In its memorandum in

support of the motion for a preliminary injunction, HC2 argued that both directly as a member of

the Bar of the State of New York and as a matter of his employment agreement pursuant to which he agreed to comply with the rules of the Bar of New York, Delaney was bound to keep the confidences of HC2, the Client, and the Law Firm, and that he had violated those obligations.

## PROCEDURAL HISTORY

This action was commenced on April 22, 2020 by HC2, alleging claims of breach of contract and faithless servant against Delaney. Dkt. No. 1.[2] Delaney filed his answer and first set of counterclaims on May 13, 2020. Dkt. No. 26. He asserted nine counterclaims: fraudulent inducement, fraudulent misrepresentation, whistleblower retaliation in violation of N.Y. Lab. L. ("NYLL") §§ 740 and 215, breach of a confidential relationship, intentional infliction of emotional distress, invasion of privacy under N.Y. Civ. Rights L. §§ 50 and 51, failure to pay New York sick leave, defamation per se, and abuse of process.

On June 3, 2020, HC2 moved to dismiss the first set of counterclaims. Dkt No. 61.

---

[2] Simultaneously, HC2 filed an application for an order to show cause why a temporary restraining order and preliminary injunction should not be entered against Delaney preventing Delaney, in part, from disclosing confidential information he obtained during the course of his work for HC2. Dkt No. 5. That same day, the Court denied the *ex parte* application for a temporary restraining order, partly on the grounds that as a member of the bar, Delaney "surely [was] aware that the disclosure of client confidences without consent can subject him to severe remedies with respect to his ability to practice law" and that "the filing of this lawsuit and this Order itself should put him on notice that future improper disclosures can be met with the most severe sanctions." Dkt. No. 9. After receiving briefing and hearing argument from both parties, on April 29, 2020, the Court entered an order restraining Delaney from divulging any privileged or confidential information that he learned through his employment with HC2. *See* Dkt. No. 14. The Court also set a schedule for briefing and a hearing on Plaintiff's motion for a preliminary injunction. By opinion and order delivered orally and on the record on May 27, 2020, the Court denied HC2's motion for a preliminary injunction on the grounds that HC2 had not identified the confidential information that Delaney allegedly disclosed with the requisite specificity (notably, HC2 declined to file with the Court a copy of the sealed Florida Action complaint which allegedly contained the illicit disclosures), and did not meet its burden to show that there was a threat of irreparable injury because it had provided no evidence to support the likelihood that Delaney would disclose any confidential information in the future. *See* Dkt. No. 65 at 8-11, 16-22.

The Court granted HC2's motion and dismissed the counterclaims without prejudice by opinion and order delivered orally and on the record on July 17, 2020. *See* Dkt. No. 76. In brief, the Court dismissed the claims for fraudulent inducement and fraudulent misrepresentation for failure to satisfy the pleading requirements of Fed. R. Civ. P. 9(b). The counterclaims failed to identify who made the alleged fraudulent statements, where and when they were made, and who was responsible for any omission and the context of such omission. *Id*. at 3-4. The Court dismissed the claim for whistleblower retaliation because Delaney did not allege any activity, policy, or practice of HC2 that was in violation of any law, rule, or regulation. The Court noted the existence of state court decisions holding that, as a matter of state pleading, a complaint for illegally terminating a whistleblower need not identify the specific law, rule, or regulation that the employer has violated, but the Court ruled that the counterclaim failed even to identify facts that would violate a law, rule or regulation. *Id*. at 4-5. The Court dismissed the claim under NYLL Section 215, which addresses complaints about conduct that the employee reasonably and in good faith believes violates a provision of the labor laws or order of the Commissioner of Labor, because Delaney did not allege HC2's conduct violated any specific provision of the NYLL. *Id*. at 5. The Court dismissed the counterclaim for breach of a confidential relationship because Delaney did not allege any facts to support the claim that HC2 had disclosed confidential information in violation of a duty to Delaney. *Id*. at 6. The Court also dismissed Delaney's counterclaim for intentional infliction of emotional distress. Delaney alleged that HC2 intentionally inflicted emotional distress on him by disclosing his name and that he was working on the Project and by the statements it made in this litigation. The Court ruled that the claim based on the alleged unlawful disclosure was conclusory and that the claim based on statements in this litigation sought to make tortious conduct that was protected by the litigation

privilege.  *Id*. at 6.  The Court dismissed the counterclaim for invasion of privacy in violation of N.Y. Civ. Rights L. §§ 50 and 51 as too general and conclusory to support a claim for relief.  *Id*. It dismissed the claim for the failure to pay unpaid sick leave under N. Y. Lab. L. § 196-B on the grounds that such provision did not take effect until September 30, 2020—after Delaney's termination.  *Id*. at 7.  It dismissed the claims for defamation and abuse of process because those claims were based solely on HC2's statements in this litigation, which are subject to an absolute litigation privilege.  *Id*.

The Court granted Delaney leave to replead if he believed in good faith he could state a claim for relief.  *Id*. at 8.

Delaney filed his amended answer and the Amended Counterclaims on July 31, 2020. Dkt. No. 74.  In his Amended Counterclaims, Delaney alleges four claims for relief that echo those in his earlier pleading: whistleblower retaliation, breach of confidentiality, intentional infliction of emotional distress, and abuse of process.  He has dropped his claims for fraudulent inducement, fraudulent misrepresentation, invasion of privacy, failure to pay New York sick leave, and defamation.

HC2 moved to dismiss the Amended Counterclaims on August 17, 2020.  Dkt. No. 81. Delaney opposed on August 31, 2020.  Dkt. No. 89.  HC2 filed its reply brief on September 8, 2020.  Dkt. No. 91.

## LEGAL STANDARD

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."  *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020) (citing *Orientview Techs. LLC v. Seven For All Mankind, LLC*, 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)).  To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be

granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

### A.    Whistleblower Retaliation in Violation of NYLL Sections 740 and 215

In Count One, Delaney alleges that HC2 violated NYLL §§ 740 ("Section 740") and 215 ("Section 215") by terminating his employment after he complained about HC2's handling of the Covid-19 pandemic. Specifically, he alleges that he was terminated because of the complaints contained in his March 17, 2020 email and for criticizing HC2's human resources department. Dkt. No. 74 ¶ 22. Delaney also alleges the instant lawsuit was filed in retaliation for his complaints.

Section 740 provides, in relevant part, that "[a]n employer shall not take any retaliatory personnel action against an employee because such employee . . . discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of the employer that is

in violation of law, rule or regulation which violation creates and prevents a substantial and specific danger to the public health or safety."  N.Y. Lab. L. § 740.  Thus, "[a]t the pleading stage, a plaintiff must (1) specify that an actual violation occurred, and (2) describe how the defendant's activities endangered the health and safety of the public."  *Semeraro v. Woodner Co.*, 2018 WL 3222542, at *6 (S.D.N.Y. July 2, 2018); *see also Barker v. Peconic Landing at Southold, Inc.*, 885 F. Supp. 2d 564, 569-70 (E.D.N.Y. 2012) ("To maintain an action under Section 740, an employee must plead and prove that the employer engaged in an activity, policy, or practice that constituted an actual violation of law, rule, or regulation.") (internal citations and quotations omitted).

Under Section 740, neither the complaint to the employer nor the complaint filed in court need identify the actual law, rule, or regulation the employer violated, but "the employee's complaint to the company must 'identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the allegedly complained-of conduct.'"  *Tonra v. Kadmon Hldg's, Inc.*, 405 F. Supp. 3d 576, 586 (S.D.N.Y. 2019) (quoting *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 992 N.Y.S.2d 163, 165 (2014)).  Moreover, the substantive allegations of the complaint must allege facts that, if true, would violate a specific law, rule or regulation.  *See Webb-Weber*, 992 N.Y.S.2d at 166 (sustaining complaint where "[t]he substantive allegations in the complaint . . . sufficiently support plaintiff's allegation that defendants violated various laws, rules or regulations"); *see also Ulysse v. AAR Aircraft Component Servs.*, 131 N.Y.S.3d 609, 610 (2d Dep't 2020) (granting summary judgment where "the incidents forming the subjects of the plaintiff's complaints did not involve any actual violation of a law, rule, or regulation"); *Kamdem-Ouaffo v. Pepsico, Inc.*, 21 N.Y.S.3d 150, 151 (2d Dep't 2015) (affirming summary judgment for defendant where

11

communications did not involve actual violations of law or regulation); *Tomo v. Episcopal Health Servs., Inc.*, 925 N.Y.S.2d 563, 566 (2d Dep't 2011) (dismissing complaint where threatened conduct was not consummated because "there was no actual violation of any law, rule or regulation"); *Khan v. State Univ. of N.Y. Health Sci. Ctr. at Brooklyn,* 734 N.Y.S.2d 92, 93 (2d Dep't. 2001) (same); *Perez v. G&P Auto Wash Inc.* 930 F. Supp. 2d 423, 437 (E.D.N.Y. 2013) (granting summary judgment where plaintiff failed to offer evidence of an activity that violated any law or regulation); *Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 268 (S.D.N.Y. 2001) ("New York's Whistleblower Act provides New York employees with a limited protection for a carefully-defined category of whistleblowing activity: reporting violations of any law, rule or regulation which 'creates and presents a substantial and specific danger to the public health or safety.'") (citing NYLL § 740(2)(a)).[3]

Delaney's allegations fail to state a claim under Section 740.  Delaney bases his claim on his March 17, 2020 email to HC2 complaining that HC2 had permitted several employees to come to work with "flu-like symptoms," noting that his workplace was a "closed environment," and requesting the opportunity to "work from home or be paid to stay at home."  Dkt. No. 74-1. Delaney claims that the conduct that was the subject of his March 17, 2020 email violated executive orders by Governor Cuomo's declaring a State of Emergency and instructing certain

---

[3] The New York Court of Appeals has explained that "the language and legislative history of Labor Law s 740 militate in favor of a construction of that statute requiring proof of an actual violation of law to sustain a cause of action."  *Bordell v. General Elec. Co.*, 88 N.Y.2d 869, 871 (1996).  The language of Section 740 thus is markedly different from that of Section 75-b of the Civil Service Law, a whistleblower statute that protects the rights of public employees.  "While the latter statute was amended to protect public employees' disclosure of information 'which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action,' no such amendment was ever made to Section 740."  *Barker*, 885 F. Supp. 2d at 570 (citing *Bordell*, 88 N.Y.2d at 871).  "[P]rior to the enactment of Labor law § 740, three successive efforts to enact a whistleblowers' statute embodying a reasonable belief standard had failed." *Bordell*, 208 A.D.2d 219 (3d Dep't 1995).

categories of employers to observe certain safety measures, *id.* ¶ 11; guidance issued by the New

York City Health Department ("NYCHD") to New York employers that they should promote

physical distancing and send home immediately workers who arrive sick or become sick at work

("NYCHD Guidance"), *id.* ¶ 36; and interim guidance of the federal Centers for Disease Control

and Prevention ("CDC") that indicate that employers "are responsible for providing a safe and

healthy workplace" and should "separate[e] sick employees" ("CDC Guidance"), *id.* ¶ 37.

Drawing all reasonable inferences in favor of Delaney, the complaint nevertheless fails to

allege conduct that, at the time, violated any law, rule or regulation.  The only Executive Orders

by Governor Cuomo that pre-dated Delaney's March 17, 2020 email (i.e., the only Executive

Orders that could possibly have been the basis of Delaney's complaint and HC2's alleged

retaliation) are Executive Order No. 202, issued on March 7, 2020, and Executive Order 202.4,

issued on March 16, 2020.  Neither Executive Order prohibited the conduct of which Delaney

complained or established any requirements for employers to bar employees who appeared to be

sick from coming to work or to offer work from home options.  Executive Order 202 declared a

state of emergency, but it said nothing of what precautions employers should be taking.  *See* Dkt

No. 95-8; N.Y. Exec. Order 202 (March 7, 2020), *available at* https://www.governor.ny.gov/

news/no-202-declaring-disaster-emergency-state-new-york.  Executive Order 202.4 was directed

to local governments and political subdivisions.  It required "[a]ny local government or political

subdivision . . . , effective March 17, 2020, [to] allow non-essential personnel . . . to be able to

work from home or take leave without charging accruals."  N.Y. Exec. Order 202.4 (March 16,

2020), *available at* https://www.governor.ny.gov/news/no-2024-continuing-temporary-

suspension-and-modification-laws-relating-disaster-emergency.  The Executive Order was not

addressed to private employers and did not require such employers to offer a work from home

option or make it illegal for them to permit employees with flu-like symptoms to come into work.  *See Tonra*, 405 F. Supp. 3d at 587 (dismissing complaint where conduct did not violate a law, rule or regulation); *Semeraro*, 2018 WL 3222542, at *6 (dismissing complaint where plaintiff did not properly plead that an actual violation occurred); *Klein v. Metropolitan Child Servs., Inc.*, 954 N.Y.S.2d 559, 561 (2d Dep't 2012) ("There must be an actual violation of a law, rule or regulation" to make out a claim under NYLL § 140).[4]

The guidance of the NYCDH and CDC to which Delaney points also are not laws, rules, or regulations the violation of which can give rise to a New York whistleblower claim.  For an activity, policy, or practice to come within the ambit of Section 740, it must "violat[e] . . . a law, rule or regulation."  N.Y. Lab. L. § 740(2)(a).  Section 740(1)(c) defines "law, rule or regulation" to "include[e] any duly enacted statute or ordinance or any rule or regulation promulgated pursuant to any federal, state or local statute or ordinance."  N.Y. Lab. L. § 740(1)(c).

In *Segarra v. Fed. Reserve of New York*, another court in this District addressed a similar question of whether federal agency guidance could be the predicate for a federal whistleblower retaliation claim pursuant to a federal law, 12 U.S.C. § 1831j, which prohibits banking agencies from, inter alia, terminating employees for providing information regarding "any possible violation of any *law or regulation* . . ." 12 U.S.C. § 1831j(a)(2) (emphasis added).  The court noted that "[a] 'central distinction' in administrative law is between those agency pronouncements that amount to 'substantive rules' and those that are merely 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'"  *Segarra v. Fed. Reserve of New York*, 17 F. Supp. 3d 304, 311 (S.D.N.Y. 2014), *aff'd*, 802 F.3d 409 (2d

---

[4] HC2 also argues that the Executive Order does not constitute a "law, rule or regulation" under Section 740.  The Court need not reach that issue.  Even if it did constitute a law, rule, or regulation, HC2's conduct did not violate it.

14

Cir. 2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979)).  The *Segarra* court

explained:

> The former category of agency actions creates new obligations or rights, *N.Y.C. Emps.' Ret. Sys. v. S.E.C.*, 45 F.3d 7, 12 (2d Cir.1995); must be subjected to the Administrative Procedure Act's notice-and-comment procedures, *see* 5 U.S.C. § 553(b)-(d); and carries the force of law, *N.Y.C. Emps. Ret. Sys.*, 45 F.3d at 12. The latter category—of interpretative rules and general policy statements—merely clarifies existing law, *see id.*; need not undergo notice and comment, *see* 5 U.S.C. § 553(b)(3)(A); and "lack the force of law," *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

*Id.* at 311.  The *Segarra* court thus concluded that agency guidance was not subsumed within

"law or regulation" under 12 U.S.C. § 1831j.  *Id.* at 312.

A similar analysis applies here.  Delaney has offered no reason to suspect that the New

York legislature in passing Section 740 had a different view of a law, rule, or regulation than

Congress had in mind when it referred to a "law or regulation."  The guidance issued by the

NYCDH and CDC are plainly not "duly enacted statute[s]."  *See* N.Y. Lab. L. § 740(1)(c).

Neither are they "rule[s] or regulation[s] promulgated pursuant to any federal, state or local

statute or ordinance."  *See id.*  Under federal law, as noted in *Segarra*, substantive rules that

carry the force of law are "subjected to the Administrative Procedure Act's notice-and-comment

procedures." *Segarra*, 17 F. Supp. 3d at 311; *see* 5 U.S.C. §§ 553(b)-(d).  Similarly, "[f]or a New

York City agency's pronouncement to be a rule with the force and effect of law, it must be

adopted in accordance with the rulemaking requirements under the City Administrative

Procedure Act."  *1700 York Assocs. v. Kaskel*, 701 N.Y.S.2d 233, 240 (Civ. Ct. 1999) (collecting

cases); *see* N.Y.C. Charter §§ 1041–46.  Neither the CDC Guidance nor the NYCDH Guidance

was promulgated pursuant to the relevant administrative procedure act that govern federal and

city regulations respectively.

Significantly, Delaney has not alleged, nor do the documents themselves reflect, that the NYCHD or the CDC purported to interpret some rule or regulation with force of law capable of being violated when they promulgated their respective guidances. The NYCDH Guidance to which Delaney points comes in the form of answers to frequently asked questions regarding the 2019 novel coronavirus for businesses and employers. *See* Dkt. No. 95-2. It contains recommendations for steps employers can take to prevent the spread of Covid-19. Those steps include that an employer should: recommend that employees who have "symptoms of an acute respiratory illness" stay home "until they no longer have a fever," "[e]ncourage employees to get the flu vaccine," "[e]mphasize and encourage healthy hygiene habits and etiquette," "[e]ncourage employees who are sick to stay home and seek medical care if needed," "[s]eparate employees who are sick," and "[m]ake sure [that their] work policies are flexible and consistent with public health guidelines." *Id*. at 2. HC2's activity on March 16 and 17, 2020 arguably was inconsistent with the recommendation that employees who were sick should be separated or encouraged to stay at home and that an employer should have flexible work policies. The guidance, however, was just that—guidance, in the form of recommendations. However prudent it may have been to follow the guidance, the guidance itself did not create any legally binding obligations that could have been violated, even by its own terms. It did not require employers to separate employees who were sick any more than it required them to encourage employees to get the flu vaccine. And it did not require them to permit a work-from-home option or make it illegal for employers to suspend a project rather than permitting employees to work on it from home.

The CDC Guidance was issued on March 2, 2020, under the title "Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus." Dkt. No. 95-5. It was based

on what was "currently known" about Covid-19 and pointed out "[m]uch is unknown about how the virus that causes Covid-19 spreads." *Id*. It contained guidance, or recommendations, to "help prevent workplace exposures to acute respiratory illnesses, including COVID-19, in non-healthcare settings." *Id*. The CDC Guidance contained "Recommended strategies for employers to use now." *Id*. Like the NYCDH Guidance, the CDC Interim Guidance contained the "CDC recommend[ation] that employees who appear to have acute respiratory illness (i.e. cough, shortness of breath) upon arrival to work or become sick during the day should be separated from other employees and be sent home immediately," that "[s]ick employees should cover their noses and mouths with a tissue when coughing or sneezing (or an elbow or shoulder if no tissue is available)," and that an employer should "[a]ctively encourage sick employees to stay home." *Id*. It also recommended that employers "[t]alk with companies that provide your business with contract or temporary employees about the importance of sick employees staying home and encourage them to develop non-punitive leave policies." *Id*. Those "strategies," however, were stated to be recommendations. They constituted advice that the CDC "commend[ed] to the attention of [employers] as reputable, worthy, or desirable." American Heritage Online Dictionary (defining "recommend"), *available at* https://ahdictionary.com/word/search.html?q=recommend. They were not mandates or dictates, did not constitute laws, rules, or regulations, and did not admit of violations.

Moreover, neither Delaney's March 17, 2020 email nor the complaint itself alleges conduct by HC2 that, if true, would contradict CDC Guidance. In particular, the complaint did not allege that employees were coming into work with acute respiratory illnesses or that those employees who were sick and coughing or sneezing were failing to cover their noses and mouths with a tissue. And the CDC Guidance did not require employers to offer work-from-home

17

options. Indeed, and to the contrary, it appeared to recognize that employers might need to have employees work at the office and should only, when that was not possible, offer non-punitive leave policies. Thus, even if Delaney's employment was terminated because of his complaint that HC2 was allowing employees with flu-like symptoms to come to work and that HC2 had not offered a work-from-home option, that complaint did not trigger rights for Delaney under Section 740 based on a violation of the CDC Guidance or make his subsequent termination illegal.

Delaney also alleges a violation of Section 215. That provision prohibits an employer from "discharge[ing], threatening, penalizing, or in any other manner discriminat[ing] or retaliate[ing] against any employee (i) because such employee has made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the NYLL] or any order issued by [the Commissioner of Labor]." N.Y. Lab L. § 215(1).

Delaney, however, fails to respond to HC2's argument that the complaint does not allege that Delaney made a complaint about conduct that he reasonably and in good faith believed violated the New York Labor Laws or an order of the Commissioner of Labor. Thus, the Court deems the claim to be abandoned. *See Youmans v. Schriro*, 2013 WL 6284422, at *5 (S.D.N.Y. Dec. 3, 2013) ("A plaintiff's failure to respond to contentions raised in a motion to dismiss claims constitutes an abandonment of those claims.") (collecting cases). Even if it were not abandoned, it would not state a claim for relief. The complaint does not allege that Delaney made a complaint about a violation of the New York Labor Laws or an order of the Commissioner of Labor. *See Copantitla v. Fiskardo Estiatorio Inc.*, 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011) (to state a claim for retaliation under NYLL Section 215, a plaintiff must allege

that "while employed by the defendant, [he] made a complaint about the employer's violation of [NYLL] and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action"); *Kassman v. KPMG LLP*, 925 F. Supp.2d 453, 472 (S.D.N.Y. 2013) (dismissing a claim under Section 215 because the alleged complaints did not "ris[e] to the level of specificity to state a retaliation claim under . . . the New York Labor Law"); *Robledo v. No. 9 Parfume Leashold*, 2013 WL 1718917, at *9 (S.D.N.Y. Apr. 9, 2013) (dismissing a Section 215 claim where plaintiff did not "[make] a complaint—to anyone—by which she indicated that she had any good-faith belief that Defendants had violated any provision of the NYLL or any order of the Labor Commissioner").

## B.      Breach of a Confidential Relationship

Delaney alleges in Count Two that HC2 breached their confidential relationship by publicly disclosing his confidential information without his authorization.  The alleged confidential information that Delaney alleges was disclosed consists of Delaney's name, resume, status as an employee working on the Project, and identity as the *John Doe* plaintiff in the Florida Action.

Specifically, Delaney complains that HC2 "misused information about him" based upon the call that he purportedly received on November 28, 2019 "from a well-connected influential tax lawyer whose professional interests were potentially at risk from the investigation."  Dkt. No. 74 ¶ 47.  Delaney asserts that "[t]he only way these individuals in Thailand could have known about Delaney's work on this review was by a disclosure from it."  *Id.* ¶ 47.  He also complains that HC2 exposed him as the *John Doe* in the Florida Action by its allegations in the complaint in this action.  *Id.* ¶¶ 48.  Finally, Delaney complains that on May 22, 2020, HC2 violated his confidence and the protective order, Dkt. No. 22 ("Protective Order"), by publicly filing

Delaney's resume on the public docket as an exhibit in support of HC2's motion for a preliminary injunction. *Id.* ¶ 57.

Delaney does not properly allege that HC2 owed him a duty of confidentiality, that he had a protectable interest in the confidentiality of his name, and that he was working on the Project or that HC2 disclosed that he was working on the Project. "For a breach of confidence claim to be established, plaintiff must show that the parties either stood in a relationship imposing a duty of trust or confidentiality, or that they entered into an agreement establishing such a confidential relationship." *Stewart v. World Wrestling Fed'n Entm't, Inc.*, 2005 WL 66890, at *4 (S.D.N.Y. Jan. 11, 2005). To recover for disclosure of confidential information, a plaintiff must allege the creation of a confidential relationship and that the defendant, in fact, accepted that relationship. *See id.* ("Courts will find a duty not to reveal confidential information only when the recipient has accepted the confidential relationship.") (citing *Smith v. Weinstein*, 578 F. Supp. 1297, 1307 (S.D.N.Y 1984)). "Such a relationship may arise either explicitly by contract, or implicitly by the actions of the parties or other circumstances." *Id.* (citing *Klein v. Ekco Prods. Co.*, 135 N.Y.S.2d 391, 395-96 (Sup. Ct. 1954).[5]

Delaney, however, has not pled that HC2 owed him any duty of confidentiality, either by contract or arising from his relationship to it as its employee. Pursuant to his employment agreement with HC2, Delaney assumed certain obligations of confidentiality toward HC2, the Law Firm, and the Client. Under the Employment Agreement, Delaney agreed "not to divulge

---

[5] For example, a fiduciary may owe a duty of confidentiality to his principal. *See Poller v. VioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) ("A breach of fiduciary duty, and generally in tandem, of loyalty, 'occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, *misuse of confidential information*, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity.'") (quoting *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010)).

any confidential information . . . obtained in the course of any assignment with an HC[2] client to which Attorney has provided temporary services under this Agreement as described in Exhibit A, attached hereto and made a part hereof." Dkt. No. 1 ¶ 37. Pursuant to the NDA, Delaney also assumed certain confidentiality obligations. *Id*. ¶ 38. The obligations, however, were not reciprocal. HC2 did not agree to keep his name or identity confidential. Nor can any such obligation be inferred from the agreement. Indeed, the opposite inference obtains. Delaney was being retained by an employment agency on a document review project of an investigation conducted by a law firm involving the law firm's client. Contrary to Delaney's conclusory assertion that "HC2 never had the right to disclose anything about Delaney to third parties," Dkt. No. 74 ¶ 47, Delaney had no reason to expect that HC2, or those with whom HC2 was in privity, would necessarily keep his identity and work on the Project confidential. HC2's employment agreement with Delaney specifically contemplated that the information Delaney provided HC2 would be shared with third parties including HC2's clients. It stated, "HC[2] is in the business of providing attorneys, paralegals, and other legal professionals ('Contract Professional(s)') . . . to satisfy the short-term and long-term staffing needs of its third party clients," and further that "HC[2]'s clients may accept or reject Contract Professional [sic] referred to them by HC[2] for any reason or no reason." Dkt. No. 45-1. Although Delaney avers that the Client wanted to keep the investigation it was conducting confidential, he has alleged no facts to support that if, and when, the Client decided it was in its interest to disclose the investigation, it would be precluded from doing so or precluded from mentioning Delaney's name and his work on the investigation. It would have been unreasonable for Delaney to assume otherwise.

Moreover, even assuming HC2 owed some undefined obligation of confidentiality, there is no well-pled allegation that the information Delaney contends was disclosed was confidential

or that HC2 in fact disclosed it.  To plead a claim for disclosure of confidential information, a plaintiff must allege facts showing that there was confidential information belonging to him that was disclosed, identify the information, and plead sufficient facts that a reasonable inference can be drawn that the defendant was the source of the information.  *See Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*, 55 N.Y.S.3d 54, 55 (1st Dep't 2017) (affirming dismissal where plaintiff "does not identify what confidential information was allegedly misused by defendant during the two year confidentiality period"); *cf. Diversified Fuel Carriers Corp. v. Coastal Oil NY, Inc.*, 720 N.Y.S.2d 169, 170 (2d Dep't 2001) (affirming post-verdict judgment as a matter of law where plaintiff "failed to provide sufficient evidence from which the jury could rationally determine that the defendant breached the confidentiality agreement in question").  The Amended Counterclaims are deficient on every account.  Delaney has not pled that he himself kept confidential or protected his relationship with HC2 and the work he was doing for it.  *See Edelman v. Starwood Cap. Grp.*, LLC, 892 N.Y.S.2d 37, 39 (1st Dep't 2009) (affirming dismissal of a claim for misappropriation of proprietary information where "plaintiffs did not allege that [they] took sufficient precautionary measures to insure that the information remained secret") (citation omitted).  Moreover, Delaney's pleadings that HC2 disclosed his status as an employee on the Project is merely speculative.  Delaney complains that an influential tax lawyer in Thailand "whose professional interests were potentially at risk from the investigation" sent him a suspicious email in November 2019, Dkt. No. 74 ¶ 8, and attempts to draw from that the inferences that (a) the individual learned that Delaney was working on the Project; and (b) that the individual learned of Delaney's work on the project through a tortious disclosure by HC2.  His claim, however, is pure surmise, and not does not allege sufficient factual material to state a claim.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive

dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555).  Delaney does not allege what was said by the Thai lawyer that gives rise to the reasonable inference that the lawyer was contacting Delaney because the lawyer knew that Delaney was working on the Project, or any facts to support the proposition that, if the lawyer learned of Delaney working on the Project, he learned of it through HC2.  Delaney admits that he himself is a Thai national who intends to return to Thailand.  Dkt. No. ¶ 47.  He also notes that others worked on the Project and knew of his involvement.  Dkt. No. 1 ¶ 2; Dkt. No. 74 ¶ 2 ("Defendant admits that 'Delaney, along with two other HC2 employees, began working on the Project at HC2's facility in New York City . . .").  Thus, even if one were to assume that the Thai lawyer had learned of Delaney's involvement, there is no reason to assume the information came from HC2.  Although Delaney claims that he did not want his involvement in the Project to become known to individuals in Thailand, Dkt. No. 74 ¶ 47, he engages in guesswork when he complains that the information was "leak[ed]" by HC2.  *Id*.  Indeed, this speculative assertion is undermined by Delaney's own pleadings which otherwise assert that HC2 jealously guards its confidences, including by reminding Delaney of his own his obligations of non-disclosure.

HC2 also did not violate any obligations of confidentiality by referring to the Florida Action in its complaint in this action.  Believing that Delaney had violated his contractual and ethical responsibilities to it, the Law Firm, and the Client, HC2 had every right to file a complaint against him and to do it publicly.  Delaney undertook contractual obligations to HC2; if HC2 believed there was a breach, it had to have a right to enforce those obligations.

Moreover, the reference in the complaint in this action to the *John Doe* complaint filed in the Florida Action was not some scurrilous, irrelevant material.  It forms the heart of HC2's

complaint here—that Delaney improperly disclosed confidential and privileged material. HC2 not only did not have the obligation to withhold Delaney's name, it likely did not have the right to withhold his name. Federal Rule of Civil Procedure 10(a) requires the caption of a civil case to "name all the parties." Fed. R. Civ. P. 10(a); *see, e.g.*, *N. Jersey Media Grp. Inc. v. Doe Nos. 1-5*, 2012 WL 5899331, at *3 (S.D.N.Y. Nov. 26, 2012) (applying the Rule 10(a) standard to a defendant's motion to proceed anonymously). "[T]his requirement, though seemingly pedestrian, serves the vital purpose of facilitating public scrutiny of judicial proceedings." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188-89 (2d Cir. 2008); *see also Doe v. Del Rio*, 241 F.R.D. 154, 156-59 (S.D.N.Y. 2006) (discussing the presumption against anonymous pleading, its exceptions, and the reasons underlying the "significant interest in open judicial proceedings even in ordinary civil litigation between private parties"). Delaney has made no motion to seal his name as it appears in this lawsuit, and has made no showing why his interest in anonymity outweighs the public interest in disclosure. *See Sealed Plaintiff*, 537 F.3d at 189 ("[i]dentifying the parties to the proceeding is an important dimension of publicness. The people have a right to know who is using their courts.") (quoting *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir.1997) (Posner, J.)). If Delaney had wanted to assure his anonymity to the public with respect to any employment related dispute, he could have negotiated for a contractual provision requiring confidential arbitration of all disputes with HC2. He did not do so. What he is not free to do is engage in conduct that allegedly breached his agreement with HC2 and then complain when HC2 attempts to call him to account for such conduct in a federal forum available to HC2 and in which Delaney is subject to jurisdiction.

A similar point applies to the disclosure of Delaney's resume. The Protective Order did not create an entitlement on Delaney's part to keep that information from the public docket. It

conferred the right on HC2 to disclose any information Delaney produced to the Court, Dkt. No.

22 at 3 § 6(I), and did not "affect or restrict the rights of" HC2 "with respect to its own

documents or information produced in this action," *id*. at 4 § 11.  Delaney was put on notice

"that the Second Circuit puts limitations on the documents or information that may be filed in

redacted form or under seal and that the Court retains discretion not to afford confidential

treatment to any Confidential Discovery Material submitted to the Court or presented in

connection with any motion, application or proceeding that may result in an order and/or

decision by the Court" and that "there is no presumption that Confidential Discovery Material

will be filed with the Court under seal." *Id*. at 4 § 13.  It appears that the resume was improperly

marked as confidential in the first place.  It does not contain any information entitling Delaney to

confidential treatment under the terms of the Protective Order (notably it does not contain

Delany's phone number or address).  Delaney did not make a motion, as he could have, for the

resume to be under seal.  And, in any event, had either Delaney or HC2 made a motion to file it

under seal, such motion would have been denied.  *See Lugosch v. Pyramid Co. of Onondaga*,

435 F.3d 110, 119-20 (2d Cir. 2006) (holding that common law and First Amendment right of

access can be overcome only if specific, on the record, findings are made demonstrating that

closure is essential to preserving higher values and is narrowly tailored to serve that interest).

### C.      Intentional Infliction of Emotional Distress

Under New York law, a claim for intentional infliction of emotional distress ("IIED")

requires: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a

substantial probability of causing, severe emotional distress; (3) a causal connection between the

conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820,

827 (2d Cir. 1999).  Intentional infliction of emotion distress is a "highly disfavored [tort] under

New York law." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) (citation

omitted).  The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Marlin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985).

Delaney alleges that HC2 intentionally inflicted emotional distress on him by the following alleged conduct: (1) "allow[ing] the disclosure of Delaney's confidential and personal information to opposing lawyers and lobbyists in Thailand without his consent," Dkt. No. 74 ¶ 54; (2) terminating Delaney for making a public health and safety complaint, *id.* ¶ 55; (3) filing this lawsuit to ruin Delaney's professional reputation, *id.* ¶ 56; (4) posting unsealed resume on the public docket, *id.* ¶ 57; (5) harassing Delaney and interfering with his right to peace and quiet because while he was in Nebraska, "the front desk at Delaney's Hotel in Nebraska received what they said was 'a suspicious phone call' from someone purporting to know him asking if he was there and his room number and then hanging up," *id.* ¶ 58; and (6) placing Delaney "on the industry DNR ('Do Not Reuse') blacklist which would preclude him from future document review work," *id.* ¶ 59.

The Court has already addressed the first four allegations in connection with Delaney's substantive tort claims.  Those allegations cannot be made to state a claim simply by relabeling them intentional infliction of emotional distress.  *See Turley*, 774 F.3d at 159 ("[The] New York Court of Appeals . . . has cautioned that a claim for IIED may not be sustainable 'where the conduct complained of falls well within the ambit of other traditional tort liability.'") (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 558 (1978)); *id.* at 159 n.18 ("[W]here the gravamen of a complaint is another tort, IIED is not available as a cause of action.") (quoting *Young v. Krantz*, 434 S.W.3d 335, 344 (Tex. Ct. App. May 28, 2014)).  Moreover, as to these four theories, Delaney has not alleged either "extreme and outrageous conduct" or "intent to cause, or reckless

disregard of a substantial probability of causing, severe emotional distress." *Stuto*, 164 F.3d at 827. Delaney was an at-will employee. HC2 had every right to end his employment whether because, as the email Delaney cites sets forth, the Client decided not to continue the Project in New York due to the health concerns arising from the Covid-19 pandemic or simply because HC2 was not willing to accede to Delaney's demand that he be permitted to work from home. *Murphy v. American Home Prods Corp.*, 58 N.Y.2d 293, 303 (1983) ("[T]here is . . . no cause of action in tort in New York for abusive or wrongful discharge of an at-will employee, [and] plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress.").

HC2 also had the right, whether or not its breach of contract claim in this Court succeeds, to bring this lawsuit and to allow the Court to decide whether it was meritorious or not. The filing of this lawsuit and the activities connected with it are ordinary litigation. They are neither extreme nor outrageous. *See, e.g.*, *Hebrew Inst. for Deaf & Exceptional Children v. Kahana*, 873 N.Y.S.2d 234, 234 (Sup. Ct. 2008) ("[T]he mere commencement of litigation, even if alleged for the purpose of harassment and intimidation, is insufficient to support a claim for intentional infliction of emotional distress."). Nor do the Amended Counterclaims offer anything other than conclusory allegations that HC2 acted with the intent to cause, or in reckless disregard of a substantial probability of causing, severe emotional distress. From Delaney's own allegations, his employment was terminated because HC2 (or its Client) was unwilling to continue to employ him on the terms that Delaney (and perhaps HC2 and its Client) believed were safe. HC2 filed the lawsuit not to inflict emotional distress but to obtain relief in the form of an order preventing Delaney from disclosing confidential information.

As to statements made by HC2 in the course of this lawsuit, such statements are "absolutely privileged as long as they are pertinent to the subject of the litigation." *In re Swift*, 2016 WL 355515 at *4 (Bankr. E.D.N.Y. Jan. 28, 2016) (citing *Front v. Khalil*, 4 N.Y.S.3d 581, 583 (2015)). Such statements therefore cannot form the basis for an IIED claim. *See id.* ("[T]he [litigation] privilege is . . . applicable to intentional infliction of emotional distress claims.") (citing *Taggart v. Moody's Investors Serv.*, Inc., 2007 WL 2076980, at *6 (S.D.N.Y. July 17, 2007) ("[A] plaintiff's claim for intentional infliction of emotional distress cannot arise out of statements made during a judicial or quasi-judicial proceeding where those statements are material and pertinent to the questions involved in the proceedings.") (internal quotation marks and citations omitted)); *see also Brady v. John Goldman, Esq.*, 2016 WL 8201788, at *8 (S.D.N.Y. Dec. 5, 2016) ("Cases relying on statements made in the context of adversarial litigation have been summarily dismissed under [the IIED] standard.") (citing *Kaye v. Trump*, 873 N.Y.S.2d 5, 6 (1st Dep't 2009) (statements made in adversarial litigation "cannot provide a foundation for the claim" for IIED); *Yalkowsky v. Century Apts. Assocs.*, 626 N.Y.S.2d 181, 183 (1st Dep't 1995) (same)), *report and recommendation adopted sub nom. Brady v. Goldman*, 2017 WL 111749 (S.D.N.Y. Jan. 11, 2017), *aff'd*, 714 F. App'x 63 (2d Cir. 2018).

Delaney's last two theories, that he received a "suspicious" phone call to his hotel room in Nebraska, and that HC2 placed him on the "do not reuse" blacklist which would preclude him from future document review work, are speculative and are not supported by sufficient "factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). They must be dismissed for that reason alone.

### D.    Abuse of Process

To state a claim for abuse of process under New York law, a plaintiff must plausibly allege that the defendant "(1) employed regularly issued legal process to compel performance or

forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in

order to obtain a collateral objective that is outside the legitimate ends of the process." *Teddy

Volkswagen of the Bronx, LLC v. Demersky*, 2020 WL 6424115, at *2 (S.D.N.Y. Nov. 1, 2020);

*see Manhattan Enter. Grp. LLC v. Higgins*, 816 F. App'x 512, 514 (2d Cir. June 1, 2020)

("Under New York law, 'a malicious abuse of process claim lies against a defendant who (1)

employs regularly issued legal process to compel performance or forbearance of some act (2)

with intent to do harm without excuse or justification, and (3) in order to obtain a collateral

objective that it outside the legitimate ends of the process.'") (quoting *Savino v. City of New

York*, 331 F.3d 63, 76 (2d Cir. 2003)).

Under New York law, "the institution of a civil action by summons and complaint is not

legally considered process capable of being abused." *Curiano v. Suozzi*, 63 N.Y.2d 113, 114

(1984); *see Demersky*, 2020 WL 6424115, at *2 (same); *Influx Capital, LLC v. Pershin*, 131

N.Y.S.3d 712, 716 (2d Dep't 2020) ("[T]he mere commencement of a civil action cannot serve

as the basis for a cause of action alleging abuse of process.").  "Process is a 'direction or demand

that the person to whom it is directed shall perform or refrain from the doing of some prescribed

act.'" *Williams v. Williams*, 298 N.Y.S.2d 473, 476 (1969) (citation omitted).  "It follows that

there must be an unlawful interference with one's person or property under color of process in

order that action for abuse of process may lie."  *Id*.  Examples of writs which can be so abused

include writs of "attachment, execution, garnishment, or sequestration proceedings, or arrest of

the person, or criminal prosecution, or even such infrequent cases as the use of a subpoena for

the collection of a debt."  *Id.* at 476 n.1 (quotation marks and citation omitted); *see also Greco v.

Christoffersen*, 896 N.Y.S.2d 363, 365-66 (2d Dep't 2010) (holding that "the mere

commencement of a lawsuit cannot serve as the basis for a cause of action alleging abuse of

process" and that interference with person or property comes from "resort to a provisional remedy, such as arrest, attachment, injunction, receivership, or notice of pendency"); *Island Fed. Credit Union v. Smith*, 875 N.Y.S.2d 198, 201 (2d Dep't 2009) ("A claim to recover damages for abuse of process cannot be based on the mere commencement of an action by summons and complaint, without unlawful interference with person or property."). Thus, the filing of a complaint itself does not constitute the requisite "unlawful interference with one's person or property under color of process." *Williams*, 298 N.Y.S.2d at 476. Neither does "the expense arising from the defense of a lawsuit," which is "an insufficient injury to sustain the cause of action." *Stroock & Stroock & Lavan v. Beltrami*, 550 N.Y.S.2d 337, 338 (1990).

A party also cannot state a claim by alleging that a lawsuit was filed against it to gain tactical advantage in that or another litigation. *Tenore v. Kantrowitz, Goldhamer & Graifman, P.C.*, 907 N.Y.S.2d 255, 257 (2d Dep't 2010) (allegation that defendant undertook litigation with an objective of "obtaining a tactical advantage in a pending divorce action" insufficient to state a claim for relief). Skillful lawyers not infrequently take advantage of whatever forums are available to them to prevail either in the prosecution of a lawsuit or in the defense of another lawsuit. Such conduct is part of the litigation process; it is not tortious.

Delaney's allegations do not state a claim for abuse of process. He complains that HC2, in this action, made "outrageous allegations seeking a temporary restraining order on default," Dkt. No. 74 ¶ 67, and made false allegations in its pleadings, *id*. ¶ 69. Those allegations do not satisfy any of the elements of an abuse-of-process claim. If Delaney believes that HC2 cannot "put forward any evidence supporting its claims, then he should . . . mov[e] for summary judgment." *Demersky*, 2020 WL 6424115, at *3. "The defense to purportedly frivolous litigation is generally to prevail in that litigation, not to seek a state-law tort remedy." *Id*., at *2.

Delaney also alleges that it was wrongful for HC2 to file its litigation in this Court when Delaney had "sought refuge in Florida" and "there was a pending action in Florida."  Dkt. No. 74 ¶¶ 66-67.  However, Delaney does not deny, but admits, that he is a resident of New York and an attorney licensed to practice law in New York.  Dkt. No. 1 ¶ 14; Dkt. No. 74 ¶ 14.  HC2 is incorporated in the District of Columbia and has its principal place of business in Illinois.  Dkt. No. 1 ¶ 13.  HC2's cause of action arises, in substantial part, from Delaney's conduct in New York—he was employed in New York and he allegedly took the confidential information of HC2, the Law Firm, and the Client while he was in New York and extorted HC2 while in New York.  HC2 was not required to file in Florida, and certainly not required to file confidentially.  Diversity jurisdiction, personal jurisdiction and venue properly lie in this Court.  HC2 is not a party to the Florida Action.  Even if it were, that Delaney filed suit in Florida did not compel HC2 to file in that same forum.  *See Harris v. Steinem*, 571 F.2d 119, 123-24 (2d Cir. 1978); *Sanders v. New World Design Build, Inc.*, 2020 WL 1957371, at *3 (S.D.N.Y. Apr. 23, 2020).

Delaney further complains that HC2 filed this action, and filed in the Southern District of New York, to "intimidate him" and to force him to "incur costs."  Dkt. No. 74 ¶ 67.  However, if the allegations of the complaint are assumed to be true, and at this stage they must be, Delaney committed very serious misconduct against HC2 and its clients.  If, as a result of that conduct, it has been forced to incur costs, that is an expense of its own doing.  *See Stroock*, 550 N.Y.S.2d at 338.

Finally, Delaney complains that HC2 and counsel for the defendants in the Florida Action are cooperating in connection with the Florida Action and seeking there to obtain a "desirable ruling albeit under different evidentiary standards," Dkt. No. 74 ¶ 70, that can be "used collaterally in this action," *id*. ¶ 72.  The legitimate defense of a litigation, however, cannot

constitute an abuse of process.  The defendants in the Florida action—who are not defendants

here—have a right to defend themselves and, if they have sought HC2's help and HC2 has

provided it, there is nothing Plaintiff alleges that would create any liability for such cooperation.[6]

## CONCLUSION

The motion to dismiss the counterclaims is GRANTED.  IT IS FURTHER ORDERED

that the parties shall appear for a post-discovery status conference on January 5, 2021 at 12:00

p.m.  At that date and time the parties are directed to dial the Court's conference line at 888-251-

2909 (access code: 2123101).

The Clerk of Court is respectfully directed to close Dkt. Nos. 81 and 83.


SO ORDERED.


Dated: December 18, 2020
     New York, New York                                 LEWIS J. LIMAN
                                          United States District Judge

---

[6] Plaintiff alleges that the litigation has been picked up by the press.  But he does not allege that HC2 was the source of the press articles or that, if it was, it did anything improper in that respect.